**AKIN GUMP STRAUSS HAUER & FELD LLP**
Marshall L. Baker (SBN 300987)
mbaker@akingump.com
Lauren E. Huennekens (SBN 328855)
lhuennekens@akingump.com
1999 Avenue of the Stars, Suite 600
Los Angeles, CA  90067-6022
Telephone:   310.229.1000
Facsimile:   310.229.1001

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Anthony T. Pierce*
apierce@akingump.com
Mark R. Herring*
mherring@akingump.com
Caroline L. Wolverton*
cwolverton@akingump.com
Robert S. Strauss Tower
2001 K Street, N.W.
Washington, DC  20006-1037
Telephone:  202.887.4000
Facsimile:   202.887.4288
*Pro Hac Vice App. Forthcoming

*Attorneys for Plaintiffs Epic Systems Corporation, OCHIN, Inc.,
Reid Hospital & Health Care Services, Inc., Trinity Health Corporation,
and UMass Memorial Health Care, Inc.*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Epic Systems Corporation; OCHIN, Inc.; Reid Hospital & Health Care Services, Inc. d/b/a Reid Health; Trinity Health Corporation; and UMass Memorial Health Care, Inc., <br><br> Plaintiffs, <br><br> v. <br><br> Health Gorilla, Inc.; RavillaMed PLLC; Avinash Ravilla; Shere Saidon; LlamaLab, Inc.; Unique Medi Tech LLC, d/b/a Mammoth Dx; Mammoth Path Solution, LLC; Mammoth Rx, Inc.; Ryan Hilton; Daniel Baker; Max Toovey; Unit 387 LLC; SelfRx, LLC d/b/a Myself.Health; Critical Care Nurse Consultants, LLC d/b/a GuardDog Telehealth; Hoppr, LLC; Meredith Manak, and DOES 1-100, <br><br> Defendants. | Case No. _____ <br><br> **COMPLAINT SEEKING IMMEDIATE AND PERMANENT INJUNCTIVE RELIEF FOR:** <br><br> **(1) Fraud;** <br><br> **(2) Aiding and Abetting Fraud;** <br><br> **(3) Violations of California Business and Professions Code § 17200 et seq.;** <br><br> **(4) Breach of Contract; and** <br><br> **(5) Violations of Federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030 et seq.** <br><br> **JURY TRIAL DEMANDED** <br><br> Date Action Filed:      January 13, 2026 |

Plaintiffs Epic Systems Corporation ("Epic"), OCHIN, Inc. ("OCHIN"), Reid Hospital & Health Care Services, Inc. d/b/a Reid Health ("Reid"), Trinity Health Corporation ("Trinity"), and UMass Memorial Health Care, Inc. ("UMass Memorial Health" and, together with Epic, OCHIN, Reid, and Trinity, "Plaintiffs") by and through their attorneys, for their Complaint against Defendants Health Gorilla, Inc. ("Health Gorilla"), RavillaMed PLLC ("RavillaMed"), LlamaLab, Inc., also d/b/a LlamaLab AI ("LlamaLab"), Mammoth Rx, Inc., Unique Medi Tech, LLC, d/b/a Mammoth Dx, and Mammoth Path Solution, LLC (together with Mammoth Dx, "Mammoth"), Unit 387 LLC ("Unit 387"), SelfRx, LLC, d/b/a MySelf.Health ("SelfRx"), Hoppr, LLC ("Hoppr"), Critical Care Nurse Consultants, LLC, d/b/a GuardDog Telehealth ("GuardDog"), Avinash Ravilla, Shere Saidon, Ryan Hilton, Daniel Baker, Max Toovey, and Meredith Manak, allege, based on knowledge or information and belief derived from independent sources, as follows:

## INTRODUCTION

1.     Epic, OCHIN, Reid, Trinity, and UMass Memorial Health bring this action to put a stop to those who are exploiting health information exchange frameworks to fraudulently access and steal sensitive patient health information for financial gain. Masquerading as healthcare providers who are treating patients, these bad actors have accessed and monetized many thousands of patient records.  These actors are putting the enormous positive patient outcomes achieved through interoperability at risk.  If not stopped, they will continue to inappropriately market the patient data they have already taken and will take more through their almost unfettered access to the patient records of millions of patients held in the custody of most providers in America, including provider organizations using Epic's interoperability software.

2.     These rings, which include Defendants, are attempting to turn nationwide interoperability frameworks into data marts where sensitive patient information can be bought and sold without patient consent or their physicians' knowledge.  In doing so, they are ruining the substantial progress healthcare interoperability has made for many

2

patients. When used appropriately, interoperability ensures that medical care is informed by a patient's medical history, allowing healthcare providers to improve patient outcomes. Interoperability has profoundly enhanced the quality of patient care, and national interoperability frameworks now facilitate the real-time exchange of patient records across networks, with tens of millions of patient records being seamlessly exchanged each day. Before interoperability, providers often had to rely on a patient's memory for their medical history. In some circumstances, obtaining a medical history would not be possible, for example if a patient arrived unconscious in an emergency department of a hospital to which they had never been. But with interoperability, with basic identifying information about a patient, a hospital can access that patient's medical history.

3.    At stake are both the protection of patient records that contain some of a person's most sensitive data, such as genetic, mental wellbeing, and reproductive information, and the ability of physicians to keep their promises to patients that their information will be kept private. The federal Health Insurance Portability and Accountability Act and the Health Information Technology for Economic and Clinical Health ("HITECH") Act, along with their implementing regulations, (all together, "HIPAA") establish providers as custodians and stewards of their patients' data. Among other things, HIPAA requires that providers make express, written promises to each patient not to use or disclose medical information except under established conditions for specific purposes, such as treatment or payment. For each of these purposes, there are unique requisite conditions, tailored to the purpose of the use or disclosure, that must be met before the information can be used or disclosed. California and other states have similar protections for health information.

4.    If the bad actors exploiting data access are not stopped, nationwide interoperability is at risk. To enable interoperability, there are two national frameworks responsible for more than a billion patient-record exchanges each month: Carequality and TEFCA. Health systems and providers that participate in these frameworks make patient data available to other participants and rely on both the rules of the frameworks to which

every participant agrees and the honesty of framework participants to help them keep their promises to patients and comply with federal and state conditions of use and disclosure. To protect the privacy and security of sensitive health data, these frameworks create contractual rules and governance structures, including rules for onboarding participants seeking to automatically receive patient records for treatment purposes. The implementers of these frameworks, like Defendant Health Gorilla, control who can enter the frameworks and thus who will have unfettered access to sensitive clinical patient records. As such, they have the corresponding important obligation to ensure that their participants are accessing the framework for legitimate purposes of providing clinical treatment to patients before they are onboarded. They are supposed to protect the sanctity of the frameworks and stop bad actors from infiltrating it or abusing it under false pretenses.

5.      Once onboarded to the framework by their implementer, a participant is able to take patient records in real time by providing only basic demographic information like a patient's name and address and is allowed to take the volumes of patients' records it requests, without manual review by the disclosing provider. The vetting and onboarding of participants by implementers like Health Gorilla and compliance with the framework terms to which all participants agree is therefore essential to upholding the promises made to patients, complying with HIPAA and other applicable laws, and ensuring the network remains a safe and secure place for providers and their patients' records. Without this trust that implementers and their participants are fulfilling their contractual obligations, these frameworks would not exist, and healthcare providers and their patients would lose the enormous benefits of interoperability.

6.      Epic is an electronic health record ("EHR") developer that pioneered healthcare interoperability when it released Care Everywhere, the first EHR-based interoperability network, in the early 2000s. To connect with users of other EHR systems, Epic was a founding member of the Carequality interoperability framework. More recently, Epic was among the first EHR software companies to have customers on the

Trusted Exchange Framework and Common Agreement ("TEFCA"), a federally sponsored interoperability framework created by Congress through the bipartisan 21st Century Cures Act. With Carequality, Epic serves as an "implementer" organization that is responsible for vetting its "connections" to ensure they can be trusted to comply with the requirements of the framework prior to granting access to exchange patient records. With TEFCA, Epic's subsidiary Epic Nexus serves a similar role. As of January 2026, over 1,900 hospitals and 49,000 clinics use Epic's EHR software to exchange patient records through TEFCA.

7. OCHIN is a nonprofit corporation that connects and optimizes whole-patient care at thousands of healthcare providers' offices nationwide to provide improved access and health outcomes in rural and traditionally medically underserved communities. It utilizes OCHIN Epic EHR software, which is anchored in a one patient, one record model that improves patient health by more efficiently and fully connecting community health organizations within an expanding system of care. OCHIN enables healthcare providers to implement this software with project management, workflow optimization, and training for healthcare providers and their staff. OCHIN is also connected to the Carequality and TEFCA interoperability frameworks as a Carequality Connection and Participant, respectively.

8. Reid is a nonprofit, sole community hospital and healthcare system serving patients in eight (8) counties in both Ohio and Indiana.

9. Trinity is a nonprofit, Catholic healthcare system with providers in 25 states, including Saint Agnes Medical Center in Fresno, California. It operates 92 hospitals and 101 continuing care locations, and many other health and well-being services. Trinity is connected to the Carequality and TEFCA frameworks so that it can provide the best, most informed care possible to its patients.

10. UMass Memorial Health is a private, nonprofit, safety net healthcare system serving central Massachusetts. It operates a four-campus academic medical center, a physician group, and three community hospitals. UMass Memorial Health is the clinical

partner and primary teaching hospital for the Commonwealth of Massachusetts' public UMass Chan Medical School.

11.     Interoperability frameworks are being exploited despite Carequality and TEFCA requirements that implementer organizations protect the privacy and security of sensitive health information.  Actors like Defendants operate as organized syndicates to monetize patient records without patients' knowledge or consent.  In many instances, these bad actors assert they are healthcare providers and request patient records for the purpose of treating patients but take patient records for other purposes, including to market them to lawyers looking for potential claimants with specific conditions and diagnoses that would qualify them to join mass tort class action lawsuits.  These groups exploit the physicians and patients who were supposed to be helped by interoperability frameworks.

12.     To cover their tracks, these nefarious actors obscure their true purpose through fictitious websites, shell entities, and sham National Provider Identification ("NPI") numbers in the National Plan and Provider Enumeration System ("NPPES") administered by the Centers for Medicare & Medicaid Services ("CMS") to create an illusion of legitimate patient treatment activity.  Even more worrisome, they attempt to avoid detection by injecting clinically useless documents into interoperability frameworks to give the false impression that they are treating patients, which risks patient safety and wastes valuable clinician time.  In some cases, the "clinical" documents sent through the framework contain no clinical information.  Others merely organize other physicians' existing diagnoses into lists associated with PFAS exposures, which is plainly relevant to "forever chemical" mass-tort litigation, rather than treatment of any underlying health condition.

13.     When presented with evidence of their misconduct, these organizations deflect with denials and misinformation, knowing that the patient records custodians (the healthcare providers) have limited tools to ascertain the truth.  This misinformation can include false assertions that entities taking patient records have no connection to entities

selling patient records to litigation-related third parties for plaintiff recruitment.  These organizations make such false assertions, even in some cases through sworn affidavits or declarations, even when publicly available information demonstrates the entities taking patient records and the entities selling them share common ownership, management, and employees.  For example, Defendant Health Gorilla asserted that in the timeframe of August 2023, the business relationship "dissolved" between Defendant RavillaMed, which takes patient records under the stated purpose of treatment, and Defendant LlamaLab, which sells patient records for litigation purposes.  However, the facts show the relationship never dissolved.  In an early attempt to take patient records through Carequality in the fall of 2024, Defendant Shere Saidon, the CEO of LlamaLab, participated in Defendant RavillaMed's discussions with another implementer who conducted a review of RavillaMed and determined to terminate the relationship.  The owner of RavillaMed, Defendant Avinash (Avi) Ravilla, D.O., is, in fact, married to the director of patient records and automation for Defendant LlamaLab.  And in September 2025, a nurse employed by LlamaLab signed "treatment" documents for RavillaMed, showing no meaningful separation between the companies.  Indeed, as recently as January 8, 2026, Health Gorilla tendered a purportedly sworn statement signed by Defendant Ravilla, in which he denied any business arrangement with LlamaLab, despite evidence to the contrary, including being identified as LlamaLab's Chief Medical Officer on a now deleted page on LlamaLab's website, as reflected in the following screenshot.

14.     As part of their scheme and to evade detection, bad actors like Defendants also threaten litigation against providers or implementers that raise questions about their purported treatment purpose for requesting patient records.  Bad actors like Defendants have falsely framed Epic and providers' efforts to safeguard patients' private medical information as information blocking that is harmful to patients and as unlawful obstruction. This intimidation campaign is designed to chill scrutiny and preserve the unscrupulous actors' access to patient records so they can monetize them, including by selling them to mass tort law firms.

15.     When caught, rather than stopping their activity, the bad entity owners, operators, and those in their inner circles simply create new companies.  The scheme thus operates like a Hydra: when one fraudulent entity is exposed, the bad actors birth a new one.  As an example, when concerns were raised to Health Gorilla about one of their connections, an entity called Critical Care Nurse Consulting, over its affiliation with law firms, it abruptly stopped taking patient records via Carequality in September 2024.  That very same month, a related organization previously onboarded by Health Gorilla, Defendant SelfRx, began taking large volumes of patient records.  Both Critical Care Nurse Consulting and SelfRx are customers of Defendant Unit 387, an intermediary health data broker onboarded by Health Gorilla.  As a second example, in October 2024, Carequality announced that Integritort, LLC ("Integritort") was "not permitted to participate in Carequality for 12 months for any Permitted Purpose" after it took patient records for non-treatment purposes of mass tort client identification.  That same month, Defendant Mammoth – co-founded by the former CEO of Integritort, convicted felon Defendant Daniel Baker – began taking large volumes of patient records through Health Gorilla.

16.     These organizations' schemes rely on technology implementers like Defendant Health Gorilla performing little or no vetting prior to granting them access to interoperability frameworks and falsely representing that they are taking patient records for treatment purposes.  Then, when challenged, these implementers provide fronts for

misinformation to ensure continued transaction volume and revenue, rather than conducting thorough reviews to ensure patient privacy, and defend their customers in the face of compelling evidence that shows their customers are not providing treatment. This affirmative misinformation campaign is precisely what Health Gorilla has done in its defense of Defendants Mammoth and RavillaMed, and Health Gorilla has for months flatly ignored concerns raised about Unit 387 and its associated customers SelfRx and GuardDog.

17.    The organizations' subterfuge further exploits the interoperability exchange environment, including the fact that Carequality (a nonprofit created by the Sequoia Project) does not review entities onboarded by implementers to a network comprised of more than 100,000 connections with sometimes hundreds of participant changes happening each day. TEFCA is operated in a similar fashion by the same Sequoia Project under contract with the federal government. These frameworks do not incorporate background checks or prohibit individuals who have previously engaged in criminal activities from owning or managing companies that are taking sensitive data on the frameworks. There is no independent vetting conducted by Carequality or Sequoia on behalf of TEFCA prior to Connections or Participants gaining access to patient records via their respective frameworks. To Plaintiffs' knowledge, neither Carequality nor TEFCA have staff to police these frameworks to conduct ongoing independent reviews on the appropriateness of framework participants accessing private patient records. The process to raise concerns requires lodging a dispute to be resolved in an opaque forum where vendor confidentiality is valued above protecting the privacy rights of patients. Disputes are resolved confidentially behind closed doors without transparency to the community of providers connected to the frameworks regarding identified problems, and the dispute resolution process is insufficient to prevent the misconduct at issue in this case from continuing to occur.

18.    Bad actors who exploit the interoperability frameworks undermine the trust upon which healthcare interoperability is founded and threaten the entire interoperability

ecosystem. The well-intentioned goals of Congress in supporting exchange of information to facilitate treatment and patients' access to their own health information are thwarted by these actors seeking to monetize the data.

19. The misconduct harms healthcare providers like Reid, Trinity, and UMass Memorial Health that have been forced to expend resources in the form of funds and employee time to investigate the breadth of Defendants' misconduct and address data integrity and privacy issues and have also had to spend time on monitoring and attempting to mitigate the harms caused by Defendants and those of their ilk. Epic and OCHIN have been harmed in the same way and have also suffered losses in employee time and diversion of resources to address this wrongdoing and customer complaints that have been raised about the wrongdoing and its effects on data integrity, privacy, and the interoperability system as a whole.

20. Defendants in this case are precisely the sort of malefactors that plague the interoperability system, viewing patient records as a liquid commodity to exploit and thereby reducing patients' ability to control their own health information. As just one example, Defendant RavillaMed joined interoperability frameworks under the representation that it was a healthcare provider seeking access to patient records in order to treat patients. Defendant Health Gorilla, in turn, falsely represented in the framework directories that RavillaMed was requesting patient records for treatment purposes. This allowed RavillaMed to obtain patient records, including records of Epic's and OCHIN's healthcare provider customers, including Reid, Trinity, and UMass Memorial Health, under the false pretense that RavillaMed is providing treatment when in fact it sells the patient records for profit to unauthorized third parties. RavillaMed feeds these patient records to Defendant LlamaLab, a company that is closely connected to RavillaMed and that touts its "same-day patient record retrieval for law firm" services and in turn sells those patient records to litigation-related entities. Defendants RavillaMed, Mammoth, and Unit 387 are members of Health Gorilla's interoperability network and have all agreed to the "flowdown" terms of the frameworks required for participation, yet Health

Gorilla fails in its duty as an implementer to ensure that they abide by the requirements for participation or are suspended or terminated for this misconduct.

21.    In so doing, Defendant Health Gorilla has knowingly participated in and enabled its connections' abuse of their access to patient records.  Epic has notified Health Gorilla repeatedly that its connections lacked legitimate treatment purposes for accessing patient records, only to be met with excuses including, "it was a technical glitch that won't happen again."  Over time, it has become apparent that Health Gorilla's excuses are fabricated and that it is in league with its connections' misuse of sensitive health information as a commodity.

22.    If healthcare providers participating in interoperability frameworks cannot be confident that a request claiming treatment is actually for treatment, they might feel compelled to leave the framework.  And other healthcare providers that have not yet joined will be dissuaded from participating.

23.    Interoperability can only serve its purpose of enhancing patient care if healthcare providers participate by exchanging patient records.  If healthcare providers cease participating or decide against joining in the first place, the cornerstone innovation of healthcare interoperability may soon be reduced to a bygone ideal.

24.    Plaintiffs file this action to end this exploitation of the interoperability frameworks, and the added costs it forces Plaintiffs to incur and to preserve the trust upon which the frameworks are founded.

25.     Plaintiffs seek immediate injunctive relief to stop the misconduct that threatens not only their institutions and patients and their privacy rights but also healthcare interoperability's very viability.  Without judicial intervention, there will be continuing and irreparable damage to patients; providers such as Reid, Trinity, UMass Memorial Health and others; Epic; OCHIN; and the overall integrity of interoperability.

# PARTIES

## I.  Plaintiffs

26.     Plaintiff Epic is a Wisconsin corporation with its principal place of business in Verona, Wisconsin.  Epic develops a variety of software tools for the healthcare industry, including Care Everywhere, a data sharing tool that enables the exchange of over 20 million patient records daily.  Epic provides services to customers across the globe, including California.  Epic Nexus, Inc. is a wholly owned subsidiary of Epic and is responsible for interoperable exchange of information on TEFCA and the signatory to the relevant TEFCA agreement referred to herein.  Epic Nexus has duly assigned to Epic the claims against Defendants that Epic Nexus has in this action for good and valuable consideration.   Epic Nexus's and Epic's healthcare treatment provider customers provided patient records to Defendants directly or indirectly based on the representations that the patient records were being requested by other healthcare providers for purposes of treatment.

