# Exhibit A

## Carequality® Connected Agreement

This Carequality Connected Agreement (the "Agreement" or "CCA") is made by and between _____, a _____ (the "Applicant") and Carequality, Inc., a Virginia non-stock corporation ("Carequality") effective as of the date Carequality executes this Agreement (the "Effective Date"). Applicant and Carequality may be referred to in this Agreement as a "Party" or referred to collectively as "Parties".

WHEREAS, Carequality provides a strategy, process and mechanisms that will support trusted, secure, interoperable exchange of healthcare information across geographies, vendor affinities, and existing information network relationships using different data sharing networks.

WHEREAS, Carequality supports a collaborative process among industry and government to facilitate consensus and develop the essential elements needed to allow this widespread connectivity.

WHEREAS, those organizations that elect to engage in exchange activities through the Carequality Elements and execute a Carequality Connected Agreement ("Implementers") will be able to interoperate with all other Implementers and avoid the need to join multiple data exchange networks; and

WHEREAS, Applicant, by signing this Agreement, agrees to be bound by its terms and become an Implementer if approved as such.

NOW, THEREFORE, in consideration of the premises set forth below and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1.      *Definitions*:  As used herein, the following terms have the following meanings:

    1.1  <u>Adverse Security Event</u>:  The unauthorized acquisition, access, disclosure, or use of individually identifiable health information (as defined in the HIPAA Regulations) while such information is being transmitted between Implementers or Carequality Connections as specified by a Carequality Implementation Guide and pursuant to a valid CCA,  but shall not include (i) any unauthorized acquisition, access, disclosure or use of encrypted data; (ii) any unintentional acquisition, access, disclosure, or use of health information if (I) such acquisition, access, disclosure, or use was made in good faith and within the course and scope of the employment, or if not an employee, as a member of the workforce of an End User; and (II) such health information is not further acquired, accessed, disclosed or used by the End User; or (iii) any acquisition, access, disclosure or use of information that was not directly related to use of the Carequality Elements or this Agreement.

    1.2  <u>Applicable Law</u>: (i) If Applicant is not a Federal agency, all applicable statutes and regulations of the State(s) or jurisdiction(s) in which Applicant operates, as well as all applicable Federal statutes, and regulations; or (ii) if Applicant is a Federal agency, all applicable Federal statutes, regulations, standards and policy requirements of the Applicant agency.

    1.3  <u>Applicant</u>: The Party that has signed the CCA and agreed to comply with its terms as a Carequality Implementer.  This term is used to distinguish the specific organization that is a Party to this Agreement from other Implementers, and applies to that Party both during the period in which it is seeking to attain Implementer status, and after it is accepted as an Implementer.

1

1.4    Applicant Business Rule: A data sharing restriction that Applicant has adopted for itself and its customers, participants or other constituent entities.   An Applicant Business Rule may only be based on a policy decision that Applicant has made with respect to the handling of patient data identified as clinically or legally sensitive, or to the consent or authorization that is required to share data with other Implementers and Carequality Connections.   It is not necessary that the Applicant Business Rule be required by Applicable Law or be based on Applicable Law.

1.5    Business Associate: An organization that is defined as a "business associate" in 45 C.F.R. § 160.103 of the HIPAA Regulations.

1.6    Business Day(s):  Monday through Friday excluding federal or state holidays.

1.7    Carequality Connection: An organization that is properly listed in the Carequality Directory in accordance with the requirements of Section 15 of this CCA.

1.8    Carequality Connection Terms: The terms set forth in Exhibit 1, and, if applicable, as further amended by Carequality.

1.9    Carequality Directory: A set of information that includes entries for all organizations who have been accepted as Carequality Implementers, along with those organizations' Carequality Connections which serves as the definitive reference for identifying those organizations who are valid participants in exchange activities through the Carequality Elements, and for obtaining the information needed to establish technical connectivity with such organizations.

1.10   Carequality Elements:  Those elements that have been adopted by Carequality to support widespread interoperability among Implementers including, but not limited to, the Carequality Connected Agreement, the Carequality Connection Terms, the Carequality Directory, Implementation Guides, and the Carequality Policies.

1.11   Carequality Policies: Those policies and procedures adopted by Carequality which are binding on Carequality, Implementers, Carequality Connections or all of them.

1.12   Carequality Use Case: A combination of a set of functional needs and a particular technical architecture for addressing those needs, for which the Carequality Steering Committee ("Steering Committee") has adopted an Implementation Guide.

1.13   Confidential Information: Proprietary or confidential materials or information of a Discloser in any medium or format that a Discloser labels as such upon disclosure or given the nature of the information or the circumstances surrounding its disclosure, reasonably should be considered confidential.  With respect to Carequality, Confidential Information also includes those components of the Carequality Elements that the Carequality Steering Committee determines should be labeled Confidential.  Notwithstanding any label to the contrary, Confidential Information does not include any Contribution (even if included in a Carequality Element); any information which is or becomes known publicly through no fault of a Recipient; is learned of by a Recipient from a third party entitled to disclose it; is already known to a Recipient before receipt from a Discloser as documented by the Recipient's written records; or, is independently developed by Recipient without reference to, reliance on, or use of, Discloser's Confidential Information.

2

1.14 <u>Contribution</u>: Any submission by a Discloser to Carequality intended by the Discloser to be considered for inclusion in any of the Carequality Elements, including comments submitted on any media, oral discussions at meetings of any work group, committee or sub-committee or other types of submissions.

1.15 <u>Covered Entity</u>: An organization that is defined as a "covered entity" in 45 C.F.R. § 160.103 of the HIPAA Regulations.

1.16 <u>Discloser</u>: The Party that discloses Confidential Information to a Recipient.

1.17 <u>Dispute</u>: Any controversy, dispute, or disagreement arising out of or relating to the interpretation or implementation of the Carequality Elements.

1.18 <u>End User</u>: An individual or program generating a request for information, responding to a request for information, publishing information to a list of recipients or receiving published information through the Carequality Elements.

1.19 <u>Exchange Activity</u>:  Any use of the capability provided or supported by the Carequality Elements to exchange information among Implementers or their Carequality Connection.

1.20 <u>Governmental Entity</u>: A local, state or Federal agency.

1.21 <u>HIPAA Regulations</u>: The Standards for Privacy of Individually Identifiable Health Information and the Security Standards for the Protection of Electronic Protected Health Information (45 C.F.R. Parts 160 and 164) promulgated by the U.S. Department of Health and Human Services under the Health Insurance Portability and Accountability Act (HIPAA) of 1996, as in effect on the Effective Date of this Agreement and as may be amended, modified, or renumbered.

