**NELSON MULLINS RILEY & SCARBOROUGH LLP**
James C. Wald (Bar No. 229108)
Pacific Gateway
19191 South Vermont Avenue, Suite 900
Torrance, CA 90502
Telephone: 424-221-7459
Email: james.wald@nelsonmullins.com

**NELSON MULLINS RILEY & SCARBOROUGH LLP**
Brook B. Andrews (*pro hac vice application forthcoming*)
Meridian Building
1320 Main Street, 17th Floor
Columbia, SC 29201
Telephone: 803-255-5508
Email: brook.andrews@nelsonmullins.com

**NELSON MULLINS RILEY & SCARBOROUGH LLP**
Joshua Redelman (*pro hac vice application forthcoming*)
Heritage Plaza
1111 Bagby Street, Suite 2100
Houston, TX 77002
Telephone: 346-646-5889
Email: joshua.redelman@nelsonmullins.com

*Attorneys for Defendants RavillaMed PLLC, Avinash Ravilla, Shere Saidon, and LlamaLab, Inc.*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| Epic Systems Corporation; OCHIN, Inc.; Reid Hospital & Health Care Services, Inc. d/b/a Reid Health; Trinity Health Corporation; and UMass Memorial Health Care, Inc., <br><br> Plaintiffs, <br><br> v. | Case No. 2:26-CV-00321-FMO-RAO <br><br> **DEFENDANTS RAVILLAMED PLLC, AVINASH RAVILLA, SHERE SAIDON, AND LLAMALAB, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' COMPLAINT FOR FAILURE TO STATE A CLAIM** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Health Gorilla, Inc.; RavillaMed PLLC; Avinash Ravilla; Shere Saidon; LlamaLab, Inc.; Unique Medi Tech LLC, d/b/a Mammoth Dx; Mammoth Path Solution, LLC; Mammoth Rx, Inc.; Ryan Hilton; Daniel Baker; Max Toovey; Unit 387 LLC; SelfRx, LLC d/b/a Myself.Health; Critical Care Nurse Consultants, LLC d/b/a GuardDog Telehealth; Hoppr, LLC; Meredith Manak, and DOES 1-100,

Defendants.

Date:  April 16, 2026
Time: 10:00 a.m.
Ctrm:  6D

*[Filed concurrently with Proposed Order]*

Complaint Filed: January 13, 2026

# NOTICE OF MOTION

PLEASE TAKE NOTICE that, on April 16, 2026 at 10:00 a.m., or as soon thereafter as the matter may be heard, Defendants Dr. Avinash Ravilla, RavillaMed, PLLC, Shere Saidon, and LlamaLab, Inc. (together the "RavillaMed Defendants"), will bring for hearing this motion to dismiss Plaintiffs' Complaint. ECF No. 1. This motion will be made before the Honorable Fernando M. Olguin, United States District Judge, Courtroom 6D, located in the First Street Federal Courthouse, 350 W. 1st Street, Los Angeles, CA 90012.

The RavillaMed Defendants move to dismiss without prejudice under Fed. R. Civ. P. 12(b)(6) on the grounds that each of Plaintiffs' claims are barred as premature for failure to exhaust contractually-obligated dispute resolution procedures.

This motion is made upon this Notice, the attached Memorandum of Points and Authorities, and all pleadings, records, and other documents on file with the Court in this action, and upon such oral argument as may be presented at the hearing of this motion. This motion is made following the conference of counsel pursuant to Local Rule 7-3 which was held on February 13, 2026.[1]

Dated: February 25, 2026          Respectfully submitted,

By:  /s/James C. Wald
     James C. Wald (Bar No. 229108)
     *Attorney for Defendants RavillaMed PLLC,*
     *Avinash Ravilla, Shere Saidon, and LlamaLab,*
     *Inc.*

---

[1] In moving to dismiss based on Plaintiffs' failure to exhaust their contractually obligated dispute resolution processes, the RavillaMed Defendants do not waive, and expressly reserve, all other defenses they have to Plaintiffs' Complaint, including but not limited to Epic's questionable standing to bring this suit, the insufficiency of Plaintiffs' fraud allegations under Federal Rule of Civil Procedure Rule 9(b), and Plaintiffs' implausible injury and damages allegations.

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................5

INTRODUCTION .....................................................................................8

BACKGROUND ......................................................................................10

    I.    The Carequality and TEFCA Governing Agreements Require Plaintiffs to Pursue their Claims Under an Alternative Dispute Resolution Process ..............................................................12

    II.    Plaintiffs Initiated, Then Abandoned, the Dispute Resolution Process.................................................................................16

ARGUMENT ..........................................................................................17

    I.    The Court Should Dismiss Plaintiffs' Claims Against the RavillaMed Defendants Because Plaintiffs Failed to Exhaust the Dispute Resolution Process Required Under the Health Information Frameworks..................................................18

        A.    Satisfaction of the TEFCA and Carequality Dispute Resolution Provisions Is a Condition Precedent to Litigation.......19

        B.    The Only Exception is "Immediate Injunctive Relief," Which Plaintiffs Have Not Pursued.............................22

    II.    Plaintiffs are Equitably Estopped from Suing Non-Signatory Defendants for Claims that Arise Under and are Intertwined with the Carequality and TEFCA Agreements...............................26

CONCLUSION .......................................................................................29

1

## **TABLE OF AUTHORITIES**

2

3

**Page(s)**

4

**Cases**

5    *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)....................................................................17

6    *ASP Props. Grp., L.P. v. Fard, Inc.*, 133 Cal. App. 4th 1257 (2005) ............19, 26

7    *B & O Mfg., Inc. v. Home Depot U.S.A., Inc.*, No. C 07–02864, 2007 WL
8       3232276 (N.D. Cal. Nov. 1, 2007) ..............................................................20

     *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)..................................................17
9
     *Bliss v. Cal. Coop. Producers*, 30 Cal.2d 240 (1947) .........................................11
10

11   *Brosnan v. Dry Cleaning Station, Inc.*, No. C–08–02028, 2008 WL 2388392
        (N.D. Cal. June 6, 2008)..........................................................................19, 22
12
     *Burch v. California Dep't of Motor Vehicles*, No. 2:13-CV-01283-TLN-DB,
13      2017 WL 3537242 (E.D. Cal. Aug. 17, 2017) ..............................................23

14   *Centaur Corp. v. ON Semiconductor Components Indus., LLC*, No. 09-cv-2041,
        2010 WL 444715 (S.D. Cal. Feb. 2, 2010).....................................................19
15
     *Charles J. Rounds Co. v. Joint Council of Teamsters, No. 42*, 4 Cal. 3d 888
16      (1971)...........................................................................................................19

17   *Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969 (9th Cir. 2004)........................17

18   *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 68 Cal. App.
        4th 445 (1998)................................................................................................26
19
     *Comer v. Micor, Inc.*, 436 F.3d 1098 (9th Cir. 2006) ........................................27
20

21   *Delamater v. Anytime Fitness, Inc.*, 722 F. Supp. 2d 1168 (E.D. Cal. 2010)
        .................................................................................................................19, 22
22
     *Dominion Transmission, Inc. v. Precision Pipeline, Inc.*, No. 3:13-cv-442, 2013
23      WL 5962939 (E.D. Va. 2013) ......................................................................20

