1  QUINN EMANUEL URQUHART &
2    SULLIVAN, LLP
3  Adam Wolfson (Bar No. 262125)
    adamwolfson@quinnemanuel.com
   Ryan Landes (Bar No. 252642)
4    ryanlandes@quinnemanuel.com
   David M. Elihu (Bar No. 303043)
5    davidelihu@quinnemanuel.com
   Julia S. Choe (Bar No. 287038)
6    juliachoe@quinnemanuel.com
   Jenny Braun (*pro hac vice* forthcoming)
7    jennybraun@quinnemanuel.com
   865 South Figueroa Street, 10th Floor
8  Los Angeles, California 90017-2543
    Telephone: (213) 443-3000
9    Facsimile:      (213) 443-3100

10  *Attorneys for Defendant Health Gorilla, Inc.*

11              UNITED STATES DISTRICT COURT

12     CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

13

| | |
|---|---|
| 14  Epic Systems Corporation; OCHIN, Inc.; Reid Hospital & Health Care Services, Inc. d/b/a Reid Health; Trinity Health Corporation; and UMass Memorial Health Care, Inc., | Case No. 2:26-cv-00321-FMO-RAO |
| 17              Plaintiffs, | **DEFENDANT HEALTH GORILLA, INC.'S MEMORANDUM SUPPORTING ITS MOTION TO DISMISS  THE COMPLAINT PURSUANT TO RULE 12(B)(6)** |
| 18              vs. | |
| 19  Health Gorilla, Inc.; RavillaMed PLLC; Avinash Ravilla; Shere Saidon; LlamaLab, Inc.; Unique Medi Tech LLC, d/b/a Mammoth Dx; Mammoth Path Solution, LLC; Mammoth Rx, Inc.; Ryan Hilton; Daniel Baker; Max Toovey; Unit 387 LLC; SelfRx, LLC d/b/a Myself.Health; Critical Care Nurse Consultants, LLC d/b/a GuardDog Telehealth; Hoppr, LLC; Meredith Manak, and DOES 1-100, | *[Filed concurrently with Notice of Motion and [Proposed] Order]* |
| | Date:        April 23, 2026 |
| | Time:        10:00 am |
| | Location:    Courtroom 6D |
| | Complaint Filed: January 13, 2026 |
| | Trial Date:     None Set |
| 25              Defendants. | District Judge:   Hon. Fernando M. Olguin |

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................. 1

BACKGROUND ....................................................................................... 4

I.   HEALTH RECORD INTEROPERABILITY FRAMEWORK BASICS ........ 4

II.  THE PARTIES' RELATIONSHIPS AND RELEVANT OBLIGATIONS ...................................................................................... 5

III. THE CCA AND COMMON AGREEMENT EACH REQUIRE PRIVATE DISPUTE RESOLUTION BEFORE LITIGATION ..................... 7

     A.  Carequality Requires Internal Dispute Resolution Before Litigation ......................................................................... 7

     B.  TEFCA Requires Internal Dispute Resolution Before Litigation ........... 7

IV.  PLAINTIFFS DID NOT PURSUE DISPUTE RESOLUTION BEFORE FILING SUIT, AND NEVER MOVED FOR INJUNCTIVE RELIEF .......... 8

V.   PLAINTIFFS ALLEGE ONLY THAT HEALTH GORILLA SHOULD HAVE KNOWN ABOUT IMPROPER TREATMENT REQUESTS ............. 8

VI.  HAD PLAINTIFFS NOT JUMPED INTO LITIGATION, THEY WOULD HAVE LEARNED MUCH .................................................. 8

LEGAL STANDARDS ............................................................................ 9

CHOICE OF LAW .................................................................................. 10

ARGUMENT ........................................................................................... 10

I.   THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFFS FAILED TO SATISFY CONTRACTUAL PRECONDITIONS TO SUIT ................................................................ 10

     A.  Plaintiffs Failed To Exhaust Mandatory Alternative Dispute Provisions ......................................................................... 11

     B.  The "Immediate Injunctive Relief" Exception Does Not Apply ......... 12

     C.  Plaintiffs Cannot Avoid Their Dispute Resolution Obligations With Vague Futility Arguments ............................................. 12

     D.  The Contracts' Structure Demonstrates Why It Is Important To Follow The Dispute Resolution Processes ............................ 12

II.  PLAINTIFFS' CONTRACT CLAIM AGAINST HEALTH GORILLA FAILS ....................................................................................... 13

     A.  Legal Standard For Third-Party Beneficiary Status ............... 13

B. CC Plaintiffs Cannot Sue For Breach Of Contract, And Epic Can Only Sue For Breach Of CCA Section 13 ............................................. 14

1. CC Plaintiffs do not have third party rights to enforce Health Gorilla's CCA ........................................................................... 14

2. Plaintiffs do not have rights to enforce CCA §§ 15 or 16 .......... 15

3. Plaintiffs cannot enforce the CC Terms against Health Gorilla ................................................................................................. 15

4. Plaintiffs have no third-party beneficiary standing under the Common Agreement .................................................................... 16

C. Epic Has Not Alleged Willful, Reckless, Or Intentional Breach Of CCA Section 13 ................................................................................ 16

III. PLAINTIFFS DO NOT PLAUSIBLY ALLEGE FRAUD CLAIMS AGAINST HEALTH GORILLA ................................................................. 17

A. The Complaint Fails To Identify Any Actionable Misrepresentation From Health Gorilla .................................................. 17

B. The Complaint Fails To Plead Actual, Justifiable Reliance On Health Gorilla's Acts ........................................................................ 19

1. Plaintiffs disclaimed reliance based on network inclusion ........ 19

2. The Complaint alleges the harm was providing health records; neither Epic nor OCHIN allege they did so ................. 20

3. CC Plaintiffs do not allege they acted in response to anything from Health Gorilla .................................................... 20

C. The Complaint Fails To Plausibly Plead Health Gorilla's Scienter .................................................................................................... 21

D. Plaintiffs Fail To Allege Damages Caused By Health Gorilla's Alleged Fraud .................................................................................... 21

IV. THE AIDING-AND-ABETTING CLAIMS FAIL FOR LACK OF ACTUAL KNOWLEDGE ................................................................................ 22

V. EPIC'S CLAIMS ARE BASED ON VOLUNTARY COSTS AND SHOULD BE DISMISSED ................................................................................ 23

CONCLUSION ................................................................................................ 24

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ahmed v. Hamilton Ins. DAC*,
   409 So.3d 704 (Fla. 3d DCA 2025).................................................................. 14

*Balsam v. Tucows Inc.*,
   627 F.3d 1158 (9th Cir. 2010) ...................................................................... 14

*Beckwith v. Dahl*,
   205 Cal. App. 4th 1039 (2012).............................................................20, 22

*Bell Atlantic v. Twombly*,
   550 U.S. 544 (2007) ...................................................................................... 9

*Bhatia v. Silvergate Bank*,
   725 F. Supp. 3d 1079 (S.D. Cal. 2024) ........................................................ 22

*Caltex Plastics v. Raytheon Co.*,
   2014 WL 12687419 (C.D. Cal. Apr. 24, 2014).............................................. 16

*Casey v. U.S. Bank Nat'l Ass'n*,
   127 Cal. App. 4th 1138 (2005).................................................................... 23

