**BLANK ROME LLP**
Christopher Petersen (SBN 251439)
chris.petersen@blankrome.com
Alycia S. Tulloch (SBN 335916)
alycia.tulloch@blankrome.com
2029 Century Park East, 6th Floor
Los Angeles, CA 90067
Telephone:    424.239.3400
Facsimile:    424.239.3434

**BLANK ROME LLP**
Mark L. Johansen (*Pro Hac Vice*)
mark.johansen@blankrome.com
Neakzaad ("Neak") Horriat (*Pro Hac Vice*)
Neakzaad.horriat@blankrome.com
200 Crescent Court, Suite 1000
Dallas, TX 75201
Telephone:    972.850.1450
Facsimile:    972.850.1451

*Attorneys for Defendants*
UNIT 387, LLC, HOPPR, LLC,
AND MEREDITH MANAK

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Epic Systems Corporation; OCHIN, Inc.; Reid Hospital & Health Care Services, Inc. d/b/a Reid Health; Trinity Health Corporation; and UMass Memorial Health Care, Inc., | Case No. 2:26-cv-00321-FMO-RAO |
| Plaintiffs, | **UNIT 387 DEFENDANTS' 12(B)(6) MOTION TO DISMISS** |
| v. | Date:         May 21, 2026<br>Time:         10:00 a.m.<br>Courtroom:  6D<br>Judge:        Fernando M. Olguin |
| Health Gorilla, Inc.; RavillaMed PLLC; Avinash Ravilla; Shere Saidon; LlamaLab, Inc.; Unique Medi Tech LLC, d/b/a Mammoth Dx; Mammoth Path Solution, LLC; Mammoth Rx, Inc.; Ryan Hilton; Daniel Baker; Max Toovey; Unit 387 LLC; SelfRx, LLC d/b/a Myself.Health; Critical Care Nurse Consultants, LLC d/b/a GuardDog Telehealth; Hoppr, LLC; Meredith Manak, and DOES 1-100, | Complaint Filed:  1/13/2026 |
| Defendants. | |

UNIT 387 DEFENDANTS' 12(B)(6) MOTION TO DISMISS

# TABLE OF CONTENTS

I.      CONTENTS ................................................................................................................ 1

II.     INTRODUCTION ..................................................................................................... 1

III.    FACTUAL BACKGROUND .................................................................................... 4

   A.   The Health Record Interoperability Framework. .............................................. 4

   B.   The Unit 387 Defendants. ................................................................................. 4

   C.   The Claims Against The Unit 387 Defendants. ................................................. 5

IV.     LEGAL STANDARDS ............................................................................................ 11

V.      ARGUMENT ........................................................................................................... 12

   A.   The Complaint Should Be Dismissed Because Plaintiffs Failed to Satisfy Contractual Preconditions to Suit. ......................................................................................... 12

      1.   Plaintiffs Refused to Exhaust Mandatory Alternative Dispute Provisions. ................... 12

      2.   The "Immediate Injunctive Relief" Exception Does Not Apply. ................................. 13

      3.   Plaintiffs Are Not Absolved from Participating in Dispute Resolution ........................ 13

   B.   The Fraud Claim Against The Unit 387 Defendants Fails. ............................................... 14

      1.   The Complaint Fails to Identify Any Actionable Misrepresentation by the Unit 387 Defendants. ................................................................................................................. 15

      2.   The Complaint Fails to Plead Actual, Justifiable Reliance on Any Act by the Unit 387 Defendants. ................................................................................................................. 17

      3.   The Complaint Fails to Plausibly Plead Scienter. ................................................... 18

      4.   Plaintiffs Fail to Allege Damages Caused by the Unit 387 Defendants' Alleged Fraud. 19

   C.   The Aiding-and-Abetting Claims Fail for Lack of Actual Knowledge. ........................... 20

   D.   The Unfair Competition Claim Fails. ................................................................. 21

   E.   The Breach of Contract Claim Against Unit 387 Warrants Dismissal. ............................ 22

      1.   Plaintiffs Have Not Established Third-Party Beneficiary Standing. .............................. 22

      2.   The Complaint Does Not Allege Unit 387 Itself Breached Any Contractual Obligation. 23

      3.   The Contract Claim Is Also Barred by the Mandatory Dispute Resolution Provisions. 23

   F.   Epic and OCHIN Lack Article III Standing. ........................................................ 23

VI.     CONCLUSION ........................................................................................................ 24

L.R. 11-6.2 Certificate of Compliance ........................................................................... 26

UNIT 387 DEFENDANTS' 12(B)(6) MOTION TO DISMISS

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................................... 11

*Barnes & Noble, Inc. v. LSI Corp.*,
   849 F. Supp. 2d 925 (N.D. Cal. 2012) ...................................................................... 15

*Beckwith v. Dahl*,
   205 Cal. App. 4th 1039 (2012) ........................................................................... 18, 19

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................................................... 11

*Bhatia v. Silvergate Bank*,
   725 F. Supp. 3d 1079 (S.D. Cal. 2024) ..................................................................... 20

*Casey v. U.S. Bank Nat'l Ass'n*,
   127 Cal. App. 4th 1138 (2005) ................................................................................. 20

*Cholla Ready Mix, Inc. v. Civish*,
   382 F.3d 969 (9th Cir. 2004)..................................................................................... 11

*Clapper v. Amnesty International USA*,
   568 U.S. 398 (2013)............................................................................................. 21, 24

*Columbia Cas. Co. v. Cottage Health Sys.*,
   2015 WL 4497730 (C.D. Cal. July 17, 2015) ........................................................... 13

*Dix v. Nova Benefit Plans, LLC*,
   2015 WL 12859221 (C.D. Cal. Apr. 28, 2015) ......................................................... 17

*In re First Alliance Mortgage Co.*,
   471 F.3d 977 (9th Cir. 2006)................................................................................. 2, 20

*Goonewardene v. ADP, LLC*,
   434 P.3d 124 (Cal. 2019) .......................................................................................... 14

*Guido v. Koopman*,
   1 Cal. App. 4th 837 (1991) ....................................................................................... 17

*Kearns v. Ford Motor Co.*,
   567 F.3d 1120 (9th Cir. 2009)................................................................... 2, 12, 14, 16

*Loffman v. California Dep't of Educ.*,
   119 F.4th 1147 (9th Cir. 2024) ................................................................................. 24

UNIT 387 DEFENDANTS' 12(B)(6) MOTION TO DISMISS

*Lujan v. Defs. of Wildlife*,
 504 U.S. 555 (1992) ............................................................................................... 23

*Novak v. United States*,
 795 F.3d 1012 (9th Cir. 2015) ......................................................................... 23, 24

