**BLANK ROME LLP**
Christopher Petersen (SBN 251439)
chris.petersen@blankrome.com
Alycia S. Tulloch (SBN 335916)
alycia.tulloch@blankrome.com
2029 Century Park East, 6th Floor
Los Angeles, CA 90067
Telephone:  424.239.3400
Facsimile:   424.239.3434

**BLANK ROME LLP**
Mark L. Johansen (*Pro Hac Vice*)
mark.johansen@blankrome.com
Neakzaad ("Neak") Horriat (*Pro Hac Vice*)
Neakzaad.horriat@blankrome.com
200 Crescent Court, Suite 1000
Dallas, TX 75201
Telephone:  972.850.1450
Facsimile:   972.850.1451

*Attorneys for Defendants*
UNIT 387, LLC, HOPPR, LLC,
AND MEREDITH MANAK

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Epic Systems Corporation; OCHIN, Inc.; Reid Hospital & Health Care Services, Inc. d/b/a Reid Health; Trinity Health Corporation; and UMass Memorial Health Care, Inc., <br><br> Plaintiffs, <br><br> v. <br><br> Health Gorilla, Inc.; RavillaMed PLLC; Avinash Ravilla; Shere Saidon; LlamaLab, Inc.; Unique Medi Tech LLC, d/b/a Mammoth Dx; Mammoth Path Solution, LLC; Mammoth Rx, Inc.; Ryan Hilton; Daniel Baker; Max Toovey; Unit 387 LLC; SelfRx, LLC d/b/a Myself.Health; Critical Care Nurse Consultants, LLC d/b/a GuardDog Telehealth; Hoppr, LLC; Meredith Manak, and DOES 1-100, <br><br> Defendants. | Case No. 2:26-cv-00321-FMO-RAO <br><br> **UNIT 387 DEFENDANTS' REPLY IN SUPPORT OF 12(B)(6) MOTION TO DISMISS** <br><br> Date:            May 21, 2026 <br> Time:            10:00 a.m. <br> Courtroom:     6D <br> Judge:          Fernando M. Olguin <br><br> Complaint Filed:   1/13/2026 |

UNIT 387 DEFENDANTS' REPLY IN SUPPORT OF 12(B)(6) MOTION TO DISMISS

# TABLE OF CONTENTS

|  | | Page |
|---|---|---|

I.    INTRODUCTION ...........................................................................6

II.    ARGUMENT ................................................................................7

    A.    Plaintiffs Failed to Exhaust Mandatory Dispute Resolution Procedures....7

        i.    The Agreements Unambiguously Require Pre-Suit Submission of Disputes. ....................................................................................7

        ii.    The "Immediate Injunctive Relief" Exception Does Not Apply. ........9

        iii.    Plaintiffs' Futility Arguments Are Refuted by Their Own Complaint. ...............................................................................11

        iv.    Ms. Manak and Hoppr's Alleged Inability to Invoke the Dispute Resolution Procedures Underscores the Implausibility of Plaintiffs' Claims Against Them. ...............................................................13

    B.    The Fraud Claim Fails Because Plaintiffs' Opposition Rewrites the Complaint. .................................................................................13

        i.    Plaintiffs' Opposition Brief Manufactures the "Who, What, When, Where, and How" by Rewriting Allegations Not Found in the Complaint. ................................................................................13

        ii.    Plaintiffs' Case Authorities are Inapposite.....................................15

        iii.    Plaintiffs Do Not Allege Actual, Justifiable Reliance. ....................16

        iv.    The Scienter Allegations Describe Negligence, Not Fraud. .............18

        v.    Plaintiffs Fail to Allege Damages Caused by the Unit 387 Defendants. ...............................................................................19

    C.    The Aiding and Abetting Claims Fail for Lack of Actual Knowledge.....19

    D.    The Breach of Contract Claim Warrants Dismissal.................................21

        i.    Plaintiffs Rewrite the Complaint to Manufacture a Breach. .............21

        ii.    Plaintiffs' Third-Party Beneficiary Standing Is Not Established......22

    E.    The UCL Claim Fails Because the Fraud Claim Fails.............................22

    F.    Epic and OCHIN Lack Article III Standing...........................................23

III.    CONCLUSION.............................................................................24

L.R. 11-6.2 CERTIFICATE OF COMPLIANCE.................................................26

UNIT 387 DEFENDANTS' 12(B)(6) MOTION TO DISMISS

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arriagarazo v. BMW of N. Am., LLC*,
    64 Cal. App. 5th 742 (2021)...............................................................................9, 10

*Berman v. Bank of America, N.A.*,
    2025 WL 2885491, at \*14 (Olguin, J.)......................................................................20

*Bhatia v. Silvergate Bank*,
    725 F. Supp. 3d 1079, 1116 (S.D. Cal. 2024) .........................................................20

*Blair v. Rent-A-Ctr., Inc.*,
    928 F.3d 819 (9th Cir. 2019) ............................................................................. 12, 13

*Bortz v. JPMorgan Chase Bank, N.A.*,
    2022 WL 1489832 (S.D. Cal. May 10, 2022)...........................................................20

*Casey v. U.S. Bank Nat'l Ass'n*,
    127 Cal. App. 4th 1138 (2005)....................................................................... 19, 21

*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    68 Cal. App. 4th 445 (1998)...................................................................................10

*Clapper v. Amnesty International USA*,
    568 U.S. 398, 414 n.5 (2013) .................................................................................23

*Columbia Cas. Co. v. Cottage Health Sys.*,
    2015 WL 4497730 (C.D. Cal. July 17, 2015) ........................................................8, 9

*Cruz v. PacifiCare Health Sys., Inc.*,
    30 Cal. 4th 303 (2003)............................................................................................12

*Debeikes v. Hawaiian Airlines*,
    141 F. Supp. 3d 1075 (D. Haw. 2015), aff'd, 725 F. App'x 499 (9th
    Cir. 2018)...............................................................................................................11

*Dix v. Nova Benefit Plans, LLC*,
    2015 WL 12859221 (C.D. Cal. Apr. 28, 2015)........................................................16

*Erlich v. Menezes*,
    21 Cal. 4th 543 (1999).............................................................................................15