27.     Plaintiff OCHIN is an Oregon 501(c)(3) nonprofit organization with its principal place of business in Portland, Oregon.  OCHIN operates as a trusted nonprofit using its EHR software to improve access and health outcomes in rural and traditionally underserved communities, including multiple sites in California and in this District, from which Defendants took patient records.  Its OCHIN Epic EHR software enables the exchange of millions of patient records monthly.

28.     Plaintiff Reid Health is an Indiana 501(c)(3) nonprofit organization with its principal place of business in Richmond, Indiana.  Reid is designated as a sole community hospital and provides healthcare services to patients across 8 (eight) counties in both Ohio and Indiana.

29.     Plaintiff Trinity Health Corporation is an Indiana tax-exempt 501(c)(3) nonprofit organization with its headquarters in Livonia, Michigan.  Trinity is a nonprofit, Catholic healthcare system with providers in 25 states, including Saint Agnes Medical Center in Fresno, California, from which Defendants took patient records.

30.     Plaintiff UMass Memorial Health is Central Massachusetts' largest nonprofit integrated healthcare system, serving as the clinical partner to the State's UMass Chan Medical School, offering comprehensive care from primary to quaternary levels through its hospitals, physician group, home health, hospice, and behavioral health services, with UMass Memorial Medical Center as its flagship academic medical center.

## II.     Health Gorilla

31.     Defendant Health Gorilla is a Delaware corporation with its principal place of business in Coral Gables, Florida.  Health Gorilla is authorized to transact business in California and, on information and belief, maintains offices located at Mountain View, California.  Health Gorilla connected Defendants RavillaMed, Mammoth (i.e., Mammoth Dx and Mammoth Path Solution, LLC), and Unit 387 to the Carequality framework and RavillaMed and Mammoth to the TEFCA framework so that they could obtain patient records.  In doing so, Health Gorilla affirmatively asserted that Defendants RavillaMed, Mammoth (i.e., Mammoth Dx and Mammoth Path Solution, LLC), and Unit 387's customers (Defendants SelfRx and GuardDog) were healthcare providers seeking access to the patient records for treatment purposes.  As required by Carequality and TEFCA, Health Gorilla flowed down the terms of the framework agreements to its customers, including Defendants RavillaMed, Mammoth, and Unit 387.

## III.     The RavillaMed Defendants

32.     Defendant RavillaMed is a Pennsylvania professional limited liability company with a principal place of business in Philadelphia, Pennsylvania.  RavillaMed purports to provide "Comprehensive Chronic Care Management, Tailored to You" through personalized care plans, expert support, medication management, and condition monitoring.[1]  When joining the Carequality and TEFCA interoperability frameworks through Defendant Health Gorilla, RavillaMed asserted that it was a healthcare provider seeking access to patient records for treatment purposes.

---

[1] *Home*, RavillaMed, https://ravillamed.com/ [https://web.archive.org/web/20260113045449/https://ravillamed.com/] (last visited Jan. 12, 2026).

33.     Defendant LlamaLab is a Delaware corporation that also does business as LlamaLab AI.  LlamaLab's principal place of business is New York, New York. LlamaLab characterizes itself as "the future of patient record management for law firms, offering same-day patient record retrieval services and medical-grade AI analysis tools that cut retrieval and analysis time from months to minutes."[2]  It "enable[s] firms to build stronger cases, increase caseloads, and generate higher settlement values."[3]  LlamaLab is closely connected to RavillaMed, as explained further below.

34.     Defendant Avinash Ravilla is a Doctor of Osteopathy who is the founder and owner of Defendant RavillaMed PLLC.  LlamaLab identified Defendant Ravilla as its Chief Medical Officer on its website.  Ravilla maintains close personal relationships with Gary Chan, LlamaLab's Chief Revenue Officer, and Shikha Patel, a Clinical Informatics Nurse at LlamaLab.  Defendant Ravilla is married to Ami Sangani, whose LinkedIn profile identifies her as LlamaLab's Director of Medical Records and Clinical Automation.  Upon information and belief, Defendant Ravilla currently resides in and is a citizen of Miami, Florida.

35.     Defendant Shere Saidon is Defendant LlamaLab's founder and CEO. Defendant Saidon is an engineer and has touted LlamaLab's technical solutions to class action lawyers at the "Mass Torts Made Perfect" conference as recently as October 2025.[4] Upon information and belief, Defendant Saidon resides in and is a citizen of New York, New York.

36.     Defendants RavillaMed, Avinash Ravilla, Shere Saidon, and LlamaLab, Inc. are at times referred to herein collectively as the "RavillaMed Defendants."

---

[2] Llamalab, LinkedIn, *About Us*, https://www.linkedin.com/company/llamalab [https://web.archive.org/web/20260110182330/https://www.linkedin.com/company/llamalab] (last visited Jan. 6, 2026).

[3] *Id.*

[4] *Shere Saidon Speaker Bio*, Mass Torts Made Perfect, https://mtmp.com/speaker/shere-saidon/ [https://web.archive.org/web/20260112164101/https://mtmp.com/speaker/shere-saidon/] (last visited Jan. 12, 2026).

## IV.    The Mammoth Defendants

37.    Defendant Unique Medi Tech, LLC is a Delaware limited liability company doing business as Mammoth Dx.  Mammoth Dx's principal place of business is in Lake Forest, California.  It holds itself out as "a leading provider in molecular and pathology laboratory testing."[5]   When joining the TEFCA interoperability framework through Defendant Health Gorilla, Mammoth Dx asserted that it was a healthcare provider seeking access to patient records for treatment purposes.

38.    Defendant Mammoth Path Solution, LLC is a Delaware limited liability corporation with a principal place of business in Lake Forest, California, at the same address as Mammoth Dx.  When joining the Carequality and TEFCA interoperability frameworks through Health Gorilla, Mammoth Path Solution asserted that it was a healthcare provider seeking access to patient records for treatment purposes.

39.    Defendant Mammoth Rx, Inc. is a Delaware corporation with a principal place of business in Lake Forest, California, at the same location as Defendants Mammoth Dx and Mammoth Path Solution, LLC.  On its public website, Mammoth Rx uses the same logo as Mammoth Dx and describes itself as a healthcare technology and software company that builds integrated digital platforms and solutions for the healthcare ecosystem. Defendant Ryan Hilton, the CEO of Defendant Mammoth Path Solution, LLC, has affirmed in an affidavit that Mammoth Rx, Inc. was a member of the "Mammoth Family."  Mammoth Rx purports to provide connections to patient records and offers a variety of "solutions" in the medical field, including those that purport to "organize and monetize health data."[6]

40.    Defendant Ryan Hilton is both the CEO and owner of Defendant Mammoth Path Solution, LLC and Defendant Mammoth Rx, Inc.  Defendant Hilton co-founded Defendant Mammoth Rx, Inc. with Defendant Daniel Baker, and Hilton is also the CEO

---

[5] *Who We Are*, Mammoth Dx, https://mammoth-dx.com/ [https://web.archive.org/web/20260110183715/https://mammoth-dx.com/] (last visited Jan. 10, 2026).

[6] *Solutions*, Mammoth Rx, https://www.mammothrx.com/solutions/data-management [https://web.archive.org/web/20260110184205/https://www.mammothrx.com/solutions/data-management] (last visited Jan. 10, 2026).

and owner of Defendant Mammoth Dx.  Upon information and belief, Defendant Hilton currently resides in and is a citizen of Laguna Hills, California.

41.    Defendant Daniel Baker is the co-founder and Chief Technology Officer of Defendant Mammoth Rx and is also a founding member and manager of Integritort. Defendants Hilton and Baker are the CEO and Chief Financial Officer of Mammoth Global, Inc., according to a 2018 filing with the California Secretary of State.  Upon information and belief, Defendant Baker currently resides in and is a citizen of California.

42.    Defendant Max Toovey is the Chief Commercial and Strategy Officer at Mammoth Rx.  Max Toovey has held himself out as Chief Commercial and Strategy Officer for Nationwide Healthcare Provider Corp, an entity that markets access to patient records to lawyers and others representing potential social security claimants.  Upon information and belief, Defendant Toovey currently resides in and is a citizen of Los Angeles, California.

43.    Defendants Unique Medi Tech, LLC d/b/a Mammoth Dx, Mammoth Path Solution, LLC, Mammoth Rx, Inc., Ryan Hilton, Daniel Baker, and Max Toovey are at times referred to herein collectively as the "Mammoth Defendants."

**V.    The Unit 387 Defendants**

44.    Unit 387 LLC is a Texas limited liability company, with its principal place of business located in Dallas, Texas. Unit 387 is what Carequality refers to as a "candidate implementer," and it onboards other connections onto the framework through an implementer, in this case Health Gorilla.  Like implementers, candidate implementers are required to validate their connections and ensure that they are accurately representing their purpose of exchange. When joining the Carequality interoperability framework through Defendant Health Gorilla, Unit 387 asserted that it was a candidate implementer and would not be initiating requests for records.  Through its connection with Health Gorilla, Unit 387 also provides access to the Carequality framework to downstream connections like Defendants SelfRx and GuardDog, in both cases on the basis that these

Defendants are purported healthcare providers seeking access to patient records for treatment purposes.

45.    Defendant Meredith Manak is the founder and CEO of Defendant Unit 387. Another Carequality Implementer, Commonwell, has stated on its website that "Unit 387's solution offers providers an online portal that can pull all records of an individual using their name, date of birth, and address NO MATTER where that data exists. Thanks to the connection to Commonwell and Carequality, the solution can pull data from hundreds of different electronic health records vendors."[7] Defendant Manak also founded Defendant Hoppr, a company that specializes in retrieving patient records for mass tort law firms and insurance companies.  At a legal conference to establish her expertise in multidistrict litigation ("MDL"), Manak provided she "started her career in mass torts at an international defense firm and transitioned to personal injury with leadership roles in numerous MDLs such as Fen-Phen, Baycol and Zantac."[8]  Upon information and belief, Defendant Manak currently resides in and is a citizen of Dallas, Texas.

46.    Defendant Hoppr, LLC is a Texas limited liability company, with its principal place of business located in Dallas, Texas. According to Defendant Manak's bio, Hoppr describes itself as "a company that locates, aggregates, and normalizes healthcare data from any source across the US."[9]

47.    Defendant Critical Care Nurse Consultants LLC, doing business as GuardDog Telehealth, is a Texas limited liability company, with its principal place of business in Austin, Texas.  When seeking to join the Carequality interoperability

---

[7] *This Is Magic! Simplifying Data Exchange with Unit 387*, Commonwell Health All. (Sept. 26, 2023), https://www.commonwellalliance.org/news-center/commonwell-blog/this-is-magic-simplifying-data-exchange-with-unit-387/ [https://web.archive.org/web/20260113030211/https://www.commonwellalliance.org/news-center/commonwell-blog/this-is-magic-simplifying-data-exchange-with-unit-387/].

[8] *Meredith Manak*, Atlas Lawyers, https://atlaslawyers.com/team-member/meredith-manak/ [web.archive.org/web/20260113030620/https://atlaslawyers.com/team-member/meredith-manak/] (last visited Jan. 12, 2026).

[9] *Id.*

framework, GuardDog asserted that it was a healthcare provider seeking access to patient records for treatment purposes.

48.    Defendant SelfRx LLC, doing business as MySelf.Health, is a Massachusetts limited liability company with its principal place of business in Boston, Massachusetts. SelfRx maintains offices in Palo Alto, California.  The company asserts it "provides blood sugar, blood pressure, and weight monitoring and coaching…"[10]  When seeking to join the Carequality interoperability framework, SelfRx asserted that it was a healthcare provider seeking access to patient records for treatment purposes.

49.    Defendants Unit 387, Hoppr, GuardDog, SelfRx, and Meredith Manak are at times referred to herein collectively as the "Unit 387 Defendants."

## JURISDICTION AND VENUE

50.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367(a) because this action arises under federal law and all related state-law claims derive from a common nucleus of operative fact.  The Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000 as to each Defendant and there is complete diversity of citizenship between the parties.

51.    This Court has personal jurisdiction over Defendants because (a) Defendants Mammoth Dx, Mammoth Path Solution, LLC, and Mammoth Rx's principal place of business is in California; (b) Defendant Health Gorilla is authorized to transact business in California and has offices in the state, and (c) Defendant Health Gorilla, the Unit 387 Defendants, the Mammoth Defendants, and the RavillaMed Defendants purposefully directed conduct at California by accessing or facilitating the access of patient records of Californians who were treated by healthcare providers in California.

52.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims in this action occurred in the Central District of California.

---

[10] MySelf.Health, https://myself.health/ [https://web.archive.org/web/20251117073216/https://myself.health/] (last visited Jan. 12, 2026).

## FACTS

### I.    The Carequality Interoperability Framework

53.    Carequality is a 501(c)(3) nonprofit organization that operates a national interoperability framework (the "Carequality Framework") designed to enable the exchange of electronic healthcare information among participating entities.    The Carequality Framework was launched in 2014 to unite the many different technologies comprising the healthcare ecosystem with common technical standards, confidentiality rules and a directory of participants and their electronic endpoints.

54.    The Carequality Framework consists of two types of entities: Implementers, which operate health data-sharing networks, and Carequality Connections ("CC"), which are members of an Implementer's network such as healthcare providers.    By analogy, Implementers are like cellular networks (e.g., AT&T, Verizon, etc.), and CCs are like cell phone users—participation in the Carequality Framework is similar to how a cell phone user on AT&T's network is able to communicate with a cell phone user on Verizon's network.    Similarly, the Carequality Framework enables participant healthcare providers using different electronic health record software products, including Epic's, to exchange clinical information for the purpose of treatment using industry-defined technical standards.

55.    Carequality maintains a central directory that includes the electronic endpoints that enable the communication among Implementers and CCs.    Once a connection is entered into Carequality's directory and distributed to all Implementers, it can query for and take any patient's patient record if it asserts a valid purpose for doing so.    Typically, a connection requires only basic demographic information (such as an individual's name, address, date of birth) to query and receive back a patient's medical information.

56.    Given that ease of access, Implementers must vet their CCs, including candidate implementers, prior to entering them into the Carequality directory.    Indeed, Carequality itself does not do any review and instead "Carequality expressly relies upon

Applicant [here, the party applying to become an Implementer] to maintain information about its Carequality Connections for use with the Carequality Directory, and Carequality expressly disclaims any responsibility to verify the accuracy of the information." *See* Exhibit ("Ex.") A, Carequality Connected Agreement ("CCA") § 15.1. The relevant Carequality agreements and terms are all standardized and publicly available on Carequality's website.[11]

57. The information that Implementers and CCs exchange within the Carequality Framework includes sensitive, personally identifiable healthcare data, including information protected under HIPAA. According to Carequality, over 1.2 billion medical documents are exchanged each month through the Carequality framework.

58. Health Gorilla is an Implementer within the Carequality Framework. RavillaMed, Mammoth, and Unit 387 are CCs within Health Gorilla's network. As a "candidate implementer," Unit 387 also onboards downstream connections, such as Defendants, SelfRx and GuardDog, which access the Carequality Framework through Unit 387's connection with Health Gorilla.

59. To join the Carequality Framework Implementers must execute a CCA, which is a contract between the Implementer and Carequality governing the terms and conditions of participation. Health Gorilla has entered into a CCA with Carequality.

60. Implementers, in turn, onboard CCs to the Carequality Framework through agreements called Carequality Connection Terms ("CC Terms"). Ex. B, CC Terms. These contracts between the CC and the Implementer set forth the terms and conditions of the CC's participation in the Carequality Framework. Upon information and belief, RavillaMed, Mammoth, and Unit 387 entered CC Terms with Health Gorilla.

61. To participate in the Carequality Framework, each Implementer and CC must establish one or more specific "Use Cases." A Use Case is a specific usage model for participation in the Carequality Framework based on the Implementer's or CC's

---

[11] *Resources*, Carequality, https://carequality.org/resources/ [https://web.archive.org/web/20260113035129/https://carequality.org/resources/] (last visited Jan. 12, 2026).

interaction with other participants.  For example, the Query-Based Document Exchange Use Case makes patient records available upon request by appropriate parties across the healthcare ecosystem – such as a hospital that needs a patient's record from the patient's primary care physician.

62.    For each Use Case, Carequality has published a corresponding "Implementation Guide" that includes mandatory provisions to which Implementers and CCs are contractually bound.

63.    Once included in the Carequality Framework, CCs may request health information from other CCs and Implementers within the framework, in accordance with the Implementation Guide.  However, not all CCs are authorized to request records for every permitted purpose.  A CC may request a record only for a permitted purpose explicitly identified in the relevant Implementation Guide.

64.    Health Gorilla has been approved for only the "Query-Based Document Exchange" Use Case.  Under the Query-Based Document Exchange Implementation Guide, Ex. C, Query-Based Document Exchange Implementation Guide, the "permitted purposes" include "Treatment," as well as "Payment," "Health Care Operations," "Public Health Activities," "Patient Request," "Coverage Determination," and "Other Authorization-Based Disclosures."  Each designation of a permitted purpose, including "Treatment," is an affirmative representation of fact upon which Carequality participants rely in responding to queries made over the framework.

65.    Specifying a permitted purpose when initiating a query within the Carequality Framework is essential for promoting trust and safeguarding patient privacy within the framework.  For example, if an insurance company submits a query for payment, it only requires (and, under HIPAA, is only permitted) relevant details such as the date of service and procedure type – not the patient's entire patient record, based on HIPAA's "minimum necessary" rule.  By requiring the insurance company to specify that the query is for payment, the Carequality Framework helps prevent the disclosure of sensitive, unnecessary information.

66.     Misuse of purposes is improper, and misuse of the "Treatment" purpose is especially pernicious because when a query is sent using the "Treatment" purpose, what is effectively the full patient record is automatically disclosed to the requestor.  The responder *must* respond with the patient record without reviewing it or applying any discretion, meaning the responder cannot manually review the validity of the request.

67.     The Query-Based Document Exchange Implementation Guide defines "Treatment" in the same manner as HIPAA, which in turn defines treatment as "the provision, coordination, or management of health care and related services by one more health care providers, including the coordination or management of health care by a health care provider with a third party; consultation between health care providers relating to a patient; or the referral of a patient for health care from one health care provider to another."

68.     When a CC initiates a query for a patient record, that query is routed to the CC that maintains the patient record, typically a healthcare provider who stores the patient record in a secure database, which can be on its own premises or off-site using a third-party hosting service.  The CC compiles the patient record and then responds by delivering it to the CC that initiated the query.  Exchanges are machine-to-machine, meaning that no person is in the middle reviewing each request.

**A.     The Carequality Connected Agreement (CCA)**

69.     The CCA is the foundation for trusted exchange within the Carequality Framework and sets forth the standard terms agreed to by all Implementers.

70.     Section 7 of the CCA requires the Implementer to comply with all mandatory components of the Carequality Policies and the relevant Implementation Guides.  Ex. A, CCA § 7.

71.     Sections 7, 15.2, and 15.4 of the CCA require the Implementer to ensure that its CCs comply with the CC Terms and all applicable components of the Implementation Guides and Carequality Policies.  *Id.* §§ 7, 15.2, 15.4.