1.22 <u>Implementation Guide</u>: A guide adopted by Carequality that sets forth the technical specifications and additional business rules that apply to Implementers and Carequality Connections who declare support for a specific Carequality Use Case.  Additional business rules will include, but not be limited to, permitted purposes for the Carequality Use Case, roles associated with the Carequality Use Case and specifications on compliance with Section 8 of this Agreement ("Non-Discrimination").

1.23 <u>Implementer</u>: An organization that has signed the Carequality Connected Agreement and been accepted as such by Carequality.

1.24 <u>Recipient</u>: The Party that receives Confidential Information from a Discloser.

2.    ***Recognition of Applicant as an Implementer.***

2.1    Applicant shall submit an application, via a form provided by Carequality, seeking to be recognized as an Implementer.  The purpose of the application shall be for Applicant to demonstrate, to the satisfaction of Carequality, that Applicant is reasonably positioned to meet its obligations under this Agreement.   All applications will be reviewed by Carequality using the review criteria adopted by the Steering Committee. Applicant warrants and represents that: (i) information submitted to Carequality in connection with Applicant's application and any other documentation or information provided by Applicant to Carequality is, to the best of Applicant's knowledge, accurate and complete; and (ii) it has the organizational infrastructure, legal authority and financial resources to comply with the obligations in this Agreement.

3

2.2  Carequality shall inform each Applicant in writing as to whether its application was accepted or rejected. Upon receiving written notice from Carequality that Applicant has demonstrated that it is able to meet its obligations under this Agreement, Applicant shall be recognized by Carequality as an Implementer, subject to all obligations, terms and conditions contained herein and entitled to all rights and benefits conferred upon Implementers including, but not limited to, inclusion in the Carequality Directory. Applicant shall not represent itself as an Implementer until receiving such written notice from Carequality.

2.3  Applicant acknowledges that other Implementers will be permitted to identify themselves as Implementers if such Implementers have demonstrated to the satisfaction of Carequality that they are able to meet their obligations as such.  APPLICANT ACKNOWLEDGES AND AGREES THAT CAREQUALITY MAKES NO REPRESENTATIONS OR WARRANTIES THAT ANY ORGANIZATION IDENTIFYING ITSELF AS AN IMPLEMENTER OR ANY TECHNOLOGY PLATFORMS USED OR PROVIDED BY AN ORGANIZATION IDENTIFYING ITSELF AS AN IMPLEMENTER WILL BE SAFE, ERROR FREE, ACCURATE, INTEROPERABLE OR UNINTERRUPTED.

3.     *Carequality Steering Committee*.  Carequality has established the Steering Committee to serve as the governing body over all Carequality activities and has given it responsibility and authority over the rights, responsibilities and obligations of Carequality set forth in this CCA.  Applicant acknowledges the authority of the Steering Committee and hereby grants to the Steering Committee the right to provide governance, oversight, facilitation and support for the Implementers by conducting activities including, but not limited to, the following:

      a.     Developing and maintaining the Carequality Elements; and

      b.     Developing and amending Carequality Policies.

To the extent permitted under Applicable Law, this grant of authority to the Steering Committee is unconditional and does not require any further consideration or action by Applicant.  The Steering Committee shall have the authority to unilaterally delegate to the Chairperson of the Steering Committee, a subcommittee of the Steering Committee or Carequality staff any of the responsibilities granted to the Steering Committee herein. The Steering Committee may engage contractors to perform specific duties associated with the exercise of the authorities and responsibilities granted to the Steering Committee herein.

4.     *Fees*.  Applicant shall pay the fees set forth on Schedule 1 attached hereto (the "Fees").  Carequality shall invoice Applicant for all Fees in accordance with Schedule 1. Unless otherwise set forth in Schedule 1, invoices shall be due and payable by Applicant within sixty (60) days after receipt thereof unless Applicant notifies Carequality in writing that it is disputing the invoice and identifies the specific reasons it is disputing the invoice.  Other than with regard to invoiced amounts that are disputed in good faith, any collection costs, attorney's fees or other expenses reasonably incurred by Carequality in collecting amounts due under this Agreement are the responsibility of Applicant, unless Applicant is a U.S. federal agency, in which case such costs, fees, or other expenses will be the responsibility of Applicant only if awarded by a court of competent jurisdiction. Applicant shall continue to incur Fees during any period of time in which Applicant is suspended pursuant to this Section or Section 5.3.  In the event Applicant fails to make any undisputed payment required hereunder, upon at least ten (10) days prior written notice, Carequality, without limitation to any other remedy it may have, may suspend Applicant's ability to participate in any Exchange Activity under this Agreement.  If Applicant makes payment within the 10 day notice period, Carequality will not suspend Applicant's ability to participate in any Exchange Activity under this

Agreement for the non-payment. If Applicant is a U.S. federal agency, it shall pay those Fees that are applicable to U.S. federal agencies as set forth in Schedule 1.

4.1 **Changes to Fees.** Schedule 1 may be updated by Carequality from time-to-time in relation to operational costs and other market factors in order to ensure the sustainability of the activities conducted under the Carequality Elements. In light of the foregoing, changes to Schedule 1 are not subject to the Amendment process set forth in Section 21.4. Carequality shall provide Applicant not less than ninety (90) days' advance written notice of any adjustments to the Fees set forth in Schedule 1.

5. *Term and Termination.*

5.1 **Term**. This Agreement shall commence on the Effective Date and shall continue until terminated in accordance with this Section.

5.2 **Termination**. Applicant may terminate this Agreement at any time by providing sixty (60) days prior written notice to Carequality. Carequality may terminate this Agreement with immediate effect by giving notice to Applicant if: (i) Applicant is in material breach of any of the terms and conditions of this Agreement and fails to remedy such breach within 30 days after receiving notice of such breach; or (ii) Applicant breaches a material provision of this Agreement where such breach is not capable of remedy. Carequality may terminate this Agreement by providing Applicant with ninety (90) days prior written notice in the event that Carequality ceases to support interoperability through the use of the Carequality Elements. If Applicant is a U.S. federal agency, then the Contract Disputes Act ("CDA"), 41 U.S.C. sections 7101 et seq., shall govern alleged breaches under this Agreement.

5.3 **Suspension**.