     *Empire State Sur. Co. v. Nw. Lumber Co.*, 203 F. 417 (9th Cir. 1913)...............23
24
     *Ford v. Cole*, No. CV 21-88-DMG-MAR, 2023 WL 4681362 (C.D. Cal. June 2,
25      2023)..............................................................................................................24

26   *Founding Members of the Newport Beach Country Club v. Newport Beach
        Country Club, Inc.*, 109 Cal. App. 4th 944 (2003)..........................................18
27
     *Gallatin Wildlife Ass'n v. United States Forest Serv.*, 743 F. App'x 753 (9th Cir.
28      2018)..............................................................................................................23

*Goldman v. KPMG, LLP*, 173 Cal. App. 4th 209 (2009) ........................27, 28, 29

*Guzman v. RLI Corp.*, No. CV2008318-JAK-ASX, 2020 WL 6815025 (C.D. Cal. Nov. 6, 2020) ........................................................................................................24

*Hemphill v. Wright Family, LLC*, 234 Cal. App. 4th 911 (2015)........................25

*In re S. Bay United Pentecostal Church*, 992 F.3d 945 (9th Cir. 2021) .............23

*JSM Tuscany, LLC v. Superior Ct.*, 193 Cal. App. 4th 1222 (2011)....................27

*Kim v. City of Santa Clara*, 448 F. App'x 780 (9th Cir. 2011) (Tashima, J, dissenting)............................................................................................................23

*Kramer v. Toyota Motor Corp.*, 705 F.3d 1122 (9th Cir. 2013) (summarizing California estoppel doctrine) ..................................................................27, 28

*Lloyd's Underwriters v. Craig & Rush, Inc.*, 26 Cal. App. 4th 1194 (1994) ..............................................................................................................18

*Lujano v. Warden of Golden State Annex Det. Facility*, No. 1:26-CV-00131-TLN-AC, 2026 WL 77428 (E.D. Cal. Jan. 9, 2026) ........................................24

*Moreno v. Quemuel*, 219 Cal. App. 4th 914 (2013) ............................................23

*Pareto v. FDIC*, 139 F.3d 696 (9th Cir. 1998) ....................................................18

*Sackman v. City of Los Angeles*, No. CV1500090-DMG-FFM, 2015 WL 13917122 (C.D. Cal. Jan. 26, 2015) ..................................................................24

*Salinas Valley Mem'l Healthcare Sys. v. Monterey Peninsula Horticulture, Inc.*, No. 17-CV-07076-LHK, 2019 WL 2569545 (N.D. Cal. June 21, 2019) ..............................................................................................................19

*Sanders Cnty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741 (9th Cir. 2012) ..............................................................................................................23

*Sor Tech., LLC v. MWR Life, LLC*, No. 318-cv-2358, 2019 WL 4060350 (S.D. Cal. Aug. 28, 2019) ..............................................................................................19

*Target Corp. v. Wolters Kluwer Health, Inc.*, No. CV 15-6350-AB, 2015 WL 12646483 (C.D. Cal. Dec. 16, 2015).........................................................19, 22

*Tattoo Art, Inc. v. Tat Int'l, LLC*, 711 F.Supp.2d 645 (E.D. Va. 2010) ..............20

*Weeks v. Home Depot U.S.A., Inc.*, No. 19-6780, 2020 WL 5947811 (C.D. Cal. Sept. 18, 2020) (Olguin, J.)........................................................................17, 18

*Whatley v. Valdovinos*, No. 318-cv-02761-CAB-BGS, 2019 WL 997224 (S.D. Cal. Mar. 1, 2019)................................................................................................24

**Rules**

Fed. R. Civ. P. 9(b) ................................................................................................3

6

Fed. R. Civ. P. 12(b)(6) ............................................................3

Fed. R. Civ. P. 65(b) ..............................................................25

Local Rule 7-3 .......................................................................3

**Statutes**

Cal. Civ. Code § 1436................................................................19

California Business & Professions Code § 17200 et seq. .....................11

**Other Authorities**

Black's Law Dictionary (12th ed. 2024) ..................................23, 25

Black's Law Dictionary 764 (8th ed. 2004) ..................................23

Black's Law Dictionary 816 (9th ed. 2009) ..................................23

Computer Fraud and Abuse Act .................................................12

Implementer's or Carequality Connection's Act...............................13

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

### INTRODUCTION

Plaintiffs Epic Systems Corporation ("Epic"), Reid Hospital & Health Care Services, Inc., Trinity Health Corporation, and UMass Memorial Health Care, Inc. (collectively, the "Plaintiffs") had no business filing this lawsuit. At its core, this lawsuit is an attempt by Epic, the dominant player in the electronic health records market, and some of the hospital systems it serves, to thwart independent and innovative health care providers from accessing patient records through two health information exchange networks to enable such providers to safely treat those patients. Although Epic claims that it is "deeply committed to ensuring patients' health information can follow them wherever they receive treatment," this commitment plainly does not extend to smaller providers whom Epic considers a competitive threat. ECF No. 1 at ¶ 113. By crushing potential competition, Epic and its hospital system customers can continue to secure their dominant market position and health records and health care revenue streams. Setting aside Plaintiffs' ulterior motives, their lawsuit cannot survive because it fails to overcome a fundamental threshold issue.

As Plaintiffs are well aware, the contracts they put at issue require Plaintiffs to exhaust a private dispute resolution process before filing a lawsuit. Yet Plaintiffs did not exhaust those efforts – indeed, the plaintiff hospital systems did not even participate in the dispute resolution process that Epic began, only to later abandon. Instead, Plaintiffs chose to file a ninety-page complaint in this Court, in a premeditated plan to publicly defame the RavillaMed Defendants while attempting to hide behind the litigation privilege to shield themselves from liability. As Plaintiffs know, this case could be tied up in court for years until the RavillaMed Defendants can exonerate themselves once and for all. But by then, even if Plaintiffs do not prevail on the merits of their claims, the effect on the RavillaMed Defendants will be the same – Plaintiffs will have already wreaked irreparable havoc on the businesses and reputations of the RavillaMed Defendants in the interim.

The problem with the Plaintiffs' strategy is that it paints a wildly false and defamatory picture of the RavillaMed Defendants that is detached from reality. The truth is that the RavillaMed Defendants did nothing wrong. Dr. Ravilla, through RavillaMed, offers telehealth services to patients. Shere Saidon and his company, LlamaLab, offer technical services to RavillaMed. For both companies, patient care and privacy are paramount. Neither company steals, sells, or misuses patient information – period. Although Plaintiffs do not understand, do not like, and do not want to compete with the RavillaMed Defendants' businesses, that does not allow Plaintiffs to fabricate and broadcast baseless allegations.