*Chess v. CF Arcis IX LLC*,
   2020 WL 4207322 (N.D. Cal. July 22, 2020) ............................................... 12

*Clapper v. Amnesty International USA*,
   568 U.S. 398 (2013) .................................................................................... 23

*Columbia Cas. Co. v. Cottage Health Sys.*,
   2015 WL 4497730 (C.D. Cal. July 17, 2015) ............................................... 11

*Dix v. Nova Benefit Plans, LLC*,
   2015 WL 12859221 (C.D. Cal. Apr. 28, 2015).............................................. 20

*In re First Alliance Mortgage Co.*,
   471 F.3d 977 (9th Cir. 2006)....................................................................... 22

*In re Gilead Scis. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008) ..................................................................... 10

MOTION TO DISMISS THE COMPLAINT

*Godecke v. Kinetic Concepts*,
    937 F.3d 1201 (9th Cir. 2019) ................................................................ 10

*Goonewardene v. ADP, LLC*,
    434 P.3d 124 (Cal. 2019) .......................................................... 13, 14, 16

*Greenstein v. Noblr Reciprocal Exch.*,
    585 F. Supp. 3d 1220 (N.D. Cal. 2022) .................................................. 24

*Guido v. Koopman*,
    1 Cal. App. 4th 837 (1991) ................................................................... 19

*Kearns v. Ford Motor Co.*,
    567 F.3d 1120 (9th Cir. 2009) ................................................... 10, 17, 18

*Laatz v. Zazzle, Inc.*,
    682 F. Supp. 3d 791 (N.D. Cal. 2023) .................................................... 13

*Loffman v. California Dep't of Educ.*,
    119 F.4th 1147 (9th Cir. 2024) .............................................................. 23

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ............................................................................. 23

*Morsi v. Wellington Reg'l Med. Ctr., LLC*,
    419 So.3d 93 (Fla. 4th DCA 2025) ....................................................... 14

*In re Nexus 6P Prods. Liab. Litig.*,
    293 F. Supp. 3d 888 (N.D. Cal. 2018) ............................................. 10, 11

*Petersen v. Allstate Indem. Co.*,
    281 F.R.D. 413 (C.D. Cal. 2012) ......................................................... 21

*Sanford v. MemberWorks, Inc.*,
    625 F.3d 550 (9th Cir. 2010) ................................................................ 17

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ............................................................................. 10

## **Other Authorities**

Fed. R. Civ. P. 9(b) ................................................................... 10, 17, 18

Fed. R. Civ. P. 12(b)(6) .................................................................... 9

# GLOSSARY

| Term | Definition | Source |
|---|---|---|
| **Applicant** | "The Party that has signed the CCA and agreed to comply with its terms as a Carequality Implementer." | CCA § 1.3 (Compl. Ex. A) |
| **Carequality** | "[A] 501(c)(3) nonprofit organization that operates a national interoperability framework (the 'Carequality Framework') designed to enable the exchange of electronic healthcare information among participating entities." | Compl. ¶ 53 |
| **Carequality Connected Agreement ("CCA")** | The agreement executed by "organizations that elect to engage in exchange activities through the Carequality Elements," enabling them "to interoperate with all other Implementers and avoid the need to join multiple data exchange networks." | CCA Recitals (Compl. Ex. A) |
| **Carequality Connection ("CC")** | "An organization that is properly listed in the Carequality Directory in accordance with the requirements of Section 15 of this CCA." | CCA § 1.7 (Compl. Ex. A) |
| **Carequality Connection Terms ("CC Terms")** | "The terms set forth in Exhibit 1" of the CCA. Implementers shall "require such Carequality Connections to, at a minimum, comply with the Carequality Connection Terms." | CCA §§ 1.8, 15.2 (Compl. Ex. A) |
| **Carequality Directory** | "A set of information that includes entries for all organizations who have been accepted as Carequality Implementers, along with those organizations' Carequality Connections which serves as the definitive reference for identifying those organizations who are valid participants in exchange activities through the Carequality Elements." | CCA § 1.9 (Compl. Ex. A) |
| **Common Agreement ("CA")** | "[T]he Common Agreement for Nationwide Health Information Interoperability, the QHIN Technical Framework (QTF), all Standard Operating Procedures (SOPs), and all other attachments, exhibits, and artifacts incorporated therein by reference." Entered into "by and between The Sequoia Project, Inc.… acting as the current Recognized Coordinating Entity … and [Signatory]." | CA § 1.1, Recitals (Compl. Ex. E) |
| **Dispute** | Under the CCA: "Any controversy, dispute, or disagreement arising out of or relating to the interpretation or implementation of the Carequality Elements." Under the CA: "(i) a disagreement about any provision of this Common Agreement . . . or (ii) a concern or complaint about the actions, or any failure to act, of Signatory, the RCE, any other QHIN, or another QHIN's Participant(s) or Subparticipant(s)." | CCA § 1.17 (Compl. Ex. A); CA § 1.1 (Compl. Ex. E) |
| **Dispute Resolution Process** | The "non-binding dispute resolution process established by Carequality." | CCA §§ 20.1–20.2 (Compl. Ex. A); |
| **Implementer** | "An organization that has signed the Carequality Connected Agreement and been accepted as such by Carequality." | CCA § 1.23 (Compl. Ex. A) |

| Term | Definition | Source |
|------|-----------|--------|
| **Organization** | "The Carequality Connection on which these Carequality Connection Terms are binding." | CC Terms § 1.22 (Compl. Ex. B) |
| **Participant** | "[A] U.S. Entity that has entered into the ToP in a legally binding contract with a QHIN to use the QHIN's Designated Network Services to participate in TEFCA Exchange in compliance with the ToP." | CA § 1.1 (Compl. Ex. E) |
| **Qualified Health Information Network ("QHIN")** | "[A] Health Information Network that is a U.S. Entity that has been Designated by the RCE and is a Party to the Common Agreement countersigned by the RCE." | CA § 1.1 (Compl. Ex. E) |
| **Recognized Coordinating Entity ("RCE")** | "[T]he entity selected by ONC that enters into the Common Agreement with QHINs in order to impose, at a minimum, the requirements of the Common Agreement, including the SOPs and the QTF, on the QHINs and administer such requirements on an ongoing basis." | CA § 1.1, Recitals (Compl. Ex. E) |
| **Subparticipant** | "[A] U.S. Entity that has entered into the ToP in a legally binding contract with a Participant or another Subparticipant to use the Participant's or Subparticipant's Connectivity Services to participate in TEFCA Exchange in compliance with the ToP." | CA § 1.1 (Compl. Ex. E) |
| **TEFCA (Trusted Exchange Framework and Common Agreement)** | "[A] federally endorsed network-of-networks, with Qualified Health Information Networks(QHINs) enabling exchange of data among their network members and customers, referred to as Participants and Subparticipants." | CA Recitals (Compl. Ex. E); QTF Overview (Compl. Ex. I) |
| **Terms of Participation ("ToP")** | "[T]he requirements set forth in Exhibit 1 to the Common Agreement to which: QHINs must contractually obligate their Participants to agree; to which QHINs must contractually obligate their Participants to contractually obligate their Subparticipants … to agree, in order to participate in TEFCA Exchange." | CA § 1.1 (Compl. Ex. E) |

MOTION TO DISMISS THE COMPLAINT

**PRELIMINARY STATEMENT**

With this lawsuit, Plaintiffs bypass mandatory contractual dispute resolution procedures and attempt to escalate a healthcare governance dispute into a federal action. These efforts are the latest in Epic's strategy to undermine nationwide healthcare interoperability. At issue are Carequality and TEFCA, frameworks healthcare providers use to exchange billions of patient records. Interoperability through these frameworks is critical to patient safety and efficient healthcare nationwide: it enables providers to access a patient's history and medications. Without it, patients face delayed care or even mistaken prescriptions.