*Pareto v. FDIC*,
 139 F.3d 696 (9th Cir. 1998) .................................................................................. 11

*Petersen v. Allstate Indem. Co.*,
 281 F.R.D. 413 (C.D. Cal. 2012) ........................................................................... 19

*Sanford v. MemberWorks, Inc.*,
 625 F.3d 550 (9th Cir. 2010) .................................................................................. 15

*Wanetick v. Mel's of Modesto, Inc.*,
 811 F. Supp. 1402 (N.D. Cal. 1992) ....................................................................... 17

*Weeks v. Home Depot U.S.A., Inc.*,
 No. 19-6780, 2020 WL 5947811 (C.D. Cal. Sept. 18, 2020) (Olguin, J.) .............. 11

**Statutes**

California Business & Professions Code §17200 ............................................... 2, 3, 5, 21

**Other Authorities**

Rule 9(b) ................................................................................................... 2, 10, 12, 15

Rule 12(b) ................................................................................................................ 17

UNIT 387 DEFENDANTS' 12(B)(6) MOTION TO DISMISS

Defendants Unit 387 LLC, Hoppr, LLC, and Meredith Manak (collectively, the "Unit 387 Defendants") move to dismiss the Complaint ("Complaint") filed by Plaintiffs Epic Systems Corporation ("Epic"), OCHIN, Inc. ("OCHIN"), Reid Hospital & Health Care Services, Inc. d/b/a Reid Health ("Reid"), Trinity Health Corporation ("Trinity"), and UMass Memorial Health Care, Inc. ("UMass Memorial Health" and, together with Epic, OCHIN, Reid, and Trinity, "Plaintiffs"), as follows:

## II.   INTRODUCTION

A first principle is that "the simplest explanation is most often the correct one." And the simplest explanation for why the Plaintiffs failed to allege any factual allegations against the Unit 387 Defendants in support of their various claims is because no supporting facts exist. The Complaint [ECF No. 1] should be dismissed as to the Unit 387 Defendants not simply because of a procedural protection afforded by the Rules, but because it would be unjust to permit serious legal claims to persist without any factual basis or support. However, the Complaint shows that Plaintiffs may not be interested in that most elemental notion.

Rather, Plaintiffs filed this lawsuit to strengthen their already firm grip on a nationwide network of healthcare interoperability systems. Everyone in the healthcare space knows Epic dominates the healthcare records market. In fact, Epic has been the subject of numerous recent lawsuits complaining of its attempt at monopolizing and unfairly cornering the healthcare records industry. Earlier this month, Epic was sued by The American Association of Disability Justice and two other plaintiffs for monopolizing the market for healthcare record systems and restricting disabled individuals' access to their own medical records on an Epic platform called, MyChart. This instant lawsuit is Epic's latest salvo in its continued campaign in market dominance. Epic and the other Plaintiffs are unfortunately using their market power to prevent others from accessing patient records, which are at the heart of patient care. But despite the Plaintiffs' transparent business motives, their Complaint suffers from serious maladies, which render their Complaint moribund.

1

Plaintiffs' claims against the Unit 387 Defendants should be dismissed because (1) Plaintiffs failed to satisfy the contractually required preconditions to litigation, and (2) because the Complaint fails to state any cognizable claim against these Defendants. First, Plaintiffs have improperly bypassed mandatory contractual dispute resolution procedures to escalate what is fundamentally a healthcare governance dispute into a federal lawsuit. Substantively, Plaintiffs completely fail to allege sufficient factual allegations against the Unit 387 Defendants. Plaintiffs have not pled any facts that support a facially plausible cause of action against the Unit 387 Defendants.

As to the contractually mandated dispute resolution procedures, Plaintiffs' efforts at reframing the contracts fail. The Carequality Connected Agreement ("CCA") and the Trusted Exchange Framework and Common Agreement ("TEFCA") each mandate that disputes be resolved through internal frameworks rather than public litigation. This is because litigation on nuanced healthcare interoperability issues can have disastrous effects on the networks, those operating within them, and the providers and patients who depend on them. Plaintiffs acknowledge these contractual requirements yet chose to bypass them. That alone warrants dismissal.

Ignoring the procedural defects, Plaintiffs' substantive claims fail on the merits. Plaintiffs allege four causes of action against the Unit 387 Defendants: (1) fraud, (2) aiding-and-abetting fraud, (3) breach of contract, and (4) a catchall violation of California Business & Professions Code §17200.

***First***, the fraud and aiding-and-abetting fraud claims against the Unit 387 Defendants do not satisfy the particularity requirements of Rule 9(b) because the Complaint fails to identify any specific false statement by any of the Unit 387 Defendants to anyone, let alone the "who, what, when, where, and how" required for pleading fraud allegations in the Ninth Circuit. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009). The aiding-and-abetting claims fail because Plaintiffs do

UNIT 387 DEFENDANTS' 12(B)(6) MOTION TO DISMISS

not adequately allege actual knowledge—a required element—relying instead on conclusory allegations that these Defendants "should have known" or failed to exercise adequate diligence, which sounds in negligence—not fraud. Furthermore, without a valid fraud claim, there cannot be an aiding and abetting fraud claim. Moreover, Plaintiffs do not state any factual allegations supporting fraud or any other misrepresentations because none exist.

*Second*, the breach of contract claim against Unit 387 fails because Plaintiffs have not demonstrated third-party beneficiary standing and because Unit 387, as a candidate implementer, did not itself initiate the queries at issue. Plaintiffs' Complaint overlooks that Plaintiffs have no contract with any of the Unit 387 Defendants and further takes for granted that Plaintiffs are in alleged privity with Unit 387, such that Plaintiffs could assert a breach of contract as purported "third party beneficiaries." Finally, Epic and OCHIN lack Article III standing because their alleged injuries—voluntary investigative costs and future monitoring expenses—are not cognizable injuries in fact.

*Third*, the catchall claim for violating California Business & Professions Code §17200 fails as it is nothing more than a re-packaging of its above causes of action against the Unit 387 Defendants, which are threadbare and unaccompanied by sufficient factual allegations to plausibly state a claim. In a similar fashion, there are insufficient factual allegations to support and justify any conclusory allegation that the Unit 387 Defendants committed any wrongdoing. Finding an alternative label for the same unsupported claims of fraud and aiding-and-abetting fraud does not drop the standard for pleading the underlying acts of alleged wrongdoing.

The Court should dismiss all claims against Unit 387, Hoppr, and Ms. Manak with prejudice.