UNIT 387 DEFENDANTS' 12(B)(6) MOTION TO DISMISS

*In re First All. Mortg. Co.*,
    471 F.3d 977 (9th Cir. 2006) ............................................................................. 19, 20

*Hough v. Carroll*,
    2025 WL 1674425 (C.D. Cal. May 5, 2025) .......................................................... 20

*ILWU v. NLRB*,
    978 F.3d 625 (9th Cir. 2020) ................................................................................ 10

*Int'l Bhd. of Teamsters v. NASA Servs., Inc.*,
    957 F.3d 1038, 1043 (9th Cir. 2020) .................................................................... 8, 9

*Jimirro v. Paley Center for Media*,
    2025 WL 2994996 (C.D. Cal. Sept. 17, 2025) ....................................................... 10

*Jones v. Union Pac. R. Co.*,
    968 F.2d 937, 942 (9th Cir. 1992) ......................................................................... 12

*Kelly v. Beazer Homes USA, Inc.*,
    552 F. App'x 666 (9th Cir. 2014) .......................................................................... 22

*Khast v. Wash. Mut. Bank*,
    2010 WL 11684849, at *3 (S.D. Cal. Oct. 26, 2010) ......................................... 15, 16

*Labbe v. Dometic Corp.*,
    2022 WL 846972 (E.D. Cal. Mar. 22, 2022) ...................................................... 17, 18

*United States ex rel. Lee v. Corinthian Colleges*,
    655 F.3d 984 (9th Cir. 2011) ................................................................................ 19

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
    514 U.S. 52 (1995) ................................................................................................. 9

*Metalclad Corp. v. Ventana Env't Organizational P'ship*,
    109 Cal. App. 4th 1705 (2003) ............................................................................... 9

*Petersen v. Allstate Indem. Co.*,
    281 F.R.D. 413 (C.D. Cal. 2012) .......................................................................... 18

*Storm Mfg. Grp. Inc. v. Weather Tec Corp.*,
    2013 WL 5352698 (C.D. Cal. Sept. 23, 2013) .................................................. 23, 24

*Swartz v. KPMG LLP*,
    *Id.*, at 764-65 (9th Cir. 2007) ............................................................................... 16

4

UNIT 387 DEFENDANTS' 12(B)(6) MOTION TO DISMISS

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*,
754 F. Supp. 2d 1145, 1189 (C.D. Cal. 2010) .................................................... 12

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ...................................................................................... 23, 24

*Vasquez-Rodriguez v. Garland*,
7 F.4th 888 (9th Cir. 2021) .................................................................................. 11

*Vernon Fire Fighters v. City of Vernon*,
107 Cal. App. 3d 802, 826 (1980) ....................................................................... 12

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ................................................................................................. 10

**Statutes**

HIPAA ................................................................................................................ 22, 23

**Other Authorities**

Fed. R. Civ. P.
9(b) ............................................................................................................*passim*
65(b)(1)(A) .......................................................................................................... 10

UNIT 387 DEFENDANTS' 12(B)(6) MOTION TO DISMISS

## I.    INTRODUCTION

Plaintiffs' Opposition [ECF 105] to the Unit 387 Defendants' Motion to Dismiss [ECF 85] confirms the very deficiencies it now seeks to overcome. Unable to defend the Complaint [ECF 1] as written, Plaintiffs systematically rewrite its allegations—dropping conditional language, elevating conclusory legal assertions over its other factual allegations, and conjuring specificity *ex nihilo*. However, Plaintiffs' Opposition cannot bridge the gap between the conclusory allegations in the Complaint and the standard for properly pleading its claims. Undeterred, Plaintiffs recharacterize the Complaint's conditional, speculative, and conclusory allegations as if they were particularized statements of fact. But at this stage, the Court must evaluate the Complaint as written—not as Plaintiffs now wish to rewrite it. The Complaint's actual allegations against the Unit 387 Defendants are fatally deficient for each of the reasons set forth in the Unit 387 Defendants' Motion and as further detailed below.

Plaintiffs' Opposition employs two recurring tactics. First, it disingenuously rewrites the Complaint's allegations to manufacture specificity that is not found in the Complaint. It is likely for this reason that Plaintiffs' Opposition fails to actually quote the Complaint's factual allegations against the Unit 387 Defendants. Opp. 11-13. For example, the Complaint states that Unit 387 "would have represented" its treatment purposes, but knowing this is insufficient, Plaintiffs drop the conditional language entirely and present these allegations in their Opposition as though they were direct factual assertions. Opp. 15. Second, Plaintiffs repeatedly cite paragraph 311 of the Complaint—a conclusory legal recitation buried in the breach of contract cause of action—to purportedly show that Unit 387 "requested patient records." But paragraph 311 directly contradicts the Complaint's own factual allegation in paragraph 44, which states that Unit 387 "would not be initiating requests for records." Plaintiffs cannot defeat a motion to dismiss by contradicting their own factual allegations with legal conclusions.

UNIT 387 DEFENDANTS' 12(B)(6) MOTION TO DISMISS

Plaintiffs also double down on their perfunctory "efforts" of seeking injunctive relief and selectively citing (and selectively avoiding) the terms of agreements they helped create to avoid the fact that this lawsuit is improper. Instead of exhausting mandatory dispute procedures they helped institute, Plaintiffs misconstrue their agreements and selectively invoke certain provisions while avoiding others.

These are not minor issues. They go to the heart of every claim against the Unit 387 Defendants. Without the manufactured specificity that exists only in the Opposition—and not in the 90-page Complaint—Plaintiffs cannot satisfy Rule 9(b) and have not properly pled reliance or scienter, and facts supporting a breach of contract. Additionally, Plaintiffs fail to demonstrate why this lawsuit is a proper vehicle for dealing with exclusively administrative matters that present no risk of damages to Plaintiffs or the public at large. The Unit 387 Defendants' Motion to Dismiss should be granted with prejudice.