72.    Section 13 of the CCA provides that the Implementer "shall only engage in exchange activities through the Carequality Elements for permitted purposes as defined in the Implementation Guides." *Id.* § 13.

**B.    The Carequality Connection Terms (CC Terms)**

73.    The CC Terms set forth the standard terms that Implementers are required to make binding on any CC prior to allowing them to engage in exchange activities.

74.    Section 5 of the CC Terms requires the CC to comply with all mandatory components of the Carequality Policies and the relevant Implementation Guides.  Ex. B, CC Terms § 5.

75.    Section 12 of the CC Terms provides that the CC "shall only engage in exchange activities through the Carequality Elements for permitted purposes as defined in the Implementation Guides." *Id.* § 12.

76.    Section 12 further provides that if the CC is not a Covered Entity under HIPAA regulations, then "(i) Organization [the CC] may only use the interoperability available through Carequality to transmit or receive information on behalf of its End Users and not on its own behalf; and (ii) Organization will not re-use, re-disclose, aggregate, de-identify or sell any information transacted by its End Users for its own benefit unless its respective Carequality Connections or End Users have given Organization the explicit written authority to do so."

**C.    The Implementation Guide and Relevant Policies**

77.    Section 3.1 of the Implementation Guide for the Query-Based Document Exchange provides that "[w]hen an Implementer or CC initiates a query for information, it shall clearly identify the specific Permitted Purpose for the query in the SAML token for the message…"  Ex. C, Query-Based Document Exchange Implementation Guide § 3.1.

78.    Section 3.1 of the Implementation Guide for Query-Based Document Exchanges provides that "Permitted Purposes for queries to be made under this Use Case are:"  (1) "Treatment," (2) "Payment," (3) "Health Care Operations," (4) "Public Health

Activities," (5) "Patient Request," (6) "Coverage Determination," and (7) "Other Authorization-Based Disclosures."

79.    Section 4.1 of the Implementation Guide for the Query-Based Document Exchange and Section 4.1 of the Carequality Framework Policies provide that "[…] organizations claiming treatment must actually be providing treatment, or be making the request on behalf of a network member that is providing treatment." *Id.* § 4.1.

80.    Only healthcare providers can assert a treatment purpose.  To that end, Section 3.2.1 of the Carequality Framework Policies requires that an Implementer or CC asserting a Treatment purpose provide one of the following pieces of evidence: (1) Organization-level National Provider Identification ("NPI") (Type 2), or Provider-level NPI (Type 1) in cases where an Organization-level NPI is not needed and has not been acquired; (2) State-level certification/accreditation/licensure; or (3) Clinical Laboratory Improvement Amendments ("CLIA") certification (for labs).  Ex. D, Carequality Framework Policies.

## II.    The Trusted Exchange Framework and Common Agreement (TEFCA)

81.    Many of the participants in the Carequality Framework also participate in TEFCA, a separate, federal framework for nationwide sharing of health information. TEFCA was authorized by Congress in the 21st Century Cures Act and launched in 2023 with the goal of enabling the sharing of health records between providers, patients, payers, and government agencies.  Much like the Carequality Framework, TEFCA operates as a network of networks, allowing interoperability between health systems using distinct health IT vendors, creating common technology standards, data use agreements, and directories with electronic endpoints for each participant.

82.    TEFCA is comprised of several categories of entities:

83.    The Recognized Coordinating Entity ("RCE") is the organization that is responsible for developing, maintaining, implementing, and overseeing TEFCA.  In August of 2019, HHS awarded the RCE contract to the nonprofit Sequoia Project, whose staff also administer Carequality.

84.     Qualified Health Information Networks ("QHINs") are data sharing networks that serve as the central nodes within TEFCA.  They are the equivalent of Implementers within the Carequality Framework.

85.     Participants are organizations within a QHIN's network, such as healthcare providers, members, customers, and vendors.  They are the equivalent of CCs within the Carequality Framework.

86.     Health Gorilla is a QHIN, and RavillaMed and Mammoth are Participants through Health Gorilla.

87.     QHINs and Participants share patient records within TEFCA, which include sensitive, personally identifiable data that is protected under HIPAA.

88.     To join TEFCA, QHINs must execute the Common Agreement, which is a contract between the QHIN and the RCE governing the terms and conditions of participation.  Ex. E, Common Agreement.  Upon information and belief, Health Gorilla has entered into the Common Agreement with the RCE.  The relevant TEFCA agreements and terms are all standardized and publicly available on the Sequoia Project's website.[12]

89.     QHINs, in turn, onboard Participants to TEFCA through agreements called Terms of Participation ("ToPs").  Ex. F, ToPs.  These contracts between the Participant and the QHIN set forth the terms and conditions of the Participant's involvement in TEFCA.  They must be accepted without modification.  Upon information and belief, RavillaMed and Mammoth entered ToPs with Health Gorilla.

90.     TEFCA has promulgated Standard Operating Procedures ("SOPs") to address the procedures and rules applicable to specific types of activity within TEFCA. As relevant here, the Exchange Purposes SOP ("XP SOP") and the Exchange Purpose Implementation SOP for Treatment ("XP SOP:Treatment") govern the sharing of information within TEFCA for Treatment purposes.  Ex. G, XP SOP; Ex. H, XP SOP: Treatment.

---

[12] *Resources*, Sequoia Project, https://rce.sequoiaproject.org/tefca-and-rce-resources/ [https://web.archive.org/web/20260113035617/https://rce.sequoiaproject.org/tefca-and-rce-resources/] (last visited Jan. 12, 2026).

91.    TEFCA has also promulgated a QHIN Technical Framework, which contains technical, functional, privacy, and security requirements for both QHINs and Participants.  Ex. I, QHIN Technical Framework.

92.    QHINs and Participants are obligated through the Common Agreement and ToPs to abide by the TEFCA SOPs and QHIN Technical Framework.

93.    Once included in TEFCA, Participants may request health information from other Participants and QHINs in accordance with the SOPs and QHIN Technical Framework.

94.    However, a Participant may request a record only for a permitted purpose explicitly identified in the applicable SOPs.  When initiating a query for health information, a Participant identifies the purpose for the query by including a TEFCA XP Code.  As stated in the XP SOP, "inclusion of an XP Code in the transaction is an attestation that the transaction adheres to the requirements in this SOP and/or an applicable XP Implementation SOP, as well as the Framework Agreements, the QHIN Technical Framework, and Applicable Law."  Ex. G, XP SOP.

95.    The permitted purposes under XP SOP include "Treatment," "Payment," "Healthcare Operations," "Public Health," "Individual Access Services," and "Government Benefits Determination." Each designation of a permitted purpose, including "Treatment," is an affirmative representation of fact upon which TEFCA participants rely in responding to queries made over the framework.

96.    If the TEFCA XP Code is labeled as required, then the recipient Participant *must* respond with the requested information with limited exceptions.  For example, Participants must respond to all requests labeled with the TEFCA Required Treatment code of "T-TRTMNT" while it is optional to respond to the Treatment XP code of "T-TREAT."

97.    "Treatment" is defined in the XP SOP and XP SOP:Treatment in the same manner as HIPAA, which in turn defines treatment as "the provision, coordination, or management of health care and related services by one or more health care providers,

including the coordination or management of health care by a health care provider with a third party; consultation between health care providers relating to a patient; or the referral of a patient for health care from one health care provider to another."  Ex. G, XP SOP; Ex. H, XP SOP:Treatment.    However, all requests claiming the TEFCA Required Treatment code of T-TRTMNT must meet the definitions set forth in section 5.3 Definition of the XP SOP:Treatment.  "Health care" is, in turn, defined under HIPAA to mean "care, services, or supplies related to the health of an individual" and to include "[p]reventive, diagnostic, therapeutic, rehabilitative, maintenance, or palliative care, and counseling, service, assessment, or procedure with respect to the physical or mental condition, or functional status, of an individual or that affects the structure or function of the body" as well as  "[s]ale or dispensing of a drug, device, equipment, or other item in accordance with a prescription."  As such, only health care providers can assert a treatment purpose, and TEFCA SOPs require QHINs to demand evidence that participants asserting a treatment purpose are, in fact, providers that are requesting records in connection with furnishing care to their patients.

98.    When a Participant initiates a query for a patient's health information, that query is sent through its QHIN to all other QHINs for each QHIN to determine if they or any of their Participants have the patient's health information.  For any QHIN or Participant that has the patient's health information, they will compile the patient record, typically from a secure database maintained by the Participant that can be on its own premises or off-site using a third-party hosting service.  That Participant then sends the requested patient record back through its QHIN to the requestor's QHIN, which is responsible for routing the patient record to the Participant that initiated the query.

A.    The Common Agreement

99.    The Common Agreement is created by statute and is the foundation for trusted exchange within TEFCA and sets forth the standard terms agreed to by all QHINs.

100.    Section 1.2.4 requires the QHIN to contractually obligate its Participants to comply with the ToPs.  Ex. E, Common Agreement § 1.2.4.

101.   Section 7.4.1 provides that the QHIN "shall be responsible for its acts and omissions, and the acts or omissions of its Participants and their Subparticipants…," except as prohibited by applicable law.  *Id.* § 7.4.1.

102.   Section 9.1 provides that "[s]ignatory may only utilize Designated Network Services for purposes of facilitating TEFCA Exchange.  TEFCA Exchange may only be utilized for an XP. . . .  All TEFCA Exchange is governed by and must comply with the Framework Agreements governing the QHINs, Participants, and Subparticipants."  *Id.* § 9.1.

103.   Section 9.2 provides that signatory may Use TI (defined as "TEFCA Information," meaning information exchanged through TEFCA subject to some limitations) in any manner that: "(i) is not prohibited by Applicable Law; (ii) is consistent with Signatory's Privacy and Security Notice, if applicable; and (iii) is in accordance with Sections 11 and 12 of this Common Agreement, if applicable."  *Id.* § 9.2.

### B.   Terms of Participation (ToPs)

104.   The ToPs set forth the standard terms that QHINs are required to make binding on any Participant prior to allowing them to engage in exchange activities.

105.   Section 5.1 provides "[y]ou may only utilize TEFCA Exchange for an XP [exchange purpose]….  All TEFCA Exchange is governed by and must comply with the Framework Agreements [with respect to QHINs, the Common Agreement; and with respect to a Participant or Subparticipant, the ToPs] governing the QHINs, Participants, and Subparticipants engaging in the TEFCA Exchange."  Ex. F, ToPs § 5.1.

106.   Section 5.2 provides "[y]ou may Use TI in any manner that: (i) is not prohibited by Applicable Law; (ii) is consistent with Your Privacy and Security Notice, if applicable; and (iii) is in accordance with Sections 7 and 8 of these ToP."  *Id.* § 5.2.

107.   Section 7.1 provides that Participants that are Non-HIPAA Entities (i.e., that are not "Covered Entities" or "Business Associates" under HIPAA) shall comply with the HIPAA Privacy Rule with respect to Individually Identifiable Information that is Protected Health Information ("PHI").  *Id.* § 7.1.

108.   Section 9 provides that Participants "shall comply with all Applicable Law and shall implement and act in accordance with any provision required by the ToP, including all applicable SOPs and provisions of the QTF, when engaging in or facilitating TEFCA Exchange." *Id.* § 9.

109.   Section 13.1 provides that "[s]ignator[ies] shall comply with all Applicable Law and shall implement and act in accordance with any provision required by this Common Agreement, including all applicable SOPs and provisions of the QTF, when providing Designated Network Services or otherwise engaging in or facilitating TEFCA Exchange." *Id.* § 13.1.

110.   Section 13.2.2 provides that "[s]ignator[ies] shall be responsible for taking reasonable steps to confirm that all of its Participants and Subparticipants are abiding by the ToP, all applicable SOPs, and any decisions made pursuant to Section 16.3." *Id.* § 13.2.2.

111.   Section 14.2 provides that "The SOPs are incorporated by reference into this Common Agreement, and Signatory shall comply with all SOPs that are applicable to it. In the ToP, Participants and Subparticipants will agree to comply with all applicable SOPs." *Id.* § 14.2.

## III.    Plaintiffs and the Interoperability Frameworks

112.   Nearly fifty years ago, Epic was founded to develop healthcare software built around the patient to provide a comprehensive record of a patient's healthcare journey. This software allows hospitals, healthcare providers, and others to create, store, and exchange patients' patient records electronically.  It also allows patients to access their own records, empowering them to use their health information to get well, stay well, and live healthier.

113.   Epic is deeply committed to ensuring patients' health information can follow them wherever they receive treatment.  Epic pioneered healthcare interoperability through the creation of the Epic Care Everywhere network, a first-of-its-kind EHR network governed by Epic's healthcare provider customer community that allows Epic's

healthcare provider customers to exchange comprehensive patient records with other providers within the network.

114.   Epic's healthcare provider customers also rely on Care Everywhere software to connect with providers using other vendors' software.  To help providers with a single on-ramp to nationwide interoperability, Epic was a founding member of Carequality, a first-of-its-kind "network-of-networks" or framework enabling providers using different vendors' software to connect to each other.  In Carequality, Epic brings its network of providers to interoperate with other vendors' networks. Epic went live with the first cohort of Implementers in 2016.

115.   More recently, Epic led the EHR industry in being the first EHR vendor to join TEFCA, the federally sponsored network-of-networks.  Epic Nexus was one of the original QHINs under TEFCA and went live in 2023.  Many health systems using Epic are TEFCA Participants.

116.   Similarly, twenty-five years ago, OCHIN, a 501(c)(3) nonprofit was founded with federal grant funding to connect six community health centers in Oregon with the goal of providing them the best available health technology and support to promote health in their communities.  OCHIN has evolved to be a trusted nonprofit corporation that connects and optimizes whole-patient care at thousands of healthcare providers' offices nationwide.  Its goal is to deliver knowledge-driven EHR solutions that achieve well-being and good health for all patients.  OCHIN's software and implementation services expand patient access to healthcare, strengthen healthcare by providing efficient and fuller access to patient records, and improve health outcomes in rural and medically underserved communities.  In service of its mission, OCHIN has also joined the Carequality and TEFCA frameworks.

117.   Reid serves patients at its community hospitals in Indiana and Ohio and is connected to both the Carequality and TEFCA frameworks as one of Epic's healthcare provider customers.

30

118.   Trinity is a nonprofit, Catholic healthcare system with providers in 25 states, including Saint Agnes Medical Center in Fresno, California, and an Epic healthcare provider customer connected to both the Carequality and TEFCA frameworks.

119.   UMass Memorial Health is a private, nonprofit, safety net healthcare system serving central Massachusetts, operating a four-campus academic medical center, a physician group, and three community hospitals.  UMass Memorial Health is the clinical partner and primary teaching hospital for the Commonwealth of Massachusetts' public UMass Chan Medical School, and is an Epic healthcare provider customer that is connected to the Carequality and TEFCA networks.

120.   Reid, Trinity, UMass Memorial Health and other healthcare providers that connect to the interoperability frameworks through Epic and OCHIN value interoperability to complete the picture of their patient's medical history.   The completeness and accuracy of these records is important to a physician's ability to make a diagnosis and care plan.  Epic's provider customers, including Reid, Trinity, and UMass Memorial Health, and OCHIN's provider customers, use Care Everywhere interoperability software to ensure both they and other providers and hospitals all have complete pictures.  In the context of the Carequality and TEFCA frameworks, Epic's Care Everywhere software is used to exchange data with providers in other vendors' networks.

121.   Healthcare providers, like Reid, Trinity, and UMass Memorial Health are the custodians of the patient records, which consist of some of the most sensitive, private data that exists about any given person.  As such, HIPAA regulates how providers must protect this information.  For example, only the "minimum necessary" information may be shared for non-treatment purposes.

122.   Safeguarding patient privacy is essential to providers' ability to build trust with their patients.  This trust encourages patients to share their most sensitive information with their care providers, which allows them to get better care.  Conversely, unauthorized disclosure of sensitive health information can harm patients, including through embarrassment, stigma, and discrimination.

123. Given that the stakes of a CC being added to the directory are so high and that Carequality itself does not verify the accuracy of their directory entries, Epic and its Care Everywhere Governing Council, which is composed of volunteer Epic customer representatives elected by their peers and governs the Care Everywhere network, perform additional diligence when Implementers add new CCs prior to distributing the CCs' connection to Epic's customers. This diligence includes reviewing how the participants characterize their business purpose and how they provide treatment, based on publicly available information on their websites and following up with the Implementer or QHIN if needed. Epic performs similar diligence for Participants onboarded to the TEFCA framework.

## IV.    Interoperability Frameworks Are Being Exploited

124. Unscrupulous businesses and individuals are exploiting interoperability frameworks to obtain patient records on a large scale under the false pretense of providing treatment. These entities improperly obtain access to patient records for the purpose of profiting by illegally selling them to third parties.

125. These abusers have repeatedly targeted the Carequality Framework, including by improperly gaining access to records of Epic's healthcare provider customers. These groups are now exploiting the federally sponsored TEFCA framework.

126. When these groups are caught in their schemes, they do not stop their prohibited behavior, but instead use increasingly sophisticated techniques to further disguise their abuse of interoperability frameworks.

127. While their initial attempts to gain access to the treatment networks were more obviously on behalf of law firms, these actors now camouflage themselves to bolster the outward appearance that they are providing medical treatment. They use medical-sounding names for their companies. Their websites have photos of clinical settings, descriptions of their purported clinical care, and some have access features for patients to seek care. But a closer inspection reveals the photos are often stock images, videos are

sometimes AI-generated, the care descriptions are typically vague, and their sites, including patient access features, are either non-functional or have limited functionality.

128.    Some companies also use ownership structures and different entities to separate the company that obtains the patient record from the company that sells the patient record.  For instance, Defendant Ravilla's company – RavillaMed – obtains the data for purported "treatment" purposes – while Defendant LlamaLab – where Ravilla's wife Ami Sangani works as the director of patient records and automation, sells records to third parties, including law firms, for litigation-related purposes.

129.    Further, these companies are manipulating their exchange metrics to appear like an entity providing treatment.  Under normal conditions, treatment-based exchange of patient records occurs in an even pattern and the volume of patient records exchanged between providers is reciprocal because when a record is sent for the purpose of treatment, the results of that treatment are shared back to the original provider organization.  Large spikes in the number of records retrieved or non-reciprocal exchange are not typical and are grounds for an Implementer to investigate what might be occurring and are one potential indicator that records may not have been obtained for a treatment purpose.  In connection with a security and privacy risk associated with Integritort, in April 2024, Epic published a widely distributed risk notification document in which Epic explained that among the indicia of non-treatment-based exchange are sudden spikes in exchange and only one-way record retrieval with no records being returned.  Bad actors like Defendants learned from this and evolved their tactics to hide their true purpose by eliminating spikes and returning a more even amount of records.  However, upon inspection, the returned records—which can be injected into patient charts and reviewed by future care providers—often contain junk data with little or no clinical information.    Junk transactions like those of Defendants thus increase server costs, jam the traffic of real records being exchanged, and waste valuable clinician time for providers like those at Reid, Trinity, and UMass Memorial Health and at OCHIN's sites.  Worse, junk records can cloud the true patient medical history and negatively impact patient care.  And the

Defendants' junk records further confirm that no treatment was actually provided, contrary to representations otherwise. The exploitation of access to patient records through the Carequality and TEFCA frameworks is a problem that is becoming increasingly complex and alarming

130.    In fall 2022, Kno2, a Carequality Implementer, added to Carequality's directory approximately thirty entries whose plain names appeared to be those of law firms.