5.3.1 <u>Suspension by Carequality</u>. Carequality may suspend Applicant's ability to participate in any Exchange Activity under this Agreement in accordance with Section 4 or in the event that Carequality determines, following completion of a preliminary investigation, that (i) Applicant has breached a material provision of this Agreement and failed to cure such breach within fifteen (15) days, or such other period of time that the Parties have agreed to, of receiving notice of same; or (ii) there is a substantial likelihood that Applicant's acts or omissions create an immediate threat, or will cause irreparable harm, to another Party, an Implementer, Carequality Connection, End User, organization or individual (collectively, a "Threat Condition"). To the extent that Carequality determines that one of Applicant's Carequality Connections has created a Threat Condition, Carequality may suspend that Carequality Connection's ability to participate in any Exchange Activity under this Agreement. Except for a suspension in accordance with Section 4, Carequality will make a reasonable effort to notify Applicant in advance of its intent to suspend Applicant or one of Applicant's Carequality Connections. Upon suspension of either Applicant or one of Applicant's Carequality Connections, Carequality will work collaboratively with Applicant to resolve the issue leading to the suspension.

5.3.2 <u>Voluntary suspension by Applicant</u>. Notwithstanding the foregoing, Applicant may request that Carequality temporarily suspend Applicant's ability to participate in any Exchange Activity under this Agreement in the event that Applicant cannot comply with the terms and conditions of this Agreement.

5.3.3 <u>Selective suspension by Applicant</u>. Applicant may determine that it must suspend exchanging with another Implementer with which it is otherwise required to exchange in accordance with

5

Carequality Use Case Implementation Guide because of reasonable and legitimate concerns related to the privacy and security of information that is exchanged. If Applicant makes this determination, it is required to notify Carequality and the Implementer it is suspending promptly of its decision and the reason(s) for making the decision. If Applicant makes the decision to suspend, it is required within thirty (30) days to initiate the Dispute Resolution Process in order to resolve whatever issues led to the decision to suspend, or end its suspension and resume exchanging with the other Implementer. Provided that Applicant selectively suspends exchanging with another Implementer in accordance with this Section 5.3.3, such selective suspension shall not be deemed a violation of Section 8.

5.3.4    Notwithstanding anything to the contrary set forth herein, Carequality retains the right to suspend any Carequality activity or Carequality Use Case (i) upon ten (10) days prior notice to Applicant if Carequality determines that Carequality's interests are threatened or (ii) immediately if Carequality determines that the safety or security of any individual or of Confidential Information is threatened.

5.3.5    The suspension of Applicant's ability to participate in any Exchange Activity under this Agreement pursuant to this Section 5.3 has no effect on either Party's obligations hereunder. Notwithstanding the foregoing, during any suspension pursuant to this Section 5.3, Applicant's inability to participate in any Exchange Activity under this Agreement, or comply with those terms of this Agreement that require participation in any Exchange Activity shall not be deemed a breach of this Agreement.

5.4    **Effect of Termination**. Upon termination of this Agreement for any reason, Carequality shall immediately remove Applicant and its Carequality Connections from the Carequality Directory and any other lists of Implementers that Carequality maintains. Applicant shall (i) promptly remove all references that identify it as a Carequality Implementer from all electronic media, and (ii) cease all use of any material, including but not limited to product manuals, marketing literature, and web content that identifies it as a Carequality Implementer. Within twenty (20) business days of termination of this Agreement, Applicant shall confirm to Carequality, in writing, that it has complied with this Section.

6.    *Legal Requirements*. Each Party shall, at all times, fully comply with all Applicable Law relating to this Agreement and the use of the Carequality Elements. To further support the privacy, confidentiality, and security of health information exchanged pursuant to this Agreement, Applicant agrees that when acting as an Implementer, it will comply with the provisions of the HIPAA Regulations that are applicable to Business Associates as a minimum contractual standard of conduct even if Applicant is not a Covered Entity, a Business Associate, or a Governmental Entity. Notwithstanding any provision of this Agreement to the contrary, an Applicant or Implementer that is a federal agency and is not otherwise subject to the HIPAA Regulations shall not be required to comply with the HIPAA Regulations under this Agreement.

7.    *Compliance with the Implementation Guides and Carequality Policies*. Beginning on a date to be mutually agreed upon by Applicant and Carequality, Applicant shall implement and maintain support of at least one Carequality Use Case and shall indicate to Carequality the Applicant's role in such Carequality Use Case ("Carequality Use Case Role"). For all Carequality Use Cases supported by Applicant, Applicant shall comply with all components (unless such components are designated as optional) set forth in the applicable Implementation Guide that apply to (i) the Applicant's Carequality Use Case Role or (ii) all Implementers. Applicant is encouraged, but not required, to comply with all optional components of the applicable Implementation Guide(s). Applicant shall also comply with all Carequality Policies applicable to Implementers and require that its Carequality Connections comply with all applicable components of the Implementation Guide(s) and Carequality Policies. In the event of a conflict between the terms of this Agreement and the Implementation Guide(s) or Carequality Policies, the terms of this Agreement shall

control. Notwithstanding any provision of this Agreement to the contrary, if Applicant or Carequality Connection is a U.S. federal agency, no change in policies or procedures shall apply to such agency until the agency has received 60 days' prior written notice of the change and has assented in writing to the change. If the agency does not assent or does not object based on federal law to the change(s) in writing within 60 days, the change(s) shall apply to the agency. In the event of an agency objection based on federal law, if the objection is not resolved prior to the effective date of the change(s) to which the agency objects, the agency may voluntarily and/or selectively suspend participation, or Carequality may suspend the agency if the agency is unable to comply with the change(s) pending continued efforts to reach a resolution.

8.    ***Non-Discrimination***. With respect to Implementers and Implementers' Carequality Connections that have implemented the same Carequality Use Case as Applicant and Applicant's Carequality Connections, neither Applicant nor its Carequality Connections shall unfairly or unreasonably limit exchange or interoperability with such Implementers or their Carequality Connections. Each Carequality Use Case's Implementation Guide will provide specific requirements for compliance with this requirement in the context of that Carequality Use Case.

9.    ***Applicant Autonomy***. To the extent that Applicant has adopted Applicant Business Rules, Applicant is permitted to continue acting in accordance with such Applicant Business Rules, even if they restrict Applicant's ability to support exchange of information with other Implementers or to meet the requirements of Section 8 above, provided that Applicant applies such Applicant Business Rules consistently with respect to other Implementers and the Applicant Business Rules do not impose unfair or unreasonable conditions that would unfairly or unreasonably limit interoperability.

10.    ***Accountability***.

10.1 **Applicant Accountability.**

10.1.1    Statement of General Principle. To the extent not prohibited by Applicable Law, Applicant shall be responsible for its acts and omissions and not for the acts or omissions of any other Implementer. Notwithstanding any provision in this Agreement to the contrary, Applicant shall not be liable for any act or omission if a cause of action for such act or omission is otherwise prohibited by Applicable Law. This section shall not be construed as a hold harmless or indemnification provision.