Another reason Plaintiffs turned their back to the mandatory dispute resolution processes at issue is also clear. In their Complaint, Plaintiffs essentially concede they are attempting to avoid dispute resolution procedures they cannot control, sidestep independent boards they do not respect, and circumvent the authority of those boards to render decisions they do not like. The Complaint is remarkably candid in this assessment. But whatever Plaintiffs' opinions, these are the procedures to which they – and everyone else participating in these electronic health records networks – are bound. Allowing Plaintiffs to bypass their contractually obligated dispute resolution procedures would force this Court to adjudicate complex questions that the parties expressly agreed to submit to private boards with specialized technical knowledge to handle these types of disputes.[2]

The only exception to the mandatory dispute resolution process occurs when a party seeks "immediate injunctive relief," but Plaintiffs have not sought *immediate* relief either. Plaintiffs admit in their own allegations that they submitted their grievances against the RavillaMed Defendants to the dispute resolution boards on

---

[2] Indeed, Plaintiffs' current allegations may be only the tip of the iceberg. Plaintiffs named 100 "Doe" Defendants to the Complaint, effectively reserving the right to inject into this case any future network access dispute Plaintiffs choose.

RavillaMed Defendants' Motion to Dismiss

November 7, over three months ago.  They filed suit on January 13, nearly two months ago.  But, as of the date of this filing, Plaintiffs still have not filed an application for a temporary restraining order or a motion for preliminary injunction.  In other words, they have shown no immediacy or urgency whatsoever.  As sophisticated parties represented by sophisticated counsel, Plaintiffs know they must file a motion for temporary restraining order or seek a preliminary injunction without delay.  Yet, indisputably, they have not done so.[3]

Allowing this case to survive would undermine this Court's fundamental interests in promoting judicial economy, fairness, and respect for the parties' contractual commitments.  If Plaintiffs believe they have a legitimate grievance, they must abide by the procedure the parties adopted to resolve such grievances.  As explained below, the RavillaMed Defendants respectfully request that the Court dismiss this case without prejudice, so the parties can address these issues in the appropriate forum and put an end to Plaintiffs' baseless allegations.

## BACKGROUND

Plaintiffs OCHIN, Reid, Trinity, and UMass (collectively, the "Hospital Plaintiffs") are members of two health information networks: Carequality and the Trusted Exchange Framework and Common Agreement ("TEFCA").  For the Carequality framework, Epic serves as an "implementer," facilitating access to the exchange network for the Hospital Plaintiffs and other "Carequality Connections." ECF No. 1 ("Compl.") ¶¶ 6, 7, 116, 117, 118, 119.  For the TEFCA framework, Epic plays the same role under the title of Qualified Health Information Network

---

[3] Nor could Plaintiffs meet any standard for such exigent relief.  As Plaintiffs acknowledge, their internal dispute against RavillaMed already resulted in a perfunctory suspension of RavillaMed's access to the Carequality and TEFCA interoperability frameworks.  ECF No. 1 at ¶ 188.  Any attempt to obtain a temporary restraining order or preliminary injunction against the RavillaMed Defendants would be moot.

("QHIN"), facilitating access to the exchange network for the Hospital Plaintiffs and other "Participants." *Id.* ¶¶ 115-19.[4]

Defendant Avinash Ravilla is a Doctor of Osteopathy who founded and owns RavillaMed. *Id.* ¶ 32. Through RavillaMed, Dr. Ravilla offers medical services, including the evaluation and management of chronic health conditions. *Id.* Like the Hospital Plaintiffs, RavillaMed is a Carequality Connection and TEFCA Participant. *Id.* ¶ 32. Co-Defendant Health Gorilla is RavillaMed's implementer in the Carequality network and as its QHIN in the TEFCA network. *Id.*

In their Complaint, Plaintiffs allege RavillaMed accessed patient records through the Carequality and TEFCA networks from the Hospital Plaintiffs. *Id.* ¶ 146. Although RavillaMed stated it was obtaining these patient records to treat its patients, Plaintiffs allege it did not actually provide treatment. *Id.* ¶ 157. That (baseless) allegation is at the center of every claim against the RavillaMed Defendants. *See* FRAUD, *id.* ¶¶ 202-03 ("RavillaMed obtained those patient records based on the assertion that the patient records were all being sought for treatment purposes. . . Those assertions were false. . . ."); AIDING AND ABBETTING FRAUD, *id.* ¶ 254 ("Defendants Ravilla and Saidon knew that RavillaMed was misstating its true purpose and that its treatment-purpose requests were false. . . ."); CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200 ET SEQ., *id.* ¶ 282 ("Defendants engaged in unlawful and fraudulent business practices by misrepresenting the purposes for which they sought patient records. . . ."); BREACH OF CONTRACT, *id.* ¶¶ 309, 315 ("By submitting fraudulent requests for patient data to conceal that the requests were not made for a permitted purpose," RavillaMed breached the

---

[4] Technically speaking, Epic alleges that its subsidiary, Epic Nexus, assigned its claims as a QHIN in the TEFCA framework to Epic. *Id.* ¶ 26. That assignment, however, does not allow Epic to avoid the RavillaMed's defenses or arguments here. *See Bliss v. Cal. Coop. Producers*, 30 Cal.2d 240, 248 (1947) ("The general rule is that an assignee … is subject to all equities and defenses existing at or before notice of the assignment.").

Carequality and TEFCA terms); COMPUTER FRAUD AND ABUSE ACT, *id*. ¶ 323 ("By fraudulently obtaining access to the Carequality Framework and TEFCA based on false assertions of 'treatment', RavillaMed gained access to protected computers used to store sensitive patient records.").

## I.    The Carequality and TEFCA Governing Agreements Require Plaintiffs to Pursue their Claims Under an Alternative Dispute Resolution Process.

Parties to the Carequality and TEFCA frameworks are bound by several related agreements, each of which contains a mandatory dispute resolution procedure.  Epic is bound as an implementer to the Carequality Connected Agreement ("the Implementer's Agreement") (ECF No. 1-1 ("Exhibit A")), while the Hospital Plaintiffs – along with RavillaMed – are bound as Carequality Connections to the Carequality Connection Terms ("the Connection Terms") (ECF No. 1-2 ("Exhibit B")).  Similarly, under the TEFCA framework, Epic is bound as a QHIN to the Common Agreement for Nationwide Health Information Interoperability ("the Common Agreement").  ECF No. 1-5 ("Exhibit E").  The Hospital Plaintiffs, along with RavillaMed, are bound as TEFCA Participants to the Terms of Participation ("the ToP").  ECF No. 1-6 ("Exhibit F").

*The Implementer's Agreement*

Section 20 of the Implementer's Agreement provides:

20.    ***Dispute Resolution.***[5]

20.1  Applicant acknowledges that it may be in its best interest to resolve Disputes between or among Applicant or Applicant's Carequality Connections, and Carequality, other Implementers or their Carequality Connections through a collaborative, collegial process rather than through

---

[5] The Implementer's Agreement defines "dispute" as "[a]ny controversy, dispute, or disagreement arising out of or relating to the interpretation or implementation of the Carequality Elements."  The "Carequality Elements" include all "elements that have been adopted by Carequality to support widespread interoperability among Implementers including, but not limited to, the Carequality Connected Agreement, the Carequality Connection Terms, the Carequality Directory, Implementation Guides, and the Carequality Policies."  ECF No. 1-1 at ¶¶ 1.10, 1.17.

civil litigation. Applicant has reached this conclusion based upon the fact that the legal and factual issues involved in this Agreement are unique, novel, and complex and limited case law exists which addresses the legal issues that could arise from this Agreement. Therefore, Applicant *shall* submit Disputes to the non-binding dispute resolution process established by Carequality ("Dispute Resolution Process") (Exhibit 2). Applicant also agrees to direct its Carequality Connections to use their best efforts to resolve issues that may arise between its Carequality Connections and other Implementers' Carequality Connections or other Implementers to the extent that such Implementers do not have Carequality Connections through informal discussions before seeking to invoke the Dispute Resolution Process. In addition, Applicant agrees that if such informal discussions do not successfully resolve the issues after good faith efforts, then before a Dispute is submitted to the Dispute Resolution Process, Applicant will seek to facilitate the informal resolution of such issues directly between itself and the other affected Implementer(s). To the extent that such issues cannot be resolved through cooperation between Applicant and the other Implementer(s), Applicant on behalf of its Carequality Connection may choose to submit the Dispute to the Dispute Resolution Process….