For years, Epic has punished those who uphold interoperability networks that do not leave Epic with veto power over who can gain and facilitate lawful EHR access. With smear campaigns advanced in public and private, Epic has brazenly sought to deter both its competitors and customers from embracing innovation in interoperability and supporting a more efficient, safer healthcare system. Epic has even attempted to use its dominant position in EHR-exchange markets to control information shared on the networks and exclude smaller participants for Epic's benefit.

This lawsuit is part of that strategy.

As Plaintiffs note, the Carequality and TEFCA networks can only proceed based on trust—trust that participants will do everything reasonably possible to ensure safe exchange, and that those with incentives to damage the networks will not do so. Epic has abused that trust in the guise of acting as the networks' unappointed protector. By calling into question the networks' ability to self-police—which is written into the very operative contracts that Epic helped to draft in the formation of Carequality and TEFCA—Plaintiffs have done far more damage to the networks than the limited instances of alleged improper record requests. Make no mistake: this lawsuit is an attack on interoperability, led by a party that stands most to profit from

the networks' downfall.[1] The lawsuit also relies on facts that Health Gorilla *provided to Epic* after it cooperated in investigations concerning certain network participants, during a months-long process involving Carequality, the TEFCA network administrator, and several of the nation's largest health providers. None of the providers that joined Health Gorilla's investigation are plaintiffs, which is telling— as discovery and trial would show, there is nothing *there* that supports claims against Health Gorilla for wrongdoing.

But there is no reason to reach discovery. Notwithstanding the Complaint's resounding factual misrepresentations, Plaintiffs are improperly before this Court and assert deficient claims.

***First***, and as further evidence that this lawsuit is nothing more than an attempt to undermine the legitimacy of healthcare interoperability frameworks, Plaintiffs failed to satisfy Carequality's and TEFCA's mandatory dispute resolution provisions. Each framework requires participants to engage in internal processes instead of running to court exactly because public litigation on nuanced issues such as these can have disastrous effects for the networks, those operating within them, and patients who depend on them. As the Complaint itself shows, Carequality and the TEFCA RCE (the administrator appointed under the TEFCA framework) are capable of acting in their contractually appointed role. And the Complaint further shows why addressing dispute resolution within the framework is important: previous parties Epic has accused of wrongdoing have been found by the governing bodies completely blameless. Given Plaintiffs have failed to pursue their contractually mandated disputed resolution process, they cannot as a matter of law pursue this lawsuit.

***Second***, even if the Complaint were properly brought, Plaintiffs have no enforceable contractual rights against Health Gorilla. Plaintiffs attempt to invoke

---

[1]  Epic touts in its introduction that "over 1,900 hospitals and 49,000 clinics" use its EHR software. Compl. ¶6.

MOTION TO DISMISS THE COMPLAINT

third-party beneficiary status, but TEFCA provides **no** third-party beneficiary status at all and the plain terms of the Carequality Connected Agreement ("CCA") and Carequality Connection ("CC") Terms show that no CC Plaintiff can sue Health Gorilla, and Epic and OCHIN can only sue for breach of CCA Section 13. As to Section 13, the Complaint facially fails to allege a breach.

**Third**, the fraud and aiding-and-abetting claims (Counts 1-6) fail to satisfy Rule 9's pleading requirements as to Health Gorilla, as well as basic requirements for each claim. The Complaint does not identify any specific false statement by Health Gorilla. Instead, it speculates about what Health Gorilla "would have affirmed" during onboarding of the other defendants onto the networks, and it conflates administrative acts with affirmative misrepresentations. No Plaintiff alleges reliance (let alone reasonable reliance) on any particular statement by Health Gorilla, and the scienter allegations are both circular and insufficient. The aiding-and-abetting claims similarly fail because Plaintiffs must allege Health Gorilla actually knew about the fraud; however, the Complaint pleads at most that Health Gorilla should have been more suspicious; *i.e.*, was negligent. That is not enough.

**Fourth**, OCHIN and Epic each lack standing.  Epic is at once the mastermind of this lawsuit and the main beneficiary of crippled interoperability networks as the self-proclaimed "pioneer" in EHR exchange, *i.e.*, a long-entrenched and dominant market player, Compl. ¶6.[2] Yet their claimed damages are costs incurred in investigating alleged fraud on their customers, as well as investments to supposedly prevent future fraud. Voluntary costs are not compensable damages, and neither Epic nor OCHIN allege they suffered (or even could suffer, since they are not providers) the specifically enumerated harms in the complaint; *i.e.*, providing health records to one of the non-Health Gorilla defendants.

---

[2]  All "¶" citations are to the Complaint.

Epic tries to paint itself as a good actor because it has come under sustained criticism and inquiry from regulators and private plaintiffs for its widespread unfair business practices, and it desperately needs a distraction from its primary goals, which are to continue enriching itself at the expense of patients nationwide. The case should be dismissed.

## **BACKGROUND**

## I.    **HEALTH RECORD INTEROPERABILITY FRAMEWORK BASICS**

Carequality and the Trusted Exchange Framework and Common Agreement ("TEFCA") are national interoperability frameworks designed to enable the electronic exchange of healthcare information. ¶¶53, 81. The frameworks, which are federally mandated but private, operate through a hub-and-spoke contractual structure wherein "Implementers" (in Carequality parlance) and Qualified Health Information Networks, aka "QHINs" (in TEFCA) execute a form contract with the framework administrator to act as infrastructure providers. ¶¶54, 59, 88. For Carequality, the framework administrator is Carequality itself. ¶¶53, 55. Under TEFCA, the administrator is called the Recognized Coordinating Entity ("RCE"). ¶83. The agreement a Carequality Implementer signs is called the Carequality Connected Agreement (the "CCA"). ¶59; *see also* Compl. Ex. A. A QHIN signs the TEFCA itself, which is more commonly called the "Common Agreement." ¶99.

Both Carequality and TEFCA facilitate, *inter alia*, the free exchange of health records for "treatment" purposes. ¶¶64, 95, 97. Congress mandates such exchange to improve patient care coordination, reduce health disparities, and eliminate information blocking. ¶81. If, say, a dominant healthcare software provider were not subject to this requirement, it could act as a bottleneck by imposing unreasonable fees for basic access to patients' health records.

After contracting with a framework administrator, an Implementer (in Carequality) or QHIN (in TEFCA) onboards providers and other entities that will actually exchange patient records on its network. In Carequality, these network

-4-

participants are called Carequality Connections ("CCs"); in TEFCA, they are "Participants," and their sub-entities are "Subparticipants." ¶¶7, 102. The Implementer/QHIN onboards these entities through contracts called the Carequality Connection Terms ("CC Terms") and TEFCA Terms of Participation ("ToP"). ¶¶60, 89. Implementers/QHINs thus serve as infrastructure providers and gatekeepers, whereas CCs/Participants are the entities that actually hold and exchange patient data.