UNIT 387 DEFENDANTS' 12(B)(6) MOTION TO DISMISS

## III.    FACTUAL BACKGROUND

### A.    The Health Record Interoperability Framework.

Carequality and the Trusted Exchange Framework and Common Agreement ("TEFCA") are national interoperability frameworks designed to enable the electronic exchange of healthcare information. ECF No. 1, ¶¶53, 81. These frameworks operate through a hub-and-spoke contractual structure. In Carequality, "Implementers", which operate health data-sharing networks, execute a form contract with the framework administrator, Carequality, to act as infrastructure providers that onboard "Carequality Connections" (or "CCs") to the network. ¶54. CCs are members of Implementer's networks, such as healthcare providers. *Id*. Carequality Implementers sign an agreement called the Carequality Connected Agreement (the "CCA"). ¶59; *see also* Compl. Ex. A. TEFCA operates similarly, with Qualified Health Information Networks ("QHINs") onboarding "Participants" and "Subparticipants." A QHIN signs the TEFCA itself, which is more commonly called the "Common Agreement." ¶99. Under TEFCA, the administrator is called the Recognized Coordinating Entity ("RCE"). ¶83.

The frameworks—Carequality and TEFCA—both facilitate the free exchange of health records for permitted purposes, including, *inter alia*, "treatment" for patients. In Carequality, when a CC or Participant initiates a query for records, that query is routed to the healthcare provider maintaining the patient record, which compiles and returns it to the requesting entity. ¶68. TEFCA operates similarly with a Participant sending a query through its QHIN to all other QHINs. If a Participant has the requested data, it returns the records through the same QHIN chain. ¶98. Critically, as Plaintiffs acknowledge, exchanges are "machine-to-machine, meaning that no person is in the middle reviewing each request." ¶68.

### B.    The Unit 387 Defendants.

Unit 387 LLC is a Texas limited liability company based in Dallas that serves as a "candidate implementer" within the Carequality framework through Health

4

Gorilla. ¶174. As a candidate implementer, Unit 387 does not initiate queries for patient records; rather, it onboards downstream connections such as SelfRx and GuardDog, which are alleged to be healthcare providers seeking patient records for treatment purposes. The Complaint alleges that Unit 387 was entered into the Carequality directory in September 2022. ¶174.

Defendant Meredith Manak is the founder and CEO of both Unit 387 and Hoppr. ¶173. Defendant Hoppr, LLC is a Texas limited liability company that allegedly "locates, aggregates, and normalizes healthcare data from any source across the US." ¶46. There is no allegation that Hoppr is itself a Carequality Connection, TEFCA Participant, or TEFCA Subparticipant—nor that Hoppr ever directly accessed any interoperability framework. *See generally*, ECF. No. 1.

**C.   The Claims Against The Unit 387 Defendants.**

Plaintiffs assert the following claims against the Unit 387 Defendants:

- **Count Three (Fraud)**: Against Health Gorilla and the Unit 387 Defendants.
- **Count Six (Aiding and Abetting Fraud)**: Against Health Gorilla and the Unit 387 Defendants.
- **Count Seven (California Business & Professions Code §17200)**: Against all Defendants.
- **Count Nine (Breach of Contract)**: Against RavillaMed, Mammoth, and Unit 387.

In support of **Count Three**, Plaintiff makes only the following "factual" allegations against the Unit 387 Defendants:

- "***Unit 387*** <u>*would have*</u> *represented to Health Gorilla that **Unit 387** sought access because its customers needed patient records for treatment purposes, and Health Gorilla* <u>*would have*</u> *affirmed that representation to the framework and all of the participants on the framework, including Epic and Epic's healthcare provider customers,*

5

*including Reid, Trinity, and UMass Memorial Health, as well as OCHIN and its healthcare provider customers. Since gaining access to the Carequality framework, **Unit 387's** customers have taken over 100,000 records through Carequality from Epic's healthcare provider customers community members alone."* ¶174 (emphasis added).

- *"From September 2022 to November 2025, **Unit 387** facilitated others such as Defendants SelfRx, GuardDog and its predecessor Critical Care Nurse Consulting in obtaining sensitive patient records from Epic and OCHIN's healthcare provider customers in California and other states, including Reid, Trinity, and UMass Memorial Health, through Carequality, asserting that the requests were for treatment purposes."* ¶182.

- *"Epic believes that **Unit 387**, either directly or through its own customers, knowingly transmitted the data to **Hoppr** for sale for profit, in violation of Sections 22 and 23 of the CC Terms as well as HIPAA. On information and belief, **Hoppr** knowingly obtained the data disclosed by **Unit 387** or its customers in violation of the law. As shown above, Defendant **Manak** carried out these bad acts to benefit the interests of the interconnected business web that **Manak** operates for the improper purposes of obtaining and then selling patient records that they take from the interoperability frameworks under the false pretense of providing 'treatment' to patients. Simply put, **Manak** tried to hide the connections between herself and her closely held companies and their affiliates (**Defendants Unit 387, Hoppr,** GuardDog, and SelfRx) to evade detection...."* ¶182.

- *"[SelfRx's and GuardDog's] assertions were false because SelfRx's and GuardDog's true purposes for seeking those patient records was to further the **Unit 387 Defendants'** commercial interests by selling the*

6

UNIT 387 DEFENDANTS' 12(B)(6) MOTION TO DISMISS

*patient records, either directly to undisclosed law firms and other third parties, or to and through an intermediary such as Defendant **Hoppr**."* ¶238.

- *"SelfRx and GuardDog knew that the treatment representations were false at the time they were made for all patient records relating to persons who were not under SelfRx's or GuardDog's medical care and for which SelfRx or GuardDog sought access to the patient records for the **Unit 387 Defendants'** own commercial purposes...."* ¶239.

- *"SelfRx and GuardDog intended for Plaintiffs to rely on the false treatment-purpose representations...."* ¶240.

- *"Defendant **Manak** [...] made or directed the false statements or fraudulently omitted them when acting as the candidate implementer to SelfRx and GuardDog and thereby granting SelfRx and GuardDog with access to the Carequality framework through Health Gorilla. **Manak** also fraudulently omitted her connection with **Hoppr** to other participants in Carequality outside the circle of trust between the **Unit 387 Defendants** and Health Gorilla, and their respective affiliates and confidantes, so that no one else was advised that Unit 387 was being operated by a person with known ties to the mass tort industry and who actively owned and operated **Hoppr**...."* ¶241.

- *"**Hoppr**, acting at the direction and control of **Manak**, similarly omitted to inform Carequality or Plaintiffs of its connection or role in the **Unit 387 Defendants'** scheme."* ¶241.