## II. <u>ARGUMENT</u>

### A. **Plaintiffs Failed to Exhaust Mandatory Dispute Resolution Procedures.**

    i.    <u>The Agreements Unambiguously Require Pre-Suit Submission of Disputes.</u>

Plaintiffs' central contention—that the CCA and Common Agreement merely "encourage" dispute resolution—depends on selectively quoting only the portions of each contract that address scenarios inapplicable to this proceeding. The full text of CCA Section 20.1 reads:

> Applicant acknowledges that it may be in its best interest to resolve Disputes between or among Applicant or Applicant's Carequality Connections, and Carequality, other Implementers or their Carequality Connections through a collaborative, collegial process rather than through civil litigation. Applicant has reached this conclusion based upon the fact that the legal and factual issues involved in this Agreement are unique, novel, and complex and limited case law exists which addresses the legal issues that could arise from this Agreement. **Therefore, Applicant *shall* submit Disputes to the non-binding dispute resolution process established by Carequality** ("Dispute Resolution Process").

7

Ex. A (CCA) § 20.1 (emphasis added). The word "shall" is mandatory. The parties agreed that the novelty and complexity of interoperability issues, coupled with the dearth of relevant case law, made litigation an inappropriate mechanism to resolve disputes—and they required participation in the Dispute Resolution Process as a precondition to pursuing litigation.

The permissive language Plaintiffs cite—"may choose to submit"—appears only in the clause governing an Applicant sponsoring a dispute on behalf of a downstream entity: "Applicant on behalf of its Carequality Connection may choose to submit the Dispute to the Dispute Resolution Process." Ex. A (CCA) § 20.1. However, there is no allegation that Epic or OCHIN refused to pursue the Dispute Resolution Process on any other Plaintiffs' behalf. Instead, every Plaintiff here sues in its own capacity. The CC Terms reinforce this: a Connection "is required to undertake these efforts in the event of a Dispute before seeking any other recourse." Ex. B (CC Terms) § 9.2 (emphasis added). Plaintiffs do not even allege they requested that their Implementers pursue the process on their behalf.

The Common Agreement is effectively the same: a "Signatory agrees to participate in the Dispute Resolution Process with respect to any Dispute[,]" and "may on its own behalf or on behalf of its Participant(s) … choose to submit…" Ex. E (CA) §15.1.

Plaintiffs cite *Int'l Bhd. of Teamsters v. NASA Servs., Inc.*, for the proposition that conditions precedent must be expressed in "plain, clear, and unambiguous language." 957 F.3d 1038, 1043 (9th Cir. 2020). The language here satisfies that standard: "shall submit," "agrees to participate with respect to any Dispute," "material breach," and "required before seeking any other recourse." *See Columbia Cas. Co. v. Cottage Health Sys.*, 2015 WL 4497730, at *2 (C.D. Cal. July 17, 2015) (dismissing for failure to exhaust contractually required ADR). Plaintiffs attempt to distinguish Columbia Casualty by pointing to that contract's phrase "no judicial proceeding shall be commenced until" ADR terminates. Opp. 7. But Teamsters does

UNIT 387 DEFENDANTS' 12(B)(6) MOTION TO DISMISS

not require those magic words; it requires only that the language be "plain, clear, and unambiguous." 957 F.3d at 1043. The CCA's "shall submit" and the CC Terms' "required before seeking any other recourse" are precisely that.

Plaintiffs further argue that a breach of the dispute resolution obligation is merely "contractual"—potentially triggering suspension or termination, but not dismissal. Opp. 7-8. *Columbia Casualty* squarely rejected that reasoning. 2015 WL 4497730, at *2 (dismissing complaint without prejudice for failure to abide by ADR provision in contract). Under Plaintiffs' logic, any party could circumvent any dispute resolution requirement by accepting the breach label and filing suit anyway. That would render every such clause meaningless. Courts do not read contracts to nullify their own terms. *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995). Moreover, Plaintiffs invoke these very contracts as the source of their third-party enforcement rights while simultaneously refusing to honor those same contracts' dispute resolution obligations. They cannot have it both ways. *Metalclad Corp. v. Ventana Env't Organizational P'ship*, 109 Cal. App. 4th 1705, 1717-1718 (2003) (party cannot claim contract benefits while avoiding dispute resolution).

ii.    The "Immediate Injunctive Relief" Exception Does Not Apply.

Plaintiffs claim to satisfy the narrow exception for "immediate injunctive relief" simply because their 90-page Complaint includes a prayer for permanent injunction among its many remedies. Opp. 7-8. This reads the word "immediate" out of the contract entirely—the opposite of what sound contractual interpretation requires. *Arriagarazo v. BMW of N. Am., LLC*, 64 Cal. App. 5th 742, 748 (2021) ("Courts must refrain from altering or rewriting a contract, and they must not add a term to a contract about which the agreement is silent.").

Contrary to Plaintiffs' baseless argument, the Unit 387 Defendants are not attempting to add terms to the plain language of the agreements. Opp. 7-8 ("Defendants should not be permitted to add to or alter the express language of the agreements."). Indeed, several aspects of the agreements demonstrate "immediate

UNIT 387 DEFENDANTS' 12(B)(6) MOTION TO DISMISS

injunctive relief" refers to emergency relief—a TRO or preliminary injunction. First, the exceptions invoke "irreparable harm" as the basis for seeking such relief—the hallmark of emergency injunctive proceedings. Ex. A (CCA) § 20.2.1; Ex. E (CA) § 15.2.1; *see also* Fed. R. Civ. P. 65(b)(1)(A); *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Second, a party invoking the exception must notify Carequality or the RCE "within two (2) business days of filing for the injunctive relief." Ex. A (CCA) § 20.2.1. That two-business-day clock makes sense only for emergency motions filed at the outset of a dispute, not a complaint seeking permanent injunction filed more than a year after the alleged harm arose. Third, the return-to-process provisions state that if "the injunctive relief sought . . . is not granted," the party "must" submit the dispute to the Dispute Resolution Process. Ex. A (CCA) § 20.2.2; Ex. E (CA) § 15.2.2. Under Plaintiffs' reading, these ADR provisions would never apply because the litigation would fully resolve before being requires to then participate in the dispute resolution process. Courts do not construe contracts in ways that nullify their own provisions. *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 68 Cal. App. 4th 445, 473 (1998).