131.    In response to Epic's requests for additional information about the purpose of these new law firm entries' requests for patient data, Kno2 claimed Treatment purposes.  After further discussions did not resolve Epic's doubts about that claim, Epic formally escalated the issue to Carequality's dispute resolution process.  However, Carequality leadership rejected the dispute and opted instead to manage the disagreement informally, which allowed Kno2 to quietly remove the disputed entries from the directory without transparency to the providers and others in the Carequality community.  Health Gorilla was notified of the basis for Epic's dispute about Kno2's law-firm-related directory entries in September 2022.

132.    In October 2023, another Carequality Implementer added Integritort to the Carequality directory under the assertion of treatment purposes.  Yet Integri*tort*'s very name should have made obvious that it was not a healthcare provider.  Moreover, a video on Integritort's website described it as "bring[ing] transparency and efficiency to the mass tort business" and "seamlessly integrating real-time patient records into the mass tort process."[13] Cursory due diligence would have confirmed the truth.

133.    In November 2023, the Care Everywhere Governing Council concluded that Integritort's use case was not treatment, contrary to Integritort's representations, and Epic thus did not load Integritort into its own directory for the Care Everywhere network.

---

[13] Integritort Tech, *Integritort 1080p 230827*, at 0:03 (YouTube, Aug. 27, 2023), https://www.youtube.com/watch?v=chuuWi7KUJo [https://web.archive.org/web/20260113032256/https://www.youtube.com/watch?v=chuuWi7KUJo].

134.   After Epic learned in March 2024 that Integritort was nonetheless actively taking patient records from providers, Epic filed a formal Carequality Dispute. Amongst the facts presented in the dispute was a video of an Integritort sales pitch to a law firm lead generation business in which Integritort's leadership stated that it could quickly evaluate whether any individual in the United States is a potential plaintiff for a mass tort suit by retrieving their medical history "from womb to tomb."  The video demonstrated this capacity by retrieving, in real time, an audience member's sensitive health information by falsely claiming the treatment purpose through Carequality.  Integritort's CEO, Defendant Daniel Baker, who actively participated in the recorded sales video, had been criminally prosecuted and banned from the U.S. securities industry for fraud in 2014.

135.   In October 2024, Carequality released a resolution banning Integritort from Carequality for a year and provided that Integritort, and any successor entities or entities owned or operated by any owner of Integritort (including Defendant Daniel Baker), could only be reinstated after that year if the Carequality Steering Committee approved.

136.   In another instance, in the Spring 2024, Constant Care Health ("CCH"), a Carequality connection of Health Gorilla, was discovered to not be providing treatment as represented but instead providing services to class action lawyers.  A leaked CCH memo revealed its business model and confirmed its non-treatment purpose in describing its pitch "to explain to [law firms] why they should choose to enroll" with CCH, including that CCH is free, "will not replace any of your doctors or clinicians," "will not diagnose your condition," and "will not prescribe medicines."  It explained that the benefit of enrolling is to help "gather a complete and accurate list of your medical care" to "make sure your attorney has everything they need for your claim" and "speed up the decision process" for a lawsuit.

137.   After Carequality reviewed CCH, Health Gorilla removed it from the directory, without sharing any explanation to the Carequality Implementer community which would have allowed Implementers to notify any impacted healthcare providers. Over the course of the year that CCH was live on Carequality, CCH took more than

59,000 records from healthcare providers using Epic (and undoubtedly many more records from healthcare providers not using Epic) and shared only 80 back. In the end, the findings were kept secret, and neither Carequality nor Health Gorilla ever provided an explanation or notice to other Implementers or healthcare providers about CCH's inappropriate access to so many healthcare records. Bad actors who seek to exploit the interoperability framework know and rely on Carequality's secretive approach to managing problems on the network because they know if they get caught, the worst fate they will face is a closed-door dispute proceeding.

## V.    Defendants' Abuses of the Interoperability Framework

138.    Using the same sophisticated camouflaging schemes identified above, Defendants in this case abuse interoperability frameworks by accessing sensitive patient records under false assertions of treatment purposes and providing those patient records to third parties who have no right to them. If not stopped by this Court, Defendants, and those like them, will continue to do so.

139.    Defendant Health Gorilla is a Carequality Implementer approved for the Query-Based Document Exchange Use Case and added Defendants RavillaMed, Mammoth, SelfRx, and Unit 387 as CCs. Health Gorilla is also a TEFCA QHIN that onboarded Defendants RavillaMed and Mammoth as Participants. When joining both frameworks, RavillaMed and Mammoth represented that they sought access to patient records for treatment purposes. Based on a statement from Health Gorilla, Defendants Unit 387 and SelfRx evidently made similar representations when they joined the Carequality Framework, as Health Gorilla stated by email on September 1, 2022: "Unit 387 is candidate implementer for SelfRx LLC and they will not be initiating queries. SelfRx LLC is their provider organization https://myself.health/. They are providing blood sugar monitoring and treatment for diabetes patients. NPI is 1164010765 and we confirm their Treatment purpose." GuardDog also has represented that its connection to the Carequality framework (by way of Unit 387 and Health Gorilla) is proper based on GuardDog's treatment purposes.

140.　Despite their representations of treatment purposes and their obligations under their Carequality and TEFCA agreements, the RavillaMed Defendants, Mammoth Defendants, and Unit 387 Defendants have fraudulently accessed sensitive, private patient records for non-treatment purposes in violation of California law, other states' laws, and federal law.  Health Gorilla has knowingly enabled them to do so.

141.　Like other bad actors, the RavillaMed Defendants, Mammoth Defendants, and Unit 387 Defendants use sophisticated camouflaging techniques to cloak their wrongdoing, including by building complex interconnected webs of companies that are all driven by closely-connected individuals who work together to achieve Defendants' common missions to obtain access to sensitive patient records under the false pretense of "treatment," so that those patient records can be monetized to Defendants' financial benefit.

### A.　The RavillaMed Defendants

142.　Defendant RavillaMed acting in concert with its employees and affiliates, including Defendants Avinash Ravilla, D.O., Shere Saidon, and LlamaLab, engaged in a deliberate scheme to unlawfully obtain and misappropriate confidential patient records, including records of California patients who received treatment from Epic's healthcare provider customers in California.

143.　RavillaMed was incorporated in Pennsylvania on July 29, 2024.  Its website was created on August 13, 2024.

144.　RavillaMed was first entered on the Carequality directory on August 23, 2024 by Implementer Metriport.  RavillaMed pulled 32 records from Epic's provider customers under this directory entry in August of 2024.  During the Metriport onboarding process, Defendant Shere Saidon attended virtual meetings where he handled the technical details of RavillaMed's integration, as reflected in part by the following excerpted Slack chat between Saidon, Defendant Ravilla and a Metriport representative, which demonstrates the connection between Defendants Ravilla, Saidon, RavillaMed and LlamaLab, and reveals the critical role that Defendant Saidon plays in the RavillaMed

Defendants' scheme – Saidon facilitates, from a technical perspective, the RavillaMed Defendants' connections to the interoperability frameworks.



145.   Metriport quickly grew suspicious of RavillaMed's purposes and removed it from Carequality, largely based on the involvement of Defendants Saidon and LlamaLab, a business associated with obtaining records for law firms.   After August 2024, Metriport's RavillaMed directory entry was never used to pull records from Epic's healthcare provider customers again.

146.   On October 7, 2024, Health Gorilla entered RavillaMed into the Carequality directory and the TEFCA directory.  As an Implementer, Health Gorilla knew or should have known that RavillaMed was previously active on Carequality with Metriport for a short period of a few weeks, a clear red flag.  Consistent with the requirements of the frameworks, RavillaMed would have represented to Health Gorilla that RavillaMed sought access because it needed patient records for treatment purposes, and Health Gorilla would have affirmed that representation to the frameworks and all of the participants on the frameworks, including Epic and Epic's healthcare provider customers, including Reid,

Trinity, UMass Memorial Health, as well as OCHIN and its healthcare provider customers. Since gaining access to the interoperability frameworks, RavillaMed has taken over 42,000 patient records through Carequality and TEFCA from Epic's healthcare provider customers alone (in addition to an unknown number of patient records that were taken from organizations nationwide, including from the U.S. Department of Veterans Affairs ("VA") and providers using other EHRs), including over 500 from Trinity, and scores more from Reid and UMass Memorial Health, all using Health Gorilla. It has taken over 350 patient records through the same frameworks from OCHIN's healthcare provider customers, using Health Gorilla.

147. In RavillaMed's Pennsylvania incorporation documents, Defendant Ravilla is listed as the Governor of RavillaMed. RavillaMed's address is a residential address in Philadelphia owned by Kunal Lodaya, a close associate of Defendant Ravilla. The mailing address is another residential address in New York, this one owned by the "R. Ravilla Living Trust UAD." There is no other physical address associated with RavillaMed.

148. The RavillaMed domain (ravillamed.com) website offers minimal substantive information explaining how its services are actually delivered, and most pages make broad, generalized healthcare statements. The pictures are almost exclusively stock photography images with one identical image appearing across three different pages. The website largely omits contact information such as address and phone number, and the "Contact us" feature has a significant functionality failure – after filling out the required fields, no visible submit button is present. All of this presents a serious red flag about the existence or extent of RavillaMed's actual treatment of patients.

149. RavillaMed's pattern of accessing patient records also reveals large spikes. For instance, in August 2025, it took more than 17,000 patient records from the Epic community alone, and in October 2025, it took almost 10,000 more, which is highly unusual for a small medical practice such as RavillaMed.

150.    Further, RavillaMed sent back to providers far fewer patient records than it took.  This non-reciprocal exchange pattern between RavillaMed and healthcare providers using Epic is atypical for a healthcare provider and presents another red flag that the purported healthcare provider (RavillaMed) did not actually provide treatment.  This non-reciprocal exchange pattern is reflected in the following chart.



151.    Further, review of patient records that Defendant RavillaMed returned to Epic's healthcare provider customers revealed records reflecting no evidence of treatment by any RavillaMed clinician.  There were no diagnoses, prescriptions, or treatment plans from RavillaMed clinicians.  Instead, the patient records primarily consisted of *previous* diagnoses made by providers other than RavillaMed and organized to highlight forever chemical PFAS-associated diagnosis, a subject matter that is highly litigated in mass tort and class action lawsuits.

152.    RavillaMed is closely affiliated with Defendant LlamaLab.  LlamaLab is in the business of selling patient records to trial attorneys and not providing treatment to patients.  LlamaLab's website (www.llamalab.ai) explains that the company offers

"Same-Day Medical Records Retrieval for Law Firms" and related services.   The company's corporate LinkedIn account posted that LlamaLab can obtain records from the VA in seven days, which raises significant red flags that LlamaLab is obtaining the patient records improperly because using proper channels for such records would take much longer, in part because a valid patient authorization is required for the non-treatment purposes for which LlamaLab obtains and sells them.   LlamaLab was a sponsor for the October 2025 Mass Torts Made Perfect conference and participated as an exhibitor in the Medical Record category.   Its booth offered same-day access to patient records without copy or facility fees, which again demonstrates serious red flags because LlamaLab is not treating patients and therefore should have no way of retrieving "treatment" records same-day in this manner.   On its website, LlamaLab claims that its "entire retrieval process is fully HIPAA compliant" and that its services include a "signed [business associate agreement] protecting the platform from discovery."

153.   RavillaMed's owner/Governor Defendant Ravilla was listed on LlamaLab's website as its Chief Medical Officer.[14]   Defendant Ravilla's wife, Ami Sangani, is LlamaLab's Director of Medical Records and Clinical Automation.  Further, LlamaLab's head of sales, Gary Chan, and Clinical informatics Nurse Shikha Patel were members of the Ravilla/Sangani wedding party.[15]

154.   Defendant Ravilla is tagged along with LlamaLab team members in a public LinkedIn post about a mass torts conference LlamaLab attended.[16]

[14] *Business Cards*, LlamaLab, https://web.archive.org/web/20250426111148/https://www.llamalab.ai/business-cards (last visited Jan. 12, 2026) (LlamaLab has since removed this listing to obscure the close ties between itself and RavillaMed and thereby further their scheme; the information is now only available in internet archives).

[15] *Orlando, FL Indian Wedding by Dream Light Visuals*, Maharani Weddings (Sept. 13, 2024), https://www.maharaniweddings.com/2024-09-13/16286-orlando-fl-indian-wedding-by-dream-light-visuals [https://web.archive.org/web/20260113033132/https://www.maharaniweddings.com/2024-09-13/16286-orlando-fl-indian-wedding-by-dream-light-visuals].

[16] *See* Image posted by Gary Chan, LinkedIn, https://www.linkedin.com/posts/garywchan_mtmp-activity-7386471404990255105-Lenv?utm_source=share&utm_medium=member_ios&rcm=ACoAACQjfuUBUJwaeTohBl50XxBowFR5C-U2YIY

*(Cont'd on next page)*

155. Further evidence of the connection between Defendant Ravilla and LlamaLab includes that Ravilla is the owner of LL Medical Clinic and LL Medical Clinic, in turn, shares a number of employees with Defendant LlamaLab. As relevant here, (1) Ami Sangani, the LlamaLab Director of Medical Records and Clinical Automation and Defendant Ravilla's wife, is the authorized official for LL Medical Clinic's Kansas and New Jersey NPIs; (2) Roshni Sangvi, a physician assistant at LlamaLab, is the authorized official for LL Medical Clinic's California NPI; and (3) Deena Jarba, a LlamaLab Clinical Informatics Nurse, is the authorized official for LL Medical Clinic's Pennsylvania NPI.

156. The connections between the RavillaMed Defendants and their affiliates can be seen in the following chart.



157. From October 2024 to December 2025, RavillaMed obtained sensitive patient records from Epic's and OCHIN's healthcare provider customers in California and other states, including from Reid, Trinity, and UMass Memorial Health, through the

---

[https://web.archive.org/web/20260110202953/https://www.linkedin.com/posts/garywchan_mtmp-activity-7386471404990255105-Lenv?utm_source=share&utm_medium=member_ios&rcm=ACoAACQjfuUBUJwaeTohBl50XxBowFR5C-U2YIY] (last visited Jan. 12, 2026) (LlamaLab CRO posting that the Llamalab team, including Dr. Ravilla, was at a mass torts conference selling the Llamalab service).

Carequality and TEFCA frameworks, asserting that the requests were for treatment purposes. Some of the improperly accessed data was about California patients and belonged to Californian Epic and OCHIN healthcare provider customers, including Epic's customer Trinity, and some of the improperly accessed data was stored on customers' servers in California. On information and belief, RavillaMed then knowingly transmitted some of those patient records to LlamaLab for sale for profit in violation of the law and Sections 22 and 23 of the CC Terms as well as the TEFCA SOPs. On information and belief, LlamaLab knowingly obtained the data disclosed by RavillaMed in violation of the law. As shown above, the individual RavillaMed Defendants, Ravilla, and Saidon, carried out these bad acts to benefit the interests of the interconnected business web that these defendants operate for the improper purposes of obtaining and then selling patient records that they take from the interoperability frameworks under the false pretense of providing "treatment" to patients. Simply put, these individuals have tried to hide the connections between themselves and their closely held companies (Defendants RavillaMed and LlamaLab) to evade detection, leveraging the size and scale of the national interoperability frameworks.

158. On November 7, 2025, Epic shared evidence of RavillaMed's misconduct with the Care Everywhere Governing Council. That same day, Epic and the Care Everywhere Governing Council escalated the matter to Carequality and Health Gorilla requesting an investigation and that the connection be stopped from taking records. Health Gorilla initially represented to Epic and to Carequality that Health Gorilla had imposed a "voluntary" suspension concerning the RavillaMed's concerns in November 2025 while it investigated the issue, but RavillaMed was nonetheless able to take records from the Epic customer community into December 2025. To date, the issues remain unresolved, and it is evident that this Court's intervention is required.

**B.    The Mammoth Defendants**

159. Defendant Mammoth (i.e., Mammoth Dx and Mammoth Path Solution, LLC) acting in concert with its employees and affiliates, including Defendants Mammoth,

Mammoth Rx, Ryan Hilton, Daniel Baker, and Max Toovey engaged in a deliberate scheme to unlawfully obtain and misuse confidential patient records, including records of California patients who received treatment from Epic's healthcare provider customers in California.

160.   Mammoth Dx represents on its website (https://mammoth-dx.com/) that it is an advanced diagnostic laboratory offering molecular and pathology testing with a focus on Epidermal Nerve Fiber Density testing.   Mammoth represents that its on-staff pathologists review historical patient records "to provide more precise results and treatment plans."

161.   In July 2024, Health Gorilla entered Mammoth into the Carequality and TEFCA directories.   Consistent with the requirements of the frameworks, Mammoth would have represented to Health Gorilla that Mammoth sought access because it needed patient records for treatment purposes, and Health Gorilla would have affirmed that representation to the frameworks and all of the participants on the frameworks, including Epic and Epic's healthcare provider customers, including Reid, Trinity, and UMass Memorial Health, as well as OCHIN and its healthcare provider customers.   Since gaining access to the interoperability frameworks, Mammoth – using Health Gorilla – has taken over 140,000 patient records through Carequality and TEFCA from Epic's healthcare provider customers (in addition to an unknown number of patient records that were taken from organizations nationwide, including from the VA and providers using other EHRs), including over 18,000 patient from California providers and over 3,000 patient records from Reid, Trinity, and UMass Memorial Health.   Mammoth has taken over 1,500 patient records through these frameworks from OCHIN's healthcare provider customers, using Health Gorilla.

162.   Mammoth exhibits highly abnormal patient-record exchange patterns. Rather than the steady, reciprocal flow of patient records associated with patient care, Mammoth has taken large quantities of patient records in spikes, as reflected in the

following chart, which is a clear red flag that the patient records were accessed for non-treatment purposes.



Patient Records Taken by Mammoth from Epic's Customers

163.    A number of Epic's healthcare provider customers reviewed patient records returned to them by Mammoth.  Records received from Mammoth lack basic clinical information that one would expect from a CLIA-certified laboratory, such as test results and dates.  They instead include vague clinical notes that also lack basic information such as a date, a clinical assessment, a plan, or clinical recommendations.  It is unclear what services, if any, Mammoth purports to have provided.  The records are blank or otherwise clinically useless, in other words junk data, which is a clear red flag that no treatment was provided.

164.    Mammoth Rx's website (https://www.mammothrx.com/) as significant functionality flaws drawing into question its legitimacy.  Under "Solutions," they have the same generic descriptions for each of the drop-down selections Credibl, Assist MD,

Plug MD, Mammoth Path Solution, Lab Leopard, Claim AI and Hippo Connect.  The links to each of these solutions are dead links.  Press articles on the site also have dead links.  All of this presents a serious red flag about the existence or extent of Mammoth's actual treatment of patients.  As for Defendant Mammoth Path Solution, LLC, the other Mammoth entity that shares the same location with Mammoth Dx and is connected by Health Gorilla to the Carequality and TEFCA frameworks, it appears to have no public website at all, undermining the existence or extent of any treatment it actually provides to patients.