10.1.2    Harm to Carequality. Subject to Sections 10.3 and 19 of this Agreement that exclude certain types of damages or limit overall damages, Applicant shall be responsible for harm suffered by Carequality to the extent that the harm was caused by Applicant's breach of this Agreement.

10.1.3    Harm to other Implementers. Subject to Sections 10.3 and 19 of this Agreement that exclude certain types of damages or limit overall damages, Applicant shall be responsible for harm suffered by another Implementer to the extent that the harm was caused by Applicant's willful or reckless act or intentional misconduct in each case in breach of a Section of this Agreement to which the other Implementer is a third party beneficiary pursuant to Section 21.6 of this Agreement.

10.1.4    Implementers with no Carequality Connections. If Applicant does not designate any Carequality Connections for a specific Carequality Use Case, then Applicant shall be responsible to other Implementers' Carequality Connections for harm suffered by other Implementers' Carequality Connections to the extent that the harm was caused by Applicant's willful act or intentional misconduct in breach of this Agreement. If Applicant chooses to both designate Carequality Connections for a specific Carequality Use

Case and also directly engage in the exchange of information using the same Carequality Use Case, then Applicant shall be responsible to other Implementer's Carequality Connections for harm suffered by other Implementer's Carequality Connections to the extent that the harm was caused by Applicant's willful act or intentional misconduct in breach of this Agreement while participating in the Carequality Use Case directly and not through its Carequality Connections  In all cases, Applicant's liability shall be subject to Sections 10.3 and 19 of this Agreement that exclude certain types of damages or limit overall damages.

10.1.5   Federal agencies. Notwithstanding any provision of this Agreement to the contrary, if Applicant is a U.S. federal agency it is understood and agreed that nothing in this Agreement shall limit the sovereign immunity enjoyed by the agency or limit its legal right to recover damages against Carequality, Implementers, or their Carequality Connections. If Applicant is a U.S. federal agency, then Applicant shall not have any indemnification obligations to Carequality or to any other Implementer, their Carequality Connections or any third party in connection with this Agreement. No provision of the CCA, or the Carequality Connection Terms, shall be construed as an indemnification requirement for any federal agency.

10.2 **Carequality Accountability**. Applicant has agreed to comply with this Agreement.  Accordingly, Applicant will not hold Carequality, or anyone acting on its behalf, including but not limited to members of the Steering Committee, Advisory Council or any work group or subcommittee, its contractors, employees or agents liable for any damages, losses, liabilities or injuries arising from or related to this Agreement, except to the extent that such damages, losses, liabilities or injuries are the direct result of Carequality's breach of this Agreement. This section shall not be construed as a hold harmless or indemnification provision.

10.3 **Limitation on Liability**. Notwithstanding anything in this Agreement to the contrary, in no event shall either Carequality's or Applicant's total liability to each other  and all third party beneficiaries arising from or relating to this Agreement exceed an aggregate amount equal to three million dollars ($3,000,000), whether a claim for any such liability or damages is premised upon breach of contract, breach of warranty, negligence, strict liability, or any other theories of liability, even if such Party has been apprised of the possibility or likelihood of such damages occurring.

11.     *Cooperation*.  Applicant understands and acknowledges that numerous activities with respect to this Agreement shall likely involve other Implementers and their Carequality Connections, employees, agents, and third party contractors, vendors, or consultants. To the extent not legally prohibited, Applicant shall: (a) respond in a timely manner to inquiries from Carequality, Implementers or their Carequality Connections about possible issues related to the Carequality Use Case(s) supported by Applicant; (b) collaboratively participate in discussions coordinated by Carequality to address differing interpretations of requirements set forth in an applicable Implementation Guide(s) prior to pursuing the Dispute Resolution Process; (c) make reasonable efforts to notify other Implementers when persistent and widespread connectivity failures are occurring with those Implementers or their Carequality Connections so that all those affected can investigate the problems and identify the root cause(s) of the connectivity failures; (d) work cooperatively including, without limitation, facilitating contact between other Implementers or their Carequality Connections and Applicants' Carequality Connections, to address the root cause(s) of persistent and widespread connectivity failures; (e) subject to Applicant's right to restrict or condition its cooperation or disclosure of information in the interest of preserving privileges in any foreseeable dispute or litigation or protecting Applicant's confidential information, provide reasonable information (or direct its Carequality Connections to do so) to other Implementers in support of collaborative efforts to resolve issues or Disputes; (f) require that Applicant's Carequality Connections will provide information and other relevant assistance to Applicant in connection with this Section 11; and (g) subject to Applicant's right to restrict or condition

its cooperation or disclosure of information in the interest of preserving privileges in any foreseeable litigation or protecting Applicant's Confidential Information, provide reasonable information to aid the efforts of other Implementers or their Carequality Connections to understand, contain, and mitigate an Adverse Security Event, at the request of such Implementer or Carequality Connection. In no case shall Applicant be required to disclose individually identifiable health information in violation of Applicable Law. In seeking an Implementer's cooperation, Applicant shall make all reasonable efforts to accommodate the Implementer's schedules and reasonable operational concerns.

12.     *Adverse Security Event Reporting*.

12.1 As soon as reasonably practicable, but no later than five (5) business days after determining that an Adverse Security Event has occurred and is likely to have an adverse impact on an Implementer(s) or Carequality Connection(s), Applicant shall provide a notification to Carequality and all Implementers that are likely impacted by the Event. The notification should include sufficient information for the recipient of the notification to understand the nature of the Adverse Security Event. Applicant shall supplement the information contained in the notification as it becomes available and cooperate with other Implementers and their Carequality Connections in accordance with Section 11(g) of this Agreement. Notwithstanding the foregoing, Applicant agrees that (a) within one (1) hour of learning that an Adverse Security Event occurred and that such Event may involve an Implementer or Carequality Connection that is a Federal agency, it shall alert the Federal agency in accordance with the procedures and contacts provided by such Federal agency and (b) that within twenty-four (24) hours after determining that an Adverse Security Event has occurred and is likely to have an adverse impact on an Implementer(s) or Carequality Connection(s) that is a Federal agency, Applicant shall provide a notification to all such Implementers or Carequality Connections that are likely impacted by the Event in accordance with the procedures and contacts provided by such Federal agency.

12.2 Section 12.1 shall not be deemed to supersede Applicant's obligations (if any) under relevant security incident, breach notification or confidentiality provisions of Applicable Law. Compliance with Section 12.1 shall not relieve Applicant of any other security incident or breach reporting requirements under Applicable Law including, but not limited to, those related to individuals.