ECF No. 1-1 (emphasis added).

There is one exception to this requirement. If the "Applicant (i) believes that another Implementer's or Carequality Connection's act or omission will cause irreparable harm to Applicant or another organization or individual (e.g. Implementer, Carequality Connection, End User or consumer) and (ii) pursues immediate injunctive relief against such Implementer or Carequality Connection in a court of competent jurisdiction." *Id*. at ¶ 20.2.1. Even then, "[i]f the immediate injunctive relief is denied, and Applicant chooses to pursue the Dispute, the Dispute must be submitted to the Dispute Resolution Process." *Id*. at ¶ 20.2.2. It is only after "following the Dispute Resolution Process" that an Applicant is free to "pursue any remedies available to it in a court of competent jurisdiction." *Id*. at ¶ 20.5. If the "Applicant refuses to participate in the Dispute Resolution Process, such refusal shall constitute a material breach of this Agreement and may be grounds for termination. . . ." *Id*. at ¶ 20.1.

*The Connection Terms*

Similarly, as Carequality Connections, the Hospital Plaintiffs (along with Defendant RavillaMed) are bound by the Connection Terms, which include a dispute resolution provision that is similar to corresponding terms of the Implementer's Agreement:

> 9. **Dispute Resolution.**[6]
>
> 9.1. Organization acknowledges that it may be in its best interest to resolve Disputes between or among Organization, or its End Users, and Carequality, other Implementers or their Carequality Connections through a collaborative, collegial process rather than through civil litigation. Organization has reached this conclusion based upon the fact that the legal and factual issues involved in these Carequality Connection Terms are unique, novel, and complex and limited case law exists which addresses the legal issues that could arise from these Carequality Connection Terms or the Enforcing Agreement. Organization acknowledges that Carequality has adopted a Dispute Resolution Process which Organization agrees to follow. Further, Organization agrees to use its best efforts to resolve Disputes with Carequality, other Carequality Connections and their Implementers or with another Implementer directly if the Dispute does not involve another Implementers' Carequality Connections, through discussions with those involved in such Dispute before even submitting the Dispute to its Implementer pursuant to the Dispute Resolution Process….

ECF No. 1-2.

If, "despite using its best efforts," a Connection "cannot resolve any Dispute through discussions with the other parties," it must "notify the Sponsoring Implementer of the Dispute and request that the Implementer initiate the Dispute Resolution Process." *Id*. at ¶ 9.2. The Connection is "required to undertake these efforts in the event of a Dispute *before seeking any other recourse*." *Id*. (emphasis added).

---

[6] "Dispute" and "Carequality Elements" share the same definition in the Connection Terms as they do in the Implementer's Agreement. *See id*. at ¶¶ 1.7, 1.14.

As with the Implementer's Agreement, the Connection Terms includes an exception to the mandatory dispute resolution process if a Connection: (i) believes that another party's act or omission will cause irreparable harm and (ii) pursues immediate injunctive relief. *Id.* at ¶ 9.3. If the request for immediate injunctive relief is denied, "the Dispute must be submitted to the Organization's Sponsoring Implementer in accordance with the Dispute Resolution Process so that the Sponsoring Implementer can determine next steps." *Id.*

*The Common Agreement*

Epic's obligations as a signatory to TEFCA's Common Agreement bind them to a virtually identical dispute resolution process:

15. **Dispute Resolution**.

15.1. <u>Acknowledgement and Consent to Dispute Resolution Process</u>. Signatory acknowledges that it may be in its best interest to resolve Disputes related to the Common Agreement through a collaborative, collegial process rather than through civil litigation. Signatory has reached this conclusion based upon the fact that the legal and factual issues related to the exchange and related activities under the Common Agreement are unique, novel, and complex, and limited case law exists that addresses the legal issues that could arise in connection with this Common Agreement. Therefore, Signatory agrees to participate in the Dispute Resolution Process with respect to any Dispute[7]....

To that end, Signatory shall use its best efforts to resolve Disputes that may arise with other QHINs, their respective Participants and Subparticipants, or the RCE through informal discussions before seeking to invoke the Dispute Resolution Process. Likewise, Signatory, on its own behalf and on behalf of its Participant(s) or Subparticipant(s), will seek to resolve Disputes involving the RCE through good-faith informal discussions with the RCE prior to invoking the Dispute Resolution Process. If the Dispute

---

[7] The Common Agreement defines "Dispute" as "(i) a disagreement about any provision of the Common Agreement, including any Standard Operating Procedure, the QHIN Technical Framework, and all other attachments, exhibits, and artifacts incorporated by reference; or (ii) a concern or complaint about the actions, or any failure to act, of Signatory, the RCE, or any other QHIN or another QHIN's Participant(s)." *Id.*

> cannot be resolved through cooperation between Signatory and the other
> QHIN(s) or the RCE, then the RCE may, or Signatory may on its own
> behalf or on behalf of its Participant(s) or Subparticipant(s), choose to
> submit the Dispute to the Dispute Resolution Process….

ECF No. 1-5.

As with the Carequality Agreement, if the Signatory "refuses to participate in the Dispute Resolution Process, such refusal shall constitute a material breach of this Common Agreement and may be grounds for suspension or termination of Signatory's participation in TEFCA Exchange." *Id.* An exception exists for immediate injunctive relief, where the Signatory: "(i) makes a good faith determination that is based upon available information or other evidence that another QHIN's or its Participants' or Subparticipants' acts or omissions will violate Section 7.1 or cause irreparable harm to Signatory or another organization or person (e.g., another QHIN or its Participant or an Individual); and (ii) pursues immediate injunctive relief against such QHIN or its Participant or Subparticipant in a court of competent jurisdiction in accordance with Section 19.3." *Id.* at ¶ 15.2.1. If the immediate injunctive relief sought in Section 15.2.1 is not granted and Signatory chooses to pursue the Dispute, the Dispute must be submitted to the Dispute Resolution Process in accordance with Section 15.1. *Id.* at ¶ 15.2.2. If, "following the completion of the Dispute Resolution Process," in the opinion of either Party, the Dispute Resolution Process failed to adequately resolve the Dispute, a Party may pursue any remedies available to it in a court of competent jurisdiction in accordance with Section 19.3. *Id.* at ¶ 15.5.