When a CC initiates a query for records through the Carequality network, the query is routed directly to the healthcare provider that maintains the requested record, which compiles and returns it to the requesting CC. ¶68. The Complaint emphasizes that the framework is fully automated: "Exchanges are machine-to-machine, meaning that no person is in the middle reviewing each request." ¶68.

TEFCA operates similarly: a Participant sends a query through its QHIN to all other QHINs; if a Participant has the requested data, it returns the records through the same QHIN chain. ¶98.

## II.    THE PARTIES' RELATIONSHIPS AND RELEVANT OBLIGATIONS

Plaintiffs OCHIN, Reid, Trinity, and UMass Memorial Health ("CC Plaintiffs") are CCs/Participants of Epic and connect to the respective networks through Epic; they "are the custodians of the patient records." Compl. ¶121. CC Plaintiffs, not Epic, "store data containing patient records on-site on their own servers," or "they contract out to third-party hosting services." ¶194.

As an Implementer and QHIN, Health Gorilla onboarded Defendants RavillaMed, Mammoth, and Unit 387 ("CC Defendants") as CCs and Participants. ¶¶31, 58, 86. The onboarding process involves an Implementer entering information about a CC into the Carequality directory (or TEFCA equivalent), which then distributes that information to other participants. ¶¶55-56, 98.

The CCA specifies Health Gorilla's obligations in this process.[3] An Implementer "is responsible for identifying those of its customers, participants or other constituent entities … that wish to be included in the Carequality Directory." Ex. A (CCA) § 15.1. An Implementer must (a) "require such Carequality Connections to, at a minimum, comply with the Carequality Connection Terms" and (b) "represent[] that every organization that it identifies to Carequality as a Carequality Connection is legally obligated to comply with the Carequality Connection Terms." *Id.* §15.2. By its plain terms, however, the CCA does not require the Implementer to verify the accuracy of CCs' stated purposes for every individual query they make to other network participants. *See generally id.* §15. Such an obligation would be impossible, given the interoperability networks involve the exchange of billions of health records every year. Though Section 13 provides that "Applicant shall only engage in exchange activities through the Carequality Elements for permitted purposes as defined in the Implementation Guides," *Id.* §13; thus, exchange activities **by a CC** do not constitute the Applicant's breach.

The Common Agreement imposes analogous obligations on QHINs. A QHIN must "contractually obligate its Participants to comply with the ToP." Ex. E (CA) §1.2.4. The QHIN is "responsible for taking reasonable steps to confirm that all of its Participants and Subparticipants are abiding by the ToP, all applicable SOPs, and any decisions made pursuant to Section 16.3." *Id.* §13.2.2. If a Participant is non-compliant, the QHIN must notify the Participant in writing and determine whether suspension or termination is warranted. *Id.* Further, "Signatory may only utilize Designated Network Services for purposes of facilitating TEFCA Exchange" and that "TEFCA Exchange may only be utilized for an XP [exchange purpose]." *Id.* §9.1.

---

[3] Under the CCA, "Applicant" means "[t]he Party that has signed the CCA and agreed to comply with its terms as a Carequality Implementer." Ex. A (CCA) §1.3. Health Gorilla is an "Applicant" under the CCA.

These provisions likewise do not make the QHIN the guarantor of every individual query its Participants submit.

The CCA identifies the limited circumstances in which other Implementers and CCs are third-party beneficiaries of a particular Implementer's agreement with Carequality. *See* Ex. A (CCA) §§21.6, 10.1.3. The Common Agreement contains no similar language granting third-party beneficiary status to other QHINs or Participants. *See generally* Compl. Ex. E (CA).

## III.  THE CCA AND COMMON AGREEMENT EACH REQUIRE PRIVATE DISPUTE RESOLUTION BEFORE LITIGATION

Epic signed the CCA with Carequality and, through its subsidiary Epic Nexus, signed the Common Agreement with the RCE. ¶¶6, 26, 114-115. Health Gorilla *separately* signed its own CCA with Carequality and its own Common Agreement with the RCE. ¶¶58-59, 86-88. Because CC Plaintiffs connect to the frameworks through Epic, they similarly concede they are bound by the CC Terms and ToP. ¶¶117-120.

The CCA and Common Agreement each mandate non-judicial dispute resolution—a process Plaintiffs concededly did not pursue before filing this lawsuit.

### A.  Carequality Requires Internal Dispute Resolution Before Litigation

The CCA states parties "shall submit Disputes to the non-binding dispute resolution process established by Carequality." Ex. A (CCA) §20.1. Refusal to participate constitutes a "material breach." *Id.* The sole exception permits a party to seek "immediate injunctive relief" for irreparable harm. *Id.* §20.2.

### B.  TEFCA Requires Internal Dispute Resolution Before Litigation

The Common Agreement mirrors Carequality's requirements. Signatories "agree[] to participate in the Dispute Resolution Process with respect to any Dispute," and refusal is a "material breach." Ex. E (CA) §15.1. "Disputes" broadly include any "concern or complaint about the actions, or any failure to act" of another QHIN or its Participants. *Id.* §1.1.

## IV. __PLAINTIFFS DID NOT PURSUE DISPUTE RESOLUTION BEFORE FILING SUIT, AND NEVER MOVED FOR INJUNCTIVE RELIEF__

Plaintiffs filed this lawsuit before pursuing the dispute resolution processes. The disputes underlying this lawsuit also first began in October 2025, *see* ¶189, and Plaintiffs have never applied for injunctive relief.

## V. __PLAINTIFFS ALLEGE ONLY THAT HEALTH GORILLA SHOULD HAVE KNOWN ABOUT IMPROPER TREATMENT REQUESTS__

The gravamen of the Complaint is that certain CCs obtained patient records by falsely claiming "treatment" purposes because their actual purpose was allegedly not treatment but to sell records to law firms and other third parties. ¶¶1, 20, 124. CC Defendants represented ***to Health Gorilla*** that they sought access to patient records for treatment purposes. ¶¶139, 146, 161, 174, 176, 177. Nevertheless, Plaintiffs seek to hold Health Gorilla liable for allegedly failing to discover these false representations through adequate vetting. ¶¶185-186, 209-210. But the Complaint does not (cannot) allege that Health Gorilla initiated any query in connection with any specific record exchange.

## VI. __HAD PLAINTIFFS NOT JUMPED INTO LITIGATION, THEY WOULD HAVE LEARNED MUCH__

The Complaint establishes the following, years-long timeline:

- September 2022: Health Gorilla onboarded Unit 387. ¶174.
- September 2022: SelfRx gained access to the directory. ¶176.
- October 2023: Critical Care Nurse Consulting (allegedly related to GuardDog) "exhibited highly abnormal exchange patterns." ¶180.
- July 2024: Health Gorilla onboarded Mammoth. ¶161.
- October 2024: Health Gorilla onboarded RavillaMed. ¶146.
- October-November 2024: Epic sent letters to Health Gorilla expressing concerns. ¶187(a).
- October 24, 2025: Epic escalated concerns about Mammoth to Health Gorilla. ¶189.

- November 7, 2025: Epic escalated concerns about RavillaMed to Carequality and Health Gorilla. ¶158.