- *"**Unit 387**, SelfRx, GuardDog, and **Manak** intended for Plaintiffs to rely on the false treatment-purpose representations, and the omissions concerning **Manak** and **Hoppr's** connection so that SelfRx and GuardDog could obtain the patient records. The **Unit 387 Defendants** knew that they could not obtain the patient records if they*

UNIT 387 DEFENDANTS' 12(B)(6) MOTION TO DISMISS

*misrepresented their true purpose for seeking patient records, in violation of the requirements of Carequality and the law, including without limitation, HIPAA. The **Unit 387 Defendants** also knew that omitting the connection with **Manak** and **Hoppr** would assist them in evading detection, given the healthcare industry's growing experience with bad actors' abuses of the interoperability frameworks as described above.*" ¶242.

- "*Plaintiffs have been harmed as a direct consequence of the fraudulent conduct of the **Unit 387 Defendants** and Health Gorilla.*" ¶249.

Noticeably absent from these allegations is any detail about any alleged fraudulent statements the Unit 387 Defendants allegedly made to Plaintiffs (or anyone else for that matter).

In support of **Count Six**, Plaintiff makes only the following "factual" allegations against the Unit 387 Defendants:

- "*As described above, the **Unit 387 Defendants** made false statements of material fact and omitted material facts to induce Plaintiffs into facilitating access to patient records, which they would not have done had they known the true purpose of the request.*" ¶271.

- "***Manak** knew that **Unit 387's** customers SelfRx and GuardDog were misstating their true purposes and that their treatment-purpose requests were false with respect to certain patient records because SelfRx and GuardDog's true purposes for seeking those patient records was to further the **Unit 387 Defendants'** commercial interests by selling the patient records....*" ¶272.

- "***Manak** provided substantial assistance to SelfRx's and GuardDog's fraud by knowingly facilitating the false representations and omissions that were essential to the scheme described herein by either making the false representations and omissions themselves as described above or*

8

*providing cover for the false representations and omissions and enabling **Unit 387** to make the fraudulent requests despite knowing that the patient records were not requested for treatment purposes.*" ¶273.

- "*Health Gorilla has provided substantial assistance to the **Unit 387 Defendants'** fraud by affirmatively representing that **Unit 387's** customers SelfRx and GuardDog were providing treatment....*" ¶275.

- "*Plaintiffs have been harmed as a direct consequence of this fraudulent conduct.*" ¶276.

Much like Count Three, there are no factual allegations to support Count Six against the Unit 387 Defendants. Plaintiff only provides threadbare and conclusory allegations of alleged "fraud," a "scheme," and "damages."

For **Count Seven**, the only factual allegations made against the Unit 387 Defendants are as follows:

- "***Defendants** engaged in unlawful and fraudulent business practices by misrepresenting the purposes for which they sought patient records, thereby obtaining records in California they were not authorized to access or disclose and otherwise misusing those patient records for improper purposes, including by selling of offering for sale those patient records.*" ¶282.

- "*The acts described above by **Defendants** constitute unlawful and fraudulent acts and practices within the meaning of California Business and Professions Code Section 17200 et seq.*" ¶

- "*These acts are fraudulent and unlawful because they violated multiple independent state and federal laws....*" ¶283.

- "*Plaintiffs have been harmed as a direct consequence of the unlawful and fraudulent conduct of the **Defendants**.*" ¶284.

UNIT 387 DEFENDANTS' 12(B)(6) MOTION TO DISMISS

Just like the other causes of action Plaintiffs assert, but even to a greater extent for this catch-all claim, there are no factual allegations pled against the Unit 387 Defendants.

For **Count Nine**, the only factual allegations made against the Unit 387 Defendants are as follows:

- "*By submitting fraudulent requests for patient data to conceal that the requests were not made for a permitted purpose, RavillaMed, Mammoth, and **Unit 387** breached Section 5 of the CC Terms….*" ¶309.
- "*The fraudulent requests made by RavillaMed, Mammoth, and **Unit 387** also breached Section 12 of the CC Terms….*" ¶310.
- "*RavillaMed, Mammoth, and **Unit 387** violated these provisions by requesting patient records under the guise of treatment purposes to conceal that the true reason for the request was not a permitted purpose under the Implementation Guide.*" ¶311.
- "*By submitting fraudulent requests for patient data to conceal that the requests were not made for a permitted purpose, RavillaMed, Mammoth, and **Unit 387** breached several provisions of the ToPs….*" ¶315.
- "*Plaintiffs have been harmed as a direct consequence of RavillaMed's, Mammoth's, and **Unit 387's** breaches of contract.*" ¶316.

All of the above-recited allegations—even if true, which they are not—do not plausibly state a breach of contract claim against Unit 387, much less a plausible one. Plaintiffs do not allege that Unit 387 is a party to any contract, describe how Unit 387 breached such a contract, or how Plaintiffs were allegedly damaged.

Plaintiffs' threadbare allegations are insufficient to satisfy their heightened pleading burden under Rule 9(b) thereby justifying dismissal of the above claims against the Unit 387 Defendants. And even for the breach of contract claim, which is

10

UNIT 387 DEFENDANTS' 12(B)(6) MOTION TO DISMISS

not subject Rule 9(b)'s particularity requirements, Plaintiffs allege insufficient facts to state a cognizable claim against Unit 387.

## IV.  LEGAL STANDARDS[1]

Under Rule 12(b)(6), dismissal is proper when the complaint does not allege sufficient facts to support a cognizable legal theory. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007). To survive a motion to dismiss, a complaint must "proffer enough facts to state a claim to relief that is plausible on its face." *Weeks v. Home Depot U.S.A., Inc.*, No. 19-6780, 2020 WL 5947811, at *2 (C.D. Cal. Sept. 18, 2020) (Olguin, J.) (internal quotations and citations omitted). A claim is facially plausible when the factual allegations allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In so doing, a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *see also Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969, 973 (9th Cir. 2004) ("[T]he court is not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged. Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.") (citations and internal quotation marks omitted). Accordingly, while a court must accept facially plausible factual allegations as true, conclusory allegations and unwarranted inferences are not entitled to the same presumption. *Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir. 1998); *Weeks*, 2020 WL 5947811, at *2.

---

[1] The Complaint does not clearly identify which state's law governs its common-law claims. "Due to variances among state laws, failure to allege which state law governs a common law claim is grounds for dismissal." *In re Nexus 6P Prods. Liab. Litig.*, 293 F. Supp. 3d 888, 933 (N.D. Cal. 2018). The Unit 387 Defendants are Texas entities and Ms. Manak is alleged to reside in Texas. Plaintiffs' failure to specify the applicable law is an independent ground for dismissal of all common-law claims. Because the Complaint implies California law governs, the Unit 387 Defendants address the claims under California law without conceding its applicability.