Plaintiffs cite *Jimirro v. Paley Center for Media*, 2025 WL 2994996, at *4 (C.D. Cal. Sept. 17, 2025), and *Arriagarazo v. BMW of N. Am.*, 64 Cal. App. 5th 742, 748 (2021), for the proposition that courts may not add terms the contract omits, arguing that the Unit 387 Defendants improperly read "temporary restraining order" or "preliminary injunction" into the term "immediate injunctive relief." Opp. 7-8. However, a contract does not need to include specific instances of every event covered by otherwise clear words. *ILWU v. NLRB*, 978 F.3d 625, 641 (9th Cir. 2020) (citation omitted) ("mere generality tends to denote breadth, not ambiguity"). But, even if that were not the case, as Plaintiffs note, courts will not interpret a contract to read out critical words. Opp. 8. Under Plaintiffs' reading, there is no meaning to the words "immediate" and "irreparable harm." TROs and preliminary injunctions were (and remain) a well-known concept, as are the requirements to obtain either form of

UNIT 387 DEFENDANTS' 12(B)(6) MOTION TO DISMISS

relief. With such *immediate* forms of injunctive relief available and contract language clearly reading on their requirements, there is no good faith argument that "immediate" means anything other than injunctive relief a party seeks to apply *immediately* at the start of litigation.

Finally, Plaintiffs' reference to the injunctive relief in the stipulated consent order entered against former Defendant GuardDog (ECF 79) is irrelevant. That order was a "compromise of disputed claims only," entered without any admissions, and "does not affect the rights, claims, defenses and/or other positions of any Defendant to this Action other than GuardDog." [ECF 79 ¶¶ 3-4, 13]. The exception requires relief against the specific party causing the alleged harm. Ex. A (CCA) § 20.2.1. Unit 387 is not GuardDog.

               iii.    <u>Plaintiffs' Futility Arguments Are Refuted by Their Own Complaint.</u>

Plaintiffs wrongly claim the dispute resolution process is "futile." Opp. 8-9. But futility requires a showing that the process itself will not proceed according to its terms—not that a respondent has been or will be uncooperative. *See Vasquez-Rodriguez v. Garland*, 7 F.4th 888, 896 (9th Cir. 2021) (futility requires demonstration that adverse decision was certain); *Debeikes v. Hawaiian Airlines*, 141 F. Supp. 3d 1075, 1092 (D. Haw. 2015), aff'd, 725 F. App'x 499 (9th Cir. 2018) (futility inapplicable where plaintiff does not attempt to pursue the process). Plaintiffs never formally submitted a dispute under CCA § 20.1 or Common Agreement § 15.1. They cannot claim a process they never invoked was futile.

Plaintiffs' own Complaint refutes the futility argument. For example, Plaintiffs allege that Carequality banned Integritort from the framework following the Dispute Resolution Process. Compl. ¶¶ 15; 134-135. The very relief Plaintiffs say they need—suspension of network access and removal of offending connections—is precisely what Carequality and the RCE can and do impose. Ex. A (CCA) §§ 5.3, 13; Ex. E (CA) § 14.2. Epic helped design these frameworks, agreed to use them, and

UNIT 387 DEFENDANTS' 12(B)(6) MOTION TO DISMISS

successfully used them against prior bad actors. Plaintiffs cannot credibly claim the process is futile when their own allegations demonstrate it works. Compl. ¶¶ 15; 134-135.

Additionally, Plaintiffs' authorities are distinguishable and unhelpful. First, *Vernon Fire Fighters v. City of Vernon*, rested on the fact that the same body whose conduct was challenged served as the decision-maker and had pre-announced its view of the outcome—a structural bias absent here, where disputes are resolved by independent bodies (Carequality and the RCE). 107 Cal. App. 3d 802, 826 (1980). Next, *Jones v. Union Pac. R. Co.*, actually supports the Unit 387 Defendants. 968 F.2d 937, 942 (9th Cir. 1992). There, the Ninth Circuit remanded because the plaintiff had never made a concrete factual showing that exhaustion would be futile, confirming that futility is not presumed. Finally, *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*, is also distinguishable because there, the defendant's inadequate conduct was itself part of the formal dispute process the plaintiff was required to exhaust. 754 F. Supp. 2d 1145, 1189 (C.D. Cal. 2010). Here, Plaintiffs conflate informal pre-dispute communications with the formal processes they never invoked.

Finally, Plaintiffs' public injunction argument under *Blair v. Rent-A-Ctr., Inc.*, 928 F.3d 819, 824 (9th Cir. 2019), and *Cruz v. PacifiCare Health Sys., Inc.*, 30 Cal. 4th 303, 315-16 (2003), fares no better. *Blair* demonstrates a public injunction must prohibit unlawful conduct that actually threatens future injury to the general public and not conduct that primarily affects a plaintiff. The relief Plaintiffs actually seek—suspension of network access, removal of connections, and return of records—primarily benefits Plaintiffs and their provider-customers. That is precisely the relief the frameworks provide. Dressing the claim as a UCL "public injunction" is a strategic choice to manufacture a gap between what Plaintiffs seek and what the dispute resolution process offers. Additionally, even if some portion of the requested

UNIT 387 DEFENDANTS' 12(B)(6) MOTION TO DISMISS

relief qualified as a true public injunction under *Blair*, that would not excuse compliance as to the remaining claims.

        iv.    <u>Ms. Manak and Hoppr's Alleged Inability to Invoke the Dispute Resolution Procedures Underscores the Implausibility of Plaintiffs' Claims Against Them.</u>

Plaintiffs argue that Ms. Manak and Hoppr cannot enforce the dispute resolution provisions because they are not signatories. Opp. 10-11. This argument is a double-edged sword. If Ms. Manak and Hoppr are so attenuated from the framework agreements that they cannot invoke the agreements' protections, then Plaintiffs' theory that Ms. Manak and Hoppr are liable for fraud and aiding and abetting fraud arising from those same framework obligations is all the more implausible. Plaintiffs cannot simultaneously argue that the agreements are sufficiently connected to Ms. Manak and Hoppr to impose tort liability on them, yet insufficiently connected for them to benefit from the agreements' protections. Regardless, Unit 387 is a signatory to the CC Terms and has standing to enforce the dispute resolution obligations—and dismissal of claims against Unit 387 would independently warrant dismissal of derivative or ancillary claims as to Ms. Manak and Hoppr.