165.   Publicly available information indicates that Defendant Daniel Baker, the former CEO of Integritort, who pleaded guilty in this District in 2014 to conspiracy to defraud the United States in violation of 18 U.S.C. 371[17] and a person who is prohibited from exchanging securities by the SEC[18], was the founder and Chief Technology Officer (CTO) of Mammoth Rx.  Further, Mammoth Dx's website contains a listing of Defendant Baker as its CTO, although that listing is now hidden and available only on the Wayback Machine.  In further evidence of the connection, a filing with the California Secretary of State lists Defendant Hilton as the CEO and Defendant Baker as the CFO of Mammoth Global, Inc.  Even further, Baker is listed as the Director of Assist MD and the Manager of Claim.AI, both of which are listed as products of Mammoth Rx on its website.  Indeed, when presented with mounting evidence of the connection, Health Gorilla was forced to later concede to Carequality there was a connection between Mammoth and Defendant Baker, but Health Gorilla minimized the connection by asserting he was only a "consultant" to Mammoth in the past.  Further indication that Mammoth works with attorneys is from the company that Mammoth Rx used to develop its website, "Deceptive.co."   Deceptive described Mammoth Rx as helping "from nurses to lab

---

[17] ECF 14, *United States v. Daniel Baker*, Case 8:14-cr-00041 (C.D. Cal June 16, 2014).

[18] In the Matter of Daniel R. Baker, Securities and Exchange Commission, *Order Instituting Administrative Proceedings Pursuant to Section 15(b) of the Securities and Exchange Act of 1934, Making Findings, and Imposing Remedial Sanctions*, File No. 3-16030 (Aug. 22, 2014).

technicians, from surgeons to *medical attorneys*—Mammoth Rx brings them together." [emphasis added].

166.    After Epic brought evidence of Mammoth's ties to Baker to Health Gorilla's attention on October 24, 2025, one month later Health Gorilla responded with a carefully crafted denial of any relationship between Mammoth *and Integritort* (notably not Baker). Health Gorilla reported it was "satisfied" based on the findings of its "extensive investigation" that Epic's concerns were unfounded.  Health Gorilla also tendered a sworn affidavit executed in Orange County, California, on November 18, 2025, from Defendant Ryan Hilton in which he describes Defendants Mammoth Path Solution, Mammoth Dx, and Mammoth Rx as the "Mammoth Family"; affirmed that Baker "has never been a founder, co-founder, or principal of any entity within the Mammoth Family"; and denied that Baker had ever "held any financial interest—directly or indirectly—in any of the collective companies, nor has he participated in the management, governance, operations, or strategic decision-making in any capacity."  This affidavit is false.

167.    Defendant Hilton is also listed on an NPI as the owner of Nationwide Healthcare Provider Corp (NHPC), which markets patient records to attorneys. Mammoth and NHPC share a street address (20505 Crescent Bay Drive, Lake Forest, CA 92630-8825).  Further, Defendant Toovey, who holds himself out as the Chief Commercial & Strategy Officer of NHPC, also was previously listed on Mammoth Rx's website as the Chief Commercial and Strategy Officer.  In a letter advertising its services to social security claimant representatives, Defendant Toovey bragged that "NHPC's digital system pulls records straight from providers' EHRs and sends them to representative firms. This cuts down wait times from weeks to minutes."  As an experienced individual in the patient records retrieval industry, Toovey knew or should know that the only conceivable way this could be accomplished would be by falsely claiming the treatment purpose through TEFCA or Carequality.

168.    According to public records, including the Mammoth Dx website (https://mammoth-dx.com/), Mammoth Dx is the trade name for Unique Medi Tech, LLC.

The NPI for Unique Medi Tech lists Defendant Hilton as its owner and authorized official. Unique Medi Tech, LLC is a Delaware limited liability company that is headquartered in California and appears to have a current CLIA certificate. Unique Medi Tech has been suspended from doing business in California and is not in good standing in Delaware due to its failure to meet tax obligations in both states. While Unique Medi Tech appears to be enrolled in Medicare with a current CLIA certificate, Mammoth Dx used the Medicare enrollment and CLIA certification credentials of a separate entity, Defendant Mammoth Path Solution, LLC, to gain admission into TEFCA.

169.    In Defendant Mammoth Path Solution's NPI, Defendant Hilton is also listed as its owner and authorized official.

170.    From July 2024 to October 2025, Mammoth obtained sensitive patient records from Epic and OCHIN's healthcare provider customers in California and other states, including Reid, Trinity, and UMass Memorial Health, other states through Carequality and TEFCA, falsely asserting that the requests were for treatment purposes and without requisite authorization. Some of the improperly accessed data was for California patients and belonged to Californian Epic healthcare provider customers, including Epic's customer Trinity, and some of the improperly accessed data was stored on customers' servers in California. On information and belief, Mammoth has disclosed the patient records to NHPC and/or other entities for sale for profit in violation of the law and Sections 22 and 23 of the CC Terms as well as the TEFCA SOPs. As shown above, the individual Mammoth Defendants, Hilton, Baker, and Toovey, carried out these bad acts to benefit the interests of the interconnected business web that these defendants operate for the improper purposes of obtaining and then selling patient records that they take from the interoperability frameworks under the false pretense of providing "treatment" to patients. Simply put, these individuals have tried to hide the connections between themselves and their closely held companies (Defendants Mammoth Dx, Mammoth Path Solution, LLC, and Mammoth Rx) to evade detection, leveraging the size and scale of the national interoperability frameworks.

171. To date, the issues raised concerning Mammoth remain unresolved, and it is evident that this Court's intervention is required.

### C.    The Unit 387 Defendants

172. Unit 387, acting in concert with its employees and affiliates, including Meredith Manak, Hoppr, GuardDog, and SelfRx engaged in a deliberate scheme to unlawfully obtain and misuse confidential patient records, including records of California patients who received treatment from Epic's healthcare provider customers in California.

173. Defendant Manak is the founder and CEO of both Defendants Unit 387 and Hoppr, an entity that "[i]nstantly aggregates all patient records" for law firms and "[p]rovide[s] near instant access to patient records" for insurance companies. These are both small entities with the sole employees being either Manak herself or Manak and one other person. Manak has attended law firm conferences targeted at personal injury attorneys and gave a presentation in September 2025 on "How to Request and Receive All of Your Client's Medical Records In Less Than 48 Hours for 1 Low Flat Fee and Not Pay a Penny for Copy Costs." As an experienced individual in the patient records retrieval industry, Manak knew or should know that the only conceivable way this could be accomplished would be by falsely claiming the treatment purpose through TEFCA or Carequality.

174. In September 2022, Health Gorilla entered Unit 387 into the Carequality directory. Consistent with the requirements of the framework, Unit 387 would have represented to Health Gorilla that Unit 387 sought access because its customers needed patient records for treatment purposes, and Health Gorilla would have affirmed that representation to the framework and all of the participants on the framework, including Epic and Epic's healthcare provider customers, including Reid, Trinity, and UMass Memorial Health, as well as OCHIN and its healthcare provider customers. Since gaining access to the Carequality framework, Unit 387's customers have taken over 100,000 records through Carequality from Epic's healthcare provider customers community members alone, including thousands from California providers and over 1,300 from

Trinity, and scores more from Reid and UMass Memorial Health using Health Gorilla. Unit 387's customers have taken nearly 1,000 records through Carequality from OCHIN's healthcare provider customers, using Health Gorilla.

175.    Unit 387 is not only a CC but also a candidate implementer, meaning it can onboard downstream connections to the interoperability frameworks under Health Gorilla and has its own connections to the frameworks, including Defendants SelfRx and GuardDog.

176.    Defendant SelfRx is one of Unit 387's downstream connections.  SelfRx has had access to the Carequality directory since September 2022.  Consistent with the requirements of the framework, SelfRx and Unit 387 would have represented to Health Gorilla that SelfRx sought access because SelfRx needed patient records for treatment purposes, and Health Gorilla would have affirmed that representation to the framework and all of the participants on the framework, including Epic and Epic's healthcare provider customers, including Reid, Trinity, and UMass Memorial Health, as well as OCHIN and its healthcare provider customers.  Since gaining access to the Carequality framework, SelfRx has taken over 100,000 patient records through Carequality from Epic's healthcare provider customers (in addition to an unknown number of patient records that were taken from organizations nationwide, including from the VA and providers using other EHRs), including over 1,000 from Trinity, and scores more from Reid and UMass Memorial Health, all using Health Gorilla and Unit 387.  SelfRx has taken nearly 1,000 patient records through Carequality from OCHIN's healthcare provider customers, using Health Gorilla and Unit 387.

177.    Defendant GuardDog is one of Unit 387's downstream connections.  GuardDog has had access to the Carequality directory since September 2024.  Consistent with the requirements of the framework, GuardDog and Unit 387 would have represented to Health Gorilla that GuardDog sought access because GuardDog needed patient records for treatment purposes, and Health Gorilla would have affirmed that representation to the framework and all of the participants on the framework, including Epic and Epic's

healthcare provider customers, including Reid, Trinity, and UMass Memorial Health, as well as OCHIN and its healthcare provider customers. Since gaining access to the Carequality and TEFCA frameworks, GuardDog has taken over 6,000 patient records through Carequality from Epic's healthcare provider customers (in addition to an unknown number of patient records that were taken from organizations nationwide, including from the VA and providers using other EHRs), including over 50 from Trinity, and additional patient records from Reid and UMass Memorial Health, using Health Gorilla and Unit 387. It has taken over 50 patient records through Carequality from OCHIN's healthcare provider customers, using Health Gorilla and Unit 387.

178.    Since its former Chief Medical Officer, Courtney Scanlon, M.D., left the organization in August 2024, SelfRx has exhibited highly abnormal patient-record exchange patterns. From October 2023 to July 2024, SelfRx requested single-digit patient records per month from Epic's healthcare provider customers. Suddenly, in August 2024, it began requesting rapidly increasing numbers of patient records in sporadic spikes. In December 2024, it took nearly 17,000 patient records from Epic's healthcare provider customers, and over 14,000 in March 2025. These spikes raise significant red flags that suggest that the patient records were not actually for treatment purposes.

179.    The NPI authorized official for Defendant GuardDog is Keli Heskett, who is also the co-founder of Mass Tort Medical Consultants, whose name and website (https://mtmc1.com/our-story/) indicate that its purpose is related to mass tort suits. Before GuardDog came onto the scene, Heskett acted as the CEO of another one of Unit 387's prior downstream connections called Critical Care Nurse *Consulting*, which bears a strikingly similar name to GuardDog's formal name—Critical Care Nurse *Consultants*. (Emphasis added.) GuardDog has taken nearly 5,000 patient records from Epic customers since September 2024.

180.    Critical Care Nurse Consulting exhibited highly abnormal patient-record exchange patterns. For most of 2023, it requested very few patient records from Epic's healthcare provider customers. Suddenly, in October 2023, it requested approximately

5,500 patient records.  It requested approximately 4,000 patient records in November 2023, and approximately 15,500 in December 2023.  That spikey exchange, which is a red flag that suggests no treatment is being provided, continued until Critical Care Nurse Consulting abruptly stopped in September 2024 with no explanation, the same month that GuardDog began taking patient records from Epic's healthcare provider customers via the Carequality framework, and through Unit 387 as onboarder for Health Gorilla.

181.    The following chart shows the telltale spikes in Critical Care Nurse Consulting's and Defendant SelfRx's patient records request data and the ways in which Defendants deploy their hydra tactics, replacing one bad actor with a new iteration to obfuscate and avoid detection.



182.    From September 2022 to November 2025, Unit 387 facilitated others such as Defendants SelfRx, GuardDog and its predecessor Critical Care Nurse Consulting in obtaining sensitive patient records from Epic and OCHIN's healthcare provider customers in California and other states, including Reid, Trinity, and UMass Memorial Health, through Carequality, asserting that the requests were for treatment purposes.  Some of the

improperly accessed data was for California patients and belonged to Epic healthcare provider customers in California, including Trinity, and some of the improperly accessed data was stored on customers' servers in California. Epic believes that Unit 387, either directly or through its own customers, knowingly transmitted the data to Hoppr for sale for profit, in violation of Sections 22 and 23 of the CC Terms as well as HIPAA. On information and belief, Hoppr knowingly obtained the data disclosed by Unit 387 or its customers in violation of the law. As shown above, Defendant Manak carried out these bad acts to benefit the interests of the interconnected business web that Manak operates for the improper purposes of obtaining and then selling patient records that they take from the interoperability frameworks under the false pretense of providing "treatment" to patients. Simply put, Manak tried to hide the connections between herself and her closely held companies and their affiliates (Defendants Unit 387, Hoppr, GuardDog, and SelfRx) to evade detection, leveraging the size and scale of the national interoperability frameworks.

183.   On November 11, 2025, Epic and the Care Everywhere Governing Council escalated concerns about Defendant Unit 387 and its CCs' misconduct in a letter to Carequality and Health Gorilla. Health Gorilla has not responded and to date, the issues remain unresolved, so it is evident that this Court's intervention is required.

### D.   Health Gorilla's Role in and Facilitation of These Abuses

184.   The common thread between Defendants RavillaMed, Mammoth, and Unit 387, and each of the other Defendants within their respective webs, is Defendant Health Gorilla. Health Gorilla played an essential role in the scheme, since it was the Implementer tasked with ensuring that its connections belonged on the frameworks and were not inappropriately accessing the data exchanged through those frameworks. Instead of protecting the sanctity of those frameworks and stopping bad actors from infiltrating it, Health Gorilla knowingly enabled the Defendants to extract sensitive patient data from healthcare providers across the United States at a staggering scale.

185.   Health Gorilla failed to verify that RavillaMed and Mammoth were healthcare providers with legitimate treatment purposes when allowing them access to the interoperability frameworks and failed to ensure that they were engaged in acceptable and lawful uses of the frameworks and the protected health information they requested. Health Gorilla also similarly failed to vet Unit 387 and its customers.   These failures occurred both prior to onboarding those CCs and after Health Gorilla became aware of concerning patterns of records requests.   Health Gorilla also made affirmative representations to explain away its customer and co-schemers' conduct when questions were raised.   For example, when Health Gorilla was questioned about massive spikes in RavillaMed's August 2025 and October 2025 records requests, Health Gorilla suggested that RavillaMed had experienced a technical glitch where repeat requests were made of the same patient.   Epic customer exchange audit logs belie that explanation, as they show a large spike in unique patient records being taken not attributable to multiple requests for a small number of patients.

186.   As outlined above, Health Gorilla should have discovered significant red flags about the RavillaMed Defendants, Mammoth Defendants, and Unit 387 Defendants, had Health Gorilla performed the diligence required of it under the law and rules governing the national interoperability frameworks

187.   But Health Gorilla did not just ignore its obligations to vet its connections to the detriment of patient privacy, it actively flouted those obligations despite being put on repeated notice of the rampant abuses by the Defendants that are outlined above. Specifically:

    a.   After Epic sent three letters informing Health Gorilla of RavillaMed, Mammoth, and Unit 387's pattern of behavior indicating abuse in October and November 2024, Health Gorilla responded with letters dismissing Epic's concerns regarding RavillaMed and Mammoth and to date has not responded regarding Unit 387.   Relying on statements from Mammoth and RavillaMed that provided little relevant information, Health Gorilla informed Epic that it was "satisfied" with Mammoth's and RavillaMed's use of its network, and saw no concerns with their problematic ties with the mass tort industry.

    b.   When Carequality and Epic questioned Health Gorilla about the connection between RavillaMed and LlamaLab, Health Gorilla denied any ownership or management connection and stated that while Dr. Ravilla and the LlamaLab founder met in *August 2023*, Defendant Ravilla has had no involvement with

LlamaLab since then.  However, as explained above, Dr. Ravilla and RavillaMed were working in concert with LlamaLab founder and CEO Defendant Saidon in August 2024 to obtain access to Carequality through Metriport, and the connections between RavillaMed and LlamaLab is obvious from multiple publicly available sources.

c. Moreover, in an attempt to convince providers that these entities were treating patients, Health Gorilla's Chief Medical Officer, Steven Lane, emailed representatives of Epic's Care Everywhere Governing Council that Mammoth and RavillaMed "are doing something that we have been driving toward as a community for some time. They are leveraging AI tools to evaluate and organize retrieved clinical data, to identify care gaps and opportunities, and to provide prioritized guidance to patients and their providers." Lane added that he reviewed the activities and documentation from Mammoth and RavillaMed and stated that it "falls well within the statutory definitions of Treatment and we all need to figure out how to support this..."

d. Even after being confronted with evidence establishing links between RavillaMed and LlamaLab, Health Gorilla continued to make affirmative representations that RavillaMed was appropriately exchanging records for treatment.  On January 8, 2026, Health Gorilla's general counsel sent Epic what purported to be an "executed sworn statement" dated December 30, 2025, signed by Defendant Avinash Ravilla in which Ravilla made several affirmative representations, in both his individual capacity and on behalf of RavillaMed, disclaiming a relationship between RavillaMed and LlamaLab:

i. "Llamalab was founded and operates as an independent entity separate and distinct from myself and RavillaMed PLLC. I, Dr. Avinash Ravilla, hold no ownership interest in Llamalab, exercise no management authority over its operations, and maintain no contractual relationship with Llamalab in any capacity whatsoever. Similarly, Llamalab holds no ownership interest in RavillaMed PLLC, exercises no management authority over RavillaMed PLLC's operations, and maintains no contractual relationship with RavillaMed PLLC in any capacity. The two entities operate entirely independently of one another in all respects. Furthermore, RavillaMed PLLC only retrieves records via Carequality and TEFCA through Health Gorilla on behalf of RavillaMed for treatment of RavillaMed patients and not on behalf of third parties." This sworn statement was intentionally misleading, if not outright false.

188.    Despite its knowledge of RavillaMed's fraudulent acts, including illegally taking and facilitating the improper use of patient records, Health Gorilla has continued to take steps to allow RavillaMed to take records.  In December 2025, Health Gorilla informed Epic and its representatives who oversee Epic's customer community on Carequality and TEFCA that Health Gorilla intended to reinstate RavillaMed's network access, enabling RavillaMed to continue its scheme of taking patient records under the false pretense that of seeking records for "treatment" and then using those patient records

for the RavillaMed Defendants' monetary gain.  On Sunday evening, January 11, 2026, the CEO of the Sequoia Project sent an email informing Epic and its representatives that, apparently despite the sworn statement from Ravilla, Health Gorilla had "voluntarily inactivated" RavillaMed on the Carequality and TEFCA directories on January 10.  One hour later, Health Gorilla's Chief Medical Officer Stephen Lane replied-all suggesting that RavillaMed might nonetheless be "treating patients related to PFAS exposure who happen to be involved in litigation."  This is another example of Health Gorilla defending their bad actor customer in the face of evidence that the customer is not accurately representing their true purpose of exchange on the frameworks.

189.   On October 24, 2025, Epic shared evidence of Mammoth's misdeeds with the Care Everywhere Governing Council.  That same day, Epic escalated these misdeeds to Health Gorilla with a letter describing the suspicious nature of Mammoth's requests and asking Health Gorilla to investigate Mammoth's activities to confirm that its patient record requests are for legitimate treatment purposes and not for the benefit of law firms or other organizations that do not treat patients.  Health Gorilla responded with a letter on November 24, 2025, alleging that it had investigated the matter and believed that Mammoth's work was consistent with a treatment purpose and that it found no evidence that records were being taken for the benefit of other parties for non-treatment purposes.

190.   In its response to Epic's letter regarding Mammoth's concerning pattern of behavior, Health Gorilla also acknowledged that it had allowed one entity, MedSync, to take patient records without undergoing any of Health Gorilla's "standard onboarding."  Health Gorilla allowed MedSync to take patient records with what appears to have been no vetting or verification, including confirming that MedSync had the authority to request records for treatment purposes.