12.3 Applicant shall have in place a reporting protocol for its Carequality Connections to notify Applicant of Adverse Security Events that have occurred, and shall clearly communicate this protocol to its Carequality Connections.

13.     *Acceptable Use*. (a) Carequality has adopted permitted purposes for the use of the Carequality Elements that are specifically set out in the Implementation Guide for each Carequality Use Case. Applicant shall only engage in exchange activities through the Carequality Elements for permitted purposes as defined in the Implementation Guides. If Applicant or its Carequality Connections do not comply with these permitted purposes or other applicable provisions in the Implementation Guide, Carequality may exercise its right to suspend Applicant or its relevant Carequality Connections in accordance with Section 5.3.     (b) If Applicant is not a Covered Entity or Governmental Entity, then (i) Applicant may use the interoperability available through Carequality only for a permitted purpose as set forth in the relevant Implementation Guide, or otherwise within the Carequality Elements, which may authorize an Implementer to use information for specific purposes that enhance the effectiveness or the efficiency of an Implementer's network; and (ii) Applicant shall not, for its own benefit, re-use, re-disclose, aggregate, de-identify or sell any information transmitted or received by its Carequality Connections or End Users through the use of the Carequality Elements pursuant to a valid CCA unless its respective Carequality Connections or End Users

9

have given Applicant the explicit written authority to do so.  For the avoidance of doubt, an Implementer shall not be considered to be acting "for its own benefit", regardless of any compensation for services or other value it receives as a result of its actions, if (i) the Implementer is acting as a Business Associate for a customer or member of its network to do something that the customer or member is allowed to do itself, as permitted by the written agreement between the Implementer and its customer or member or some other writing that is legally enforceable, or (ii) the Implementer is taking action with respect to a patient's information at the direction of that patient or that patient's Personal Representative, as defined by the HIPAA Regulations.  (c)Nothing in this Section shall restrict Applicant from having different arrangements outside of Carequality provided that Applicant can still comply with this Agreement.  This Section shall not prohibit Applicant from compiling general volume statistics (such as query volumes or number of records exchanged) about its, its Carequality Connections' or its End Users' exchange activities conducted through the Carequality Elements including with other Implementers, their Carequality Connections or End Users.  Notwithstanding the foregoing, to the extent such statistics identify any other Implementer or Carequality Connection, Applicant shall not disclose such statistics to any third party without the prior written consent of such Implementer or Carequality Connection.

14.     ***Information Handling Transparency.***  Prior to being recognized as an Implementer, and during the remainder of the Term, Applicant will make publicly available an accurate statement of its information handling practices (the "Statement of Information Handling Practices").  For example, a Statement of Information Handling Practices may be a Notice of Privacy Practices as defined in the HIPAA Regulations or may consist of a statement that Applicant does not handle information in the course of exchange activities through the Carequality Elements.  Any Statement of Information Handling Practices shall clearly disclose if the Applicant offers products and services to its customer and network members which involve access to, use and redisclosure of information that Applicant obtains by virtue of being an Implementer.

15.     ***Carequality Connections***.

15.1 Applicant is responsible for identifying those of its customers, participants or other constituent entities, if any, that wish to be included in the Carequality Directory as Carequality Connections.  Applicant may delegate this responsibility to its current Carequality Connections or their intermediary entities as appropriate.  Before listing any entity in the Carequality Directory as its Carequality Connection, Applicant must confirm that the entity does not duplicate, in terms of the healthcare information content it provides, another data source that is already a Carequality Connection of a different Implementer, for the same Use Case, and shall not list in the Carequality Directory as its Carequality Connection any such duplicative entity.  For example, if a provider organization is a Carequality Connection of a health information exchange (HIE) and, via the HIE, provides access to information ultimately sourced from its electronic health record (EHR) system, then that provider organization may not also be a Carequality Connection of its EHR vendor to provide access to substantially similar data.  As a further example, if a provider organization uses two different EHR systems within different parts of its enterprise, these two EHR systems are distinct data sources and are not duplicative for purposes of this Section, and these systems may be represented separately in the Carequality Directory by different Implementers.  For clarity, Carequality Connections are permitted to change Implementers, but may not have an active listing in the Directory by two Implementers for the same Use Case at the same time.  Applicant shall cooperate with other Implementers to avoid duplication of Directory listings in such cases, and shall make reasonable efforts to facilitate transitions from one Implementer to another.  Applicant acknowledges that it must supply information that Carequality indicates is necessary to complete a Carequality Directory entry for each Carequality Connection, in order for that Carequality Connection to be listed in the Carequality Directory.  Carequality Implementation Guides may specify particular technical architectures or approaches to

10

maintaining information about participating Carequality Connections and making it available as part of the Carequality Directory, in which case Applicant shall comply with the requirements of the relevant Implementation Guides.  Carequality expressly relies upon Applicant to maintain information about its Carequality Connections for use with the Carequality Directory, and Carequality expressly disclaims any responsibility to verify the accuracy of the information.

15.2 Prior to including any organization in the Carequality Directory as its Carequality Connection, Applicant shall require such Carequality Connections to, at a minimum, comply with the Carequality Connection Terms.  Applicant, or an intermediary entity, can do this, directly or indirectly, through an agreement that is legally binding on the Carequality Connection or through written policies and procedures that incorporate the Carequality Connection Terms without any change to such terms. For clarity, the previous sentence does not prohibit Applicant from enforcing additional terms or policies beyond the Carequality Connection Terms, as long as these terms or policies do not contradict, contravene, or otherwise undermine the Carequality Connection Terms, with respect to exchange activities through the Carequality Elements.  Applicant represents that every organization that it identifies to Carequality as a Carequality Connection is legally obligated to comply with the Carequality Connection Terms.  Subject to the requirements of section 21.4 of this Agreement, the Carequality Steering Committee may amend Exhibit 1 at any time.  As per the requirements of Section 21.4, Carequality will provide the final text of such amendments at least sixty (60) days prior to the effective date of the amendments.  Applicant, in turn, shall inform its Carequality Connections of such amendments, and make a full copy of the updated Carequality Connection Terms available to its Carequality Connections within thirty (30) days of receiving the updated Carequality Connection Terms from Carequality.   Applicant shall further inform its Carequality Connections if objections raised under Section 21.4 will prevent the amendments from going into effect.

15.3 Applicant shall employ a process by which Applicant, or its designee (including one or more of its Carequality Connections, as set forth in the next sentence), validates sufficient information to uniquely identify each End User of a Carequality Connection prior to enabling such End User to use the interoperability afforded by this Agreement.  Applicant may fulfill this responsibility directly or indirectly by contractually obligating its Carequality Connections or a subcontractor to fulfill this responsibility.