## II. Plaintiffs Initiated, Then Abandoned, the Dispute Resolution Process.

In the Complaint, Plaintiffs concede they are bound by these agreements and acknowledge the Carequality and TEFCA dispute resolution processes. They allege, however, that the dispute resolution boards are "opaque" bodies "where vendor confidentiality is valued above protecting the privacy rights of patients." ECF No. 1 at ¶ 17. They similarly characterize the dispute resolution boards as secretive,

insufficient, and protective of bad actors. *Id.* ¶¶ 17, 131, 137. Plaintiffs provide examples of instances where Epic submitted concerns to the dispute resolution process but was unsatisfied with the results. *Id.*

Plaintiffs have not alleged they have fully exhausted the mandatory dispute resolution procedures under the Carequality and TEFCA frameworks to reach a final decision concerning the RavillaMed Defendants. Instead, Plaintiffs admit that "the issues remain unresolved" concerning the RavillaMed Defendants, even though on November 7, 2025, Epic reported "evidence of RavillaMed's misconduct" to Carequality and Health Gorilla, "requesting an investigation and that [RavillaMed] be stopped from taking records." *Id.* ¶ 158. Plaintiffs also admit that on January 11, 2026 – two days before the filing their Complaint – Epic learned RavillaMed was "voluntarily inactivated" from the Carequality and TEFCA networks (*id.* ¶ 188), yet it proceeded with this lawsuit attempting to inactivate RavillaMed from those networks anyway.

## ARGUMENT

To survive a motion to dismiss, a complaint must "proffer enough facts to state a claim to relief that is plausible on its face." *Weeks v. Home Depot U.S.A., Inc.*, No. 19-6780, 2020 WL 5947811, at *2 (C.D. Cal. Sept. 18, 2020) (Olguin, J.) (internal quotations and citations omitted); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the factual allegations allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In so doing, a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *see also Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969, 973 (9th Cir. 2004) ("[T]he court is not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged. Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or

unreasonable inferences.") (citations and internal quotation marks omitted). Accordingly, while a court must accept facially plausible factual allegations as true, conclusory allegations and unwarranted inferences are not entitled to the same presumption. *Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir. 1998); *Weeks*, 2020 WL 5947811, at *2. As explained below, Plaintiffs fail to satisfy those standards here.

## I. The Court Should Dismiss Plaintiffs' Claims Against the RavillaMed Defendants Because Plaintiffs Failed to Exhaust the Dispute Resolution Process Required Under the Health Information Frameworks.

By filing their complaint, Plaintiffs presented a network eligibility dispute to this Court that they should have filed with the governance boards identified in and required by their Carequality and TEFCA contracts. Under those agreements, Plaintiffs must present all disputes concerning participant access and eligibility to a multi-step dispute resolution process. Unless Plaintiffs complete that process, they cannot file suit on those same claims, plain and simple. Plaintiffs are well-aware of these contractual obligations. They initiated the dispute resolution process against RavillaMed, only to abandon it two months later in favor of litigation.

When interpreting a contract, the court must "give effect to the parties' mutual intent at the time of contracting." *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 109 Cal. App. 4th 944, 955 (2003). If possible, the court must determine the parties' intention from the writing alone. *Id.* In interpreting the contract, its words "are to be understood in their ordinary and popular sense." *Id.* (citing *Lloyd's Underwriters v. Craig & Rush, Inc.*, 26 Cal. App. 4th 1194, 1197-1198 (1994) ("We interpret the intent and scope of the agreement by focusing on the usual and ordinary meaning of the language used and the circumstances under which the agreement was made")). The language in a contract must be interpreted "as a whole" and given a construction that best ensures its terms are "lawful, operative, definite, reasonable, and capable of being carried into effect."

*ASP Props. Grp., L.P. v. Fard, Inc*., 133 Cal. App. 4th 1257, 1269 (2005).  The interpretation must be reasonable, fair, and not lead to "absurd conclusions."  *Id.*

### A.    Satisfaction of the TEFCA and Carequality Dispute Resolution Provisions Is a Condition Precedent to Litigation.

When contracting parties agree that defined dispute-resolution steps must occur before litigation, the exhaustion of those procedures is a "condition precedent" to filing a lawsuit.  *See* Cal. Civ. Code § 1436 (providing that a condition precedent is an act that must occur "before some right dependent thereon accrues").  Under California law, a plaintiff cannot pursue its claims without completing their contractually required dispute resolution process.  *See Charles J. Rounds Co. v. Joint Council of Teamsters, No. 42*, 4 Cal. 3d 888 (1971) (the failure to complete a contractually required dispute-resolution mechanism bars a plaintiff's claims).

Federal courts consistently apply that principle to dismiss such actions for failure to state a claim.  *See, e.g.*, *Sor Tech., LLC v. MWR Life, LLC*, No. 318-cv-2358, 2019 WL 4060350, at *3 (S.D. Cal. Aug. 28, 2019) ("When a contract clause makes mediation a condition precedent to filing a lawsuit, '[f]ailure to mediate ... warrants dismissal') (quoting *Delamater v. Anytime Fitness, Inc*., 722 F. Supp. 2d 1168, 1180–81 (E.D. Cal. 2010)); *Salinas Valley Mem'l Healthcare Sys. v. Monterey Peninsula Horticulture, Inc*., No. 17-CV-07076-LHK, 2019 WL 2569545, at *4–6 (N.D. Cal. June 21, 2019) ("District courts have dismissed claims" when dispute resolution provisions, as conditions precedent to litigation, have not been followed); *Target Corp. v. Wolters Kluwer Health, Inc*., No. CV 15-6350-AB (FFMX), 2015 WL 12646483, at *4–5 (C.D. Cal. Dec. 16, 2015) (holding that "[a]n alternative dispute provision . . . is considered a condition precedent to filing lawsuit" such that failure to complete the obligation renders a lawsuit "premature"); *Centaur Corp. v. ON Semiconductor Components Indus., LLC*, No. 09-cv-2041, 2010 WL 444715, at *4 (S.D. Cal. Feb. 2, 2010) ("As mediation is a condition precedent to litigation between the parties, the current lawsuit is premature"); *Brosnan v. Dry Cleaning Station, Inc.*,

No. C–08–02028, 2008 WL 2388392, at *2 (N.D. Cal. June 6, 2008) ("failure to mediate a dispute pursuant to a contract that makes mediation a condition precedent to filing a lawsuit warrants dismissal"); *B & O Mfg., Inc. v. Home Depot U.S.A., Inc.*, No. C 07–02864, 2007 WL 3232276, *8 (N.D. Cal. Nov. 1, 2007) ("A claim that is filed before a mediation requirement, that is a condition precedent to the parties' right to sue as set forth in an agreement, is satisfied shall be dismissed."); *see also Tattoo Art, Inc. v. Tat Int'l, LLC*, 711 F.Supp.2d 645, 651 (E.D. Va. 2010) ("'[F]ailure to mediate a dispute pursuant to a contract that makes mediation a condition precedent to filing a lawsuit warrants dismissal.'").

Choosing to grant dismissal without prejudice – as opposed to a stay of litigation – is the appropriate remedy in cases like this. That way the moving party can receive the "benefit of their bargain" by placing the parties where they agreed to be had the contract been honored – out of court, and in the dispute resolution process. *See Dominion Transmission, Inc. v. Precision Pipeline, Inc.*, No. 3:13-cv-442, 2013 WL 5962939 at *6 (E.D. Va. 2013) (explaining that the plaintiff is entitled to the "benefit of its bargain" and therefore holding that, until the defendant complies with contractually-obligated dispute resolution, "the instant dispute should not be before this Court"); *Tattoo Art, Inc.*, 711 F.Supp.2d at 652 (dismissing the plaintiff's claims and explaining that, "by failing to request mediation prior to filing this lawsuit, Plaintiff denied Defendants the benefit of their bargain").