- November 11, 2025: Epic escalated concerns about Unit 387 to Carequality and Health Gorilla. ¶183.

- January 10, 2026: Health Gorilla "voluntarily inactivated" RavillaMed. ¶188.

Health Gorilla also *immediately* suspended every other CC Defendant Epic accused of improper treatment requests, and every CC Defendant remains suspended from Carequality and TEFCA to this day. Health Gorilla investigated each CC Defendant starting in October 2025, working closely with Carequality, the RCE, and several large health systems. Not a single health system that joined Health Gorilla in its investigation is a plaintiff here.

The Complaint also ascribes bad motives to actions Health Gorilla *in fact* took at either Carequality's or the RCE's suggestion, including deactivating RavillaMed and submitting its subsequent sworn declaration. *See, e.g.*, ¶¶13, 158, 187(d), 188.

Health Gorilla invited Epic to join its investigation and receive its findings at every step. Epic declined, apparently keeping itself willfully blind so it could make allegations in public without "knowing" they are false. Indeed, the day before filing, Health Gorilla offered to share its latest evidence demonstrating why Epic's concerns were unfounded. Epic did not respond and instead filed this lawsuit.

Health Gorilla reserves all rights regarding Plaintiffs' conduct, though it is a material breach of the CCA and Common Agreement to bring litigation without going through the Dispute Resolution Process, because irresponsible public allegations can damage an Implementer/QHIN and the networks. Epic should know better, as should the health provider Plaintiffs whose litigation costs are, on information and belief, being footed by Epic.

## **LEGAL STANDARDS**

Under Rule 12(b)(6), dismissal is proper when the complaint does not allege sufficient facts to support a cognizable legal theory. *Bell Atlantic v. Twombly*,

550 U.S. 544, 545 (2007). Dismissal "can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Godecke v. Kinetic Concepts*, 937 F.3d 1201, 1208 (9th Cir. 2019) (internal quotation omitted). The Court need not "accept as true allegations that contradict matters properly subject to judicial notice" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). The scope of review includes attached exhibits, documents incorporated by reference, and matters subject to judicial notice. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

Rule 9(b) requires that fraud be pled "with particularity"—identifying the "who, what, when, where, and how" of the alleged misconduct. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009).

## CHOICE OF LAW

The Complaint does not clearly identify which state's law governs its common-law claims. "Due to variances among state laws, failure to allege which state law governs a common law claim is grounds for dismissal." *In re Nexus 6P Prods. Liab. Litig.*, 293 F. Supp. 3d 888, 933 (N.D. Cal. 2018) (cleaned up). Plaintiffs' failure to specify the applicable law is an independent ground for dismissal of all claims but Count Seven. Because the Complaint gestures at California law, Health Gorilla addresses the claims under California law without conceding its applicability.

## ARGUMENT

## I.    THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFFS FAILED TO SATISFY CONTRACTUAL PRECONDITIONS TO SUIT

Plaintiffs are contractually required to pursue alternative dispute resolution before Carequality and the TEFCA RCE. They chose instead to leapfrog those processes to file this lawsuit. That is improper and requires dismissal.

-10-

A.    **Plaintiffs Failed To Exhaust Mandatory Alternative Dispute Provisions**

Epic and Health Gorilla each separately signed the CCA and Common Agreement. ¶¶26, 59, 88, 114-115. OCHIN and CC Plaintiffs also allege they are bound by the same agreements. ¶¶7, 117-120. Both agreements require resolving disputes "through a collaborative, collegial process rather than through civil litigation." Ex. A (CCA) §20.1.

Under the CCA, a party "shall submit Disputes to the non-binding dispute resolution process established by Carequality." *Id*. A Dispute encompasses "[a]ny controversy, dispute, or agreement arising out of or relating to the interpretation or implementation of the Carequality Elements," including the CCA, CC Terms, Implementation Guides, and Carequality Policies. *Id*. §§1.17, 1.10.

Under the Common Agreement, a party likewise "agrees to participate in the Dispute Resolution Process with respect to any Dispute," defined to include any "concern or complaint about the actions, or any failure to act" of another QHIN or its Participants. Ex. E (CA) §§15.1, 1.1.

Plaintiffs' claims are a Dispute under the CCA because they "aris[e] out of or relat[e] to the interpretation or implementation of the Carequality Elements," which includes the CCA, CC Terms, and Implementation Guides—the very documents underlying Plaintiffs' claims. Ex. A (CCA) §1.17; *see* ¶¶56, 59-60, 69-80, 289, 294. Similarly, the Complaint is based on a "concern or complaint" about Health Gorilla's "actions" or "failure to act"; *i.e.*, a Dispute under the Common Agreement Ex. E (CA) §15.1; *see* ¶¶99-103, 298.

Plaintiffs concede they pursued dispute resolution with other entities on similar grievances, demonstrating its applicability here. *See*, *e.g.*, ¶¶130-137. Failure to exhaust contractually required dispute resolution warrants dismissal. *Columbia Cas. Co. v. Cottage Health Sys.*, 2015 WL 4497730, at *2 (C.D. Cal. July 17, 2015).

**B.     The "Immediate Injunctive Relief" Exception Does Not Apply**

No contractual exception permits this lawsuit.

Both agreements permit bypassing dispute resolution if the party seeks "immediate injunctive relief" for "irreparable harm." *See* Ex. A (CCA) §20.2.1; Ex. E (CA) §15.2.1. Plaintiffs invoke this exception by using those words in the Complaint. ¶25. But actions speak louder than words: Epic first raised concerns in October–November 2024, escalated to Carequality in October 2025, waited three more months to file the Complaint on January 13, 2026, and did not serve it until February 4, 2026. Dkt. 28.

Since filing, Plaintiffs have not sought a TRO or preliminary injunction—*i.e.*, the forms of *immediate* injunctive relief available to plaintiffs. Because Plaintiffs have not done so, this lawsuit does not meet the exception as a matter of law.

**C.     Plaintiffs Cannot Avoid Their Dispute Resolution Obligations With Vague Futility Arguments**

Plaintiffs suggest the Dispute Resolution Processes lack "transparency" and therefore are not required. ¶17. Notably, Epic helped write both the CCA and Common Agreement—constructing the very processes it now attacks. Regardless, Plaintiffs do not allege Carequality or the RCE were unwilling or unable to act; Plaintiffs derailed the process by filing this lawsuit, and thus have no basis to avoid their contractual obligations. *See Chess v. CF Arcis IX LLC*, 2020 WL 4207322, at *13-14 (N.D. Cal. July 22, 2020).

**D.     The Contracts' Structure Demonstrates Why It Is Important To Follow The Dispute Resolution Processes**

The contracts' structure further underscores why the Dispute Resolution Processes exist—and why parties like Epic and CC Plaintiffs cannot circumvent them on trumped-up bases.

*First*, the remedy for non-compliance is suspension by Carequality or the RCE—not private litigation. Ex. A (CCA) §§5.3, 13; Ex. E (CA) §14.2. The dispute

resolution provisions exist so those bodies can respond. Where a contract provides its own enforcement mechanisms, allowing third parties to bypass them through private litigation "would not be consistent with the objectives of the contract and the reasonable expectations of the [contracting parties]." *Goonewardene v. ADP, LLC*, 434 P.3d 124, 127 (Cal. 2019).