11

Crucially, Rule 9(b) requires plaintiffs to plead fraud "with particularity"—identifying the "who, what, when, where, and how" of the alleged misconduct. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009).

Plaintiffs' Complaint fails to satisfy these standards here.

## V.    ARGUMENT

### A.    The Complaint Should Be Dismissed Because Plaintiffs Failed to Satisfy Contractual Preconditions to Suit.

Prior to initiating litigation, the Plaintiffs were contractually obligated to engage in alternative dispute resolution through Carequality and the TEFCA Recognized Coordinating Entity ("TEFCA RCE"). However, they bypassed these required processes and proceeded directly with this lawsuit. Because Plaintiffs failed to satisfy these contractual preconditions, this lawsuit is premature and warrants dismissal.

#### 1.    Plaintiffs Refused to Exhaust Mandatory Alternative Dispute Provisions.

Both the CCA and Common Agreement require resolving disputes "through a collaborative, collegial process rather than through civil litigation." Ex. A (CCA) §20.1. Under the CCA, a party "*shall* submit Disputes to the non-binding dispute resolution process established by Carequality." *Id*. (emphasis added). A "Dispute" encompasses "[a]ny controversy, dispute, or agreement arising out of or relating to the interpretation or implementation of the Carequality Elements," including the CCA, CC Terms, Implementation Guides, and Carequality Policies. *Id*. §§1.17, 1.10.

Under the Common Agreement, a party likewise "agrees to participate in the Dispute Resolution Process with respect to any Dispute," including any "concern or complaint about the actions, or any failure to act" of another QHIN or its Participants. Ex. E (CA) §§15.1, 1.1. Refusal to participate constitutes a "material breach." *Id*.

Plaintiffs' claims fall squarely within these definitions because they arise out of or relate to the interpretation and implementation of the Carequality Elements and

12

UNIT 387 DEFENDANTS' 12(B)(6) MOTION TO DISMISS

the Common Agreement—the very documents underlying Plaintiffs' claims. Ex. A (CCA) §1.17; *see* ¶¶56, 59-60, 69-80, 304, 309-311. Similarly, the Complaint is based on a "concern or complaint" about Health Gorilla's "actions" or "failure to act"; *i.e.*, a Dispute under the Common Agreement Ex. E (CA) §15.1; *see* ¶¶99-103, 298, 312- 315. Plaintiffs concede they pursued dispute resolution with other entities on similar grievances, demonstrating the process's applicability here. *See*, *e.g.*, ¶¶130-137.

Failure to exhaust contractually required dispute resolution warrants dismissal. *Columbia Cas. Co. v. Cottage Health Sys.*, 2015 WL 4497730, at *2 (C.D. Cal. July 17, 2015).

### 2. The "Immediate Injunctive Relief" Exception Does Not Apply.

No contractual exception permits this lawsuit. Both agreements permit bypassing dispute resolution only if the party seeks "immediate injunctive relief" for "irreparable harm." *See* Ex. A (CCA) §20.2.1; Ex. E (CA) §15.2.1. Plaintiffs invoke this exception merely by using those words in the Complaint.

But actions are what matter regarding contractual performance. The Complaint's timeline establishes that Epic first raised concerns about the Unit 387 Defendants to Carequality and Health Gorilla in November 2025, yet did not file suit until January 13, 2026—approximately three months later. ¶183. This alone discredits any need for immediate injunctive relief. Regardless, since filing, Plaintiffs have not sought a temporary restraining order or preliminary injunction—the forms of "immediate injunctive relief" actually available to Plaintiffs. Because Plaintiffs have not sought immediate injunctive relief, this lawsuit does not meet the exception as a matter of law.

### 3. Plaintiffs Are Not Absolved from Participating in Dispute Resolution.

Plaintiffs suggest the Dispute Resolution Processes lack "transparency" and therefore are not required. ¶17. However, Epic assisted in drafting the CCA and

13
UNIT 387 DEFENDANTS' 12(B)(6) MOTION TO DISMISS

Common Agreement—the very agreements containing the contractual provisions it now attacks. Regardless, Plaintiffs do not allege Carequality or the RCE were unwilling or unable to act; rather, Plaintiffs derailed the process by filing this lawsuit prematurely. Therefore, Plaintiffs have no basis to avoid their contractual obligations. *See Chess v. CF Arcis IX LLC*, 2020 WL 4207322, at *13-14 (N.D. Cal. July 22, 2020) (staying lawsuit and compelling arbitration based on Plaintiffs' "refusal to give notice, negotiate or mediate as required by the arbitration agreement.").

Furthermore, the contracts' terms should not be ignored, and Plaintiffs must comply with the Dispute Resolution Processes. First, both contracts' remedy for non-compliance is suspension by Carequality or the RCE—not private litigation. Ex. A (CCA) §§5.3, 13; Ex. E (CA) §14.2. The dispute resolution provisions exist so those bodies can respond to concerns—not so that entities like Plaintiffs can file burdensome litigation. Where a contract provides its own enforcement mechanisms, allowing third parties to bypass them through private litigation "would not be consistent with the objectives of the contract and the reasonable expectations of the [contracting parties]." *Goonewardene v. ADP, LLC*, 434 P.3d 124, 127 (Cal. 2019).

Second, only the CCA grants third-party beneficiary status to certain parties under certain situations, and it excludes Section 15 from that list. Ex. A (CCA) §15. Specifically, Section 15 addresses onboarding, vetting, validation, and suspension of CCs. *Id*. With this lawsuit, Plaintiffs deprive Carequality of its contractual right and ability to determine whether any Defendant violated Section 15 in contravention of the contract's clear language.

### B.     The Fraud Claim Against The Unit 387 Defendants Fails.

Common-law fraud requires: (1) misrepresentation; (2) knowledge of falsity (scienter); (3) intent to induce reliance; (4) justifiable reliance; and (5) resulting damage. *Kearns*, 567 F.3d at 1126. The fraud claim against the Unit 387 Defendants (Count 3) should be dismissed for failure to plead with particularity any actionable misrepresentation or omission, and to plausibly allege scienter or reliance.

14

UNIT 387 DEFENDANTS' 12(B)(6) MOTION TO DISMISS

**1.  The Complaint Fails to Identify Any Actionable Misrepresentation by the Unit 387 Defendants.**

To avoid dismissal under Rule 9(b), a complaint must "state the time, place, and *specific content* of the false representations as well as the identities of the parties to the misrepresentation." *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 558 (9th Cir. 2010) (emphasis added). Plaintiffs' fraud claim against the Unit 387 Defendants, and the "factual allegations" in support, do not pass muster under Rule 9(b)'s heightened standard.