**B.    The Fraud Claim Fails Because Plaintiffs' Opposition Rewrites the Complaint.**

        i.    <u>Plaintiffs' Opposition Brief Manufactures the "Who, What, When, Where, and How" by Rewriting Allegations Not Found in the Complaint.</u>

The Opposition presents an elaborate series of bullet points purporting to satisfy Rule 9(b). Opp. 11-13. However, a close comparison to the Complaint itself reveals that these bullet points bear little resemblance to the allegations actually pled.

***The "Would Have" Problem***. The Complaint's central factual allegation regarding Unit 387's onboarding states that "Unit 387 *would have* represented to

UNIT 387 DEFENDANTS' 12(B)(6) MOTION TO DISMISS

Health Gorilla that Unit 387 sought access because its customers needed patient records for treatment purposes." Compl. ¶ 174 (emphasis added). The phrase "would have" is conditional and speculative—it is an inference about what might have occurred, not an allegation about what did occur. Yet the Opposition transforms this into an entirely new allegation: "Unit 387 (who) falsely represented that it sought access to the Carequality framework for treatment purposes (what) in September 2022 (when)." Opp. 11. This is not a stylistic difference—it is a substantive rewriting of the Complaint. The same is true for all of the other bullet-point allegations included in pages 11 to 13 of Plaintiffs' Opposition. The Court should reject these disingenuous rewrites. *See Iqbal*, 556 U.S. at 678.

***The Paragraph 311 Problem***. The Opposition repeatedly cites paragraph 311—in the Ninth Cause of Action (breach of contract)—as evidence that Unit 387 itself "request[ed] patient records." Opp. 12-13, 20. Paragraph 311 states: "RavillaMed, Mammoth, and Unit 387 violated these provisions by requesting patient records under the guise of treatment purposes." Compl. ¶ 311. This is a legal conclusion in a causes-of-action section, not a factual allegation. Critically, it directly contradicts the Complaint's factual allegation in paragraph 44 that Unit 387 "asserted that it was a candidate implementer and *would not be initiating requests for records*." Compl. ¶ 44 (emphasis added). This factual allegation is actually true and must be treated accordingly. When a conclusory legal assertion in a cause of action contradicts the Complaint's own factual allegations, the factual allegation controls. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

***The "Each Query" Fabrication***. The Opposition asserts that Unit 387 "falsely represented that it, SelfRx, and GuardDog sought access to and were querying records for legitimate treatment purposes . . . each time Unit 387 itself queried records or facilitated a query." Opp. 12 (emphasis added). The Complaint contains no factual allegation that Unit 387 "itself queried records"—only the conclusory allegation in

UNIT 387 DEFENDANTS' 12(B)(6) MOTION TO DISMISS

paragraph 311. The Complaint's factual sections state the opposite: the queries were made by SelfRx and GuardDog, not Unit 387. Compl. ¶¶ 44, 174, 237-238. Plaintiffs cannot add new factual allegations through opposition briefing.

It is therefore unsurprising that Plaintiffs failed to excerpt or quote the allegations from the Complaint. The Unit 387 Defendants did so without hesitation in their Motion to Dismiss because of the obvious insufficiency of Plaintiffs' conclusory and conditional allegations. Plaintiffs should not be permitted to rewrite and mischaracterize their Complaint in its Opposition.

Additionally, Plaintiffs attempt to expand their fraud claim by characterizing contractual duties—such as obligations to vet and ensure compliance—as affirmative misrepresentations. Opp. 3-4 ("Unit 387 serves as a gatekeeper to the frameworks and is responsible for validating connections' eligibility to properly assert exchange purposes and, once connections are onboarded, ensuring their compliance with the rules governing permissible use of the frameworks" and "Each time SelfRx and GuardDog queried records, they falsely represented—through and/or as enabled by Unit 387—that they were seeking patient records for treatment purposes"). This fails as a matter of law. An alleged contract breach cannot give rise to a fraud claim. *Erlich v. Menezes*, 21 Cal. 4th 543, 551 (1999) ("conduct amounting to a breach of contract becomes tortious only when it also violates a duty independent of the contract arising from principles of tort law"). The duty to vet and validate connections is a contractual obligation under Section 15 of the CCA—not an independent tort duty owed to Plaintiffs.

          ii.     <u>Plaintiffs' Case Authorities are Inapposite.</u>

Plaintiffs' citation to *Khast v. Wash. Mut. Bank* for a "relaxed" Rule 9(b) standard in "cases of corporate fraud" is unavailing. 2010 WL 11684849, at *3 (S.D. Cal. Oct. 26, 2010). The court in *Khast*—which was adjudicating a *pro se* plaintiff's request for injunctive relief and not a 12(b)(6) motion—merely relaxed the standard for attributing particular conduct to an individual within a corporate entity when the

plaintiff may not know which individual made which statement. *Id*. It does not relax the requirement that the plaintiff allege that a false statement was made in the first place. Here, the problem is not attribution—it is that the Complaint does not allege any specific false statement by any Unit 387 Defendant. Additionally, the *Swartz v. KPMG LLP* opinion analyzed a common law fraud claim in the context of civil conspiracy and racketeering claim. The court held,

> [p]articipation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability, for each conspirator may be performing different tasks to bring about the desired result. On the other hand, Rule 9(b) does not allow a complaint to merely lump multiple defendants together but requires plaintiffs to differentiate their allegations when suing more than one defendant and inform each defendant separately of the allegations surrounding his alleged participation in the fraud.