191.   Despite its knowledge of Mammoth's fraudulent acts, including illegally taking and facilitating the improper use of patient records, Health Gorilla informed Epic that it intends to reinstate Mammoths's network access, enabling Mammoth to continue

its scheme of taking patient records under the false pretense that they are for "treatment" and then using those patient records for the Mammoth Defendants monetary gain.

## VI.    Defendants' Abuses Cause Significant Harms to Epic, OCHIN, Reid, Trinity, UMass Memorial Health, and the Nation's Healthcare System

192.    Defendants' abuses pose an imminent danger of creating a crisis in confidence in interoperability and consequent reticence among healthcare providers to participate in interoperability.

193.    This imminent threat brings with it the risk of ruining interoperability altogether for the public at large, including for patients whose lives depend on their physicians' access to their whole patient records.  Indeed, some of Epic and OCHIN's healthcare provider customers have voiced that, because of the abuses, they have contemplated limiting their participation in the Carequality and TEFCA frameworks or withdrawing from them entirely.  In fact, abuses to interoperability have forced providers – including Plaintiffs Reid, Trinity, and UMass Memorial Health – to reevaluate their full participation in the Carequality and TEFCA frameworks.   Discontinued provider participation in interoperability risks severely undermining patient care as described above.

194.    Epic's U.S. healthcare provider customers store data containing patient records on-site on their own servers, including in California, or they contract out to third-party hosting services to store the data.

195.    When CCs in Carequality and Participants in TEFCA request patient records from an Epic or OCHIN customer, the provider customer almost always retains a copy of the transmitted data.  That requires additional storage, which Epic, OCHIN, and their customers, including Reid, Trinity, and UMass Memorial Health bear the cost of, and each additional request increases storage requirements and expenses.  Epic, OCHIN, and their customers, including Reid, Trinity, and UMass Memorial Health thus incur direct costs when connections fraudulently request patient records for non-treatment purposes.

196.    Because of interoperability abuses described herein, Epic has incurred additional costs well beyond their usual costs to further monitor CCs and Implementers connected to the Carequality framework and Participants connected to the TEFCA framework.  Epic has also incurred the additional costs of developing searches specific to the Defendants' prior inappropriate taking of patient data and monitoring tools to prevent further improper disclosures of patient records.  And Epic incurred and continues to incur costs to address and mitigate Defendants' conduct and to respond to customer concerns and complaints raised by Epics healthcare provider customers.

197.    Epic, OCHIN, Reid, Trinity and UMass Memorial Health have no adequate remedy at law to address these abuses of the interoperability systems.  Monetary damages are insufficient.  Equitable relief, in the form of a court-ordered injunction, is needed to stop these Defendants from continuing to abuse the Carequality and TEFCA frameworks, to order Defendants to destroy or return the sensitive patient records in Defendants' possession or the possession of Defendants' agents and affiliates, and to prevent Defendants, and Defendants' agents and affiliates, from any further misuse of those patient records.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### FRAUD

### (Against Health Gorilla and the RavillaMed Defendants)

198.    Plaintiffs repeat and reallege the preceding paragraphs hereof, as if fully set forth herein.

199.    On August 23, 2024, RavillaMed first appeared in the Carequality directory, using another Implementer, Metriport.  In connecting with Metriport, Defendants Ravilla and Saidon met with Metriport together.  Ravilla and Saidon asserted that Saidon was a technologically savvy friend merely helping Ravilla to get connected to Carequality, implying that Saidon was not involved in his capacity as LlamaLab's CEO and founder or in an effort to further LlamaLab's and the other RavillaMed Defendants' commercial

interests in accessing patient records to sell to third parties, such as mass tort attorneys as part of LlamaLab's business model. On information and belief, those statements were knowingly false because RavillaMed's true purpose for accessing Carequality was to obtain the patient records to further the commercial interests of the RavillaMed Defendants by selling the patient records, including through LlamaLab, and Saidon was involved to further LlamaLab's commercial interests in obtaining those patient records through RavillaMed's access to the patient records by RavillaMed's connection to the interoperability frameworks.

200. Metriport quickly grew suspicious of RavillaMed's purposes and removed RavillaMed from Carequality that same month in August 2024, after RavillaMed had accessed patient records of Epic's healthcare provider customers. That rapid entry and exit from Carequality was a clear red flag to everyone in the Carequality framework about RavillaMed, given the healthcare industry's growing experience with bad actors' abuses of the interoperability frameworks as described above.

201. Health Gorilla onboarded RavillaMed to the Carequality and TEFCA frameworks shortly thereafter in October 2024, ignoring the clear red flag of RavillaMed's rapid entry and exit from Carequality through Metriport. Defendant Saidon assisted RavillaMed in the onboarding process with Health Gorilla in a similar fashion to the assistance Saidon provided RavillaMed with Metriport, all knowing that the true and primary purpose for re-joining the interoperability frameworks was to monetize the patient records for the RavillaMed Defendants' pecuniary gain.

202. From October 2024 through December 2025, using Health Gorilla's provided connection to the Carequality and TEFCA frameworks, RavillaMed obtained thousands of patient records of Epic's and OCHIN's healthcare provider customers, in California and other states, including records obtained from Plaintiffs Reid, Trinity, UMass Memorial Health, and others. RavillaMed obtained those patient records based on the assertion that the patient records were all being sought for treatment purposes.

203.   Those assertions were false because RavillaMed's true purpose for seeking those patient records was to further the RavillaMed Defendants' commercial interests by selling the patient records, either directly to undisclosed law firms and other third parties, or to and through an intermediary such as Defendant LlamaLab.

204.   RavillaMed knew that the treatment representations were false at the time they were made for all patient records relating to persons who were not under RavillaMed's medical care and for which RavillaMed sought access to the patient records for the RavillaMed Defendants' own commercial purposes and the monetary gain of RavillaMed and the rest of the RavillaMed Defendants, and not for the treatment purposes that were asserted in connection with the patient records requests.

205.   RavillaMed intended for Plaintiffs to rely on the false treatment-purpose representations so that RavillaMed could obtain the patient records.  RavillaMed knew that RavillaMed could not obtain the patient records if RavillaMed misrepresented its true purpose for seeking patient records, in violation of the requirements of Carequality, TEFCA, and the law, including without limitation, HIPAA.

206.   Defendant Ravilla was the authorized official for RavillaMed's NPI. Defendant Ravilla made or directed the above false statements on RavillaMed's behalf as RavillaMed's authorized NPI, which Ravilla held out as evidence of treatment purposes. As explained above, those statements were knowingly false with respect to all requests for patient records relating to persons whom RavillaMed was not providing medical treatment and requests for patient records that were sought for the true, but unstated, purpose of financially benefitting the RavillaMed Defendants, who sought to sell the patient records, either directly to undisclosed law firms and other third parties, or to and through an intermediary such as Defendant LlamaLab.

207.   Ravilla knew that the treatment representations were false at the time they were made for all patient records relating to persons who were not under RavillaMed's medical care and for which Ravilla sought access to the patient records for his and the RavillaMed Defendants' own commercial purposes and the monetary gain of RavillaMed

and the rest of the RavillaMed Defendants, and not for the treatment purposes that were asserted in connection with the patient records requests.

208.    Ravilla intended for Plaintiffs to rely on the false treatment-purpose representations and Ravilla's NPI so that RavillaMed could obtain the patient records. Ravilla knew that neither he nor RavillaMed could obtain the patient records if he and RavillaMed misrepresented their true purpose for seeking patient records, in violation of the requirements of Carequality, TEFCA, and the law, including without limitation, HIPAA.

209.    In onboarding RavillaMed to the Carequality and TEFCA frameworks, Health Gorilla falsely asserted that RavillaMed sought to join the frameworks for legitimate treatment purposes.    Further, despite the clear red flag presented by RavillaMed's short tenure on Carequality through Metriport, Health Gorilla failed to comply with its contractual obligations to ensure that RavillaMed was using the frameworks only for legitimate permitted purposes.    Disregarding the warning signs and its duties to protect patient privacy, Health Gorilla failed to verify that RavillaMed was a healthcare provider with a legitimate treatment purpose when onboarding RavillaMed and failed to remove RavillaMed after Epic alerted Health Gorilla to RavillaMed's concerning behavior.    Health Gorilla also falsely represented that the massive spikes in RavillaMed's August and October 2025 records requests were technical glitches causing repeat requests for records of certain patients.    Health Gorilla further falsely represented that RavillaMed was using its AI tools to organize clinical data, identify care gaps, and provide prioritized guidance – that is, for purported treatment purposes.

210.    Health Gorilla knew the statements were false because Health Gorilla was aware that it had failed to conduct adequate vetting of its connections, it was aware that RavillaMed's activity demonstrated that RavillaMed was not accessing patient records for treatment purposes, and Health Gorilla knew that healthcare provider customer audit logs would demonstrate large spikes in unique patient records being taken by RavillaMed, which suggests non-treatment purposes.

211.   Health Gorilla intended for Plaintiffs to rely on these false representations to ensure RavillaMed's continued connection to the Carequality and TEFCA frameworks to ensure continued transaction volume and revenue to Health Gorilla.

212.   In reliance on the foregoing false statements and omissions, healthcare provider customers of Epic and OCHIN in California and other states, and Plaintiffs Reid, Trinity and UMass Memorial Health, provided RavillaMed with patient records.

213.   The false statements and omissions described above were material because a reasonable person would attach importance to the representations that the request for patient records was for treatment purposes in deciding whether to respond with patient records.  The misrepresentations and omissions were material to Plaintiffs.

214.   Plaintiffs were reasonably justified in relying on these false statements and omissions because, as a member of the Carequality Framework and TEFCA, RavillaMed was bound by the CC Terms, applicable Carequality policies, TEFCA ToPs, and applicable TEFCA SOPs that prohibit disclosure of patient records outside of a permitted purpose.   Similarly, Plaintiffs were reasonably justified in relying on these false statements and omissions because, as a member of the Carequality and TEFCA frameworks, Health Gorilla was bound by the CCA, applicable Carequality policies, TEFCA Common Agreement, and applicable TEFCA SOPs.

215.   Plaintiffs have been harmed as a direct consequence of the fraudulent conduct of the RavillaMed Defendants and Health Gorilla.  Plaintiffs Reid, Trinity, and UMass Memorial Health have incurred operational expenses and been forced to expend resources in the form of funds and employee time to investigate the breadth of the harm and to address data integrity and privacy issues and have expended resources monitoring and attempting to mitigate the harm caused by the RavillaMed Defendants and Health Gorilla.  Epic and OCHIN have been harmed in the same way, and they have also incurred costs in connection with responding to fraudulent requests for records, suffered losses in employee time and diversion of resources to investigate and address this fraud and the

complaints that have been raised by healthcare providers concerning the wrongdoing and its effects on data integrity, privacy, and the interoperability frameworks as a whole.

216.    Plaintiffs have no adequate legal remedy and need an immediate and permanent injunction to stop Health Gorilla and the RavillaMed Defendants from continuing to abuse the Carequality and TEFCA frameworks, order that Health Gorilla and the RavillaMed Defendants return or destroy all patient records that were improperly obtained from the Carequality and TEFCA frameworks, and enjoin Defendants from any further improper dissemination, disclosure, or sale of any patient record that was improperly obtained from the Carequality or TEFCA frameworks.

217.    Plaintiffs seek this injunctive relief for themselves and the general public of the State of California.

## SECOND CAUSE OF ACTION

### FRAUD

### (Against Health Gorilla and the Mammoth Defendants)

218.    Plaintiffs repeat and reallege the preceding paragraphs hereof, as if fully set forth herein.

219.    From July 2024 through October 2025, Mammoth (through Defendants Mammoth Dx and Mammoth Path Solutions), using Health Gorilla's provided connection to the Carequality and TEFCA frameworks, obtained thousands of patient records of Epic's and OCHIN's healthcare provider customers, in California and other states, including records obtained from Plaintiffs Reid, Trinity, UMass Memorial Health, and others.  Mammoth obtained those patient records based on the assertion that the patient records were all being sought for treatment purposes.

220.    Those assertions were false because Mammoth's true purpose for seeking those patient records was to further the Mammoth Defendants' commercial interests by selling the patient records, either directly to undisclosed law firms and other third parties, or to and through an intermediary such as Defendant Mammoth Rx.

221.   Mammoth knew that the treatment representations were false at the time they were made for all patient records relating to persons who were not under Mammoth's medical care and for which Mammoth sought access to the patient records for the Mammoth Defendants' own commercial purposes and the monetary gain of Mammoth and the rest of the Mammoth Defendants, and not for the treatment purposes that were asserted in connection with the patient records requests.

222.   Mammoth intended for Plaintiffs to rely on the false treatment-purpose representations so that Mammoth could obtain the patient records.  Mammoth knew that Mammoth could not obtain the patient records if Mammoth misrepresented its true purpose for seeking patient records, in violation of the requirements of Carequality, TEFCA, and the law, including without limitation, HIPAA.

223.   Defendant Hilton was the authorized official for multiple Mammoth-entity NPIs.  Defendant Hilton made or directed the above false statements on Mammoth's behalf as Mammoth's authorized NPI, which Mammoth held out as evidence of treatment purposes, acting in concert with Defendants Baker and Toovey, two closely connected and leading members of the "Mammoth Family" of companies.  As explained above, those statements were knowingly false with respect to all requests for patient records relating to persons whom Mammoth was not providing medical treatment and requests for patient records that were sought for the true, but unstated, purpose of financially benefitting the Mammoth Defendants, who sought to sell the patient records, either directly to undisclosed law firms and other third parties, or to and through an intermediary such as Defendant Mammoth Rx.

224.  Hilton further falsely asserted that Mammoth was not connected to Defendant Baker, when presented evidence of the close connection and the suspicions it raised about Mammoth's true motivations.  Meanwhile, Defendant Baker omitted that he was deeply connected with Mammoth, including through his role as the co-founder and CTO of Mammoth Rx.  Defendant Toovey, the Chief Commercial and Strategy Officer of Mammoth Rx similarly omitted Defendant Baker's connection to Mammoth.  These

material misrepresentations and omissions are critical, because in October 2024, Carequality banned any entity or entities owned or operated by Defendant Baker from the Carequality framework for one year, with reinstatement permitted only if the Carequality Sterring Committee approved the reinstatement.

225. Hilton, Baker, and Toovey knew these assertions were false. They knew that the treatment representations were false at the time they were made for all patient records relating to persons who were not under Mammoth's medical care and for which Mammoth sought access to the patient records for their and Mammoth's own commercial purposes and the monetary gain of themselves and Mammoth, and not for the treatment purposes that were asserted in connection with the patient records requests. And they knew that Mammoth's connection with Baker should have disqualified Mammoth from the Carequality framework entirely and that the same underlying logic would apply equally to the TEFCA framework, in view of the serious patient privacy concerns.

226. Hilton, Baker, and Toovey intended for Plaintiffs to rely on the false treatment-purpose representations, Hilton's NPI, and the misrepresentations and omissions concerning Baker's connection to Mammoth so that Mammoth could obtain the patient records. Hilton, Baker, and Toovey knew that neither they nor Mammoth could obtain the patient records if they and Mammoth misrepresented their true purpose for seeking patient records, in violation of the requirements of Carequality, TEFCA, and the law, including without limitation, HIPAA. Hilton, Baker, and Toovey also knew that they had to falsely represent and omit the fact that Baker was deeply connected with Mammoth in order to obtain the patient records, in light of Baker's prior misconduct.

227. In onboarding Mammoth to the Carequality and TEFCA frameworks, Health Gorilla falsely asserted that Mammoth sought to join the frameworks for legitimate treatment purposes. Further, despite the clear connection between Mammoth and Defendant Baker, Health Gorilla failed to comply with its contractual obligations to ensure that Mammoth was using the frameworks only for legitimate permitted purposes. Disregarding the warning signs and its duties to protect patient privacy, Health Gorilla

PLAINTIFFS' COMPLAINT

failed to verify that Mammoth was a healthcare provider with a legitimate treatment purpose when onboarding Mammoth and failed to remove Mammoth after Epic alerted Health Gorilla to Mammoth's concerning behavior, instead opting to defend Mammoth, including by insisting that there was no connection between Defendants Baker and Mammoth. Health Gorilla further falsely represented that Mammoth was using its AI tools to organize clinical data, identify care gaps, and provide prioritized guidance – that is, for purported treatment purposes.

228. Health Gorilla knew those statements were false because Health Gorilla was aware that it had failed to conduct adequate vetting of its connections, it was aware that Mammoth's activity and prior conducted demonstrated that Mammoth was not accessing patient records for treatment purposes, and Health Gorilla knew that healthcare provider customer audit logs would demonstrate large spikes in unique patient records being taken by Mammoth, which suggests non-treatment purposes.

229. Health Gorilla intended for Plaintiffs to rely on these false representations to ensure RavillaMed's continued connection to the Carequality and TEFCA frameworks to ensure continued transaction volume and revenue to Health Gorilla.

230. In reliance on the foregoing false statements and omissions, healthcare provider customers of Epic and OCHIN in California and other states, and Plaintiffs Reid, Trinity and UMass Memorial Health, provided Mammoth with patient records.

231. The false statements and omissions described above were material because a reasonable person would attach importance to the representations that the request for patient records was for treatment purposes in deciding whether to respond with patient records. The misrepresentations and omissions were material to Plaintiffs.

232. Plaintiffs were reasonably justified in relying on these false statements and omissions because, as a member of the Carequality Framework and TEFCA, Mammoth was bound by the CC Terms, applicable Carequality policies, TEFCA ToPs, and applicable TEFCA SOPs that prohibit disclosure of patient records outside of a permitted purpose. Similarly, Plaintiffs were reasonably justified in relying on these false

PLAINTIFFS' COMPLAINT

statements and omissions because, as a member of the Carequality and TEFCA frameworks, Health Gorilla was bound by the CCA, applicable Carequality policies, TEFCA Common Agreement, and applicable TEFCA SOPs.

233.  Plaintiffs have been harmed as a direct consequence of the fraudulent conduct of the Mammoth Defendants and Health Gorilla.  Plaintiffs Reid, Trinity, and UMass Memorial Health have incurred operational expenses and been forced to expend resources in the form of funds and employee time to investigate the breadth of the harm and to address data integrity and privacy issues and have expended resources monitoring and attempting to mitigate the harm caused by the Mammoth Defendants and Health Gorilla.  Epic and OCHIN have been harmed in the same way, and they have also incurred costs in connection with responding to fraudulent requests for records, suffered losses in employee time and diversion of resources to investigate and address this fraud and the complaints that have been raised by healthcare providers concerning the wrongdoing and its effects on data integrity, privacy, and the interoperability frameworks as a whole.

234.  Plaintiffs have no adequate legal remedy and need an immediate and permanent injunction to stop Health Gorilla and the Mammoth Defendants from continuing to abuse the Carequality and TEFCA frameworks, order that Health Gorilla and the Mammoth Defendants return or destroy all patient records that were improperly obtained from the Carequality and TEFCA frameworks, and enjoin Defendants from any further improper dissemination, disclosure, or sale of any patient record that was improperly obtained from the Carequality or TEFCA frameworks.