15.4 Applicant shall maintain and exercise the ability to suspend or terminate a Carequality Connection if such Carequality Connection fails to comply with the Carequality Connection Terms or is otherwise subject to suspension by Carequality.

16.    *Confidentiality*.

16.1 Applicant and Carequality each agree to use the other Party's Confidential Information only as authorized in this Agreement solely for the purpose of performing its obligations under this Agreement, and for no other purpose.  Each Party hereto may act as a Discloser and a Recipient, accordingly. A Recipient will disclose the Confidential Information it receives only to its employees and agents who require such knowledge and use in the ordinary course and scope of their employment or retention, and are obligated to protect the confidentiality of such Confidential Information in a manner substantially equivalent to the terms required herein for treatment of Confidential Information.  Otherwise, a Recipient agrees not to disclose the Confidential Information received to anyone.  In the event a Recipient has any question about whether information and/or materials it receives is Confidential Information, it shall treat the same as if it were Confidential Information.  For the avoidance of doubt, the Carequality Elements that are not labeled as Confidential Information by the Carequality Steering Committee are not confidential and are not covered by the provisions of this Section.

11

16.2 After Carequality's acceptance of Applicant's application to be a Carequality Implementer, Carequality shall provide Applicant with access to the Carequality Directory. The Carequality Directory is intended to be used by Implementers, Carequality Connections, and End Users to create and maintain operational connectivity under the Carequality Elements, including the development and maintenance of effective user interfaces for relevant systems. Carequality is providing Applicant with access to, and the right to use, the Carequality Directory on the express condition that Applicant only use and disclose information contained in the Carequality Directory as necessary to advance the intended use of the Carequality Directory. For example, Applicant is permitted to disclose information contained in the Carequality Directory to the personnel of a Carequality Connection's EHR vendor who are engaged in assisting the Carequality Connection with establishing and maintaining connectivity via the Carequality Elements. Further, Applicant shall not use the information contained in the Carequality Directory for marketing or any form of promotion of their own products and services, unless this use and disclosure is part of an effort by Applicant to expand, or otherwise improve, connectivity via the Carequality Elements, and any promotion of Applicant's own products or services is only incidental to the primary purpose. In no event shall Applicant use the information contained in the Carequality Directory in a manner that would be reasonably expected to have a detrimental effect on another Party, Implementer, Carequality Connection, End User, or other individual or organization.

17.    *Carequality Monitoring*. Carequality, through its agents, employees and independent contractors, in order to confirm compliance with this Agreement, shall have the right, but not the obligation, to monitor exchange activities enabled by the Carequality Elements. Applicant agrees to cooperate with Carequality in these monitoring activities and to provide, at Carequality's reasonable request, information in the furtherance of Carequality's monitoring including, but not limited to, audit logs of exchange transactions and summary reports of exchange activities, to the extent that Applicant possesses such information. Nothing in this Section shall be construed as limiting or modifying Applicant's responsibilities for performance measure reporting or demonstration of compliance for a specific Carequality Use Case, as outlined in that Carequality Use Case's Implementation Guide. Nothing in this Agreement shall be construed to allow Carequality to have direct access to the information systems of any Applicant or Carequality Connection(s).

18.    *Contributions; IP Rights; Ownership of Materials; License*. Applicant acknowledges that any copyrights, patent rights, trade secrets, trademarks, service marks, trade dress, and other intellectual property in or related to Carequality including, but not limited to, this Agreement and all Exhibits, Implementation Guides, Carequality Elements, Carequality Policies, related materials, information, reports, processes (the "Carequality IP"), are protected under applicable United States law. Recognizing that the Carequality IP is the work product of the membership of Carequality, and that Carequality is the collective representative of all Implementers' interests, these intellectual property rights are asserted and held by Carequality in its capacity as the representative of its total membership and licensed to Applicant hereunder. This does not apply to Carequality trademarks, service marks or trade dress rights, which are discussed separately in Section 18.6 below. Applicant is encouraged to provide Contributions to Carequality and understands that Carequality must obtain certain rights in such Contributions in order to include the Contribution in Carequality IP. Notwithstanding any provision of this Agreement to the contrary, if Applicant is a U.S. federal agency and considers certain information to be the intellectual property of the U.S. government, the agency shall not contribute such information unless and until it has entered into a written agreement with Carequality for the transfer or license of such intellectual property rights.

18.1 With respect to each Contribution, Applicant represents that: (a) no information in the Contribution is confidential; (b) Carequality may freely disclose the information in the Contribution; and (c) to the best

of its knowledge, such Contribution is free of encumbrance as it relates to the intellectual property rights of others.

18.2 To the extent that a Contribution or any portion thereof is protected by copyright or other rights of authorship, Applicant grants a perpetual, irrevocable, non-exclusive, royalty-free, world-wide, sublicensable right and license to Carequality under all such copyrights and other rights in the Contribution to copy, modify, publish, display and distribute the Contribution (in whole or part) and to prepare derivative works based on or that incorporate all or part of such Contribution, in each case, for the purpose of incorporating such Contributions into the Carequality IP. Applicant also grants Carequality the right: (a) to register copyright in Carequality's name any Carequality IP even though it may include Contributions; and (b) to permit others, at Carequality's sole discretion, to reproduce in whole or in part the resulting Carequality IP.

18.3 Applicant shall identify to Carequality, through the issuance of a letter of assurance, any patents or patent applications which Applicant believes may be applicable to any Contribution made by Applicant within any Carequality Element specifically including, but not limited to, any Implementation Guide. This assurance shall be provided without coercion and shall take the form of a general disclaimer to the effect that the patent holder will not enforce any of its present or future patent(s) that would be required to implement or use the Carequality Element relevant to any person or entity using the patent(s) to comply with such Carequality Element.

18.4 Carequality grants to Applicant a perpetual, irrevocable, non-exclusive, royalty-free, world-wide, sublicensable right and license to use, modify, reproduce, prepare derivative works of, and disseminate the Carequality IP for the purpose of enhancing interoperability (including through the modification of its products and services to implement the Carequality Use Cases and conform to the Implementation Guides) and to otherwise exercise any and all of its rights under this Agreement. Applicant and its Carequality Connections and End Users have and will continue to possess the usage rights to the Carequality IP as authorized by this Agreement and the Carequality Connection Terms.

18.5 Applicant retains ownership of any Contribution it provides, granting only the licenses described in this Section. Nothing shall prevent Applicant from (i) changing Applicant's technology, services or any Contribution in any way, including to conform to the requirements of an Implementation Guide or (ii) making any change available to any other person or entity. Notwithstanding anything to the contrary in this Agreement, all right, title, and interest in any change to Applicant's technology, services or any Contribution will accrue to the benefit of, and be owned exclusively by, Applicant.