Here, the Carequality Implementer's Agreement, the Carequality Connection Terms, and the TEFCA Common Agreement each require Plaintiffs to exhaust the dispute resolution process before filing suit. *See* ECF Nos. 1-1 at ¶ 20.1, 1-2 at ¶ 9.1, 1-5 at ¶ 15.1 (recognizing that disputes arising under the agreements present legal and factual issues that "are unique, novel, and complex" and which are, therefore, preferable to resolve through a "collaborative, collegial process rather than through civil litigation").

RavillaMed Defendants' Motion to Dismiss

More specifically, the Carequality Implementer's Agreement, which binds Epic, provides that Epic "shall" submit all disputes to the Carequality dispute resolution process. ECF No. 1-1 at ¶ 20.1. Epic can "pursue any remedies available to it in a court of competent jurisdiction" only after "*following* the Dispute Resolution Process." *Id.* at ¶ 20.5 (emphasis added). Those dispute resolution procedures are so integral to the Carequality governance scheme that failure to follow them constitutes a material breach of the contract and can result in termination from the network. *Id.* at ¶ 20.1.[8]

Similarly, the Carequality Connection Terms require the Hospital Plaintiffs to exhaust the dispute resolution process before filing suit. The Hospital Plaintiffs each "agree[d] to follow" that process and are "required to undertake" the specified dispute-resolution efforts "*before seeking any other recourse*." ECF No. 1-2 at ¶¶ 9.1, 9.2. (emphasis added).

TEFCA's Common Agreement, which binds Epic as a party, incorporates the same requirement that alternative dispute resolution must precede litigation. *See* ECF No. 1-5 at ¶ 15.1 (requiring Epic to participate in the dispute resolution process with respect to "any dispute," including disputes brought on Plaintiffs' behalf). As with the Carequality agreements, a party may seek court intervention only to pursue immediate injunctive relief – and, if denied, must return to the dispute resolution process. *Id.* at ¶ 15.2.2. Court remedies are only available "*following the completion of the Dispute Resolution Process*." *Id.* at ¶ 15.5 (emphasis added). As with the Implementer's Agreement, refusal to participate in the dispute resolution process is a material breach of the Common Agreement and grounds for suspension or termination of participation in the TEFCA exchange. *Id.* at ¶ 15.1. Similarly, the Connection

---

[8] Even in cases where a party invokes the sole exception to the dispute resolution process, by seeking immediate injunctive relief, the agreement requires that they return to the dispute resolution process if injunctive relief is denied. *Id.* at ¶ 20.2.2.

RavillaMed Defendants' Motion to Dismiss

Terms require the Hospital Plaintiffs to follow the dispute resolution process *before seeking any other recourse* in a court of law.  ECF No. 1-2 at ¶ 9.2.

The language of these agreements is unambiguous and comports with other dispute resolution clauses courts have found to establish conditions precedent to litigation.  *See Target Corp.*, 2015 WL 12646483, at *2 (partes agreed to "follow and participate in" dispute resolution process "before pursuing any other remedy"); *Delamater*, 722 F. Supp. 2d at 1172 (parties agreed to mediate "prior to initiating any legal action or arbitration"); *Brosnan*, 2008 WL 2388392, at *1 (parties agreed to mediate "prior to initiating any legal action").  In each case, the court dismissed the complaint where the plaintiff initiated litigation prematurely.  *Id*.

## B.    The Only Exception is "Immediate Injunctive Relief," Which Plaintiffs Have Not Pursued.

Plaintiffs wrongly argue that they pursue this lawsuit under the sole exception to the dispute resolution requirements – to seek *immediate* injunctive relief.  But the Plaintiffs have done no such thing.  More than three months have passed since Plaintiffs first raised this dispute.  As explained below, it is far too late for them to pursue "immediate" relief now.

The Carequality and TEFCA mandatory dispute resolution provisions impose a single, narrow carve-out to completion of the dispute resolution process: a party may "pursue immediate injunctive relief" in court only when they believe another party is causing "irreparable harm."  ECF Nos. 1-1 at ¶ 20.2.1, 1-2 at ¶ 9.3, 1-5 at ¶ 15.2.1.  Through both context and the plain meaning of these terms, this exception is limited to actions for emergency relief.  A plaintiff must immediately invoke that exception without delay through a motion for Temporary Restraining Order ("TRO") or Preliminary Injunction ("PI").  In this case, that ship has undeniably sailed.

Plaintiffs appear to recognize that the Court should dismiss their complaint unless they invoke this narrow exception.  For that reason, Plaintiffs peppered their Complaint with assertions that they are seeking "immediate injunctive relief."  ECF

No. 1 at ¶¶ 25, 216, 259, 285, 300, 317, PRAYER FOR RELIEF.  But the relevant agreements obligate Plaintiffs to do more than characterize a demand for permanent injunctive relief as one for immediate relief.  They must take immediate action.  Yet more than three months have passed since Plaintiffs first raised this dispute, and nearly two months have passed since they filed their lawsuit.  The pursuit of "immediate" injunctive relief has long since passed.  The plain and ordinary language of the contracts, their context, and their meaning within the overall framework confirm that Plaintiffs failed to satisfy the immediacy requirement for several reasons.

First, Plaintiffs cannot satisfy the plain meaning of the phrase "immediate injunctive relief."  Under its ordinary and popular context, the word "immediate" means "[o]ccurring without delay; instant."  Black's Law Dictionary (12th ed. 2024); *see also Kim v. City of Santa Clara*, 448 F. App'x 780, 783 (9th Cir. 2011) (Tashima, J, dissenting) (defining "immediate" as "[o]ccuring without delay; instant") (quoting Black's Law Dictionary 816 (9th ed. 2009)); *Empire State Sur. Co. v. Nw. Lumber Co*., 203 F. 417, 420 (9th Cir. 1913) (defining the word "immediate" to be synonymous with "at once"); *Moreno v. Quemuel*, 219 Cal. App. 4th 914, 918 (2013) ("We give the word 'immediate' its commonsense interpretation, meaning something that is accomplished without delay"); *Burch v. California Dep't of Motor Vehicles*, No. 2:13-CV-01283-TLN-DB, 2017 WL 3537242, at *8 (E.D. Cal. Aug. 17, 2017) (defining "immediate" as "[o]ccurring without delay; instant") (quoting Black's Law Dictionary 764 (8th ed. 2004)).

When the term "immediate" is paired with the phrase "injunctive relief," it refers to filing either a motion for TRO or PI, neither of which Plaintiffs filed here. *See, e.g.*, *In re S. Bay United Pentecostal Church*, 992 F.3d 945, 949 (9th Cir. 2021) (referring to a TRO as a motion for "immediate injunctive relief"); *Gallatin Wildlife Ass'n v. United States Forest Serv*., 743 F. App'x 753, 757 (9th Cir. 2018) (referring to a motion for PI as "immediate injunctive relief"); *Sanders Cnty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 744 (9th Cir. 2012) (considering a motion for PI on

1  *de novo* review and describing it as "immediate injunctive relief"); *Guzman v. RLI*

2  *Corp.*, No. CV2008318-JAK-ASX, 2020 WL 6815025, at *3 (C.D. Cal. Nov. 6, 2020)

3  (referring to a TRO as a motion for "immediate injunctive relief"); *Sackman v. City*

4  *of Los Angeles*, No. CV1500090-DMG-FFM, 2015 WL 13917122, at *1 (C.D. Cal.