*Second*, only the CCA grants third-party beneficiary status to certain parties and only in certain situations. It **excludes** Section 15 from that list, which confirms the importance of the Carequality Dispute Resolution Process because Section 15 addresses onboarding, vetting, validation, and suspension of CCs. Ex. A (CCA) §15. With this lawsuit, Plaintiffs deprive Carequality of the ability to ***itself*** determine whether any Defendant violated Section 15. That is against the contract's plain structure.

## II.    PLAINTIFFS' CONTRACT CLAIM AGAINST HEALTH GORILLA FAILS

Count 8 alleges that Health Gorilla breached the CCA and Common Agreement. Because of the frameworks' hub-and-spoke structures, no Plaintiff has contracted directly with Health Gorilla. Plaintiffs can only assert breach of contract against Health Gorilla if they have a third-party beneficiary right to do so. CC Plaintiffs have no right to sue Health Gorilla for breach of contract, and Epic can only sue for breach of CCA Section 13. But even that single claim fails on the pleadings.

### A.    Legal Standard For Third-Party Beneficiary Status

A plaintiff cannot enforce a contract if it is neither a party to the contract nor a third-party beneficiary. *See Laatz v. Zazzle, Inc.*, 682 F. Supp. 3d 791, 810 (N.D. Cal. 2023) ("Generally, under California law, 'only a party to the contract may sue for breach of the agreement's terms.") (internal quotation omitted). A third party may bring a breach of contract action only if it establishes (1) that it would in fact benefit from the contract, (2) that "a motivating purpose of the contracting parties was to provide a benefit to the third party," and (3) that "permitting a third party to bring its

-13-

own breach of contract action against a contracting party is consistent with the objectives of the contract and the reasonable expectations of the contracting parties." *Goonewardene*, 434 P.3d at 133. "All three elements must be satisfied to permit the third party action to go forward." *Id.* Critically, "[t]here is an important analytical distinction between contracting for a benefit to an outsider and granting a right to sue for breach to that outsider." *Id.* at 137.

Generally, "[t]he test for determining whether a contract was made for the benefit of a third person is whether an intent to benefit a third person appears from the terms of the contract." *Balsam v. Tucows Inc.*, 627 F.3d 1158, 1162 (9th Cir. 2010) (internal quotation omitted); *accord Morsi v. Wellington Reg'l Med. Ctr., LLC*, 419 So.3d 93, 96 (Fla. 4th DCA 2025) (the third party must be "the direct and primary object of the contract"; a party that "receive[s] only 'incidental or consequential benefits from its enforcement'" has no standing); *Ahmed v. Hamilton Ins. DAC*, 409 So.3d 704, 708 (Fla. 3d DCA 2025) (finding insufficient pleading even where plaintiff "directly benefits from some provisions" because the contract "as a whole does not manifest intent to primarily and directly benefit" plaintiff).

## B.   CC Plaintiffs Cannot Sue For Breach Of Contract, And Epic Can Only Sue For Breach Of CCA Section 13

Here, the plain terms of the contracts either limit third-party beneficiary status to claims not asserted in the Complaint, or do not grant such status at all.

### 1.   CC Plaintiffs do not have third party rights to enforce Health Gorilla's CCA

CCA Section 21.6 identifies who may enforce the CCA as third-party beneficiaries, and for what purposes. Where a contract expressly identifies who may enforce it as a third-party beneficiary and for what purposes, those express terms control.

Notably, "[e]ach *Implementer* shall be deemed a third party beneficiary of this Agreement for purposes of enforcing Applicant's compliance with Sections 7, 8, 10.1,

10.1.3, 11, 12, 13, 19 and 20 of this Agreement." Ex. A (CCA) §21.6 (emphasis added). In contrast, CCs have third-party beneficiary status solely "for the purpose of enforcing Applicant's compliance with Section 10.1.4," "[i]n the event that Applicant does not designate any Carequality Connections or that Applicant engages in exchange directly with other Implementers' Carequality Connections." *Id.* The Complaint does not allege a breach of Section 10.1.4, nor any of the latter circumstances. Given CC Plaintiffs concede they are not "Implementers," *see* ¶¶7, 117-121, they thus do not have applicable third-party rights according to the CCA itself.

### 2. Plaintiffs do not have rights to enforce CCA §§ 15 or 16

As noted, the CCA only accords Epic (as Implementer) third-party beneficiary status to enforce specifically enumerated provisions. Ex. A (CCA) §21.6. Despite that, the Complaint attempts to allege failures of vetting, which would be breaches of Section 15 (regarding vetting and validation), and it alleges a breach of 16.2 (regarding directory use), *see* ¶¶185, 210, 294, though neither section is included in the Section 21.6 list. Accordingly, no Plaintiff—including Epic—can bring claims for breach of Sections 15 or 16.

### 3. Plaintiffs cannot enforce the CC Terms against Health Gorilla

The Complaint alleges that Plaintiffs are "express third-party beneficiaries of the CC Terms" under Section 16.2. ¶291. However, Section 16.2 grants third-party beneficiary status only for enforcing ***other CCs'*** compliance: "Implementers [and] Carequality Connections shall be deemed third party beneficiaries of these Carequality Connection Terms for purposes of enforcing ***Organization's*** compliance with these Carequality Connection Terms." Ex. B (CC Terms) §16.2 (emphasis added). An "Organization" is the "Carequality Connection on which these Carequality Connection Terms are binding"; *i.e.*, the CC signing the Terms. *Id*. §1.22.

Health Gorilla is not a CC; it is an Implementer. ¶58. Accordingly, under the CC Terms' plain language, Plaintiffs have no standing to sue Health Gorilla for breach

of the CC Terms (if Plaintiffs could even articulate any breach Health Gorilla, as Implementer, could commit).

**4.    <u>Plaintiffs have no third-party beneficiary standing under the Common Agreement</u>**

Plaintiffs allege they "are also third-party beneficiaries of the TEFCA Common Agreement" because facilitating record exchange "was a motivating purpose behind these contracts." ¶296. Under the *Goonewardene* test, the Complaint's conclusory allegations satisfy none of the three required elements. 434 P.3d at 133.

*First*, unlike the CCA, the Common Agreement contains no express third-party beneficiary provision, indicating the contracting parties did not intend to confer enforcement rights on third parties. *Second*, whether Plaintiffs generally "benefit" from an exchange framework does not make them intended beneficiaries of Health Gorilla's specific obligations to the RCE. Incidental benefit does not confer enforcement rights. *Caltex Plastics v. Raytheon Co.*, 2014 WL 12687419, at *3 (C.D. Cal. Apr. 24, 2014). *Third*, permitting Plaintiffs to sue Health Gorilla for breach of the Common Agreement would be inconsistent with the contract's structure, which channels enforcement through the RCE and the dispute resolution process—not through private suits by other QHINs or Participants. Ex. E (Common Agreement) §15.1. *Finally*, to the extent Epic alleges that Section 7.4.3 confers standing, that Section does so only to the extent that Epic actually "suffered" "harm" from a breach, which, as discussed *infra*, Epic did not.