The alleged detrimental action was healthcare providers providing patient records to SelfRx and GuardDog. ¶246. But the Complaint makes clear that providers sent records only in response to allegedly fraudulent queries made by SelfRx and GuardDog—not Unit 387, Hoppr, or Ms. Manak. ¶¶237-239. Nowhere does the Complaint allege that the Unit 387 Defendants initiated any query or asserted any permitted purpose in connection with any specific query. Indeed, the Complaint alleges that Unit 387 represented it "would not be initiating requests for records." ¶44.

As for Hoppr, the Complaint pleads no misrepresentation to any party at all. It alleges Hoppr "knowingly obtained the data disclosed by Unit 387 or its customers in violation of the law", but it does not allege that Hoppr ever communicated with any Plaintiff or made any representation that induced any Plaintiff to disclose records. ¶182. The sole allegation is that "Hoppr, acting at the direction and control of Manak, similarly omitted to inform Carequality or Plaintiffs of its connection or role in the Unit 387 Defendants' scheme." ¶241. But omission-based fraud requires a duty to speak. *Barnes & Noble, Inc. v. LSI Corp.*, 849 F. Supp. 2d 925, 936 (N.D. Cal. 2012). Plaintiffs do not allege any transactional relationship between Hoppr and any Plaintiff, any statutory or contractual disclosure duty owed by Hoppr to Plaintiffs, or any other recognized basis for a duty to disclose.

15

UNIT 387 DEFENDANTS' 12(B)(6) MOTION TO DISMISS

As for Ms. Manak, the Complaint asserts she "made or directed the false statements or fraudulently omitted them when acting as the candidate implementer to SelfRx and GuardDog" and "tried to hide the connections between herself and her closely held companies and their affiliates (Defendants Unit 387, Hoppr, GuardDog, and SelfRx) to evade detection…." ¶¶182, 241. Moreover, the Complaint does not allege that any Plaintiff ever saw or relied on any statement by which Manak purportedly concealed Hoppr's connection to Unit 387. Allegations about Manak's background in "mass torts" and conference presentations do not transform speculation into a particularized fraud claim. ¶241. This warrants dismissal as to Hoppr and Ms. Manak. As for Unit 387, no factual allegations are made—they are simply implied, such as when Plaintiffs allege, "Unit 387 would have represented to Health Gorilla that Unit 387 sought access because its customers needed patient records for treatment purposes" and "Unit 387, SelfRx, GuardDog, and Manak intended for Plaintiffs to rely on the false treatment-purpose representations" and "Plaintiffs have been harmed as a direct consequence of the fraudulent conduct of the Unit 387 Defendants and Health Gorilla." ¶¶174, 242, 249. These conditional allegations do not satisfy the requirement to identify the specific content of an allegedly false statement. *Kearns*, 567 F.3d at 1124. They are nothing more than beliefs and speculations that do not identify any specific fraudulent statements. These speculative, conclusory, and vague allegations are insufficient to satisfy Rule 9(b)'s heightened fraud-pleading standard.

Plaintiffs' Memoranda in opposition to other Defendants' Motions to Dismiss claim that sufficient factual details are pled. However, this assertion is as conclusory as the Complaint's fraud allegations. In Plaintiffs' aforementioned response-memoranda, they reference the allegation that sometime in "September 2022, Health Gorilla entered Unit 387 into the Carequality directory" as proof that they adequately pled the "who, what, where, when, and why." ¶174. This is hardly an allegation of fraud, but even if it were, Plaintiffs' other allegations are even more amorphous and

UNIT 387 DEFENDANTS' 12(B)(6) MOTION TO DISMISS

vague. For example, Plaintiffs allege that in "September 2022 through November 2025" and in "September 2024 through November 2025" SelfRx and GuardDog, respectively, improperly obtained patient records. This multiple-year window is insufficient to meet the fraud pleading standard. *Wanetick v. Mel's of Modesto, Inc.*, 811 F. Supp. 1402, 1405 (N.D. Cal. 1992) ("Aside from narrowing the series of misrepresentations to a period of ten months, Plaintiff does not identify the time or place of the allegedly fraudulent communications."). In this fashion, the Complaint identifies no time, place, or content of any statements made by the Unit 387 Defendants to any Plaintiff (or anyone else).

### 2. The Complaint Fails to Plead Actual, Justifiable Reliance on Any Act by the Unit 387 Defendants.

"Justifiable reliance is an essential element of a claim for fraudulent misrepresentation." *Guido v. Koopman*, 1 Cal. App. 4th 837, 843 (1991). The Complaint does not allege any Plaintiff relied on any particular statement by Unit 387, Hoppr, or Ms. Manak in taking or refraining from any action.

First, parties to the CCA and CC Terms explicitly "acknowledge[] that other Implementers and Carequality Connections may be added to or removed from the Carequality Directory at any time; therefore, [Applicant/Organization] may not rely upon the inclusion in the Carequality Directory of a particular Implementer or Carequality Connection." Ex. A (CCA) §19, Ex. B (CC Terms) §15. Plaintiffs agreed to these terms and therefore disclaimed the assumption that another participant's presence in the directory guarantees their compliance. In the face of such disclaimers, reliance "may be decided as a matter of law." *Dix v. Nova Benefit Plans, LLC*, 2015 WL 12859221, at *7 (C.D. Cal. Apr. 28, 2015) (finding plaintiffs' own allegations defeated justifiable reliance element and dismissing complaint with prejudice pursuant to Rule 12(b)).

However, aside from the disclaimer, the fraud count alleges that the detrimental course of action was to "provide[] [SelfRx and GuardDog] with patient

UNIT 387 DEFENDANTS' 12(B)(6) MOTION TO DISMISS

records." ¶246. Epic and OCHIN do not allege they provide patient records. ¶¶26-27. Fraud requires that the plaintiff take a "detrimental course of action" caused by "actual and justifiable reliance" on the defendant's misrepresentation. *Beckwith v. Dahl*, 205 Cal. App. 4th 1039, 1062 (2012). However, neither Epic nor OCHIN provided any records: the Complaint's fraud allegations make clear they took no action in response to any alleged fraud, meaning they cannot establish reliance.

Third, Plaintiffs Reid, Trinity, and UMass Memorial Health allege they disclosed patient records in response to queries from SelfRx and GuardDog. But the Complaint's allegations establish this disclosure was not in reliance on any particular statement by Unit 387, Hoppr, or Ms. Manak, because the allegations show none of these Defendants made any representations in connection with record queries. At most, Unit 387 onboarded SelfRx and GuardDog, but the actual treatment-purpose assertions were made by those entities, *not by Unit 387*. Nothing more is alleged. Reid, Trinity, and UMass Memorial Health do not allege any onboarding representations from Unit 387 or Ms. Manak, nor that they sent records in response to such statements.