*Id*., at 764-65 (9th Cir. 2007). Although a plaintiff may "identify the role of each defendant in the alleged fraudulent scheme" in lieu of specific conduct, the Complaint fails to (i) allege a fraudulent scheme or (ii) identify any concrete role of the Unit 387 Defendants beyond speculative, conditional allegations. *See id*. at 765.

iii.    <u>Plaintiffs Do Not Allege Actual, Justifiable Reliance.</u>

***The Reliance Disclaimer Bars Plaintiffs' Claims***. Plaintiffs attempt to narrow the CCA's reliance disclaimer, arguing it addresses only "reliance on any Implementer's or Connection's indefinite participation in the Carequality framework." Opp. 14. But the text says what it says. CCA Section 19 provides that Plaintiffs "may not rely upon the inclusion in the Carequality Directory of a particular Implementer or Carequality Connection." Ex. A (CCA) § 19 (emphasis added); *see also* Ex. B (CC Terms) § 15 (similar). Plaintiffs' fraud theory is that Unit 387's inclusion in the directory was itself a misrepresentation—the very reliance the CCA disclaims. In the face of such disclaimers, reliance "may be decided as a matter of law." *Dix v. Nova Benefit Plans, LLC*, 2015 WL 12859221, at *7 (C.D. Cal. Apr. 28, 2015) (granting summary judgment on reliance element where contract disclaimed reliance).

UNIT 387 DEFENDANTS' 12(B)(6) MOTION TO DISMISS

***No Plaintiff Acted in Reliance on Any Unit 387 Defendant Statement***. The Complaint establishes that exchanges are "machine-to-machine, meaning that no person is in the middle reviewing each request." Compl. ¶ 68. When SelfRx or GuardDog initiated a query, that query was routed directly to the healthcare provider that maintained the patient record—bearing a treatment-purpose flag that SelfRx or GuardDog asserted. No CC Plaintiff alleges it ever saw, received, or relied upon any statement by Unit 387, Hoppr, or Ms. Manak in deciding to provide records. Partly, this is because none of the Unit 387 Defendants ever made any statements in connection with making a records request, which is clear from the Complaint.

However, Plaintiffs' Opposition argues that Epic and OCHIN "allowed and enabled their customers to exchange patient records" in reliance on the Unit 387 Defendants' misrepresentations. Opp. 15. But Epic and OCHIN enabled their customers to exchange records with all participants on the frameworks as part of their ordinary business operations—not because of any specific (to date, unidentified) representation by Unit 387 about a specific Connection. No Plaintiff alleges it took any discrete action specifically in reliance on any statement by any of the Unit 387 Defendants.

***The Fraud by Nondisclosure Theory Does Not Save Plaintiffs***. Plaintiffs heavily rely on fraud by nondisclosure in attempting to avoid their failure to plead any actual misrepresentations by the Unit 387 Defendants *and* justifiable reliance. Opp. 15. Plaintiffs cite *Labbe v. Dometic Corp.* for the proposition that a plaintiff alleging concealment need only allege it was "unaware of the information at issue[.]", 2022 WL 846972 (E.D. Cal. Mar. 22, 2022). The Court in *Labbe* even recognizes "[a] plaintiff defrauded by an omission cannot be expected to explain the time, place, or even the content of that omission as specifically as the victim of a false assertion can be expected to detail a lie." *Id*. at *2. However, the Court in *Labbe* also recognized, "the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact." *Id*. at *4.

17

Plaintiffs cannot make this showing: their very own allegations demonstrate the exchange of patient records and information is "machine-to-machine." Compl. ¶ 68. Plaintiffs never allege they acted in any way that they would not have otherwise acted because the Unit 387 Defendants allegedly withheld any information. Moreover, unlike the consumer-plaintiffs in *Labbe*, the Plaintiffs were not innocent purchasers of a defective product that implicitly relied on a manufacturer's concealment of known defects. *See Labbe*, at *2-4. Instead, the Complaint paints a different picture: Plaintiffs are sophisticated market participants that helped design the very frameworks at issue, had the contractual tools to investigate and vet participants, and indeed did investigate through the Carequality dispute process in other cases. Compl. ¶¶ 130-137. Therefore, Plaintiffs' cannot cast themselves as befuddled parties that were misled and duped by small participants, such as Unit 387, in the very system they helped create.

iv.      The Scienter Allegations Describe Negligence, Not Fraud.

Plaintiffs' scienter allegations against the Unit 387 Defendants are limited to: (1) Ms. Manak's background in mass torts and relationship to Unit 387 and Hoppr; (2) Ms. Manak's founding of Hoppr; (3) "abnormal" exchange patterns exhibited by SelfRx and GuardDog; and (4) conclusory recitations that the Unit 387 Defendants "knew" others' statements were false. Compl. ¶¶ 45, 173, 178, 180-181, 241-242, 272-273. These allegations do not describe what the Unit 387 Defendants actually knew about SelfRx's or GuardDog's purposes at the time of any particular query—they ask the Court to infer knowledge from background and circumstance. This would be a negligence theory, not fraud. *See Petersen v. Allstate Indem. Co.*, 281 F.R.D. 413, 417 (C.D. Cal. 2012) (failure to use reasonable care differs from fraudulent intent).

The Opposition's bullet-point list of knowledge allegations—e.g., the Unit 387 Defendants "[k]new they, SelfRx, and GuardDog were misstating their true purpose"—are conclusory assertions that parrot the elements of fraud without

identifying any factual basis for that knowledge. Opp. 16. Additionally, these Opposition's allegations of scienter—like the allegations of misrepresentation—are conveniently rewritten. Opp. 16. Rule 9(b) permits scienter to be "alleged generally," *United States ex rel. Lee v. Corinthian Colleges*, 655 F.3d 984, 996 (9th Cir. 2011), but it does not relieve Plaintiffs of the obligation to allege facts making scienter plausible under *Iqbal*. 556 U.S. at 678.

                    v.     <u>Plaintiffs Fail to Allege Damages Caused by the Unit 387 Defendants.</u>

Plaintiffs' alleged damages flow from SelfRx's and GuardDog's allegedly false treatment-purpose queries, not from any misrepresentation or omission by Unit 387, Hoppr, or Ms. Manak. Compl. ¶¶ 237-246. The causal chain runs from SelfRx and GuardDog to the Provider Plaintiffs. Unit 387 was not "in the middle" of any particular exchange—Plaintiffs' own allegations confirm that exchanges are "machine-to-machine." Compl. ¶ 68. Plaintiffs' Opposition does not address this causal gap; it simply restates that Plaintiffs "clearly allege damages as a result of Unit 387's conduct." Opp. 17. But conclusory assertions of causation and damages are not factual allegations. *See Iqbal*, 556 U.S. at 678.