235.  Plaintiffs seek this injunctive relief for themselves and the general public of the State of California.

### THIRD CAUSE OF ACTION

### FRAUD

### (Against Health Gorilla and the Unit 387 Defendants)

236.  Plaintiffs repeat and reallege the preceding paragraphs hereof, as if fully set forth herein.

67

237.    From September 2022 through November 2025, Unit 387's customer SelfRx, using Health Gorilla's provided connection to the Carequality framework, obtained thousands of patient records of Epic's and OCHIN's healthcare provider customers, in California and other states, including records obtained from Plaintiffs Reid, Trinity, UMass Memorial Health, and others.  From September 2024 through November 2025, Unit 387's customer GuardDog, using Health Gorilla's provided connection to the Carequality framework, obtained thousands of patient records of Epic's and OCHIN's healthcare provider customers, in California and other states, including records obtained from Plaintiffs Reid, Trinity, UMass Memorial Health, and others.  SelfRx and GuardDog obtained those patient records based on the assertion that the patient records were all being sought for treatment purposes.

238.    Those assertions were false because SelfRx's and GuardDog's true purposes for seeking those patient records was to further the Unit 387 Defendants' commercial interests by selling the patient records, either directly to undisclosed law firms and other third parties, or to and through an intermediary such as Defendant Hoppr.

239.    SelfRx and GuardDog knew that the treatment representations were false at the time they were made for all patient records relating to persons who were not under SelfRx's or GuardDog's medical care and for which SelfRx or GuardDog sought access to the patient records for the Unit 387 Defendants' own commercial purposes and the monetary gain of SelfRx, GuardDog, and the rest of the Mammoth Defendants, and not for the treatment purposes that were asserted in connection with the patient records requests.

240.    SelfRx and GuardDog intended for Plaintiffs to rely on the false treatment-purpose representations so that SelfRx and GuardDog could obtain the patient records. SelfRx and GuardDog knew that neither SelfRx nor GuardDog could obtain the patient records if they misrepresented their true purpose for seeking patient records, in violation of the requirements of Carequality, and the law, including without limitation, HIPAA.

241.   Defendant Manak, the CEO of Unit 387 and founder of Hoppr, made or directed the false statements or fraudulently omitted them when acting as the candidate implementer to SelfRx and GuardDog and thereby granting SelfRx and GuardDog with access to the Carequality framework through Health Gorilla.  Manak also fraudulently omitted her connection with Hoppr to other participants in Carequality outside the circle of trust between the Unit 387 Defendants and Health Gorilla, and their respective affiliates and confidantes, so that no one else was advised that Unit 387 was being operated by a person with known ties to the mass tort industry and who actively owned and operated Hoppr, which is in the business of selling patient records for litigation-related purposes and not providing treatment.  Hoppr, acting at the direction and control of Manak, similarly omitted to inform Carequality or Plaintiffs of its connection or role in the Unit 387 Defendants' scheme.

242.   Unit 387, SelfRx, GuardDog, and Manak intended for Plaintiffs to rely on the false treatment-purpose representations, and the omissions concerning Manak and Hoppr's connection so that SelfRx and GuardDog could obtain the patient records.  The Unit 387 Defendants knew that they could not obtain the patient records if they misrepresented their true purpose for seeking patient records, in violation of the requirements of Carequality and the law, including without limitation, HIPAA.  The Unit 387 Defendants also knew that omitting the connection with Manak and Hoppr would assist them in evading detection, given the healthcare industry's growing experience with bad actors' abuses of the interoperability frameworks as described above.

243.   In allowing Unit 387 to onboard SelfRx and GuardDog to the Carequality framework, Health Gorilla falsely asserted that SelfRx and GuardDog sought to join the framework for legitimate treatment purposes.  Further, despite the clear red flag presented by the deep connections between the Unit 387 Defendants and Manak, Health Gorilla failed to comply with its contractual obligations to ensure that the Unit 387 Defendants were using the frameworks only for legitimate permitted purposes.  Disregarding the warning signs and its duties to protect patient privacy, Health Gorilla failed to verify that

Unit 387 was only onboarding healthcare providers with legitimate treatment purposes and failed to remove Unit 387's candidate implementer status and Unit 387's customers SelfRx and GuardDog after Epic alerted Health Gorilla to Unit 387's concerning behavior.

244. Health Gorilla knew the statements were false because Health Gorilla was aware that it had failed to conduct adequate vetting of its connections, it was aware that SelfRx's and GuardDog's activity demonstrated that they were not accessing patient records for treatment purposes, and Health Gorilla knew that healthcare provider customer audit logs would demonstrate large spikes in unique patient records being taken by them, which suggests non-treatment purposes.

245. Health Gorilla intended for Plaintiffs to rely on these false representations to ensure Unit 387's continued status as a candidate implementer and SelfRx's and GuardDog's continued connection to the Carequality and framework to ensure continued transaction volume and revenue to Health Gorilla.

246. In reliance on the foregoing false statements and omissions, healthcare provider customers of Epic and OCHIN in California and other states, and Plaintiffs Reid, Trinity and UMass Memorial Health, provided SelfRx and GuardDog with patient records.

247. These false statements and omissions described above were material because a reasonable person would attach importance to the representations that the request for patient records was for treatment purposes in deciding whether to respond with patient records. The misrepresentations and omissions were material to Plaintiffs.

248. Plaintiffs were reasonably justified in relying on these false statements and omissions because, as a member of the Carequality Framework, Unit 387, SelfRx and GuardDog were bound by the CC Terms, applicable Carequality policies that prohibit disclosure of patient records outside of a permitted purpose. Similarly, Plaintiffs were reasonably justified in relying on these false statements and omissions because, as a

70

member of the Carequality, Health Gorilla was bound by the CCA, applicable Carequality policies.

249.   Plaintiffs have been harmed as a direct consequence of the fraudulent conduct of the Unit 387 Defendants and Health Gorilla.  Plaintiffs Reid, Trinity, and UMass Memorial Health have incurred operational expenses and been forced to expend resources in the form of funds and employee time to investigate the breadth of the harm and to address data integrity and privacy issues and have expended resources monitoring and attempting to mitigate the harm caused by the Unit 387 Defendants and Health Gorilla.  Epic and OCHIN have been harmed in the same way, and they have also incurred costs in connection with responding to fraudulent requests for records, suffered losses in employee time and diversion of resources to investigate and address this fraud and the complaints that have been raised by healthcare providers concerning the wrongdoing and its effects on data integrity, privacy, and the interoperability frameworks as a whole.

250.   Plaintiffs have no adequate legal remedy and need an immediate and permanent injunction to stop Health Gorilla and the Unit 387 Defendants from continuing to abuse the Carequality framework, order that Health Gorilla and the Unit 387 Defendants return or destroy all patient records that were improperly obtained from the Carequality framework, enjoin Health Gorilla and the Unit 387 Defendants from any further improper dissemination, disclosure, or sale of any patient record that was improperly obtained from the Carequality framework, and prevent any future similar abuse or misconduct relating to the TEFCA framework.

251.   Plaintiffs seek this injunctive relief for themselves and the general public of the State of California.

## FOURTH CAUSE OF ACTION

### AIDING AND ABETTING FRAUD

### (Against Health Gorilla, Ravilla, and Saidon)

252.   Plaintiffs repeat and reallege the preceding paragraphs hereof, as if fully set forth herein.

71

253.   As described above, the RavillaMed Defendants made false statements of material fact and omitted material facts to induce Plaintiffs into facilitating access to patient records, which they would not have done had they known the true purpose of the requests.  Plaintiffs justifiably relied on those representations and omissions to Plaintiffs' detriment.

254.   At all relevant times, Defendants Ravilla and Saidon knew that RavillaMed was misstating its true purpose and that its treatment-purpose requests were false because RavillaMed's true purposes for seeking those patient records was to further the RavillaMed Defendants' commercial interests by selling the patient records, either directly to undisclosed law firms and other third parties, or to and through an intermediary such as Defendant LlamaLab.

255.   Ravilla and Saidon provided substantial assistance to RavillaMed's fraud by knowingly facilitating the false representations and omissions that were essential to the scheme described herein by either making the false representations and omissions themselves as described above or providing cover for the false representations and omissions and enabling Ravilla to make the fraudulent requests despite knowing that the patient records were not requested for treatment purposes – they were critically integral to the success of RavillaMed's scheme.

256.   At all relevant times, Health Gorilla knew that RavillaMed's treatment-purpose representations were false, as Health Gorilla had the clear red flag of Metriport's actions, the grave concerns raised by Epic about the RavillaMed Defendants, and the healthcare provider customer audit logs bearing clear indicia of the rampant misconduct.

257.   Health Gorilla has provided substantial assistance to the RavillaMed Defendants' fraud by affirmatively representing that RavillaMed was providing treatment, providing RavillaMed's connections to the Carequality and TEFCA frameworks to make fraudulent requests patient records, and defending RavillaMed's connections instead of removing RavillaMed from the Carequality and TEFCA frameworks in the face of overwhelming evidence of misconduct.

258.   Plaintiffs have been harmed as a direct consequence of this fraudulent conduct.  Plaintiffs Reid, Trinity, and UMass Memorial Health have incurred operational expenses and been forced to expend resources in the form of funds and employee time to investigate the breadth of the harm and to address data integrity and privacy issues and have expended resources monitoring and attempting to mitigate the harm caused by Defendants Health Gorilla, Ravilla and Saidon.  Epic and OCHIN have been harmed in the same way, and they have also incurred costs in connection with responding to fraudulent requests for records, suffered losses in employee time and diversion of resources to investigate and address this fraud and the complaints that have been raised by healthcare providers concerning the wrongdoing and its effects on data integrity, privacy, and the interoperability frameworks as a whole.

259.   Plaintiffs have no adequate legal remedy and need an immediate and permanent injunction to stop Defendants Health Gorilla, Ravilla and Saidon from continuing to abuse the Carequality and TEFCA frameworks, order that Defendants Health Gorilla, Ravilla and Saidon return or destroy all patient records that were improperly obtained from the Carequality and TEFCA frameworks, and enjoin Defendants Health Gorilla, Ravilla and Saidon from any further improper dissemination, disclosure, or sale of any patient record that was improperly obtained from the Carequality or TEFCA frameworks.

260.   Plaintiffs seek this injunctive relief for themselves and the general public of the State of California.

## **FIFTH CAUSE OF ACTION**

### **AIDING AND ABETTING FRAUD**

### **(Against Health Gorilla, Hilton, Baker, and Toovey)**

261.   Plaintiffs repeat and reallege the preceding paragraphs hereof, as if fully set forth herein.

262.   As described above, the Mammoth Defendants made false statements of material fact and omitted material facts to induce Plaintiffs into facilitating access to

73

patient records, which they would not have done had they known the true purpose of the requests. Plaintiffs justifiably relied on those representations and omissions to Plaintiffs' detriment.

263.   At all relevant times, Hilton, Baker, and Toovey knew that Mammoth was misstating its true purpose and that its treatment-purpose requests were false because Mammoth's true purposes for seeking those patient records was to further the Mammoth Defendants' commercial interests by selling the patient records, either directly to undisclosed law firms and other third parties, or to and through an intermediary such as Defendant Mammoth Rx.

264.   Hilton, Baker, and Toovey provided substantial assistance to Mammoth's fraud by knowingly facilitating the false representations and omissions that were essential to the scheme described herein by either making the false representations and omissions themselves as described above or providing cover for the false representations and omissions and enabling Mammoth to make the fraudulent requests despite knowing that the patient records were not requested for treatment purposes – they were critically integral to the success of Mammoth's scheme.

265.   At all relevant times, Health Gorilla knew that Mammoth's treatment-purpose representations were false, as Health Gorilla had the clear red flag of Defendant Baker's involvement, the grave concerns raised by Epic about the Mammoth Defendants, and the healthcare provider customer audit logs bearing clear indicia of the rampant misconduct.

266. Health Gorilla has provided substantial assistance to the Mammoth Defendants' fraud by affirmatively representing that Mammoth was providing treatment, providing Mammoth's connections to the Carequality and TEFCA frameworks to make fraudulent requests patient records, and defending Mammoth's connections instead of removing Mammoth from the Carequality and TEFCA frameworks in the face of overwhelming evidence of misconduct.

267.   Plaintiffs have been harmed as a direct consequence of this fraudulent conduct.  Plaintiffs Reid, Trinity, and UMass Memorial Health have incurred operational expenses and been forced to expend resources in the form of funds and employee time to investigate the breadth of the harm and to address data integrity and privacy issues and have expended resources monitoring and attempting to mitigate the harm caused by Defendants Health Gorilla, Hilton, Baker, and Toovey.  Epic and OCHIN have been harmed in the same way, and they have also incurred costs in connection with responding to fraudulent requests for records, suffered losses in employee time and diversion of resources to investigate and address this fraud and the complaints that have been raised by healthcare providers concerning the wrongdoing and its effects on data integrity, privacy, and the interoperability frameworks as a whole.

268.   Plaintiffs have no adequate legal remedy and need an immediate and permanent injunction to stop Defendants Health Gorilla, Hilton, Baker, and Toovey from continuing to abuse the Carequality framework, order that Defendants Health Gorilla, Hilton, Baker, and Toovey return or destroy all patient records that were improperly obtained from the Carequality frameworks, and enjoin Defendants Health Gorilla, Hilton, Baker, and Toovey from any further improper dissemination, disclosure, or sale of any patient record that was improperly obtained from the Carequality frameworks.

269.   Plaintiffs seek this injunctive relief for themselves and the general public of the State of California.

## SIXTH CAUSE OF ACTION

### AIDING AND ABETTING FRAUD

### (Against Health Gorilla and the Unit 387 Defendants)

270.   Plaintiffs repeat and reallege the preceding paragraphs hereof, as if fully set forth herein.

271.   As described above, the Unit 387 Defendants made false statements of material fact and omitted material facts to induce Plaintiffs into facilitating access to patient records, which they would not have done had they known the true purpose of the

75

requests.  Plaintiffs justifiably relied on those representations and omissions to Plaintiffs' detriment.

272.   At all relevant times, Manak knew that Unit 387's customers SelfRx and GuardDog were misstating their true purposes and that their treatment-purpose requests were false with respect to certain patient records because SelfRx and GuardDog's true purposes for seeking those patient records was to further the Unit 387 Defendants' commercial interests by selling the patient records, either directly to undisclosed law firms and other third parties, or to and through an intermediary such as Defendant Hoppr.

273.   Manak provided substantial assistance to SelfRx's and GuardDog's fraud by knowingly facilitating the false representations and omissions that were essential to the scheme described herein by either making the false representations and omissions themselves as described above or providing cover for the false representations and omissions and enabling Unit 387 to make the fraudulent requests despite knowing that the patient records were not requested for treatment purposes – they were critically integral to the success of Unit 387's scheme.

274.   At all relevant times, Health Gorilla knew that Unit 387's customers SelfRx and GuardDog's treatment-purpose representations were false, as Health Gorilla had the clear red flag of Manak's involvement, the grave concerns raised by Epic about the Unit 387 Defendants, and the healthcare provider customer audit logs bearing clear indicia of the rampant misconduct.

275.  Health Gorilla has provided substantial assistance to the Unit 387 Defendants' fraud by affirmatively representing that Unit 387's customers SelfRx and GuardDog were providing treatment, providing these entities' connections to the TEFCA framework to make fraudulent requests patient records, and failing to remove Unit 387, SelfRx or GuardDog from the TEFCA framework in the face of overwhelming evidence of misconduct.

276.  Plaintiffs have been harmed as a direct consequence of this fraudulent conduct.  Plaintiffs Reid, Trinity, and UMass Memorial Health have incurred operational

expenses and been forced to expend resources in the form of funds and employee time to investigate the breadth of the harm and to address data integrity and privacy issues and have expended resources monitoring and attempting to mitigate the harm caused by Defendants Health Gorilla and Manak. Epic and OCHIN have been harmed in the same way, and they have also incurred costs in connection with responding to fraudulent requests for records, suffered losses in employee time and diversion of resources to investigate and address this fraud and the complaints that have been raised by healthcare providers concerning the wrongdoing and its effects on data integrity, privacy, and the interoperability frameworks as a whole.

277. Plaintiffs have no adequate legal remedy and need an immediate and permanent injunction to stop Defendants Health Gorilla and Manak from continuing to abuse the Carequality framework, order that Defendants Health Gorilla and Manak return or destroy all patient records that were improperly obtained from the Carequality framework, enjoin Defendants Health Gorilla and Manak from any further improper dissemination, disclosure, or sale of any patient record that was improperly obtained from the Carequality framework, and prevent any future similar abuse or misconduct relating to the TEFCA framework.

278. Plaintiffs seek this injunctive relief for themselves and the general public of the State of California.

### SEVENTH CAUSE OF ACTION

### CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200 ET SEQ.

### (Against All Defendants)

279. Plaintiffs repeat and reallege the preceding paragraphs hereof, as if fully set forth herein.

280. California Business & Professions Code Section 17200 prohibits unlawful and fraudulent business acts or practices.

281.   California Business & Professions Code Section 17204 provides a private right of action to Plaintiffs because they have suffered an injury in fact and lost money or property as a result of Defendants' conduct described herein.

282.   Defendants engaged in unlawful and fraudulent business practices by misrepresenting the purposes for which they sought patient records, thereby obtaining records in California they were not authorized to access or disclose and otherwise misusing those patient records for improper purposes, including by selling of offering for sale those patient records.

283.   The acts described above by Defendants constitute unlawful and fraudulent acts and practices within the meaning of California Business and Professions Code Section 17200 et seq.   These acts are fraudulent and unlawful because they violated multiple independent state and federal laws, including but not limited to the following:

    a.   42 U.S.C. § 1320d-6, which prohibits persons from knowingly obtaining or disclosing individually identifiable health information without authorization, and which specifically addresses those acting under false pretenses or with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm;

    b.   45 C.F.R. § 164.502(a), which provides that a covered entity or business associate may not use or disclose PHI, except as permitted or required by HIPAA (e.g., for treatment, payment, or healthcare operations purposes);

    c.   45 C.F.R. § 164.508, which provides that a covered entity may not use or disclose PHI without an authorization that is valid under this section, except as permitted or required by the HIPAA Privacy Rule. This requirement extends to business associates through their business associate agreements (including by virtue of 45 C.F.R. § 164.504(e)(2)(ii)(H)) and 45 C.F.R. § 164.502(a)(3);

    45 C.F.R. § 164.502(b), which requires covered entities and their business associates to make "reasonable efforts" to limit their requests for or and uses and disclosures of PHI to the "minimum necessary" amount needed for the intended purpose, subject to exceptions not applicable here;

    d.   45 C.F.R. § 164.502(a)(3), which prohibits a business associate from using or disclosing PHI in a manner that is neither permitted by its contract with a covered entity nor required by law, and which specifies that a business associate may not use or disclose PHI in a manner that would violate the requirements of the HIPAA Privacy Rule if done by the covered entity;

    e.   45 C.F.R. § 164.514(h), which requires a covered entity to verify the identity and authority of any person requesting PHI, prior to disclosing PHI to such person, if the identity or authority of the requestor is not known,

subject to limited exceptions not applicable here.  This requirement extends to business associates through their business associate agreements (including by virtue of 45 C.F.R. § 164.504(e)(2)(ii)(H)) and 45 C.F.R. § 164.502(a)(3); and

f.  The Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *see* Count 10.

284.   Plaintiffs have been harmed as a direct consequence of the unlawful and fraudulent conduct of the Defendants.  Plaintiffs Reid, Trinity, and UMass Memorial Health have incurred operational expenses and been forced to expend resources in the form of funds and employee time to investigate the breadth of the harm and to address data integrity and privacy issues and have expended resources monitoring and attempting to mitigate the harm caused by the Defendants.  Epic and OCHIN have been harmed in the same way, and they have also incurred costs in connection with responding to fraudulent requests for records, suffered losses in employee time and diversion of resources to investigate and address this fraud and the complaints that have been raised by healthcare providers concerning the wrongdoing and its effects on data integrity, privacy, and the interoperability frameworks as a whole.