18.6 The trademarks, services marks, trade dress, business names, company names, and logos owned by Carequality, including without limitation CAREQUALITY and all Carequality logos, (collectively, the "Carequality Marks") are an important part of maintaining the strength and reputation of Carequality and its efforts to enable the interoperable exchange of healthcare information. Applicant may not use the Carequality Marks to brand any of Applicant's products or services and may not incorporate any Carequality Marks in any of Applicant's domain names except as provided in Carequality's published guidelines on use of trademarks. Upon Applicant being recognized by Carequality as an Implementer, Applicant shall be entitled to use and display "Carequality® Implementer" within its printed marketing materials, including on Applicant's website, to indicate that Applicant has been accepted by Carequality as an Implementer under this Agreement provided that such use is not misleading or inaccurate. No other rights are granted under this Section. Applicant shall not apply for registration of any trademark, service mark, trade dress, business name or company name, or logo that incorporates any Carequality Mark or any

13

element confusingly similar to any Carequality Mark.  In connection with any non-trademark, descriptive use of Carequality Marks, Applicant and its Carequality Connections will use the registration symbol ® or the trademark or service mark symbols, ™ or ℠, as more fully set out in the Carequality guidelines on use of trademarks, and indicate in the text that the Carequality Mark used "is the registered trademark of Carequality," "is the trademark of Carequality," or "is the service mark of Carequality," respectively.

19.  *Disclaimers*.  Applicant acknowledges that other Implementers and Carequality Connections may be added to or removed from the Carequality Directory at any time; therefore, Applicant may not rely upon the inclusion in the Carequality Directory of a particular Implementer or Carequality Connection.  IT IS EXPRESSLY AGREED THAT IN NO EVENT SHALL CAREQUALITY OR APPLICANT BE LIABLE TO EACH OTHER OR ANY THIRD PARTY BENEFICIARY FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL, OR EXEMPLARY DAMAGES, INCLUDING BUT NOT LIMITED TO, LOSS OF PROFITS OR REVENUES, LOSS OF USE, OR LOSS OF INFORMATION OR DATA, WHETHER A CLAIM FOR ANY SUCH LIABILITY OR DAMAGES IS PREMISED UPON BREACH OF CONTRACT, BREACH OF WARRANTY, NEGLIGENCE, STRICT LIABILITY, OR ANY OTHER THEORIES OF LIABILITY, EVEN IF THE PARTY HAS BEEN APPRISED OF THE POSSIBILITY OR LIKELIHOOD OF SUCH DAMAGES OCCURRING.  NO PROVISION OF THE CCA, OR THE CAREQUALITY CONNECTION TERMS, SHALL BE CONSTRUED AS AN INDEMNIFICATION REQUIREMENT FOR ANY IMPLEMENTER, INCLUDING BUT NOT LIMITED TO A FEDERAL AGENCY, THAT IS PRECLUDED BY LAW FROM INDEMNIFYING THIRD PARTIES.

20.  *Dispute Resolution*.

   20.1 Applicant acknowledges that it may be in its best interest to resolve Disputes between or among Applicant or Applicant's Carequality Connections, and Carequality, other Implementers or their Carequality Connections through a collaborative, collegial process rather than through civil litigation.  Applicant has reached this conclusion based upon the fact that the legal and factual issues involved in this Agreement are unique, novel, and complex and limited case law exists which addresses the legal issues that could arise from this Agreement.  Therefore, Applicant shall submit Disputes to the non-binding dispute resolution process established by Carequality ("Dispute Resolution Process") (Exhibit 2).  Applicant also agrees to direct its Carequality Connections to use their best efforts to resolve issues that may arise between its Carequality Connections and other Implementers' Carequality Connections or other Implementers to the extent that such Implementers do not have Carequality Connections through informal discussions before seeking to invoke the Dispute Resolution Process.  In addition, Applicant agrees that if such informal discussions do not successfully resolve the issues after good faith efforts, then before a Dispute is submitted to the Dispute Resolution Process, Applicant will seek to facilitate the informal resolution of such issues directly between itself and the other affected Implementer(s).  To the extent that such issues cannot be resolved through cooperation between Applicant and the other Implementer(s), Applicant on behalf of its Carequality Connection may choose to submit the Dispute to the Dispute Resolution Process.  Under no circumstances will the Dispute Resolution Process give Carequality any power to assess monetary damages against Applicant, Applicant's Carequality Connections, or any other Implementer or Carequality Connection.  Except in accordance with Section 20.2, if Applicant refuses to participate in the Dispute Resolution Process, such refusal shall constitute a material breach of this Agreement and may be grounds for termination in accordance with Section 5.2.

   20.2 **Immediate Injunctive Relief.**

14

20.2.1   Notwithstanding Section 20.1, Applicant may be relieved of its obligation to participate in the Dispute Resolution Process if Applicant (i) believes that another Implementer's or Carequality Connection's act or omission will cause irreparable harm to Applicant or another organization or individual (e.g. Implementer, Carequality Connection, End User or consumer) and (ii) pursues immediate injunctive relief against such Implementer or Carequality Connection in a court of competent jurisdiction. Applicant must inform Carequality of such action within two business days of filing for the injunctive relief and of the result of the action within 24 hours of learning of same. Notwithstanding any provision of this Agreement to the contrary, if Applicant is a U.S. federal agency, federal law shall govern whether and when equitable relief may be granted.

20.2.2   If the injunctive relief sought in Section 20.2(a) is not granted and Applicant chooses to pursue the Dispute, the Dispute must be submitted to the Dispute Resolution Process in accordance with Section 20.1.

20.3 **Activities during Dispute Resolution Process**. The pendency of a Dispute under this Agreement has no effect on either Party's obligations hereunder, unless Applicant suspends or terminates its rights in accordance with Section 5.2 or 5.3 or is suspended in accordance with Section 5.3.

20.4 **Implementation of Agreed Upon Resolution**. If, at any point during the Dispute Resolution Process, Applicant and all of the other parties to the Dispute accept a proposed resolution of the Dispute, Applicant and Carequality each agrees to implement the terms of the resolution in the agreed upon timeframe.

20.5 **Reservation of Rights**. If, following the Dispute Resolution Process, in the opinion of Applicant, the Dispute Resolution Process failed to adequately resolve the Dispute, Applicant may pursue any remedies available to it in a court of competent jurisdiction.

21.    *Miscellaneous/General*

21.1 **Authority to Execute**. Applicant warrants and represents that it has the full power and authority to execute this Agreement and that any representative of Applicant who executes this Agreement has full power and authority to do so on behalf of Applicant.