5  Jan. 26, 2015) (referring to an *ex parte* motion for TRO as "immediate injunctive

6  relief").

7      Indeed, when a court receives a request for "immediate injunctive relief"

8  without specifying the type of motion or request at issue, courts within the Ninth

9  Circuit construe the motion as one for TRO or PI.  *See*, *e.g.*, *Lujano v. Warden of*

10  *Golden State Annex Det. Facility*, No. 1:26-CV-00131-TLN-AC, 2026 WL 77428, at

11  *1 (E.D. Cal. Jan. 9, 2026) (construing *pro se* plaintiff's request for immediate

12  injunctive relief to be a motion for TRO); *Ford v. Cole*, No. CV 21-88-DMG-MAR,

13  2023 WL 4681362, at *1 (C.D. Cal. June 2, 2023) (construing *pro se* plaintiff's

14  request for immediate injunctive relief to be a motion for TRO); *Whatley v.*

15  *Valdovinos*, No. 318-cv-02761-CAB-BGS, 2019 WL 997224, at *1 (S.D. Cal. Mar. 1,

16  2019) (construing *pro se* plaintiff's request for immediate injunctive relief to be a

17  motion for TRO).  Although Plaintiffs contend seek a TRO and PI as stated in their

18  Complaint, it is undeniable that they have failed to pursue either of those remedies

19  immediately here.

20      Second, the RevillaMed Defendants' usual and ordinary interpretation of the

21  phrase "immediate injunctive relief" comports with the context and purpose of the

22  relevant agreements.  Under each of the relevant provisions, two elements must be

23  met to excuse a party from mandatory dispute resolution: (1) a belief that irreparable

24  harm is occurring[9]; and (2) the pursuit of immediate injunctive relief to stop it.  ECF

---

26  [9] As evidence of "significant harms," Plaintiffs assert that "Defendants' abuses
27  pose an imminent danger of creating a crisis in confidence in interoperability and
consequent reticence among healthcare providers to participate in interoperability."
28  ECF No. 1 at ¶ 193.  In addition to being purely speculative and overblown, this
assertion is facially indistinguishable from the irreparable harm Plaintiffs are

Nos. 1-1 at ¶ 20.2.1, 1-2 at ¶ 9.3, 1-5 at ¶ 15.2.1.  These two adjectives – "immediate" and "irreparable" – are *requirements for a TRO*.  *See* Fed. R. Civ. P. 65(b) (requiring affidavit or certified complaint supporting motion to "clearly show that *immediate and irreparable* injury, loss, or damage will result" absent relief) (emphasis added).  Together, these terms emphasize urgent conditions that mandate emergency relief – precisely the kind of relief granted by a motion for TRO or a motion for PI when filed immediately.  The surrounding provisions further support this reading.  As provided in each of the relevant agreements, if the immediate injunctive relief sought is "not granted," the party needs to return to the dispute resolution process.  ECF Nos. 1-1 at ¶ 20.2.2, 1-2 at ¶ 9.3, 1-5 at ¶ 15.2.2.  In other words, the agreements describe a narrow exception for injunctive relief that applies to a provisional motion that only a court can immediately enforce – not as a demand for relief for legal disputes that a plaintiff could (and must) raise before the dispute resolution boards described in the agreements.

Third, Plaintiffs cannot bypass the relevant dispute resolution boards by merely stamping the words "immediate injunctive relief" on their Complaint.  Otherwise Plaintiffs could bypass the processes established by the applicable dispute resolution systems and proceed in litigation on substantive causes of action through discovery, motions practice, and trial, vitiating the purpose of establishing a dispute resolution system at all.  That construction would render the words "immediate" and "pursue" meaningless.[10]  It would nullify the terms that require Plaintiffs to exhaust dispute resolution procedures before filing suit or, alternatively, that require Plaintiffs to return to dispute resolution if a court denies their request for immediate injunctive relief.  *Hemphill v. Wright Family, LLC*, 234 Cal. App. 4th 911, 915 (2015) ("Courts

themselves inflicting on these networks by diving into this litigation instead of following to completion the contractually-required dispute resolution processes.

[10] PURSUE, Black's Law Dictionary (12th ed. 2024) ("To follow persistently in order to seize or obtain").

RavillaMed Defendants' Motion to Dismiss

must interpret contractual language in a manner which gives force and effect to every provision, and not in a way which renders some clauses nugatory, inoperative or meaningless.") (quoting *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 68 Cal. App. 4th 445, 473 (1998)).  It would create an exception to mandatory dispute resolution so large as to swallow the rule.  In short, such a construction – in light of all the language in these agreements acknowledging the intent of the parties to commit to cooperative dispute resolution and to avoid civil litigation – would be absurd.  *See ASP Props. Grp., L.P.*, 133 Cal. App. 4th at 1269 (instructing that contractual interpretation must avoid "absurd conclusions").

This Court should interpret these agreements in the manner that is most natural and consistent with their overall design and hold that to pursue "immediate injunctive relief" means to file, without delay, a motion for TRO or PI.  It should further hold that Plaintiffs – through their failure to take such action several months ago, when they first raised these disputes – have missed the window to meet this exception.  Otherwise, Plaintiffs' unjustifiable delays or empty threats to seek emergency relief would vitiate the dispute resolution process that contractually binds them, thereby creating a real danger of irreparable harm to the future of the networks.

## II.   Plaintiffs are Equitably Estopped from Suing Non-Signatory Defendants for Claims that Arise Under and are Intertwined with the Carequality and TEFCA Agreements.

Unlike RavillaMed, Defendants Dr. Ravilla, Mr. Saidon, and LlamaLab ("the Non-Signatory Defendants") are not signatories to the Carequality and TEFCA operating agreements.  Plaintiffs' claims against these Defendants should also be dismissed because they are founded on and inexorably intertwined with the Carequality and TEFCA operating agreements.  The Court should not permit Plaintiffs to litigate claims they agreed to submit to specialized dispute resolution boards by merely naming the Non-Signatory Defendants as parties to their Complaint.  Equity compels that Plaintiffs be estopped.  The entire dispute against all RavillaMed

Defendants should be dismissed and submitted, if anywhere, to the relevant dispute resolution boards.

Plaintiffs' attempt to sue the Non-Signatory Defendants while sidestepping the Carequality and TEFCA dispute-resolution process is barred by the longstanding principles of equitable estoppel. The equitable estoppel doctrine prohibits a party from "claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes." *Comer v. Micor, Inc.,* 436 F.3d 1098, 1101 (9th Cir. 2006) (internal quotation marks omitted); *see Kramer v. Toyota Motor Corp*., 705 F.3d 1122, 1128–29 (9th Cir. 2013) (summarizing California estoppel doctrine). The "linchpin" of equitable estoppel is fairness: a signatory "cannot have it both ways" by "seek[ing] to hold the non-signatory liable pursuant to duties imposed by the agreement … but … deny[ing]" the agreement's dispute-resolution clause on the ground of non-signatory status. *Goldman v. KPMG, LLP*, 173 Cal. App. 4th 209, 220 (2009) (internal quotations omitted).