**C.    <u>Epic Has Not Alleged Willful, Reckless, Or Intentional Breach Of CCA Section 13</u>**

Although Epic, as another Implementer, can enforce Health Gorilla's compliance with Section 13, CCA Section 10.1.3 limits the circumstances under which one Implementer may hold another liable. "Applicant shall be responsible for harm suffered by another Implementer to the extent that the harm was caused by Applicant's ***willful or reckless act or intentional misconduct*** in each case in breach

of a Section of this Agreement to which the other Implementer is a third party beneficiary pursuant to Section 21.6 of this Agreement." Ex. A (CCA) §10.1.3 (emphasis added). Plaintiffs fail to plead that Health Gorilla's conduct was ***willful or reckless***—not merely negligent.

The Complaint alleges that Health Gorilla "failed to comply with its contractual obligations to ensure" that CCs used the frameworks for legitimate purposes, ¶¶209, 227, 243; "failed to verify" CCs' treatment purposes at onboarding (*id.*); "failed to remove" CCs after concerns were raised (*id.*); "***should have*** discovered significant red flags … ***had*** Health Gorilla performed the diligence required of it," ¶186 (emphasis added); "knew ***or should have known***" about CCs' prior history "***because Health Gorilla was aware that it had failed*** to conduct adequate vetting." ¶¶146, 210, 228, 244 (emphasis added). These circular allegations amount only to inadequate vetting, not willful acts to engage in exchange activities for non-permitted purposes.

Further, the allegations point to CCs' exchange activities, not to Health Gorilla's. Therefore, the claim for breach of Section 13 also fails.

## III.  PLAINTIFFS DO NOT PLAUSIBLY ALLEGE FRAUD CLAIMS AGAINST HEALTH GORILLA

Common-law fraud requires: (1) misrepresentation; (2) knowledge of falsity (scienter); (3) intent to induce reliance; (4) justifiable reliance; and (5) resulting damage. *Kearns*, 567 F.3d at 1126. The fraud claims against Health Gorilla (Counts 1-3) should be dismissed for failure to plead with particularity any actionable misrepresentation or omission, and to plausibly allege scienter or reliance.

### A.  The Complaint Fails To Identify Any Actionable Misrepresentation From Health Gorilla

To avoid dismissal under Rule 9(b), a complaint must "state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 558 (9th Cir. 2010) (internal quotation omitted).

Across all fraud counts, the alleged detrimental action was providing health records to CC Defendants. ¶¶212, 230, 246. The Complaint makes clear, however, that health providers sent records only in response to allegedly fraudulent queries made by other CCs. ¶¶68, 157, 170, 182. Nowhere, however, does the Complaint allege that **Health Gorilla** initiated any query or asserted any Permitted Purpose in connection with any specific query. Nor does it quote any specific false statement, identify any individual who made one, or describe the form, content, or timing of any misrepresentation that led to a health provider sending records to a CC Defendant.

The only Health Gorilla representations Plaintiffs identify are those it made when onboarding each of CC Defendants. However, these do not satisfy Rule 9(b) either. *First*, Plaintiffs speculate about what Health Gorilla "would have affirmed" about each CC Defendant during onboarding without providing any specific statements. ¶¶146, 161, 174, 176, 177. These conditional allegations do not satisfy the requirement to identify the specific content of an allegedly false statement. *See Kearns*, 567 F.3d at 1124 (Rule 9(b) requires "the who, what, when, where, and how" of the alleged misconduct).

*Second*, the Complaint does not allege that any health provider that sent health records to a CC Defendant even received Health Gorilla's onboarding statements. This is a major reliance problem as noted below, but also a failure of Rule 9(b) because it fails to identify which of Health Gorilla's statements are allegedly even actionable.

*Third*, Plaintiffs do not identify how Health Gorilla could be liable for the CC Defendants' allegedly fraudulent statements about individual health record queries. Plaintiffs do not identify a single CCA or Common Agreement term requiring Health Gorilla to sign off on every treatment query and, indeed, Plaintiffs allege that Health Gorilla is *not* a middleman to queries (Carequality) or does nothing but shuttle queries to other QHINs, who then send them to their own Participants (TEFCA). ¶¶55, 66,

-18-

68, 98.[4] If issues arise about compliance with network rules, then Health Gorilla is obligated to ensure its Connections' compliance. *See* Ex. A (CCA) §§15.2, 15.4; Ex. E (CA) §§7.4.1, 13.2.2. But that is what Health Gorilla did (and continues to do), even though Plaintiffs decided to run to court instead of abiding by their contractual obligations.

**B.    The Complaint Fails To Plead Actual, Justifiable Reliance On Health Gorilla's Acts**

"Justifiable reliance is an essential element of a claim for fraudulent misrepresentation," *Guido v. Koopman*, 1 Cal. App. 4th 837, 843 (1991), but the Complaint does not allege any Plaintiff relied on any particular statement by Health Gorilla in taking or refraining from any action, let alone any reasonable reliance.

**1.    Plaintiffs disclaimed reliance based on network inclusion**

Parties to the CCA explicitly "acknowledge[] that other Implementers and Carequality Connections may be added to or removed from the Carequality Directory at any time; *therefore, [Applicant/Organization]* __may not rely__ *upon the inclusion in the Carequality Directory of a particular Implementer or Carequality Connection.*" Ex. A (CCA) §19, Ex. B (CC Terms) §15 (emphases added). As a matter of law, each of Plaintiffs therefore disclaimed the assumption that another participant's presence in the directory guarantees their compliance. Plaintiffs concede they signed onto these terms. That disposes of their fraud claims against Health Gorilla, given they are based on the idea Plaintiffs reasonably relied on representations regarding Health Gorilla's belief its co-Defendants would comply with applicable rules. *See* Ex. A (CCA) §15.1; ¶¶56, 214, 232, 248. In the face of disclaimers, reliance "may be decided as a matter

---

[4]   If Epic is correct it was obvious CC Defendants were fraudulent, then under the TEFCA framework, Epic would be liable to the other CC Plaintiffs pursuant to the same theory it asserts against Health Gorilla because Epic passed the "fraudulent" inquiries to CC Plaintiffs without comment, even after it allegedly suspected them. ¶98.

of law." *Dix v. Nova Benefit Plans, LLC*, 2015 WL 12859221, at \*7 (C.D. Cal. Apr. 28, 2015).

### 2. The Complaint alleges the harm was providing health records; neither Epic nor OCHIN allege they did so

Fraud requires that the plaintiff take a "detrimental course of action" caused by "actual and justifiable reliance" on the defendant's misrepresentation. *Beckwith v. Dahl*, 205 Cal. App. 4th 1039, 1062 (2012). The fraud counts allege that the detrimental course of action was to "provide[] [CC Defendants] with patient records." ¶¶212, 230, 246.

Epic and OCHIN do ***not*** allege they provide patient records. ¶¶26-27. Since neither Epic nor OCHIN provided any records, the Complaint's fraud allegations make clear they took no action in response to any alleged fraud, meaning they cannot establish reliance.

### 3. CC Plaintiffs do not allege they acted in response to anything from Health Gorilla

Reid, Trinity, and UMass Memorial Health allege they disclosed patient records in response to queries from CC Defendants. But the allegations establish this disclosure was not in reliance on any particular ***Health Gorilla*** representation because it never made any representations with record queries—at best, it passed on CC Defendant queries (under TEFCA). ¶¶68, 98. Since Plaintiffs do not allege Health Gorilla made any representations about specific inquiries from CC Defendants— indeed, could not, *see id.*—Plaintiffs do not identify any actions taken in reliance on Health Gorilla's acts.