### 3. The Complaint Fails to Plausibly Plead Scienter.

The Complaint's scienter allegations are circular and insufficient. The Complaint asserts that the Unit 387 Defendants "knew" that SelfRx and GuardDog misstated their treatment purposes. ¶272 ("At all relevant times, Manak knew that Unit 387's customers SelfRx and GuardDog were misstating their true purposes and that their treatment-purpose requests were false…."). But the supporting factual allegations are merely based on the following assertions: (1) Ms. Manak's background in "mass torts"; (2) her founding of Hoppr, which allegedly sells records to law firms; and (3) "abnormal" exchange patterns exhibited by SelfRx and GuardDog. ¶¶45, 178 ("Manak provided she 'started her career in mass torts at an international defense firm'"; "Defendant Manak also founded Defendant Hoppr"; "SelfRx has exhibited highly abnormal patient-record exchange patterns").

18

These allegations do not describe what the Unit 387 Defendants actually knew about SelfRx's or GuardDog's purposes at the time they were onboarded—much less what the Unit 387 Defendants knew at the time of any particular query. Plaintiffs ask the Court to believe that because these downstream entities are bad actors, which is also not adequately alleged, Unit 387 and Ms. Manak must have known they were engaging in alleged fraud. That is a negligence theory dressed up as fraud—it does not describe scienter. *See Petersen v. Allstate Indem. Co.*, 281 F.R.D. 413, 417 (C.D. Cal. 2012) (distinguishing between a negligent misrepresentation and fraudulent intent).

Most glaring, however, is the absence of any allegation that any of the Unit 387 Defendants knew its own alleged representations were made with knowledge of the falsity of the statement. Simply, if there is no factual allegation of any misrepresentation, there can be no factual allegation that such misrepresentation was made with knowledge and intent. This alone disqualifies Plaintiffs' fraud claim.

### 4. Plaintiffs Fail to Allege Damages Caused by the Unit 387 Defendants' Alleged Fraud.

"[T]here are two causation elements in a fraud cause of action. First, the plaintiff's actual and justifiable reliance on the defendant's misrepresentation must have caused him to take a detrimental course of action. Second, the detrimental action taken by the plaintiff must have caused his alleged damage." *Beckwith*, 205 Cal. App. 4th at 1062.

Plaintiffs' allegations do not meet these standards. The Plaintiffs' alleged damages flow from SelfRx's and GuardDog's allegedly false treatment-purpose assertions, not from any misrepresentation or mission by Unit 387, Hoppr, or Ms. Manak—as none are alleged. Unit 387 was not "in the middle" of any particular exchange. Plaintiffs' own allegations demonstrate the "exchanges are machine-to-machine." ¶68. The causal chain runs from SelfRx and GuardDog to Plaintiffs Reid, Trinity, and UMass Memorial Health. Unit 387, Hoppr, and Ms. Manak are not links

UNIT 387 DEFENDANTS' 12(B)(6) MOTION TO DISMISS

in that chain for any intentional conduct regarding the particular representations at issue.

As for Epic and OCHIN, they allege they "have been harmed in the same way" as Reid, Trinity, and UMass Memorial Health—specifically, consequential costs of assisting their customers investigate potential issues. ¶249. Given that Plaintiffs Reid, Trinity, and UMass Memorial Health cannot establish the requisite causal link between the Unit 387 Defendants and the alleged fraud, Epic and OCHIN's even more attenuated damages fail as well.

### C. The Aiding-and-Abetting Claims Fail for Lack of Actual Knowledge.

"To plead any claim for aiding and abetting," Plaintiffs must allege that Defendants either knew "the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act," or gave "substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person." *Bhatia v. Silvergate Bank*, 725 F. Supp. 3d 1079, 1113 (S.D. Cal. 2024).

The knowledge element requires actual knowledge—not constructive knowledge, negligence, or reason to suspect. *In re First Alliance Mortgage Co.*, 471 F.3d 977, 993 (9th Cir. 2006); *Casey v. U.S. Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138, 1145 (2005). Mere suspicion is insufficient.

The Complaint does not sufficiently allege that Unit 387, Hoppr, or Ms. Manak actually knew SelfRx or GuardDog were submitting fraudulent treatment-purpose queries. Instead, it relies on "red flags" such as "abnormal" exchange patterns, Ms. Manak's background in mass torts, and her connection to Hoppr. ¶173 ("Manak knew or should know that the only conceivable way this could be accomplished would be by falsely claiming the treatment purpose through TEFCA or Carequality.") These allegations describe, at most, that Unit 387 and Ms. Manak should have been more

suspicious or should have investigated more thoroughly—which, if true, states a negligence claim, not fraud.

The Complaint also alleges that "Manak provided substantial assistance to SelfRx's and GuardDog's fraud by knowingly facilitating the false representations." ¶273. But this is a legal conclusion, not a factual allegation. The Complaint does not identify any specific act by Ms. Manak that assisted any specific fraudulent query. Merely onboarding downstream connections—which she was entitled to do as a candidate implementer—does not constitute "substantial assistance" to fraud absent actual knowledge that the connections were fraudulent. The aiding-and-abetting claims therefore fail.

### D.      The Unfair Competition Claim Fails.

Plaintiffs' California Business & Professions Code §17200 claim rests on the same factual allegations underlying the fraud and breach of contract claims. ¶¶279, 282 ("Plaintiffs repeat and reallege the preceding paragraphs hereof, as if fully set forth herein"; "Defendants engaged in unlawful and fraudulent business practices by misrepresenting the purposes for which they sought patient records"). Because Plaintiffs have not adequately alleged fraud or other misconduct by Unit 387, Hoppr, or Ms. Manak, there is no predicate "unlawful" or "fraudulent" practice to sustain the §17200 claim against these Defendants.

Additionally, Epic and OCHIN lack Article III standing to pursue this claim. They allege they suffered "costs in connection with responding to fraudulent requests for records, suffered losses in employee time and diversion of resources to investigate and address this fraud." ¶284. But Epic and OCHIN do not allege they provided records to anyone—their injuries are investigative expenses and prospective monitoring costs. *Id*. Under *Clapper v. Amnesty International USA*, 568 U.S. 398, 416 (2013), plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." Epic's claimed costs are overwhelmingly preventative, forward-looking

21

UNIT 387 DEFENDANTS' 12(B)(6) MOTION TO DISMISS

expenditures to "monitor CCs and Implementers" and "prevent further improper disclosures." These are not cognizable injuries in fact.