**C.    The Aiding and Abetting Claims Fail for Lack of Actual Knowledge.**

Aiding and abetting liability requires proof of "***actual*** knowledge of the specific primary wrong the defendant substantially assisted." *Casey v. U.S. Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138, 1145 (2005) (emphasis added); *In re First All. Mortg. Co.*, 471 F.3d 977, 993 (9th Cir. 2006). Even allegations that a defendant "knew something fishy was going on" do not suffice if they fail to connect the defendant's knowledge to the specific tort at issue. *Casey*, at 1148-1153.

Plaintiffs rest their argument primarily on the Ninth Circuit's statement in *First Alliance* that ignoring "red flags" is "enough to establish actual knowledge." Opp. 18 (citing 471 F.3d at 999). However, *First Alliance* actually supports the Unit 387

UNIT 387 DEFENDANTS' 12(B)(6) MOTION TO DISMISS

Defendants' position. First, "the actual knowledge standard does require more than a vague suspicion of wrongdoing." *In re First All. Mortg. Co.*, 471 F.3d at 993. Second, the decision "must be read in the context of the rest of the Ninth Circuit's opinion," which "makes it clear that the Ninth Circuit sustained the jury's finding of [the defendant's] actual knowledge because [it] came across and seemingly ignored 'red flags' about [the primary tortfeasor's] specific primary fraudulent conduct, not general 'red flags' of 'something fishy' or misfeasance." *Hough v. Carroll*, 2025 WL 1674425, at *7 (C.D. Cal. May 5, 2025) (granting motions to dismiss aiding and abetting fraud claims). In *First Alliance*, the defendant's own officers conducted due diligence and produced internal reports that "detailed the fraudulent practices" of the primary tortfeasor—yet defendant continued to provide financing. 471 F.3d at 994. Plaintiffs allege nothing comparable here.

Similarly, Plaintiffs' reliance on *Bhatia v. Silvergate Bank* is misplaced. 725 F. Supp. 3d 1079, 1116 (S.D. Cal. 2024). In *Bhatia*, the bank's own investigation revealed the specific fraud—the commingling of customer funds was manifest from the account structure itself. The Complaint here alleges nothing equivalent—no internal reports identifying fraud, no direct processing role in the alleged scheme, no evidence that the Unit 387 Defendants discovered specific fraudulent conduct and continued to facilitate it. At most, the Complaint alleges that Ms. Manak had a background in mass torts, founded Hoppr, and onboarded SelfRx and GuardDog. There are simply no adequately pled factual allegations that the Unit 387 Defendants had actual knowledge of a fraudulent scheme to access patient records for non-treatment purposes.

This Court's decision in *Berman v. Bank of America, N.A.*, is on point. 2025 WL 2885491, at *14 (Olguin, J.). There, this Court dismissed aiding and abetting claims where the plaintiff alleged defendants "should have connected the dots"—holding these were "textbook allegations of constructive knowledge, which does not suffice to establish [aiding and abetting] liability." *Id.* (citing *Bortz v. JPMorgan*

*Chase Bank, N.A.*, 2022 WL 1489832, at *6 (S.D. Cal. May 10, 2022) (allegations that bank "should have" recognized fraud from changes in banking patterns were "textbook allegations of constructive knowledge")). The Complaint's recurring allegation that the Unit 387 Defendants "knew" SelfRx and GuardDog were misstating their purposes—supported only by background facts about Ms. Manak's career and abnormal exchange patterns—describes what an actual investigation might have revealed, not what the Unit 387 Defendants *actually knew*. That is a negligence theory dressed up as fraud.

As for substantial assistance, the Opposition asserts that Ms. Manak "made, facilitated, and provided cover for false representations" and "enabled" false treatment assertions. Opp. 18-19. These are legal conclusions, not properly pled factual allegations. The Complaint does not identify any specific act by Ms. Manak, Unit 387, or Hoppr that assisted any specific fraudulent query. Merely onboarding downstream connections—which she was authorized to do as the CEO of a Candidate Implementer—does not constitute "substantial assistance" to fraud absent actual knowledge that the connections were engaged in fraud (which Plaintiffs have not shown). *See Casey*, 127 Cal. App. 4th at 1145.

### D.     The Breach of Contract Claim Warrants Dismissal.

i.     <u>Plaintiffs Rewrite the Complaint to Manufacture a Breach.</u>

The Opposition contends that "Plaintiffs do, in fact, allege that Unit 387 'request[ed] patient records under the guise of treatment purposes.'" Opp. 20. The sole citation is paragraph 311—the same conclusory legal assertion discussed above that contradicts the factual allegation in paragraph 44. If Unit 387 did not initiate requests for records (as the factual section alleges), it did not engage in "exchange activities" for any purpose—permitted or otherwise—and thus could not have breached Section 12 of the CC Terms, which regulates an Organization's own exchange activities.

Plaintiffs also argue that Unit 387 breached Section 12 by "transmitting patient records to Hoppr for its own commercial gain." Opp. 20. But this allegation rests entirely on mere belief. Compl. ¶ 182 ("Epic *believes that* Unit 387, either directly or through its own customers, knowingly transmitted the data to Hoppr for sale for profit") (emphasis added). That is not a factual allegation—it is a concession that Plaintiffs are speculating. Plaintiffs offer no factual support for the belief.

ii.     Plaintiffs' Third-Party Beneficiary Standing Is Not Established.

Plaintiffs assert they are third-party beneficiaries of the CC Terms under Section 16.2. Opp. 19-20. But the Complaint does not adequately allege what CC Terms Unit 387 signed or how Section 16.2's third-party beneficiary provision extends to Candidate Implementers. In fact, under Section 21.6, the CCA limits third-party beneficiary status for Connections "solely" enforcing Section 10.1.4 under specified circumstances not alleged here. The CCA's drafters knew how to confer third-party beneficiary status—and the narrow conferral confirms the intended limitation. Plaintiffs' attempt to read the first sentence of Section 21.6 (which lists specific sections for Implementers) as "non-exclusive" is obviated by the second sentence, which uses the word "solely" to limit Connection-beneficiary status to Section 10.1.4. Those are different sentences addressing different categories of entities—Implementers and Connections, respectively. The word "solely" in the second sentence cannot expand the first sentence's enumerated list for Implementers.