285.   Plaintiffs have no adequate legal remedy and need an immediate and permanent injunction to stop Defendants from continuing to abuse the Carequality and TEFCA frameworks, order that Defendants return or destroy all patient records that were improperly obtained from the Carequality and TEFCA frameworks, and enjoin Defendants from any further improper dissemination, disclosure, or sale of any patient record that was improperly obtained from the Carequality or TEFCA frameworks.

286.   Plaintiffs seek this injunctive relief for themselves and the general public of the State of California.  *See* Cal. Bus. & Prof. Code § 17203.

/ / /

/ / /

/ / /

/ / /

/ / /

## EIGHTH CAUSE OF ACTION

### BREACH OF CONTRACT

### (Against Health Gorilla)

287. Plaintiffs repeat and reallege the preceding paragraphs hereof, as if fully set forth herein.

288. The elements of breach of contract are: (1) existence of a contract; (2) performance by the plaintiff (or excuse for nonperformance); (3) defendant's breach; and (4) resulting damages to the plaintiff.

289. The CCA and the CC Terms for the Carequality framework are valid and enforceable contracts. The Common Agreement and the ToPs governing participation in the TEFCA framework are valid and enforceable contracts.

290. In California, "a contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it."  Cal. Civ. Code § 1559.  In Michigan, "any person for whose benefit a promise is made by way of contract, as hereinafter defined, has the same right to enforce said promise that he would have had if the said promise had been made directly to him as the promise."  Mich. Comp. Laws Ann. § 600.1405.  Similarly, the common law in Indiana, Massachusetts, and Oregon recognizes the right of a third party to enforce a contract made expressly for its benefit.

291. Plaintiffs are express third-party beneficiaries of the CC Terms.  Section 16.2 of the CC Terms expressly deems other Implementers and CCs (such as Plaintiffs) to be third party beneficiaries for the purpose of enforcing compliance with the CC Terms.

292. Epic is an express third-party beneficiary of the CCA. Section 21.6 expressly deems other Implementers (such as Epic) to be third party beneficiaries for the purposes of enforcing acceptable use, compliance with the Implementation Guides and Carequality Policies, as well as harm suffered by Implementer's willful or reckless act or intentional misconduct.

293. OCHIN, Reid, Trinity, and UMass Memorial Health are also third-party beneficiaries of the CCA between Health Gorilla and Carequality.  OCHIN, Reid, Trinity,

and UMass Memorial Health benefit from these agreements because, once it took effect, records could be exchanged between Plaintiffs and Health Gorilla's CCs. Facilitating this type of exchange was a motivating purpose behind these contracts – indeed, it is the primary function of the Carequality framework.

294. Health Gorilla breached Section 16.2 of the CCA by allowing RavillaMed, Mammoth, Unit 387, SelfRx and GuardDog to use its platform to make fraudulent requests for patient data. Section 16.2 of the CCA provides that:

    a. "Carequality is providing Applicant with access to, and the right to use, the Carequality Directory on the express condition that Applicant only use and disclose information contained in the Carequality Directory as necessary to advance the intended use of the Carequality Directory."

    b. "In no event shall Applicant use the information contained in the Carequality Directory in a manner that would be reasonably expected to have a detrimental effect on another Party, Implementer, Carequality Connection, End User, or other individual or organization."

295. Health Gorilla's assistance to its CCs fraudulent requests also breached Section 13 of the CCA, which provides that: "Applicant shall only engage in exchange activities through the Carequality Elements for permitted purposes as defined in the Implementation Guides."

296. Plaintiffs are also third-party beneficiaries of the TEFCA Common Agreement between Health Gorilla and the RCE, as well as the ToPs between Health Gorilla and RavillaMed and Mammoth. Plaintiffs benefit from these agreements because, once they took effect, records could be exchanged between Plaintiffs and Health Gorilla's Participants and Subparticipants. Facilitating this type of exchange was a motivating purpose behind these contracts – indeed, it is the primary function of TEFCA.

297. Allowing Plaintiffs to pursue a breach of contract claim against Defendants Health Gorilla, RavillaMed, and Mammoth aligns with the reasonable expectations of the parties when entering the ToPs and the Common Agreement. Joining TEFCA means joining a network of networks founded on principles of trust essential for the exchange of highly sensitive information. The parties would have reasonably anticipated liability if

TEFCA were used to request patient records from another participant for an impermissible purpose within the framework.

298.   By allowing RavillaMed and Mammoth to use its platform to make fraudulent requests for patient data, Health Gorilla breached several sections of the Common Agreement, including:

    a.   Section 9.1: "[s]ignatory may only utilize Designated Network Services for purposes of facilitating TEFCA Exchange.  TEFCA Exchange may only be utilized for an XP.  […] All TEFCA Exchange is governed by and must comply with the Framework Agreements governing the QHINs, Participants, and Subparticipants."

    b.   Section 9.2: "[s]ignatory may Use TI in any manner that: (i) is not prohibited by Applicable Law; (ii) is consistent with Signatory's Privacy and Security Notice, if applicable; and (iii) is in accordance with Sections 11 and 12 of this Common Agreement, if applicable."

299.   Plaintiffs have been harmed as a direct consequence of Health Gorilla's breach of contract.  Plaintiffs Reid, Trinity, and UMass Memorial Health have incurred operational expenses and been forced to expend resources in the form of funds and employee time to investigate the breadth of the harm and to address data integrity and privacy issues and have expended resources monitoring and attempting to mitigate the harm caused by the Defendants.  Epic and OCHIN have been harmed in the same way, and they have also incurred costs in connection with responding to fraudulent requests for records, suffered losses in employee time and diversion of resources to investigate and address this fraud and the complaints that have been raised by healthcare providers concerning the wrongdoing and its effects on data integrity, privacy, and the interoperability frameworks as a whole.

300.   Plaintiffs have no adequate legal remedy and need an immediate and permanent injunction to stop Defendants from continuing to abuse the Carequality and TEFCA frameworks, order that Defendants return or destroy all patient records that were improperly obtained from the Carequality and TEFCA frameworks, and enjoin Defendants from any further improper dissemination, disclosure, or sale of any patient record that was improperly obtained from the Carequality or TEFCA frameworks.

301.   Plaintiffs seek this injunctive relief for themselves and the general public of the State of California.

**NINTH CAUSE OF ACTION**

**BREACH OF CONTRACT**

**(Against RavillaMed, Mammoth, and Unit 387)**

302.   Plaintiffs repeat and reallege the preceding paragraphs hereof, as if fully set forth herein.

303.   The elements of breach of contract are: (1) existence of a contract; (2) performance by the plaintiff (or excuse for nonperformance); (3) defendant's breach; and (4) resulting damages to the plaintiff.

304.   The CCA and the CC Terms governing participation in the Carequality framework are valid and enforceable contracts.  The Common Agreement and the ToPs governing participation in the TEFCA framework are valid and enforceable contracts.

305.   In California, "a contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it."  Cal. Civ. Code § 1559.  In Michigan, "any person for whose benefit a promise is made by way of contract, as hereinafter defined, has the same right to enforce said promise that he would have had if the said promise had been made directly to him as the promise."  Mich. Comp. Laws Ann. § 600.1405.  Similarly, the common law in Indiana, Massachusetts, and Oregon recognizes the right of a third party to enforce a contract made expressly for its benefit.

306.   Plaintiffs are express third-party beneficiaries of the CC Terms.  Section 16.2 of the CC Terms expressly deems other Implementers and CCs (such as Plaintiffs) to be third party beneficiaries for the purpose of enforcing compliance with the CC Terms.

307.   Epic is an express third-party beneficiary of the CCA.   Section 21.6 expressly deems other Implementers (such as Epic) to be third party beneficiaries for the purposes of enforcing acceptable use, compliance with the Implementation Guides and Carequality Policies, as well as harm suffered by Implementer's willful or reckless act or intentional misconduct.

308.    OCHIN, Reid, Trinity, and UMass Memorial Health are also third-party beneficiaries of the CCA between Health Gorilla and Carequality. OCHIN, Reid, Trinity, and UMass Memorial Health benefit from these agreements because, once they took effect, records could be exchanged between Plaintiffs and Health Gorilla's CCs. Facilitating this type of exchange was a motivating purpose behind these contracts – indeed, it is the primary function of the Carequality framework.

309.    By submitting fraudulent requests for patient data to conceal that the requests were not made for a permitted purpose, RavillaMed, Mammoth, and Unit 387 breached Section 5 of the CC Terms, which states: "For all Carequality Use Cases supported by Organization, Organization shall comply with all components (unless such components are designated as optional) set forth in the applicable Implementation Guide that apply to (i) the Organization's Carequality Use Case Role or (ii) all Carequality Connections."

310.    The fraudulent requests made by RavillaMed, Mammoth, and Unit 387 also breached Section 12 of the CC Terms, which states:

   a. "Organization shall only engage in exchange activities through the Carequality Elements for permitted purposes as defined in the Implementation Guides."

   b. "If Organization is not a Covered Entity or Governmental entity, then (i) Organization may only use the interoperability available through Carequality to transmit or receive information on behalf of its End Users and not on its own behalf; and (ii) Organization will not re-use, re-disclose, aggregate, de-identify or sell any information transacted by its End Users for its own benefit unless its respective Carequality Connections or End Users have given Organization the explicit written authority to do so."

311.    These sections mandate compliance with the applicable Implementation Guide, which requires the CC to request data for treatment purposes only if it is actually providing treatment as defined by HIPAA (see Sections 3.1 and 4.1). RavillaMed, Mammoth, and Unit 387 violated these provisions by requesting patient records under the guise of treatment purposes to conceal that the true reason for the request was not a permitted purpose under the Implementation Guide.

312.    Plaintiffs are also third-party beneficiaries of the TEFCA Common Agreement between Health Gorilla and the RCE, as well as the ToPs between Health

Gorilla and RavillaMed and Mammoth. Plaintiffs benefit from these agreements because, once they took effect, records could be exchanged between Plaintiffs and Health Gorilla's Participants and Subparticipants. Facilitating this type of exchange was a motivating purpose behind these contracts – indeed, it is the primary function of TEFCA.

313. Allowing Plaintiffs to pursue a breach of contract claim against Defendants Health Gorilla, RavillaMed, and Mammoth aligns with the reasonable expectations of the parties when entering the ToPs and the Common Agreement. Joining TEFCA means joining a network of networks founded on principles of trust essential for the exchange of highly sensitive information. The parties would have reasonably anticipated liability if TEFCA were used to request patient records from another participant for an impermissible purpose within the framework.

314. For TEFCA, Section 7.4.1 of the Common Agreement provides that, to the extent not prohibited by applicable law, the QHIN "shall be responsible for its acts and omissions, and the acts or omissions of its Participants and their Subparticipants[…]."

315. By submitting fraudulent requests for patient data to conceal that the requests were not made for a permitted purpose, RavillaMed, Mammoth, and Unit 387 breached several provisions of the ToPs, including:

    a. Section 5.1: "[y]ou may only utilize TEFCA Exchange for an XP [exchange purpose][…]. All TEFCA Exchange is governed by and must comply with the Framework Agreements [with respect to QHINs, the Common Agreement; and with respect to a Participant or Subparticipant, the ToPs] governing the QHINs, Participants, and Subparticipants engaging in the TEFCA Exchange."

    b. Section 5.2: "[y]ou may Use TI [TEFCA Information, meaning information exchanged through TEFCA subject to some limitations] in any manner that: (i) is not prohibited by Applicable Law; (ii) is consistent with Your Privacy and Security Notice, if applicable; and (iii) is in accordance with Sections 7 and 8 of these ToP."

    c. Section 7.1, which provides that Participants who are Non-HIPAA Entities (i.e., that are not "Covered Entities" or "Business Associates" under HIPAA) shall comply with the HIPAA Privacy Rule with respect to Individually Identifiable Information that is Protected Health Information.

    d. Section 9: "[Participant] shall comply with all Applicable Law and shall implement and act in accordance with any provision required by the ToP, including all applicable SOPs and provisions of the QTF, when engaging in or facilitating TEFCA Exchange."

e. Section 13.1: "[s]ignatory shall comply with all Applicable Law and shall implement and act in accordance with any provision required by this Common Agreement, including all applicable SOPs and provisions of the QTF, when providing Designated Network Services or otherwise engaging in or facilitating TEFCA Exchange."

f. Section 13.2.2: "[s]ignatory shall be responsible for taking reasonable steps to confirm that all of its Participants and Subparticipants are abiding by the ToP, all applicable SOPs, and any decisions made pursuant to Section 16.3."

g. Section 14.2: "The SOPs are incorporated by reference into this Common Agreement, and Signatory shall comply with all SOPs that are applicable to it. In the ToP, Participants and Subparticipants will agree to comply with all applicable SOPs."

316. Plaintiffs have been harmed as a direct consequence of RavillaMed's, Mammoth's, and Unit 387's breaches of contract. Plaintiffs Reid, Trinity, and UMass Memorial Health have incurred operational expenses and been forced to expend resources in the form of funds and employee time to investigate the breadth of the harm and to address data integrity and privacy issues and have expended resources monitoring and attempting to mitigate the harm caused by the Defendants. Epic and OCHIN have been harmed in the same way, and they have also incurred costs in connection with responding to fraudulent requests for records, suffered losses in employee time and diversion of resources to investigate and address this fraud and the complaints that have been raised by healthcare providers concerning the wrongdoing and its effects on data integrity, privacy, and the interoperability frameworks as a whole.

317. Plaintiffs have no adequate legal remedy and need an immediate and permanent injunction to stop Defendants from continuing to abuse the Carequality and TEFCA frameworks, order that Defendants return or destroy all patient records that were improperly obtained from the Carequality and TEFCA frameworks, and enjoin Defendants from any further improper dissemination, disclosure, or sale of any patient record that was improperly obtained from the Carequality or TEFCA frameworks.

318. Plaintiffs seek this injunctive relief for themselves and the general public of the State of California.

## **TENTH CAUSE OF ACTION**

### **COMPUTER FRAUD AND ABUSE ACT**

### **(Against RavillaMed, Mammoth, SelfRx, GuardDog)**

319.   Plaintiffs repeat and reallege the preceding paragraphs hereof, as if fully set forth herein.

320.   The Computer Fraud and Abuse Act ("CFAA") provides a private cause of action to "any person who suffers damage or loss by reason of a violation of this section […] if the conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i)." 18 U.S.C. § 1030(g).

321.   The conduct of RavillaMed, Mammoth, SelfRx, and GuardDog in this case involves three of the aforementioned factors: (I) "loss to 1 or more persons during any 1-year period … aggregating at least $5,000 in value"; (II) "the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals"; and (IV) "a threat to public health or safety." 18 U.S.C § 1030(c)(4)(A)(i).

322.   Specifically, RavillaMed, Mammoth, SelfRx, and GuardDog violated 18 U.S.C. § 1030(a)(4), which provides a cause of action against anyone who "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period."

323.   RavillaMed, Mammoth, SelfRx, and GuardDog accessed protected computers without authorization within the meaning of the CFAA.  By fraudulently obtaining access to the Carequality Framework and TEFCA based on false assertions of "treatment", RavillaMed, Mammoth, SelfRx, and GuardDog gained access to protected computers used to store sensitive patient records.

324.   As detailed above, RavillaMed, Mammoth, SelfRx, and GuardDog's actions were conducted knowingly and with the intent to defraud.  They knew that they would not be able to access the patient records if they made their true purpose known, so they specifically chose to lie by saying they were needed for treatment purposes.

325.   Through their unlawful and fraudulent actions, RavillaMed, Mammoth, SelfRx, and GuardDog gained access collectively to approximately hundreds of thousands of protected patient records stored on protected computers.

326.   By reason of the foregoing, Epic was forced to expend money in excess of $5,000 dollars over a one-year period to investigate and respond to the improper requests, including the substantial costs associated with developing and implementing specialized tools and monitoring systems to mitigate the unauthorized queries initiated by RavillaMed, Mammoth, SelfRx, and GuardDog and considerable operational expenses resulting from the need to allocate employee time and resources to investigate the breadth of the defendants' misconduct, address customer complaints, and respond to heightened concerns regarding data integrity and privacy.

327.   The conduct of RavillaMed, Mammoth, SelfRx, and GuardDog described herein poses a threat to public health and safety by undermining trust in two crucial medical interoperability frameworks. Further, the conduct of RavillaMed, Mammoth, SelfRx, and GuardDog has led to at least the potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals.

328.   Plaintiffs have been harmed as a direct consequence of RavillaMed's, Mammoth's, SelfRx's and GuardDog's violations of the CFAA. Plaintiffs Reid, Trinity, and UMass Memorial Health have incurred operational expenses and been forced to expend resources in the form of funds and employee time to investigate the breadth of the harm and to address data integrity and privacy issues and have expended resources monitoring and attempting to mitigate the harm caused by the Defendants.  Epic and OCHIN have been harmed in the same way, and they have also incurred costs in connection with responding to fraudulent requests for records, suffered losses in

PLAINTIFFS' COMPLAINT

employee time and diversion of resources to investigate and address this fraud and the complaints that have been raised by healthcare providers concerning the wrongdoing and its effects on data integrity, privacy, and the interoperability frameworks as a whole.

329.    Plaintiffs have no adequate legal remedy and need an immediate and permanent injunction to stop Defendants from continuing to abuse the Carequality and TEFCA frameworks, order that Defendants return or destroy all patient records that were improperly obtained from the Carequality and TEFCA frameworks, and enjoin Defendants from any further improper dissemination, disclosure, or sale of any patient record that was improperly obtained from the Carequality or TEFCA frameworks.

330.    Plaintiffs seek this injunctive relief for themselves and the general public of the State of California.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request judgment as follows:

1)    Enter an immediate temporary, preliminary, and permanent injunction against Defendants as follows:

    a.    Direct Health Gorilla to immediately and permanently revoke Defendants' access to the Carequality Framework and/or TEFCA, as well as such access by any successor(s) to Defendants or any entity that they own or control;

    b.    Compel Health Gorilla to notify the TEFCA RCE and Carequality of Defendants' unlawful and fraudulent conduct;

    c.    Direct Defendants to immediately cease requesting records using the TEFCA or the Carequality Framework;

    d.    Direct Defendants to delete and to discontinue any further use or dissemination of any patient health information improperly obtained from TEFCA or Carequality Framework;

2)    Award against Defendants requiring the disgorgement of Defendants' ill-gotten gains resulting from their fraudulent misconduct;

3)    Award Plaintiffs their reasonable attorney fees and costs; and

4)    Award any such other and further relief as the Court deems just and proper.

/ / /

/ / /

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury in this action on all issues so triable.

Dated:  January 13, 2026

**AKIN GUMP STRAUSS HAUER & FELD LLP**

By:  */s/ Marshall L. Baker*
    Marshall L. Baker
    Lauren E. Huennekens

By:  */s/ Anthony T. Pierce*
    Anthony T. Pierce*
    Mark R. Herring*
    Caroline L. Wolverton*
    *Pro Hac Vice App. Forthcoming*

*Attorneys for Plaintiffs*
*Epic Systems Corporation, OCHIN, Inc.,*
*Reid Hospital & Health Care Services Inc.*
*Trinity Health Corporation, and UMass Memorial*
*Health Care, Inc.*