21.2 **Notices**. All Notices to be made under this Agreement shall be given in writing to Applicant and Carequality at the addresses set forth following each Party's signature, and shall be deemed given: (i) upon delivery, if personally delivered; (ii) upon the date indicated on the return receipt, when sent by the United States Postal Service Certified Mail, return receipt requested; and (iii) if by facsimile telecommunication or other form of electronic transmission, upon receipt when the Notice is directed to a facsimile telecommunication number or electronic mail address listed by the Party and the sending facsimile machine or electronic mail address receives confirmation of receipt by the receiving facsimile machine or electronic mail address.

21.3 **Governing Law, Forum and Jurisdiction**. In the event of a dispute between the Parties, the applicable Federal and State conflicts of law provisions that govern the operations of the Parties shall determine governing law. If any Party to a dispute is a U.S. federal agency, only Federal law shall apply.

21.4 **Amendment.** This Agreement, and any attachments or exhibits incorporated by reference into this Agreement, may be amended by Carequality from time to time provided that Carequality first provides

15

notice and an opportunity to provide feedback on the draft proposed amendment and an opportunity to object in accordance with this Section. Carequality will provide Notice of any proposed amendment to Applicant and all other Implementers at least ninety (90) calendar days prior to the proposed effective date of the amendment. Carequality will accept feedback on the draft proposed amendment from Applicant and all other Implementers for twenty-one (21) calendar days, and will provide final text of the proposed amendment to Applicant and all other Implementers no later than sixty (60) calendar days prior to the effective date of the amendment. Applicant shall have thirty (30) days from the date of the publication of the final text to advise Carequality in writing if the Applicant objects to the proposed amendment and the specific reasons for its objection. If more than one-third (1/3) of all Implementers object to the proposed amendment, then the amendment shall not go into effect. Otherwise, the amendment shall be effective at the end of the ninety (90) day notice period. Applicant shall be required to sign any amendment approved in accordance with this section or terminate participation by providing at least sixty (60) days prior written Notice of such termination to Carequality. No amendment to this Agreement shall be proposed to Applicant unless such amendment is proposed to all other Implementers. Notwithstanding the foregoing, if Carequality determines, based on advice from legal counsel, that an amendment is required in order for Carequality to remain in compliance with Applicable Law, Carequality is not required to provide Applicant and other Implementers with an opportunity to object to the amendment. However, Carequality shall still be required to provide sixty (60) days advance notice of the amendment.

21.5 **Applicable Law**. Notwithstanding anything herein to the contrary, Applicant shall not be required to do or undertake any action or omission that would cause Applicant to violate its Applicable Law.

21.6 **Third Party Beneficiary**. Each Implementer shall be deemed a third party beneficiary of this Agreement for purposes of enforcing Applicant's compliance with Sections 7, 8, 10.1, 10.1.3, 11, 12, 13, 19 and 20 of this Agreement. In the event that Applicant does not designate any Carequality Connections or that Applicant engages in exchange directly with other Implementers' Carequality Connections in a specific Carequality Use Case even though it has Carequality Connections for that specific Carequality Use Case, then each Implementer's Carequality Connections shall be deemed a third party beneficiary of this Agreement solely for the purpose of enforcing Applicant's compliance with Section 10.1.4 of this Agreement.

21.7 **Assignment**. None of this Agreement, including but not limited to any of the rights created by this Agreement, shall be assignable by either Party whether by operation of law or otherwise without the prior written approval of the other Party.

21.8 **Force Majeure**. Neither Party shall be responsible for any delays or failures in performance caused by the occurrence of events or other circumstances that are beyond its reasonable control after the exercise of commercially reasonable efforts to either prevent or mitigate the effect of any such occurrence or event.

21.9 **Severability**. If any provision of this Agreement shall be adjudged by any court of competent jurisdiction to be unenforceable or invalid, that provision shall be modified to the minimum extent necessary to achieve the purpose originally intended, if possible, and the remaining provisions of this Agreement shall remain in full force and effect and enforceable. If the provision cannot be modified to achieve the purpose originally intended, it shall be severed from the agreement and the remaining provisions of this Agreement shall remain in full force and effect and enforceable.

21.10    **Survival of Rights and Obligations**. All Sections, which by their nature are meant to survive this Agreement, shall survive expiration or termination of this Agreement.

16

21.11        **Counterparts**.  This Agreement may be executed in one or more counterparts, each of which shall be considered an original counterpart, and shall become a binding agreement when each Party shall have executed one counterpart.

21.12        **Captions**.  Captions appearing in this Agreement are for convenience only and shall not be deemed to explain, limit or amplify the provisions of this Agreement.

21.13        **Independent Parties**.  Nothing contained in this Agreement shall be deemed or construed as creating a joint venture or partnership between Applicant and Carequality.  Except as specifically set forth herein, neither Party shall have the power to control the activities and operations of, or contractually bind or commit, the other Party and their status with respect to one another is that of independent contractors.

21.14        **Entire Agreement; Waiver**.  This Agreement, together with all attachments, exhibits and artifacts incorporated by reference, contains the entire understanding of the Parties with regard to the subject matter contained herein.  The failure of either Party to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way affect the validity of this Agreement or any part hereof or the right of such Party thereafter to enforce each and every such provision.  No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach, nor shall any delay by either Party to exercise any right under this Agreement operate as a waiver of any such right.

21.15        **Effect of Agreement**.  Except as provided in Sections 2.3 and 19 ("Disclaimers") and Section 20 ("Dispute Resolution"), nothing in this Agreement shall be construed to restrict Applicant's right to pursue all remedies available under law for damages or other relief arising from acts or omissions of Carequality or other Implementers or Carequality Connections related to this Agreement, or to limit any rights, immunities or defenses to which Applicant may be entitled under Applicable Law.

21.16        **Priority**.  In the event of any conflict or inconsistency between a provision in the body of this Agreement and any exhibit or attachment hereto, the terms contained in the body of this Agreement shall prevail.

21.17        **Time Periods**.  Any of the time periods specified in this Agreement may be changed pursuant to the mutual written consent of the Parties.

21.18        **Remedies Cumulative**.  The rights and remedies of the Parties provided in this Agreement are cumulative and are in addition to any other rights and remedies provided by law.

IN WITNESS WHEREOF, the Parties to this Agreement have caused it to be duly executed by their respective duly authorized representatives as of the last date below.

Applicant                                      Carequality, Inc.

By:                                            By:

Name:_____       Name:_____

Title: _____        Title: _____

Date: _____        Date: _____