For that reason, the equitable estoppel doctrine permits a non-signatory to a contract to enforce the contract's alternative dispute resolution provisions against a plaintiff that signed the contract when the plaintiff's claims are "based on, or inextricably intertwined with, the contract containing the [dispute-resolution] clause." *JSM Tuscany, LLC v. Superior Ct*., 193 Cal. App. 4th 1222, 1241 (2011); *see Comer*, 436 F.3d at 1101 (9th Cir. 2006) (a non-signatory to an agreement can compel a signatory to comply with a contract's dispute-resolution obligation when the signatory's claims "rely on the terms of the written agreement" or are "intimately founded in and intertwined with" the underlying contract) (internal quotation marks omitted). Put differently, estoppel attaches when the claims are "dependent upon, or inextricably bound up with, the obligations imposed by the contract" the plaintiff signed. *Id*. at 229–30.

That is precisely the case here. Plaintiffs' claims against the Non-Signatory Defendants depend on the proposition that RavillaMed "exploited" the

interoperability frameworks and violated the frameworks' rules governing participation and permitted purposes. *See supra*, p. 9-10 (summarizing allegations). Those duties exist only because the Carequality and TEFCA contractual regimes define who may access the network, for what purposes, and under what restrictions. *See, e.g.*, ECF No. 1 at ¶ 4 ("To protect the privacy and security of sensitive health data, these frameworks create contractual rules and governance structures, including rules for onboarding participants seeking to automatically receive patient records for treatment purposes."); *see also generally* ¶¶ 53-68; 81-98. If a finder of fact determines that contractual interpretation against the RavillaMed Defendants is wrong, Plaintiffs' claims against the Non-Signatory Defendants collapse because those claims derive from and are intertwined with their claims that the RavillaMed Defendants did not comply with Carequality's and TEFCA's contractual participation rules.

LlamaLab's position is particularly illustrative. Plaintiffs do not allege that LlamaLab is a party to any Carequality or TEFCA agreement, that LlamaLab independently accessed the interoperability frameworks, or that any Plaintiff or framework governance body ever communicated with LlamaLab regarding the disputes at issue. *See id.* ¶¶ 32, 58, 60, 86, 89, 158, 185, 187-88. Indeed, Plaintiffs themselves allege that LlamaLab's involvement was "through RavillaMed's access to the patient records by RavillaMed's connection to the interoperability frameworks." *Id.* ¶ 199. Plaintiffs' claims against LlamaLab are thus entirely derivative of their claims against RavillaMed.

Plaintiffs cannot simultaneously "rely on [certain] terms of the written agreement" to assert their claims against non-signatories but disavow other terms of the written agreement that relate to the contract's dispute-resolution procedures. *See Goldman*, 173 Cal. App. 4th at 218, 220; *Kramer*, 705 F.3d at 1128–29 (estoppel prevents using contract obligations as the basis for claims while refusing arbitration under the same agreement). Allowing Plaintiffs to proceed in court on claims that

should not otherwise be here – merely by naming non-signatory affiliates or individuals – would render the dispute-resolution procedures meaningless. That is exactly the kind of "having it both ways" that equitable estoppel exists to prevent. *Goldman*, 173 Cal. App. 4th at 220.

Equity requires dismissal without prejudice as to the Non-Signatory Defendants until Plaintiffs comply with the dispute-resolution procedures they obligated themselves to follow. Plaintiffs cannot plausibly premise liability on the frameworks' contractual duties and network-use restrictions while insisting that only signatories are bound by the frameworks' dispute-resolution prerequisites. Under California law, the "*sine qua non* is actual dependence on the underlying contract," and Plaintiffs' claims are "dependent upon, or inextricably bound up with," those contractual obligations. *Id.* at 229–30.

## CONCLUSION

The gravamen of Plaintiffs' entire complaint against the RavillaMed Defendants is that they violated the terms of the Carequality and TEFCA agreements. Plaintiffs cannot enforce the terms of those agreements but ignore the dispute resolution process that is inexorably bound up with them. Because Plaintiffs have failed to exhaust the dispute resolution systems required by the Carequality and TEFCA agreements, this Court should dismiss the Complaint as to the RavillaMed Defendants without prejudice so the parties can pursue the underlying issues in the appropriate forums.


Dated:  February 25, 2026          Respectfully submitted,

**NELSON MULLINS RILEY & SCARBOROUGH LLP**


By:   /s/James C. Wald
JAMES C. WALD (Bar No. 229108)
Pacific Gateway
19191 South Vermont Avenue, Suite 900
Torrance, CA 90502

1
2

Telephone: 424-221-7459
Email: james.wald@nelsonmullins.com

3

BROOK B. ANDREWS (*pro hac vice application forthcoming*)
Meridian Building
1320 Main Street, 17th Floor
Columbia, SC 29201
Telephone: 803-255-5508
Email: brook.andrews@nelsonmullins.com

4
5
6
7

JOSHUA REDELMAN (*pro hac vice application forthcoming*)
Heritage Plaza
1111 Bagby Street, Suite 2100
Houston, TX 77002
Telephone: 346-646-5889
Email: joshua.redelman@nelsonmullins.com

8
9
10
11

*Attorneys for Defendants RavillaMed PLLC, Avinash Ravilla, Shere Saidon, and LlamaLab, Inc.*

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

RavillaMed Defendants' Motion to Dismiss

## **LOCAL RULE 11.6.2 CERTIFICATE OF COMPLIANCE**

The undersigned counsel of record certifies that this memorandum contains 6,617 words, which complies with the word limit set by L.R. 11-6.1.

Dated:  February 25, 2026          Respectfully submitted,

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

By:   /s/James C. Wald

JAMES C. WALD (Bar No. 229108)
Pacific Gateway
19191 South Vermont Avenue, Suite 900
Torrance, CA 90502
Telephone: 424-221-7459
Email: james.wald@nelsonmullins.com

BROOK B. ANDREWS (*pro hac vice application forthcoming*)
Meridian Building
1320 Main Street, 17th Floor
Columbia, SC 29201
Telephone: 803-255-5508
Email: brook.andrews@nelsonmullins.com

JOSHUA REDELMAN (*pro hac vice application forthcoming*)
Heritage Plaza
1111 Bagby Street, Suite 2100
Houston, TX 77002
Telephone: 346-646-5889
Email: joshua.redelman@nelsonmullins.com

*Attorneys for Defendants RavillaMed PLLC, Avinash Ravilla, Shere Saidon, and LlamaLab, Inc.*

1

## <u>CERTIFICATE OF SERVICE</u>

2      I hereby certify that on February 25, 2026, I electronically filed the foregoing

3  with the Clerk of Court using the CM/ECF system and I served a copy of the foregoing

4  pleading on all counsel for all parties, via the CM/ECF system and/or mailing same

5  by United States Mail, properly addressed, and first class postage prepaid, to all

6  counsel of record in this matter.

7

8                                  */s/ James C. Wald*

9                                  James C. Wald

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28