CC Plaintiffs also cannot establish reliance on anything Health Gorilla said when onboarding CC Defendants because CC Plaintiffs do not allege they even saw those representations, nor (more importantly, and as they must) that they sent records to CC Defendants in response to Health Gorilla's onboarding statements.

C.    __The Complaint Fails To Plausibly Plead Health Gorilla's Scienter__

The Complaint also fails to adequately plead Health Gorilla's scienter.

The Complaint's principal scienter allegation is circular: it asserts that Health Gorilla "knew the [CC Defendants'] statements were false because Health Gorilla was aware that it had failed to conduct adequate vetting." ¶210. The allegation does not describe what Health Gorilla actually knew about CC Defendants' purposes at the time of onboarding; it assumes that, because *Plaintiffs* allege CC Defendants are bad actors, Health Gorilla must have known they were when it vetted them. That is a negligence theory dressed up as fraud; it does not describe scienter. *See Petersen v. Allstate Indem. Co.*, 281 F.R.D. 413, 417 (C.D. Cal. 2012) (failure to use reasonable care differs from fraudulent intent).

The Complaint also alleges that Health Gorilla received communications from Epic raising concerns about certain CCs and responded by defending them as consistent with treatment purposes. *See* ¶¶187(a)-(d), 189. This, again, does not describe scienter; it merely shows Health Gorilla reached a different conclusion about whether the CCs' activities constituted "treatment." *Id.* A good-faith disagreement about that question is not fraudulent intent.

In sum, the Complaint's scienter allegations describe, at most, a situation in which Health Gorilla investigated concerns, credited its CCs' explanations, and reached conclusions that Plaintiffs now contend were wrong. That story does not support a claim for fraud (although it does notably describe the sort of disputes Carequality and the TEFCA RCE have been tasked by contract to resolve via the Dispute Resolution Processes, *see supra*).

D.    __Plaintiffs Fail To Allege Damages Caused By Health Gorilla's Alleged Fraud__

"[T]here are two causation elements in a fraud cause of action. First, the plaintiff's actual and justifiable reliance on the defendant's misrepresentation must have caused him to take a detrimental course of action. Second, the detrimental action

taken by the plaintiff must have caused his alleged damage." *Beckwith*, 205 Cal. App. 4th at 1062. Plaintiffs' allegations do not meet these standards.

Reid, Trinity, and UMass Memorial Health's alleged damages flow from CC Defendants' allegedly false treatment-purpose assertions, not from any misrepresentation by Health Gorilla. Health Gorilla was not "in the middle" of any particular exchange other than as the operator, *see* ¶68, or as a QHIN passing queries to Epic, which, as another QHIN, could have inquired into the treatment purpose just the same as Health Gorilla (and would be liable to CC Plaintiffs under the exact same theory it asserts here, if it were at all viable). ¶98. The causal chain runs from CC Defendants to CC Plaintiffs, and Health Gorilla is not a link in that chain for any intentional conduct respecting the particular representations at issue. Causation between Health Gorilla and CC Plaintiffs thus fails as a matter of law.

As for Epic and OCHIN, they allege they "have been harmed in the same way" as CC Plaintiffs; specifically, consequential costs of assisting their customers investigate potential issues with CC Defendants. ¶215. Given CC Plaintiffs cannot establish the requisite causal link between Health Gorilla and the alleged fraud, Epic and OCHIN's even more attenuated damages fail that test.

## IV. THE AIDING-AND-ABETTING CLAIMS FAIL FOR LACK OF ACTUAL KNOWLEDGE

"To plead any claim for aiding and abetting," Plaintiffs must allege that Defendants either: knew "the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act," or gave "substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person." *Bhatia v. Silvergate Bank*, 725 F. Supp. 3d 1079, 1113 (S.D. Cal. 2024).

The knowledge element requires actual knowledge—not constructive knowledge, negligence, or reason to suspect. *In re First Alliance Mortgage Co.*, 471

-22-

F.3d 977, 993 (9th Cir. 2006); *Casey v. U.S. Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138, 1145 (2005). Mere suspicion is insufficient.

The Complaint does not sufficiently allege Health Gorilla actually knew CC Defendants were submitting fraudulent treatment-purpose queries. Instead, it relies on "red flags" and allegations that Health Gorilla "should have" discovered the fraud, and circular reasoning that an alleged failure to vet constitutes knowledge. ¶¶186, 210, 256, 265. These allegations describe, at most, that Health Gorilla should have been more suspicious or should have investigated more thoroughly. The aiding-and-abetting claims therefore fail.

## V.    EPIC'S CLAIMS ARE BASED ON VOLUNTARY COSTS AND SHOULD BE DISMISSED

Where multiple plaintiffs seek the same relief and at least one has standing, the court retains discretion to dismiss those lacking standing. *See Loffman v. California Dep't of Educ.*, 119 F.4th 1147, 1164 (9th Cir. 2024). To establish Article III standing, plaintiffs bear the burden of showing: (1) a concrete, particularized, actual or imminent injury in fact; (2) a causal connection between the injury and the challenged conduct; and (3) a likelihood of redress from a favorable decision. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). The Court should dismiss Epic, whose alleged injuries—preventative monitoring costs against speculative future harm and purported mitigation costs—fail to establish a cognizable injury in fact. Epic's claims amount to the kind of manufactured standing the Supreme Court rejected in *Clapper v. Amnesty International USA*, 568 U.S. 398, 416 (2013).

*First*, Epic's claimed costs are overwhelmingly preventative, forward-looking expenditures. Epic alleges it incurred costs for "monitoring tools to prevent further improper disclosures of patient records" and to "further monitor CCs and Implementers." ¶196 (emphasis added). Under *Clapper*, plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." 568 U.S. at 416. The harm

Epic seeks to prevent—that unknown third parties might exploit interoperability frameworks—is speculative, not imminent.

*Second*, mitigation costs fail. Although a plaintiff can meet the injury-in-fact requirement for standing if it faces a credible, "imminent risk of harm," mitigation costs can only qualify as injury if the costs "were reasonable and necessary." *Greenstein v. Noblr Reciprocal Exch.*, 585 F. Supp. 3d 1220, 1230 (N.D. Cal. 2022) (dismissing identity theft plaintiff for lack of standing). Epic alleges no real and imminent risk to itself—the parties allegedly harmed are the healthcare providers and patients; not Epic. The Complaint alleges no facts showing those expenditures were reasonable or necessary. ¶¶196, 215, 326. That is insufficient.

## <u>CONCLUSION</u>

For the foregoing reasons, the Complaint should be dismissed in its entirety.

DATED: February 26, 2026               QUINN EMANUEL URQUHART &
                                       SULLIVAN, LLP


                                       By_____*/s/ Adam B. Wolfson*_____
                                          Adam B. Wolfson
                                          Ryan Landes
                                          David M. Elihu
                                          Julia S. Choe
                                          Jenny Braun (*pro hac vice* forthcoming)

                                          *Attorneys for Defendant Health Gorilla, Inc.*

**LOCAL RULE 11.6.2 CERTIFICATE OF COMPLIANCE**

The undersigned counsel of record certifies that this memorandum contains 6,999 words, which complies with the word limit set by L.R. 11-6.1.


By _____/s/ Adam B. Wolfson_____
                     Adam B. Wolfson