### E.   The Breach of Contract Claim Against Unit 387 Warrants Dismissal.

#### 1.   Plaintiffs Have Not Established Third-Party Beneficiary Standing.

Plaintiffs assert they are third-party beneficiaries of the CC Terms. ¶306. Section 16.2 of the CC Terms provides that "Implementers [and] Carequality Connections shall be deemed third party beneficiaries of these Carequality Connection Terms for purposes of enforcing *Organization's* compliance with these Carequality Connection Terms." Ex. B (CC Terms) §16.2 (emphasis added). An "Organization" is the "Carequality Connection on which these Carequality Connection Terms are binding"—*i.e.*, the CC signing the Terms. *Id.* §1.22.

Unit 387 is not merely a CC; it is a "candidate implementer." ¶58. The Complaint does not adequately allege what CC Terms, if any, Unit 387 signed, or whether Section 16.2's third-party beneficiary provision applies to candidate implementers. Even if it did, Plaintiffs' claims for breach of the CCA itself fail because the CCA's Section 21.6 grants third-party beneficiary status only for specifically enumerated provisions—and it excludes Section 15, which addresses onboarding and vetting. Ex. A (CCA) §15 ("Each Implementer shall be deemed a third party beneficiary of this Agreement for purposes of enforcing Applicant's compliance with Sections 7, 8, 10.1, 10.1.3, 11, 12, 13, 19 and 20 of this Agreement."). Plaintiffs' claims for inadequate vetting would fall under Section 15, which no Plaintiff can enforce as a third-party beneficiary. Ex. A (CCA) §15 ("Applicant is responsible for identifying those of its customers, participants or other constituent entities, if any, that wish to be included in the Carequality D"irectory as Carequality Connections."); *id.* at §21.6.

UNIT 387 DEFENDANTS' 12(B)(6) MOTION TO DISMISS

### 2. **The Complaint Does Not Allege Unit 387 Itself Breached Any Contractual Obligation.**

The Complaint alleges that Unit 387 "facilitated" SelfRx and GuardDog in obtaining patient records. ¶182. But the breach of contract claim is premised on the CC Terms provisions requiring a CC to "only engage in exchange activities through the Carequality Elements for permitted purposes." ¶310. The Complaint itself states that Unit 387 represented it "would not be initiating requests for records." ¶44. If Unit 387 did not initiate requests, then it did not engage in "exchange activities" for any purpose—permitted or otherwise. Attempting to hold Unit 387 vicariously liable for its downstream connections' queries under a clause that regulates an Organization's own exchange activities does not state a breach.

### 3. **The Contract Claim Is Also Barred by the Mandatory Dispute Resolution Provisions.**

As discussed *supra* Part I, Plaintiffs were required to pursue the frameworks' dispute resolution processes before filing suit. Those provisions are designed precisely to address onboarding, validation, and permitted-purpose disputes. Plaintiffs' decision to sue rather than exhaust those remedies is inconsistent with the contracts' structure and is a condition-precedent failure that requires dismissal.

### F. **Epic and OCHIN Lack Article III Standing.**

Plaintiffs' nonspecific and self-generated grievances do not establish Article III standing. Article III standing requires that a plaintiff demonstrate (1) an "injury in fact," (2) "a causal connection between the injury and the conduct complained of," and (3) a likelihood "that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (quotations omitted). "An injury in fact is an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Novak v. United States*, 795 F.3d 1012, 1018 (9th Cir. 2015) (quotation marks and alteration omitted) (citing

*Lujan*, 504 U.S. at 560). "Because a generalized grievance is not a particularized injury, a suit alleging only generalized grievances fails for lack of standing." *Id*.

Epic and OCHIN do not allege they provided records in response to any query. Their claimed injuries are investigative expenses, employee time, and future monitoring costs. These self-imposed, preventative expenditures are not "injury in fact" under Article III.

As discussed *supra* Part IV, the Supreme Court has made clear that plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416. Epic's claimed costs are overwhelmingly forward-looking"—monitoring tools to prevent further improper disclosures" and efforts "to further monitor CCs and Implementers." The harm Epic seeks to prevent—that unknown third parties might exploit interoperability frameworks—is speculative, not imminent.

Where multiple plaintiffs seek the same relief and at least one has standing, the court retains discretion to dismiss those lacking standing. *Loffman v. California Dep't of Educ.*, 119 F.4th 1147, 1164 (9th Cir. 2024). The Court should dismiss Epic's and OCHIN's claims for lack of standing.

## VI.    CONCLUSION.

For the foregoing reasons, the Complaint should be dismissed in its entirety as to Unit 387 LLC, Hoppr, LLC, and Meredith Manak. Plaintiffs failed to abide by the mandatory dispute resolution provisions that are conditions precedent to litigation. Their fraud and aiding-and-abetting theories lack the particularized factual allegations regarding the specific misrepresentations, duty to disclose, actual knowledge, reliance, causation, and damages necessary to proceed. Their unfair competition claim adds nothing independent of those defective theories and fails for the same reasons—and for lack of injury as to Epic and OCHIN. Plaintiffs' contract claim fails to allege specific acts constituting a breach and because Plaintiffs are not third party beneficiaries. Because these defects are fundamental and not curable by

amendment consistent with the Complaint's own allegations, the Court should dismiss the claims against Unit 387 LLC, Hoppr, LLC, and Meredith Manak with prejudice.

DATED: March 30, 2026          **BLANK ROME LLP**

By: */s/ Alycia S. Tulloch*
Christopher Petersen
Alycia S. Tulloch
2029 Century Park East, 6th Floor
Los Angeles, CA 90067

By: */s/ Mark L. Johansen*
Mark L. Johansen (*Pro Hac Vice*)
Neakzaad Horriat (*Pro Hac Vice*)
200 Crescent Court, Suite 1000
Dallas, TX 75201

### L.R. 11-6.2 Certificate of Compliance

The undersigned, counsel of record for Defendants Unit 387 LLC, Hoppr, LLC, and Meredith Manak, certifies that the Memorandum of Points and Authorities in support of the Motion to Dismiss contains 6,991 words, which complies with the word limit of L.R. 11-6.1.

DATED: March 30, 2026          **BLANK ROME LLP**

By: */s/ Alycia S. Tulloch*
Christopher Petersen
Alycia S. Tulloch
2029 Century Park East, 6th Floor
Los Angeles, CA 90067

By: */s/ Mark L. Johansen*
Mark L. Johansen (*Pro Hac Vice*)
Neakzaad Horriat (*Pro Hac Vice*)
200 Crescent Court, Suite 1000
Dallas, TX 75201

UNIT 387 DEFENDANTS' 12(B)(6) MOTION TO DISMISS