**E.     The UCL Claim Fails Because the Fraud Claim Fails.**

Plaintiffs contend the Unit 387 Defendants failed to address Plaintiffs' "unlawful" UCL claim predicated on HIPAA violations. Opp. 20-21. A § 17200 claim requires a predicate "unlawful, unfair or fraudulent business act or practice." The UCL claim is predicated on the same fraud and breach of contract theories that fail for the reasons above. If those claims fail, the § 17200 claim fails with them. *See Kelly v. Beazer Homes USA, Inc.*, 552 F. App'x 666, 668 (9th Cir. 2014).

UNIT 387 DEFENDANTS' 12(B)(6) MOTION TO DISMISS

As for the HIPAA-based "unlawful" prong, the Complaint does not allege that any Unit 387 Defendant is a Covered Entity or Business Associate under HIPAA, and its HIPAA allegations are directed at the scheme generally, without any specificity as to the Unit 387 Defendants' particular HIPAA obligations or violations. Compl. ¶ 283. Labeling the same unsupported factual allegations as a HIPAA violation does not cure the fundamental absence of particularized allegations against these Defendants. A UCL claim cannot serve as a vehicle to circumvent pleading deficiencies in the underlying substantive claims.

### F.    Epic and OCHIN Lack Article III Standing.

Neither Epic nor OCHIN provide any patient records. Compl. ¶¶ 26-27. Their claimed injuries—investigative expenses, monitoring costs, and customer complaint responses—are voluntary, self-imposed expenditures that do not constitute cognizable injury in fact.

Plaintiffs' reliance on footnote five in *Clapper v. Amnesty International USA*, is misplaced because it addressed situations where the plaintiff itself faced a substantial risk of recurring harm. 568 U.S. 398, 414 n.5 (2013). Here, the harm (provision of patient records) was suffered by the Provider Plaintiffs—third-party providers. Epic's decision to spend money investigating harm to its customers does not transform a third-party injury into a first-party one. *See Clapper*, 568 U.S. at 416 ("plaintiffs cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm").

Additionally, to try and establish "allegations of reputational harm," Plaintiffs cite *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021), and S*torm Mfg. Grp. Inc. v. Weather Tec Corp.*, 2013 WL 5352698, at *6 (C.D. Cal. Sept. 23, 2013). Opp. 5-6. Both cases involved injury to the plaintiff's own reputation. Here, Epic alleges that customers "contemplated limiting their participation in the Carequality and TEFCA frameworks"—reputational injury to the frameworks, not to Epic. Compl. ¶ 193. Epic does not allege that any customer has stopped using Epic's software,

UNIT 387 DEFENDANTS' 12(B)(6) MOTION TO DISMISS

terminated its relationship with Epic, or attributed wrongdoing to Epic. Therefore, *TransUnion* and *Storm* are inapplicable.

Plaintiffs' claims regarding storage costs are equally unconvincing. As for storage costs, Epic concedes that the Provider Plaintiffs (not Epic) "store data containing patient records on-site on their own servers." Compl. ¶ 194. Epic's conclusory allegation of "additional storage" (Compl. ¶ 195) is unsupported by any factual detail explaining what Epic stores, why, or how the Unit 387 Defendants' conduct caused any net increase. Therefore, additional storage costs do not confer standing.

## III.    CONCLUSION

For the foregoing reasons, and those set forth in the Unit 387 Defendants' Motion to Dismiss (ECF No. 85), the Complaint should be dismissed in its entirety and with prejudice as to Unit 387 LLC, Hoppr, LLC, and Meredith Manak. First, Plaintiffs bypassed mandatory dispute resolution procedures they contractually agreed to follow, and no exception justifies that that failure. Second, Plaintiffs' fraud claims rest on a weak foundation of conditional and conclusory allegations the Opposition attempts to disingenuously rewrite and a single conclusory paragraph (¶311) that contradicts the Complaint's own factual admission that Unit 387 would not initiate requests for records. No Plaintiff identifies a specific misrepresentation by any Unit 387 Defendant on which it actually and justifiably relied in taking a detrimental action—a fatal gap that the contractual reliance disclaimer independently confirms. The scienter and aiding-and-abetting allegations amount to nothing more than constructive knowledge—that is, negligence—which this Court has held insufficient to sustain fraud-based claims. The breach of contract claim is also moribund as it depends on the same contradicted conclusory allegation and speculation pled only on "information and belief." Finally, Epic and OCHIN, who never provided a single patient record, cannot manufacture Article III standing through voluntary investigative expenditures and attenuated theories of reputational

UNIT 387 DEFENDANTS' 12(B)(6) MOTION TO DISMISS

harm to the frameworks rather than to themselves. Because these defects are structural, pervasive, and rooted in the Complaint's own admissions, they are not curable by amendment, and the Court should dismiss all claims against the Unit 387 Defendants with prejudice.

DATED: May 7, 2026                    **BLANK ROME LLP**


By: */s/ Mark L. Johansen*
Mark L. Johansen (*Pro Hac Vice*)
Neakzaad Horriat (*Pro Hac Vice*)
200 Crescent Court, Suite 1000
Dallas, TX 75201

Christopher Petersen
Alycia S. Tulloch
2029 Century Park East, 6th Floor
Los Angeles, CA 90067

UNIT 387 DEFENDANTS' 12(B)(6) MOTION TO DISMISS

## <u>L.R. 11-6.2 CERTIFICATE OF COMPLIANCE</u>

The undersigned, counsel of record for Defendants Unit 387 LLC, Hoppr, LLC, and Meredith Manak, certifies that the Memorandum of Points and Authorities in support of the Motion to Dismiss contains 6,175 words, which complies with the word limit of L.R. 11-6.1.

DATED: May 7, 2026          **BLANK ROME LLP**


By: */s/ Mark L. Johansen*
Mark L. Johansen (*Pro Hac Vice*)
Neakzaad Horriat (*Pro Hac Vice*)
200 Crescent Court, Suite 1000
Dallas, TX 75201

Christopher Petersen
Alycia S. Tulloch
2029 Century Park East, 6th Floor
Los Angeles, CA 90067

UNIT 387 DEFENDANTS' 12(B)(6) MOTION TO DISMISS